# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | |
|---|---|
| ERIC WEINER, Individually and on Behalf of All Others Similarly Situated, | |
| Plaintiff, | Case No.: 3:17-cv-01469 |
| v. | |
| TIVITY HEALTH, INC., DONATO TRAMUTO, GLENN HARGREAVES and ADAM HOLLAND, | Chief Judge Crenshaw<br>Magistrate Judge Newbern |
| Defendants. | |

# FIRST AMENDED COMPLAINT

i

2356256 v1

# TABLE OF CONTENTS

I. Nature of the Action ............................................................................................. 1

II. Jurisdiction and Venue ....................................................................................... 4

III. Parties and Relevant Non-Parties ...................................................................... 4
  A. Lead Plaintiff ........................................................................................... 4
  B. Defendants ................................................................................................ 5
      1. Tivity Health, Inc. ........................................................................ 5
      2. Individual Defendants .................................................................. 5
  C. Former High-Level Manager .................................................................. 8

IV. Substantive Allegations ..................................................................................... 9
  A. Tivity is a health services company heavily reliant on its relationships with
      health insurance plan customers. ............................................................ 9
  B. Tivity's relationship with UHC was critical to Tivity's business and
      closely followed by analysts. ................................................................ 11
  C. Defendants learn that UHC becomes a competitor but conceal that
      information from investors. .................................................................... 12
  D. Tivity obfuscates the competitive threat posed by UHC and makes a series
      of false and misleading statements and omissions. .............................. 16
      1. FY16 Form 10-K .......................................................................... 17
      2. April 27, 2017 press release and earnings call ......................... 19
      3. 1Q17 Form 10-Q .......................................................................... 22
      4. July 27, 2017 press release ......................................................... 24
      5. 2Q17 Form 10-Q .......................................................................... 25
      6. October 26, 2017 earnings call .................................................. 27
      7. 3Q17 Form 10-Q .......................................................................... 28
  E. The truth is revealed and Tivity's stock plummets. ............................. 30
  F. Post Class-Period developments confirm Defendants' scienter. ......... 31

V. Additional Scienter Allegations ...................................................................... 32

VI. Loss Causation ................................................................................................. 34

VII. No Safe Harbor ................................................................................................. 35

VIII. Class Action Allegations .................................................................................. 36

IX. Fraud on the Market and *Affilated Ute* Allegations ...................................... 38

X. Claims for Relief .............................................................................................. 39
  Count I ................................................................................................................. 40
  Count II ................................................................................................................ 41

2356256 v1

XI.    Prayer for Relief...................................................................................................... 41

XII.   Jury Trial Demanded.............................................................................................. 41

2356256 v1

Lead Plaintiff Oklahoma Firefighters Pension and Retirement System ("Oklahoma Firefighters" or "Lead Plaintiff") makes the following allegations against Defendants Tivity Health, Inc. ("Tivity" or the "Company"), Donato Tramuto ("Tramuto"), Glenn Hargreaves ("Hargreaves"), and Adam Holland ("Holland," and together with Tramuto and Hargreaves, "Individual Defendants") (collectively "Defendants"), based on its personal knowledge, on information and belief, and on the investigation of Lead Plaintiff's counsel, which included a review of relevant U.S. Securities and Exchange Commission ("SEC") filings by the Company, regulatory filings and reports, press releases, public statements, interviews with former employees of Tivity, including a former high-level manager (referred to herein as "Former High-Level Manager"), news articles, other publications, securities analysts' reports and advisories about the Company, and other readily obtainable information. Lead Plaintiff believes that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.  NATURE OF THE ACTION

1.  This is a securities class action on behalf of purchasers of Tivity securities between March 6, 2017 and November 6, 2017, inclusive ("Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act"). As detailed herein, Lead Plaintiff's claims arise out of Defendants' series of false and misleading statements concerning Tivity's relationship with one of its most important health plan customers, United Healthcare, Inc. ("UHC"). Defendants repeatedly represented that Tivity's contractual relationship with UHC was on terms favorable to Tivity and portrayed that relationship in unqualifiedly positive terms, while failing to disclose significant historical facts to the contrary, including facts about the material deterioration of that relationship, thereby misleading the investing public.

2.      For quite some time, Defendants knew there was a significant risk that UHC's resources, combined with relatively low barriers to entry, could lead UHC to directly compete with Tivity by offering a fitness program benefit for Medicare Advantage beneficiaries similar to Tivity's flagship product, SilverSneakers. Defendants also knew that such a development would be a material consideration for the investing public, and thus indicated in Tivity's SEC filings that two important risks facing its business were: (1) that health plan customers like UHC were responsible for a significant percentage of its revenues, with UHC alone responsible for more than 10% of revenues in FY16;[1] and (2) that better-resourced entities, including its own health plan customers (although never specifically identifying which customers), *might* compete with its product offerings. But these risk disclosures only told half the story—the full truth that was omitted from certain of Tivity's public filings and statements during the Class Period was that Defendants knew UHC's entry into the market had *already happened*. Indeed, the terms of UHC's contracts with Tivity during the Class Period expressly permitted UHC to offer a competing product.

3.      By late 2016, Defendants learned that the risk of UHC becoming a competitor had materialized, as UHC began to launch its Optum Fitness Advantage program, which competed directly with Tivity's SilverSneakers program, in select states, including Washington and New Jersey. Despite learning of UHC's launch of this competitive program in advance of the 2016 October open enrollment period,[2] Defendants omitted to disclose and concealed this information from shareholders. Instead, in early 2017, Defendants touted the Company's relationship with

---

[1] "FY" means Tivity's fiscal year, which runs from January 1 to December 31, and FY16 means fiscal year 2016. Similarly, "1Q16" refers to the first quarter of 2016.

[2] Open enrollment refers to the eight-week period running from the beginning of October to the beginning of December in which individuals may elect their health plan coverage for the upcoming calendar year beginning on January 1.

2

UHC by highlighting the Company's purportedly successful contract renewal negotiations with UHC.

4.       Instead of informing the investing public that one of Tivity's most important customers was becoming a competitor, Defendants inserted new risk language into the Company's public filings stating that there was a ***chance*** that "health plan customers ***could*** attempt to offer services themselves that compete directly with our offerings or stop providing our offerings to their members." (Emphasis added.) What this omitted, and what was known to Defendants at the time this new risk disclosure was made, was that at least six months earlier, health plan customer UHC had ***already begun to offer competing services***.

5.       By presenting a historical, material fact about which Defendants had actual knowledge as a mere possibility, and by failing to disclose that historical fact, Defendants knowingly, or at least recklessly, misled the investing public. Then, even as Defendants learned later in the Class Period that UHC would be intensifying its competitive efforts by expanding its competing program beyond New Jersey and Washington to nine additional states, Defendants not only continued to withhold that information from the investing public, but continued to tout Tivity's relationship with UHC in unqualifiedly positive terms.

6.       Tivity made multiple representations in early 2017 that contract renewal negotiations with UHC were proceeding smoothly and never indicated that the Company's relationship with UHC was in peril and deteriorating in light of UHC's direct competition with Tivity. As a result, Tivity's stock price was artificially inflated and maintained at an artificially high level throughout the Class Period.

7.       On November 6, 2017, during the open enrollment period for 2018, UHC issued a press release announcing that beginning in January 2018, UHC's Optum Fitness Advantage

3

program would be available at no additional cost to customers enrolled in certain of UHC's Medicare Advantage plans in 11 states. On this news, Defendants could no longer hide that UHC—one of Tivity's most important customers—had become a direct competitor to its most important product SilverSneakers, and the facts and truth that Defendants had been concealing were revealed. As a result, Tivity's stock price plummeted, declining $16.45, or nearly 34.24%, from a close of $48.05 per share on November 3, 2017, to a close of $31.60 per share on November 6, 2017, on extraordinarily high volume of 9,034,800 shares.[3]

## II.     JURISDICTION AND VENUE

8.     The claims here arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

9.     This Court has jurisdiction over these claims pursuant to 28 U.S.C. §§ 1331 and 1337 and Section 27 of the Exchange Act.

10.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b) and (c) because one or more Defendants may be found or resides here or had agents in this district, transacted or is licensed to transact business in this district.

## III.     PARTIES AND RELEVANT NON-PARTIES

### A.     Lead Plaintiff

11.     Lead Plaintiff Oklahoma Firefighters Pension and Retirement System (defined above as "Oklahoma Firefighters" or "Lead Plaintiff") is a pension fund established by Oklahoma law for the benefit of Oklahoma firefighters. During the Class Period, Lead Plaintiff

---

[3] During the Class Period, the average trade volume was approximately 490,000 shares per day. Accordingly, the trade volume on the day of the alleged corrective disclosure was more than 18 times the daily average.

4

purchased 20,658 shares of Tivity common stock and lost more than $107,000 as a result of the misconduct described herein. Lead Plaintiff's transactions in Tivity common stock during the Class Period are set forth in the PSLRA certification previously filed with the Court and is incorporated by reference herein. *See* ECF Nos. 18-2 and 18-3.

### B. Defendants

#### 1. Tivity Health, Inc.

12.     Tivity Health, Inc. (defined herein as "Tivity") is a publicly traded Delaware corporation headquartered at 701 Cool Springs Boulevard, Franklin, Tennessee 37067. It was incorporated in 1981, and in January 2017, it rebranded and renamed itself from Healthways, Inc. ("Healthways") to Tivity, to purportedly better align with its portfolio of fitness and health improvement programs.

13.     Tivity's health and fitness programs are offered primarily to senior populations, with its flagship product being the SilverSneakers program.

14.     SilverSneakers provides access to a national network of approximately 15,000 fitness centers with which Tivity has formed relationships.

#### 2. Individual Defendants

15.     Donato Tramuto (defined herein as "Tramuto") is the CEO of Tivity and has been since November 1, 2015. He was elected to the board of Tivity while it was still known as Healthways in 2013. He served as Healthways's chairman from June 12, 2014 to 2015. He has previously served in chief executive positions at Physicians Interactive, i3 (a division of UnitedHealth Group), and Constella Health Strategies, all of which are companies in the healthcare industry. Since becoming Tivity's CEO, Tramuto has signed all of the Company's Form 10-Ks and the Sarbanes-Oxley Certifications incorporated in every Class Period Form 10-K and Form 10-Q.

5

16.     Glenn Hargreaves (defined herein as "Hargreaves") was the Company's Chief Interim Financial Officer ("CIFO") from the beginning of the Class Period until June 14, 2017, and was the Company's Chief Accounting Officer throughout the Class Period. Hargreaves participated in UHC contract renewal negotiations, signed the false and misleading FY16 Form 10-K and 1Q17 Form 10-Q, and signed the April 27, 2017 Form 8-K attaching the false and misleading April 27, 2017 press release announcing, *inter alia*, the renewal of the UHC contract and the conference call on which Tramuto made additional false and misleading statements. In his role, Hargreaves met with Tramuto and other senior management to review and/or prepare Tivity's statements made in periodic corporate filings and during conference calls with financial analysts following Tivity.

17.     Adam Holland (defined herein as "Holland") was the Company's Chief Financial Officer ("CFO") from June 14, 2017 to the end of the Class Period. Prior to joining Tivity, Holland served as Chief Financial Officer for 12 years of Kirkland's, Inc., a publicly traded company and leading retailer of home décor and gifts. Soon after his arrival at Tivity, Holland became involved in Project Success, described below, and other efforts to contain the fallout from UHC's defection, and signed the 2Q17 and 3Q17 Form 10-Qs which contained false and misleading statements and omissions, and the October 26, 2017 Form 8-K attaching the October 26, 2017 press release announcing the conference call on which Tramuto made false and misleading statements. In his role, Holland met with Tramuto and other senior management to review and/or prepare Tivity's statements made in periodic corporate filings and during conference calls with financial analysts following Tivity.

18.     Because of the Individual Defendants' respective positions with the Company, they had access to adverse undisclosed information about the Company's business, operations,

present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees. Also, given their respective positions, Individual Defendants were directly involved in negotiating Tivity's contracts with health plan customers such as UHC.

19.     It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in Tivity's public filings, press releases and earnings calls, as alleged herein, are the collective actions of the narrowly defined group of defendants defined above as the Individual Defendants. Each of the Individual Defendants, as officers of Tivity, by virtue of their high-level positions with the Company, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels, and were privy to confidential proprietary information concerning the Company and its business, operations, and contractual relationships with its customers, as alleged herein. Each acted on behalf of the Company and the actions of each, as alleged herein, can be imputed to Tivity. The Individual Defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, knew or recklessly disregarded that the false and misleading statements described herein were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

20.     As officers and controlling persons of a publicly held company whose common stock was and is registered with the SEC pursuant to the Exchange Act, and was and is traded on the NASDAQ, and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial

7

statements, business, markets, management, earnings and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Tivity's publicly traded securities would be based on truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

21.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. The Individual Defendants would have each been provided with copies of the documents alleged herein to be misleading, including the Company's quarterly and annual filings and the prepared remarks for each of the Company's quarterly earnings conference calls, prior to or shortly after their issuance and had the ability or opportunity to prevent their issuance or cause them to be corrected. Accordingly, the Individual Defendants are responsible for the accuracy of the public reports and releases detailed herein and are therefore primarily liable for the representations contained therein.

### C.     Former High-Level Manager

22.     The Former High-Level Manager was employed at Tivity from November 2005 through November 2017. The Former High-Level Manager was hired as a Senior Account Manager and eventually promoted to Manager, Provider Services and worked in that position until the Former High-Level Manager left the Company. The Former High-Level Manager reported to various individuals during his/her tenure at Tivity. The Former High-Level Manager's last supervisor was Tanya Smith, Director, Provider Relations.

23.     The Former High-Level Manager led a team of 11 account managers who were expected to collaborate with fitness center clients to promote the SilverSneakers program. The

8

Former High-Level Manager communicated with fitness centers and provided resolutions to their concerns. The Former High-Level Manager also created strategic plans to increase member engagement and executed target goals to increase program revenues. The Former High-Level Manager explained that his/her primary duty was to ensure that fitness centers complied with Tivity's policies and procedures regarding fitness center program guidelines. The Former High-Level Manager had responsibility for fitness centers in Georgia, Tennessee, Alabama and all locations west of Tennessee.

24.     As discussed in more detail below, the Former High-Level Manager confirmed, based on his/her personal knowledge, that Tivity management had actual knowledge of UHC's competing Optum Fitness Advantage program long before disclosing that knowledge to the investing public.

## IV.     SUBSTANTIVE ALLEGATIONS

### A.     Tivity is a health services company heavily reliant on its relationships with health insurance plan customers.

25.     As a health services company, Tivity's principal business is a program called SilverSneakers, which provides access to a network of approximately 15,000 fitness centers to seniors enrolled in Medicare Advantage, Medicare Supplement, and Group Retiree health plans.[4] SilverSneakers is responsible for *82% of Tivity's overall annual revenues*. Given the importance

---

[4] As mentioned, Tivity was previously named Healthways. Pursuant to a 2015 restructuring plan, Healthways divested numerous less profitable business lines in 2015 and 2016, retaining SilverSneakers and two other smaller health and fitness programs, Prime Fitness and WholeHealth Living. Prime Fitness is like SilverSneakers but is aimed at the 18-64 population and is offered through commercial health plans and employers. WholeHealth Living offers services related to complementary, alternative, and physical medicine, also primarily through health plans.

of this program to Tivity's operations, analysts have described Tivity as a "a pure-play Silver Sneakers company."

26.     Medicare is a national health insurance program that provides health insurance for Americans aged 65 and older (and certain younger people with certain disabilities).

27.     Medicare Advantage is a program whereby Medicare beneficiaries receive their Medicare benefits through private health plans.

28.     Medicare Supplement plans, also called Medigap plans, are private insurance policies that help pay some of the health care costs not covered by Medicare, like copayments, coinsurance, and deductibles.

29.     Group Retiree plans are private group health plans that integrate with Medicare provided by employers to retirees.

30.     Of these programs, the population enrolled in Medicare Advantage is the target market for Tivity's SilverSneakers. As Tramuto put it during a June 13, 2017 conference hosted by William Blair & Co., although Tivity targets Medigap enrollees as well, "our bread and butter has primarily been in the Medicare Advantage."

31.     Tivity does not itself offer or administer health insurance plans. Instead, Tivity offers SilverSneakers to such plans, like UHC, for a fee. In return, UHC customers are given SilverSneakers benefits, like access to fitness centers, as part of their coverage.

32.     This business model means that Tivity forms direct relationships with fitness centers to implement its SilverSneakers program, and that health plan customers like UHC are critical to Tivity's success because they drive membership of SilverSneakers. Indeed, Tivity has listed the fact that "[a] significant percentage of our revenues is derived from health plan customers" as a risk factor in each of its Form 10-Ks since at least fiscal year 2010.

10

33.     For example, in its FY15 Form 10-K, issued on March 4, 2016, Tivity acknowledged that its reliance on health plan customers posed important risks, including: an inability "to retain health plan customers" or "to provide our products and services to such health plan customers on terms at least as favorable to us as currently provided"; a loss of "bargaining power [vis-à-vis health plan customers], which may lead to further pressure on the prices for our products and services"; and "a reduction in the number of covered lives enrolled with our health plan customers or a decision by our health plan customers to take programs in-house."

34.     Tivity did not have exclusivity clauses with it health plan customers so competition from them was not contractually prohibited. Tivity had generally removed language prohibiting competition or requiring exclusivity years earlier, in part because of a 2011 lawsuit brought by a competitor challenging exclusivity clauses in Tivity's contracts with fitness centers.

35.     Given the foregoing, information about Tivity's relationship with health plan customers, particularly large health plans like UHC, is material to the investing public in assessing Tivity's operations and continued viability.

**B.      Tivity's relationship with UHC was critical to Tivity's business and closely followed by analysts.**

36.     Among Tivity's health plan customers, UHC loomed particularly large and was critical to Tivity's business. According to Tivity's FY16 Form 10-K, for the year ended December 31, 2016, UHC accounted for more than 10% of Tivity's revenues from continuing operations.

37.     Analysts acknowledged the importance of UHC to Tivity's SilverSneakers program. For example, in a February 24, 2017 report issued by Barrington Research, analyst Michael Petusky highlighted Tivity's "high conviction that it will renew its contract with United Healthcare, a key SilverSneakers account, within the next few months," "a recent meeting

11

between Tivity and United [that] went very well," and statements by Tivity "that there is 'terrific alignment' between the two organizations," as "very good news."

38.     Along similar lines, a February 24, 2017 Piper Jaffray report by analysts Sean Wieland and Nina Deka noted that "[t]he biggest risk in [Tivity] is the overhang on the upcoming United renewal this year, which TVTY has repeatedly stated they are confident this renewal will happen without any hiccups."

39.     As another example, an April 27, 2017 report by Jefferies analysts David Styblo and David Windley listed as a "Key Takeaway" the point that "Renewing UNH Contract Reduces Risk," given that "UNH is the second largest contract representing about 15% of revenue."

40.     None of these analysts who closely followed Tivity indicated that Tivity had expressed the possibility that the contract terms with UHC would differ in any appreciable way or result in Tivity providing less services to UHC.

**C.     Defendants learn that UHC becomes a competitor but conceal that information from investors.**

41.     While Tivity's Form 10-Ks included general, boilerplate risk disclosures concerning potential competition from "[o]ther entities, whose financial, research, staff, and marketing resources may exceed our resources," including "health plans," and there was a risk that "a decision by our health plan customers to take programs in-house could adversely affect our results of operations" the 10-Ks failed to disclose the immediacy of this risk or that the risk began materializing by at least the Fall 2016, when Defendants learned that UHC was rolling out a competitive product in at least three states.

42.     The Fall 2016 rollout of UHC's competitive product during the open enrollment period for 2017 was significant because UHC was one of Tivity's largest subscribers of

12

SilverSneakers, if not the largest. UHC began offering its Medicare Advantage customers a new benefit, Optum Fitness Advantage—that directly competed and indeed replaced SilverSneakers—in at least two states, Washington and New Jersey, and UHC had sent letters indicating it would offer its new program in at least one additional southern state.

43.     As Tivity's second largest customer by revenue, competition by UHC threatened Tivity in two directions, by introducing competition for market share and simultaneously eliminating a significant source of revenue.

44.     Given the importance of the Company's relationship with UHC, Defendants knew of these developments as they occurred. As Tivity itself has stated, Defendants regularly met with health plan customers like UHC to discuss aspects of their relationship and their contract. For example, during an April 27, 2017 earnings call, Tramuto explained that he had been "continu[ing] [his] travels to meet [Tivity's] health plan clients," and that he "plan[ed] to continue this practice because of the importance of these relationships in understanding exactly what our clients want and need from our relationship." Similarly, on a May 3, 2017 investor call at the Deutsche Bank Health Care conference, Tramuto stated that "One of the advantages that I've had over the last 1.5 years having been in health care for 40 years is that I've been able to get out and meet with the CEOs of our largest health plans and regional plans. And without a doubt, they understand that the benefit we bring is to be their conduit in getting close to the members."

45.     Moreover, before rolling out Optum Fitness Advantage in Washington, New Jersey and other states, UHC informed Tivity that they were removing SilverSneakers from its Medicare Advantage plans in those states as part of the open enrollment process. Indeed, the nature of Medicare open enrollment *requires* that health plan customers inform Tivity in advance

13

of open enrollment about the markets in which they were declining to renew SilverSneakers. Further, open enrollment lasts several months and involves significant outreach by health plans to plan participants as well as to service providers like Tivity. The introduction, therefore, of Optum Fitness Advantage necessitated significant communication by UHC with fitness centers who were also part of Tivity's network. Some of these fitness centers contacted Tivity about UHC's outreach.

46. According to the Former High-Level Manager, rumors that UHC and other clients could turn into competitors instead of partners were routine. The Former High-Level Manager explained that "over the years we knew health plan clients wanted to start their own programs."

47. In the Fall of 2016, prior to open enrollment which ran from October to December, the Former High-Level Manager was notified by an account manager, Carol Meadows, who reported directly to the Former High-Level Manager, that a fitness center partner in either Georgia, Alabama, or Arkansas had received a letter from UHC that stated UHC was beginning its own SilverSneakers-like program called Optum Fitness Advantage. The Former High-Level Manager characterized the letter as "aggressive" and said it insinuated that fitness centers would lose all SilverSneakers members, not just those insured through UHC. The Former High-Level Manager obtained a copy of the letter and immediately forwarded it to his/her supervisor, who escalated the letter up the chain of command to executive management. The Former High-Level Manager and his/her team then promptly prepared talking points to assure their fitness center partners that only UHC-SilverSneakers members would be affected by any new program rolled out by UHC. The Former High-Level Manager said that based on the letter and his/her supervisor's actions, he/she believes that Tivity's executive management knew of UHC's planned rollout of Optum Fitness Advantage as early as the Fall of 2016.

14

48.     According to the Former High-Level Manager, by early 2017, UHC was sending similar letters about Optum Fitness Advantage to fitness partners outside of New Jersey and Washington state.

49.     Any conceivable remaining uncertainty or lack of knowledge on Defendants' part as to whether UHC was a competitor dissipated entirely in January 2017, when UHC actually started operating Optum Fitness Advantage in Washington and New Jersey.

50.     Moreover, prior to the start of the Class Period, Defendants were engaged in active contract renewal negotiations with UHC. Those discussions, and the contract that was eventually signed, confirmed that UHC would escalate its competition with SilverSneakers by reducing the number of markets in which UHC would offer SilverSneakers to its members.

51.     In any event, under no circumstances can Defendants disclaim knowledge after June 2017, because they *admitted* to a William Blair analyst that they "have been aware of these contract losses [related to UHC] since June 2017."

52.     Indeed, the Former High-Level Manager learned that in June 2017 executive management formed a committee to develop a strategic plan to retain customers in light of UHC's roll out of Optum Fitness Advantage in multiple states. The plan was referred to as "Project Success." The committee met at least once in June 2017 at the Company's headquarters in Nashville, Tennessee. Caroline Khalil, Vice President of Network Partnership & Programming, was a member of the committee, and she communicated with the Former High-Level Manager and others concerning Project Success.

53.     The Former High-Level Manager further explained that in August 2017, Caroline Khalil held a conference call with select colleagues to inform them that UHC was leaving the SilverSneakers program and starting its own program called Optum Fitness Advantage.

15

54.     The Former High-Level Manager further explained that in August 2017, Tivity began implementing a communications plan to address UHC's offering of a competitive product. According to the Former High-Level Manager, it was a "chaotic" time because Tivity's senior management was unable to reach a consensus on the messaging, such that the initial communications plan was aborted midstream at the direction of Caroline Khalil, who reported to the Company's Chief Operating Officer, Ulya Khan. By September 2017, senior management approved a revised communications plan which required the Former High-Level Manager and his/her colleagues to "verbally" convey to fitness center partners that UHC was coming on board as a competitor, but directed the fitness centers that they could not make any statements regarding this information, or name the competitor, until after open enrollment began in October 2017. The Former High-Level Manager stated that Tivity did not want anything in writing shared with fitness centers about the identity of UHC and its competitive program.

55.     A November 6, 2017 Cantor Fitzgerald analyst report revealed to the investing public that the very terms of UHC's contract with Tivity "allowed [UHC] to pursue [a competitive product] in certain markets." Yet, when the contract renewal was announced to the public on April 27, 2017, Defendants failed to disclose these material facts, and instead *touted* Tivity's relationship with UHC, and the renewed contract, as unqualifiedly positive facts, while declining to reveal any details about the actual contract except that it was on "favorable" terms to Tivity.

### D.     Tivity obfuscates the competitive threat posed by UHC and makes a series of false and misleading statements and omissions.

56.     By late 2016, when Defendants were aware of UHC dropping SilverSneakers from certain markets and replacing it with UHC's own program, Defendants could and should have informed the investing public of these developments. Instead, they chose obfuscation by

16

making a series of false and misleading statements that omitted material facts in the FY16 Form 10-K, April 27, 2017 press release and earnings call, 1Q17 Form 10-Q, July 27, 2017 press release, 2Q17 Form 10-Q, October 26, 2017 earnings call, and 3Q17 Form 10-Q.

## 1. FY16 Form 10-K

57.    In its FY16 Form 10-K, filed by Tivity on March 6, 2017 and signed by Defendants Tramuto and Hargreaves, Tivity inserted new language to its risk disclosures about its reliance on health plan customers stating that "***health plan customers could attempt to offer services themselves that compete directly with our offerings or stop providing our offerings to their members.***" In full, the passage read as follows:

> **A significant percentage of our revenues is derived from health plan customers.**
>
> A significant percentage of our revenues is derived from health plan customers. The health plan industry may continue to consolidate, and we cannot assure you that we will be able to retain health plan customers, or continue to provide our products and services to such health plan customers on terms at least as favorable to us as currently provided, if they are acquired by other health plans that already participate in competing programs or are not interested in our programs. Further, consolidation among our customers, particularly our health plan customers that are part of larger healthcare enterprises, could provide these organizations with greater bargaining power, which may lead to further pressure on the prices for our products and services. In addition, a reduction in the number of covered lives enrolled with our health plan customers or in the payments we receive could adversely affect our results of operations. Our health plan customers are subject to continuing competition and reduced reimbursement rates from governmental and private sources, which could lead current or prospective customers to seek reduced fees or choose to reduce or delay the purchase of our services. ***Finally, health plan customers could attempt to offer services themselves that compete directly with our offerings or stop providing our offerings to their members.*** (Emphasis added.)

58.    The FY16 Form 10-K also made the following risk disclosure:

**We currently derive a significant percentage of our revenues from two customers.**

For the year ended December 31, 2016, Humana and United Healthcare each comprised more than 10%, and together comprised approximately 36%, of our revenues from continuing operations. Our primary contract with Humana was renewed in 2015 and

17

continues through 2020. The term of our contract with United Healthcare continues through 2017. ***The loss or restructuring of a contract with Humana, United Healthcare or our other significant customers could have a material adverse effect on our business and results of operations.*** (Emphasis added.)

59.     The bold and italicized language in these risk disclosures in paragraphs 57 and 58 are each false and misleading because they omitted material information concerning UHC's rollout of its competitive program, Optum Fitness Advantage, which had an immediate negative impact in that SilverSneakers was being replaced in certain markets. Specifically, this language led the investing public to believe that competition from important health plan customers, like UHC, and the concomitant impact on revenues remained a mere possibility, when actual competition from UHC ***had definitively begun and had been a historical fact for at least six months—and Defendants Tivity, Tramuto, and Hargreaves knew it***. Defendants Tivity, Tramuto and Hargreaves knew or recklessly disregarded that these statements was false and misleading at the time it was made because:

(a)     before and during open enrollment for 2017, which ran between October and December 2016, Tivity executives were forwarded an aggressive letter from UHC to a fitness center that stated that UHC was launching Optum Fitness Advantage and that suggested that the fitness center would lose all SilverSneakers members, not just those insured by UHC;

(b)     before January 2017, UHC informed Tivity that it would not be renewing SilverSneakers in at least New Jersey and Washington state;

(c)     in January 2017, UHC began operating Optum Fitness Advantage in New Jersey and Washington state; and

(d)     by early 2017, Tivity knew that UHC was sending letters about Optum Fitness Advantage to partners outside of New Jersey and Washington state.

18

## 2.     April 27, 2017 press release and earnings call

60.     As the Class Period progressed, Defendants Tivity, Tramuto, and Hargreaves doubled down on their obfuscation. Upon concluding contract renewal negotiations, on April 27, 2017, Tivity filed a Form 8-K signed by Hargreaves which attached a press release announcing First Quarter 2017 results and that Tivity had renewed its contract with UHC. Specifically, the press release included the following quote from Tramuto:

> "We are also pleased to announce a three-year renewal of our SilverSneakers® contract with UHC Group, continuing a 20-year relationship with a partner who shares our commitment to active lifestyles. This renewal and many other renewals we have achieved to date are a clear indication of the value of both our brand and the services provided to our customers and their members through the SilverSneakers program."

The press release also includes the following quote from Tramuto:

> Our first-quarter performance provides further evidence of our ability to fiercely execute on our plan, to produce profitable growth serving markets that have compelling long-term growth dynamics, and to deliver value to our customers and shareholders. ***Through our A-B-C-D strategy, the goals of which are to (A) add new members in our three existing networks - SilverSneakers®, Prime® Fitness and WholeHealth Living™ ; (B) build engagement and participation among our current eligible members; (C) collaborate with partners to add new products and services that will leverage the value of our brand; and (D) deepen relationships with our partners and their instructors within our national network, we believe we are well positioned to strengthen our market leadership position in serving the age 50-plus market.*** (Emphasis added.)

61.     The bold and italicized language in paragraph 60 is false and misleading because it omitted material facts necessary to make the statement not misleading. Specifically, Defendants Tivity, Tramuto, and Hargreaves omitted the following facts known to them at the time this statement was made that indicated Tivity was facing new and sizeable challenges from UHC that negatively impacted SilverSneakers' market share:

(a)     Tivity's A-B-C-D strategy was failing with respect to UHC because UHC had

introduced a competitive program to SilverSneakers that was necessarily causing

19

Tivity to lose members of its SilverSneakers program in the markets that UHC was offering Optum Fitness Advantage;

(b)     Tivity's A-B-C-D strategy was failing with respect to UHC because their business relationship was not "deepening" but rather eroding given UHC's rollout of a competitive program that would decrease Tivity's revenues from SilverSneakers; and

(c)     Tivity's market leadership position was being weakened not "strengthened" by UHC's introduction of Optum Fitness Advantage.

62.     On an earnings call held shortly thereafter, Defendant Tramuto made a series of false and misleading statements concerning the UHC contract in both prepared remarks and in response to analysts' inquiries.

63.     In his opening remarks, Tramuto stated:

This thought provides, I believe, a great segue to our announcement today of the 3-year renewal of our contract with UnitedHealth, extending our 20-year relationship with one of our largest and oldest clients. We believe UnitedHealth values our ongoing commitment to reinvest in SilverSneakers, and they understand the strength of our brand because of both its importance to the Medicare Advantage membership and the results we produce. ***This improved depth of understanding led to a renewal that was completed on favorable terms***. (Emphasis added.)

64.     After Tramuto's opening remarks, the very first question by William Blair & Company LLC analyst Ryan Scott Daniels was whether there were "any changes" to the way UHC paid Tivity that undermined margins and whether "given the strength United has seen in their [Medicare Advantage] clients with very good growth, was there any dilution to that [margin] we need to think about for 2018?" In response, Tramuto simply reiterated his prior prepared remarks:

20

*As we noted in my script is that we renewed on favorable terms, we don't get into the specifics.* And all I can tell you, as I have shared with you over the last few months, the relationship with United continues to be very strong. *And we are very pleased with the terms that we have.* (Emphasis added.)

65.     The bold and italicized language in paragraphs 63 and 64 was false and misleading because it omitted to disclose that UHC had now started to compete with Tivity, and specifically omitted the material information concerning UHC's rollout of its competitive program, Optum Fitness Advantage in Washington, New Jersey and other states. This language led the investing public to believe that Tivity's renewed contract with UHC included the same, if not better, terms than the predecessor contract, when in fact UHC was dropping SilverSneakers as an offering in some of its markets. Tramuto knew or recklessly disregarded that this statement was false and misleading at the time it was made because:

(a)     before and during open enrollment for 2017, which ran between October and December 2016, Tivity executives were forwarded an aggressive letter from UHC to a fitness center that stated that UHC was launching Optum Fitness Advantage and that suggested that the fitness center would lose all SilverSneakers members, not just those insured by UHC;

(b)     before January 2017, UHC informed Tivity that it would not be renewing SilverSneakers in at least New Jersey and Washington state;

(c)     in January 2017, UHC began operating Optum Fitness Advantage in New Jersey and Washington state;

(d)     by early 2017, Tivity knew that UHC was sending letters about Optum Fitness Advantage to partners outside of New Jersey and Washington state; and

(e)     the terms of Tivity's contract with UHC permitted UHC to offer a competitive product in certain markets.

21

66. After Tramuto's response, William Blair & Co. LLC analyst Daniels asked the follow-up question whether there was "any big switch between the way that contract is structured?" Tramuto then unequivocally answered:

> **No. And as I shared, it's favorable terms.** And we just don't get into those specifics. (Emphasis added.)

67. The bold and italicized language in paragraph 66 was false and misleading because it omitted material information concerning UHC's rollout of its competitive program Optum Fitness Advantage that rendered the UHC contract terms actually *less* "favorable" than the predecessor contract since SilverSneakers would be offered in fewer UHC Medicare Advantage markets. As a participant in the contract negotiations, Tramuto knew or recklessly disregarded that this statement was false and misleading at the time it was made because:

(a)    the actual terms of the executed UHC contract confirmed that the competitive threat posed by UHC was increasing, all of which represented a *deterioration* in Tivity's relationship with UHC which was decidedly *not* favorable to Tivity;

(b)    the new contract altered Tivity's relationship with UHC such that UHC's increasingly competitive stance would *decrease* revenues derived from SilverSneakers, and *increase* investment risk for investors; and

(c)    the terms of Tivity's contract with UHC permitted UHC to offer a competitive product in certain markets.

### 3. 1Q17 Form 10-Q

68. On May 4, 2017, Tivity filed a Form 10-Q signed by Defendant Hargreaves for the quarterly period ending March 31, 2017 which covered the time during which Tivity was in contract renewal negotiations with UHC, and was filed well after Tivity and UHC executed the contract renewal. The Form 10-Q included the following risk statements:

22

In addition to the other information set forth in this report, you should carefully consider the risks and uncertainties previously reported under the caption "Part I — Item 1A. Risk Factors" in our Annual Report on Form 10-K for the fiscal year ended December 31, 2016, the occurrence of which could materially and adversely affect our business, prospects, financial condition and operating results. The risks previously reported and described in our Annual Report on Form 10-K for the fiscal year ended December 31, 2016 and in this report are not the only risks facing our business. Additional risks and uncertainties not currently known to us or those we currently deem to be immaterial may also materially and adversely affect our business operations.

*There have been no material changes to our risk factors previously disclosed in our Annual Report on Form 10-K for the fiscal year ended December 31, 2016.* (Emphasis added.)

69.     The bold and italicized language in paragraph 68 is false and misleading because it omitted that the potential competitive and contract renewal risks that Tivity had warned of had materialized in that it had negotiated its contract with UHC on less favorable terms and that UHC had launched Optum Fitness Advantage to directly compete with SilverSneakers. Specifically, this language led the investing public to believe that competition from important health plan customers, like UHC, and the concomitant impact on revenues remained a mere possibility, when actual competition from UHC *had definitively begun and had been a historical fact for at least six months—and Defendants Tivity, Tramuto, and Hargreaves knew it*. Further, this language led the investing public to believe that the terms of the new UHC were favorable to Tivity. Defendants Tivity, Tramuto and Hargreaves knew or recklessly disregarded that this statement was false and misleading at the time it was made because:

(a)     before and during open enrollment for 2017, which ran between October and December 2016, Tivity executives were forwarded an aggressive letter from UHC to a fitness center that stated that UHC was launching Optum Fitness Advantage

23

and that suggested that the fitness center would lose all SilverSneakers members, not just those insured by UHC;

(b)     before January 2017, UHC informed Tivity that it would not be renewing SilverSneakers in at least New Jersey and Washington state;

(c)     in January 2017, UHC began operating Optum Fitness Advantage in New Jersey and Washington state; and

(d)     by early 2017, Tivity knew that UHC was sending letters about Optum Fitness Advantage to partners outside of New Jersey and Washington state.

### 4.     July 27, 2017 press release

70.     On July 27, 2017, Tivity filed a Form 8-K, signed by Defendant Holland, which attached a press release announcing the financial results for the quarterly period ending June 30, 2017. The press release stated:

> ***We believe we have a tremendous long-term opportunity to increase participation in both our SilverSneakers® and Prime® programs within each program's existing base of millions of members who are already eligible to enroll and participate.*** While much work remains to be done on the pilots to understand their results and potential, we are encouraged by developments thus far. We believe this initiative will enable us to significantly expand the number of our members whose physical, emotional and social well-being are improved by our programs, helping them lead their best lives, with dignity, vitality and purpose. (Emphasis added.)

71.     The bold and italicized language in paragraph 70 is false and misleading because it omitted material facts necessary to make the statement not misleading. Specifically, the press release omitted the following facts known to Defendants at the time this statement was made that indicated Tivity was facing new and sizeable challenges from UHC that negatively impacted SilverSneakers' market share then and into the future:

24

(a)     UHC had introduced a competitive program to SilverSneakers that was necessarily causing Tivity to lose members of its SilverSneakers program in the markets that UHC was offering Optum Fitness Advantage;

(b)     The "long-term" potential for SilverSneakers to grow was threatened given UHC's ability, under the terms of its contract with Tivity, to roll out Optum Fitness Advantage into new markets and other markets in which UHC historically offered SilverSneakers; and

(c)     Tivity had launched Project Success in June 2017 to develop a strategy to combat UHC's competitive threat.

### 5.     2Q17 Form 10-Q

72.     On August 4, 2017, Tivity filed a Form 10-Q, signed by Defendant Holland, for the quarterly period ending June 30, 2017, which was well after Tivity and UHC executed the contract renewal and at the time that Tivity was working internally to develop a strategy to combat UHC's competitive assault on SilverSneakers in multiple markets. Despite these circumstances, the Form 10-Q included the following risk statements:

> In addition to the other information set forth in this Report, you should carefully consider the risks and uncertainties previously reported under the caption "Part I — Item 1A. Risk Factors" in our Annual Report on Form 10-K for the fiscal year ended December 31, 2016, the occurrence of which could materially and adversely affect our business, prospects, financial condition and operating results. The risks previously reported and described in our Annual Report on Form 10-K for the fiscal year ended December 31, 2016 and in this Report are not the only risks facing our business. Additional risks and uncertainties not currently known to us or those we currently deem to be immaterial may also materially and adversely affect our business operations.
>
> **_There have been no material changes to our risk factors previously disclosed in our Annual Report on Form 10-K for the fiscal year ended December 31, 2016._** (Emphasis added).

25

73.     The bold and italicized language in paragraph 72 is false and misleading because it omitted that the potential competitive and contract renewal risks that Tivity had warned of had materialized in that it had negotiated its contract with UHC on less favorable terms and that UHC had launched Optum Fitness Advantage to directly compete with SilverSneakers. Specifically, this language led the investing public to believe that competition from important health plan customers, like UHC, and the concomitant impact on revenues remained a mere possibility, when actual competition from UHC *had definitively begun and had been a historical fact for at least nine months—and Defendants Tivity, Tramuto, and Holland knew it*. Further, this language led the investing public to believe that the terms of the new UHC were favorable to Tivity. Defendants Tivity, Tramuto and Holland knew or recklessly disregarded that this statement was false and misleading at the time it was made because:

(a)     before and during open enrollment for 2017, which ran between October and December 2016, Tivity executives were forwarded an aggressive letter from UHC to a fitness center that stated that UHC was launching Optum Fitness Advantage and that suggested that the fitness center would lose all SilverSneakers members, not just those insured by UHC;

(b)     before January 2017, UHC informed Tivity that it would not be renewing SilverSneakers in at least New Jersey and Washington state;

(c)     in January 2017, UHC began operating Optum Fitness Advantage in New Jersey and Washington state;

(d)     by early 2017, Tivity knew that UHC was sending letters about Optum Fitness Advantage to partners outside of New Jersey and Washington state; and

26

(e)     Tivity launched Project Success in June 2017 to develop a strategy to combat UHC's competitive threat.

### 6.     October 26, 2017 earnings call

74.     As the Class Period went on, Defendants continued to stay silent on the competitive threat posed by UHC, even as they learned that threat had materialized and they were grappling with its implications with a strategic outreach plan internally referred to as "Project Success."

75.     On October 26, 2017, Tivity held an analyst conference call in which Defendant Tramuto specifically discussed developments in 2018, but continued to omit perhaps the most significant development that UHC was planning to drop SilverSneakers and replace it with its own competitive program in additional states. Indeed, at this point, Defendants *still* had not even informed the market of UHC rolling out Optum Fitness Advantage.

76.     Specifically, during the call, Tivity's Vice President of Investor Relations, Chip Wochomurka, offered remarks about "[Tivity's] current view for 2018," which included that, "given the overall growth in Medicare Advantage enrollment year-to-date, the strength of our contract renewals in 2017 as well as winning back a few customers … [f]or 2018, we expect that our revenue growth rate and margin profile will approximate what we expect to achieve in 2017." Tramuto elaborated on "[Tivity's] focus and opportunities for 2018," and stated:

> *[W]e expect 2018 to benefit from improved performance across our functional areas. For example, we achieved a contract renewal rate of over 99% for 2018.* This hasn't happened since 2011 in the company. We produced a few new contracts that increased client penetration and had some former clients return home and come back to us. (Emphasis added.)

77.     The bold and italicized language in paragraph 76 was false and misleading because it omitted to disclose that, although Tivity renewed its contract with UHC, in 2018

27

Tivity would see the competitive threat posed by UHC increase dramatically, which would have an immediate negative impact on revenues or "performance" from SilverSneakers, As a participant in the contract negotiations, Tramuto knew or recklessly disregarded that his statement on October 26, 2017 was false and misleading at the time it was made because:

(a)     the actual terms of the renewed UHC contract confirmed that the competitive threat posed by UHC was increasing since in certain markets it was replacing SilverSneakers with Optum Fitness Advantage, all of which represented a *deterioration* in Tivity's relationship with UHC which was decidedly *not* favorable to Tivity;

(b)     the renewed contract altered Tivity's relationship with UHC such that UHC's increasingly competitive stance would ***decrease*** revenues derived from the SilverSneakers, and ***increase*** investment risk for investors; and

(c)     Tivity launched Project Success in in June 2017 to develop a strategy to combat UHC's competitive threat and a communication plan was put in place by September 2017 to make direct outreach to Tivity's fitness center partners concerning UHC's competitive program;

(d)     Defendants would later admit that they knew of contract losses arising from UHC as early as June 2017; and

(e)     Defendants would later admit that they took these UHC contract losses into account when formulating preliminary guidance for 2018.

### 7.     3Q17 Form 10-Q

78.     On November 3, 2017, Tivity filed a Form 10-Q, signed by Defendant Holland, for the quarterly period ending September 30, 2017. At the time of the filing, open enrollment for

28

2018 was underway, Tivity was aware of the markets in which UHC was rolling out Optum Fitness Advantage, and Tivity was aggressively communicating with its fitness center partners about the competitive threat to SilverSneakers. Despite these circumstances, Defendants included the following risk statements in this Form 10-Q:

> In addition to the other information set forth in this report, you should carefully consider the risks and uncertainties previously reported under the caption "Part I — Item 1A. Risk Factors" in our Annual Report on Form 10-K for the year ended December 31, 2016, the occurrence of which could materially and adversely affect our business, prospects, financial condition and operating results. The risks previously reported and described in our Annual Report on Form 10-K for the year ended December 31, 2016 and in this report are not the only risks facing our business. Additional risks and uncertainties not currently known to us or those we currently deem to be immaterial may also materially and adversely affect our business operations.
>
> ***There have been no material changes to our risk factors previously disclosed in our Annual Report on Form 10-K for the year ended December 31, 2016.*** (Emphasis added.)

79.    The bold and italicized language in paragraph 78 is false and misleading because it omitted that the potential competitive and contract renewal risks that Tivity had warned of had materialized in that it had negotiated its contract with UHC on less favorable terms and that UHC had launched Optum Fitness Advantage to directly compete with SilverSneakers. Specifically, this language led the investing public to believe that competition from important health plan customers, like UHC, and the concomitant impact on revenues remained a mere possibility, when actual competition from UHC ***had definitively begun and had been a historical fact for at least twelve months—and Defendants Tivity, Tramuto, and Holland knew it***. Further, this language led the investing public to believe that the terms of the new UHC were favorable to Tivity. Defendants Tivity, Tramuto and Holland knew or recklessly disregarded that this statement was false and misleading at the time it was made because:

29

(a)     before and during open enrollment for 2017, which ran between October and December 2016, Tivity executives were forwarded an aggressive letter from UHC to a fitness center that stated that UHC was launching Optum Fitness Advantage and that suggested that the fitness center would lose all SilverSneakers members, not just those insured by UHC;

(b)     before January 2017, UHC informed Tivity that it would not be renewing SilverSneakers in at least New Jersey and Washington state;

(c)     in January 2017, UHC began operating Optum Fitness Advantage in New Jersey and Washington state;

(d)     by early 2017, Tivity knew that UHC was sending letters about Optum Fitness Advantage to partners outside of New Jersey and Washington state;

(e)     Tivity launched Project Success in in June 2017 to develop a strategy to combat UHC's competitive threat and a communication plan was put in place by September 2017 to make direct outreach to Tivity's fitness center partners concerning UHC's competitive program;

(f)     Defendants would later admit that they knew of contract losses arising from UHC as early as June 2017; and

(g)     Defendants would later admit that they took these UHC contract losses into account when formulating preliminary guidance for 2018.

**E.     The truth is revealed and Tivity's stock plummets.**

80.     On November 6, 2017, the market finally learned what Tivity had known but concealed for a full year—that UHC had launched Optum Fitness Advantage to replace and compete with SilverSneakers in what would be a total of 11 states beginning in January 2018.

30

81. The disclosure was made not by Tivity but rather by UHC via a 9:00 a.m. press release that day, which stated: "In January 2018, Optum Fitness Advantage will be available at no additional cost to people enrolled in eligible UnitedHealthcare Medicare Advantage plans in 11 states through a large network of participating fitness centers. Plan participants will have access to the same services, privileges, classes and programs as the fitness centers' standard members, including waiver of all enrollment fees."

82. The press release further stated that "[t]he Optum Fitness Advantage program, launched by UnitedHealthcare in Washington state and New Jersey in January 2017, has been well received by local Medicare Advantage plan participants."

83. As the market absorbed this news, Tivity shares plummeted more than 34%, dropping from $48.05 at the start of trading, closing at $31.60, representing a market capitalization loss of approximately $646 million in just one day.

**F.    Post Class-Period developments confirm Defendants' scienter.**

84. In response to this news, Defendants tried to reassure the market by explaining that Tivity's 2018 guidance remained unchanged, *because Tivity had already factored UHC's actions into that guidance*. Specifically, Tivity issued a press release stating, among other things, "UHC's plans … are fully reflected within our preliminary 2018 financial guidance set forth in our earnings call on October 26, 2017, for the quarter ended September 30, 2017." This did nothing to reassure investors but rather served as an admission that, at the time it made its false and misleading statements in paragraphs 57, 58, 60, 63, 64, 66, 68, 70, 72, 76, and 78: (i) Defendants knew that UHC's Optum Fitness Advantage had already begun competing with SilverSneakers in certain markets; (ii) Defendants knew that UHC planned to compete in a total of 11 states beginning in January 2018, and (iii) Defendants chose not to inform investors of this material change in Tivity's relationship with one of its largest customers.

31

85.     Tivity's foreknowledge was further confirmed by additional admissions. For example, a November 6, 2017 report by Cantor Fitzgerald analysts Steven Halper and Yulia Norenko, stated that "[w]e spoke with TVTY management this morning about UNH's announcement. Management indicated that they were aware of UNH's intention and that under the current contract… UNH was allowed to pursue these activities in certain markets."

86.     Similarly, a November 6, 2017 report by William Blair analyst Ryan Daniels and Nick Hiller reported that "management stated that they have been aware of these contract losses since June 2017[.]"

87.     Finally, that the actual competitive threat posed by UHC was indeed a material risk that Tivity should have warned about was confirmed by Tivity itself. Specifically, in its FY17 Form 10-K, filed on February 28, 2018, Tivity finally acknowledged that "United Healthcare discontinued offering SilverSneakers to its individual Medicare Advantage beneficiaries in nine states and instead provided those beneficiaries a fitness benefit offered by its wholly owned subsidiary Optum, … [and that] United Healthcare may discontinue offering SilverSneakers to its Medicare Advantage beneficiaries in additional states in 2019 or 2020 within contractual limitations and/or may offer multiple fitness benefits, including SilverSneakers."

88.     Unfortunately for Class Members, this disclosure came far too late.

## V.     ADDITIONAL SCIENTER ALLEGATIONS

89.     That Defendants acted with scienter is bolstered by the fact that, during the Class Period, numerous Company insiders engaged in unusual and significant sales of their Tivity shares, while in possession of significant non-public information about the rising competitive threat posed by UHC.

90.     Insider trading by Defendant Hargreaves during the Class Period further indicates his scienter.

91.     During the Class Period, Hargreaves sold a total of 67,716 shares of Tivity common stock while in possession of material non-public information about UHC's competing fitness program, for proceeds of $$2,621,401.10. These sales reduced Hargreaves' stake in Tivity from approximately 70,000 shares before August 3, 2017 to approximately 39,000 shares on November 2, 2017.[5] Tellingly, Hargreaves sold no shares in the two years preceding the Class Period.

92.     During the Class Period, Tivity's Chief Legal Officer and Corporate Secretary Mary Flipse sold 28,168 shares of Tivity common stock while in possession of material non-public information about UHC's competing fitness program, for proceeds of $1,114,232.74. These sales reduced Flipse's stake in Tivity from approximately 77,000 shares before August 11, 2017 to approximately 45,000 shares on November 3, 2017.[6] Flipse sold no shares in the two years preceding the Class Period.

93.     Conan Laughlin ("Laughlin"), who served as a director member of the compensation and audit committees throughout the Class Period, is a significant activist investor and had led the successful campaign for Healthways' divestiture of businesses other than SilverSneakers.

94.     During the Class Period, Laughlin sold a significant number of Tivity shares owned by him and entities he controlled while in possession of material non-public information

---

[5] Only Hargreaves' sales of 7,137 shares on September 26, 2017 were made pursuant to a Rule 10b5-1 trading plan. Hargreaves also acquired shares pursuant to stock options with low strike prices that vested during this period, and then sold them.

[6] Only Flipse's sales of 7,808 shares on September 25, 2017 were made pursuant to a Rule 10b5-1 trading plan.

33

about the rising competitive threat to Tivity posed by UHC. Specifically, before March 1, 2017, Laughlin, jointly with North Tide Capital Master, LP, NTC Special Opportunities I Master, LP, and North Tide Capital, LLC ("North Tide entities"), owned more than 10% of Tivity's outstanding shares of common stock. Laughlin, as the manager of the North Tide entities, is deemed the beneficial owner of the shares traded by the North Tide entities.

95.     During the Class Period, Laughlin (with the North Tide entities) sold 3,750,000 shares of Tivity common stock while in possession of material non-public information concerning UHC's competing fitness program, for proceeds of $122,925,000. These sales reduced Laughlin's stake in Tivity from approximately 3,500,000 before March 1, 2017 to approximately 100,000 on August 1, 2017.[7] Laughlin sold no shares in the two years preceding the Class Period.

96.     The foregoing insider sales further support Defendants' scienter.

## VI.     LOSS CAUSATION

97.     During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated and/or maintained the price of Tivity securities at an artificially high level, and operated as a fraud or deceit on Class-Period purchasers of Tivity securities by failing to disclose and misrepresenting the adverse facts detailed herein. When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Tivity securities declined significantly as the prior artificial inflation came out of the Company's securities' prices.

---

[7] After the Class Period, between November 6, 2017 and November 21, 2017, Laughlin sold an additional 750,000 shares for proceeds of $27,413,445.62.

34

98.     As a result of their purchases of Tivity securities during the Class Period, Lead Plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

99.     By concealing from investors the adverse facts detailed herein, Defendants presented a misleading picture of the health of Tivity's business, including Tivity's relationship with its most important health plan customer, UHC. When the truth about the Company was revealed to the market, the price of Tivity's securities fell significantly. This decline removed the inflation from the price of Tivity securities, causing real economic loss to investors who had purchased Tivity securities during the Class Period.

100.    The economic loss, *i.e.*, damages, suffered by Lead Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate and/or maintain the price of Tivity securities and the subsequent significant decline in the value of Tivity securities when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## VII.    NO SAFE HARBOR

101.    The statutory safe harbor applicable to forward-looking statements under certain circumstances does not apply to any of the false and misleading statements plead in this Complaint.

102.    Either the statements complained of herein were not forward-looking statements, but rather were historical statements or statements of purportedly current facts and conditions at the time the statements were made, or to the extent there were any forward-looking statements, Tivity's verbal "Safe Harbor" warnings accompanying its oral forward-looking statements issued during the Class Period were ineffective to shield those statements from liability.

2356256 v1

103.    Further, the statutory safe harbor does not apply to statements included in financial statements that purportedly were made in accordance with GAAP, such as Tivity's Forms 10-K and 10-Q issued throughout the Class Period.

104.    To the extent that any of the false and misleading statements alleged herein can be construed as forward-looking, those statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.

105.    To the extent that any of the false and misleading statements alleged herein can be construed as forward-looking, Defendants are liable for those false or misleading statements because, at the time each such statement was made, the speaker knew the forward-looking statement was false or misleading and the forward-looking statement was authorized and/or approved by an executive officer of Tivity who knew that the forward-looking statement was false. None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

## VIII.    CLASS ACTION ALLEGATIONS

106.    Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased or otherwise acquired Tivity securities between March 6, 2017 and November 6, 2017, inclusive (the "Class"). Excluded from the Class are Defendants and their families; the officers and directors of the Company, at all relevant times, members of their immediate families; and their

36

legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

107.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Tivity common stock was actively traded on the NASDAQ. While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Tivity or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

108.    Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law complained of herein.

109.    Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

110.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

> (a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)      whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and operations of Tivity;

(c)      whether the price of Tivity securities was artificially inflated and/or maintained during the Class Period; and

(d)      to what extent the members of the Class have sustained damages and the proper measure of damages.

111.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## IX.    FRAUD ON THE MARKET AND *AFFILIATED UTE* ALLEGATIONS

112.    Lead Plaintiff is entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market doctrine because, at all relevant times, the market for Tivity securities was an efficient market for the following reasons, among others:

(a)      Tivity common stock met the requirements for listing, and was listed and actively traded, on the NASDAQ, a highly efficient, electronic stock market;

(b)      as a regulated issuer, Tivity filed periodic public reports with the SEC and the NASDAQ;

2356256 v1

(c)     Tivity regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Tivity was followed by securities analysts employed by major brokerage firms, including Barrington Research, Jefferies, Piper Jaffray, SunTrust, and UBS, among others, who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

113.    In the alternative, Lead Plaintiff is entitled to a presumption of reliance under *Affiliated Ute v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are primarily predicated upon the omission of material facts that Defendants had a duty to disclose.

114.    As a result of the foregoing, the market for Tivity securities promptly digested current information regarding Tivity from all publicly available sources and reflected such information in the prices of the common stock and other securities. Under these circumstances, all purchasers or acquirers of Tivity securities during the Class Period suffered similar injury through their purchase or acquisition of Tivity securities at artificially inflated prices and a presumption of reliance applies.

X.      CLAIMS FOR RELIEF

39

**COUNT I**
**Violation of Section 10(b) of the Exchange Act and Rule 10b-5**
**Against All Defendants**

115.    Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

116.    During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

117.    Defendants:

(a)    employed devices, schemes, and artifices to defraud;

(b)    made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and

(c)    engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

118.    Lead Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Tivity securities. Lead Plaintiff and the Class would not have purchased Tivity securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

119.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchases and acquisitions of Tivity securities during the Class Period.

40

## COUNT II
### Violation of Section 20(a) of the Exchange Act
### Against Individual Defendants

120.    Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

121.    The Individual Defendants acted as controlling persons of Tivity within the meaning of Section 20(a) of the Exchange Act as alleged herein. By reason of their positions as officers and/or directors of Tivity, and their ownership of Tivity stock, and their culpable participation, as alleged above, the Individual Defendants had the power and authority to cause Tivity to engage in the wrongful conduct complained of herein.

122.    By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## XI.    PRAYER FOR RELIEF

123.    WHEREFORE, Lead Plaintiff prays for judgment as follows:

(a)    declaring this action to be a proper class action pursuant to Federal Rule of Civil Procedure 23;

(b)    awarding compensatory damages in favor of Lead Plaintiff and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    such equitable/injunctive or other relief as deemed appropriate by the Court.

## XII.    JURY TRIAL DEMANDED

41

124.    Lead Plaintiff demands a trial by jury.

Dated: June 4, 2018                         Respectfully submitted,

                                            _/s/ J. Gerard Stranch IV_____
                                            J. Gerard Stranch IV

                                            **BRANSTETTER, STRANCH &
                                            JENNINGS, PLLC**
                                            J. Gerard Stranch IV
                                            Benjamin A. Gastel
                                            223 Rosa L. Parks Avenue
                                            Suite 200
                                            Nashville, TN 37203
                                            Telephone: (615) 254-8801
                                            Facsimile: (615) 255-5419
                                            gerards@bsjfirm.com

                                            _Liaison Counsel_

                                            **COHEN MILSTEIN SELLERS & TOLL
                                            PLLC**
                                            Steven J. Toll
                                            Times Wang
                                            Elizabeth Aniskevich
                                            1100 New York Avenue N.W.
                                            Suite 500
                                            Washington, D.C. 20005
                                            Telephone: (202) 408-4600
                                            Facsimile: (202) 408-4699
                                            stoll@cohenmilstien.com
                                            twang@cohenmilstein.com
                                            eaniskevich@cohenmilstein.com

                                            Christina D. Saler
                                            Three Logan Square, 1717 Arch Street
                                            Suite 3610
                                            Philadelphia, PA 19103
                                            Telephone: (267) 479-5707
                                            Facsimile: (267) 479-5701
                                            csaler@cohenmilstein.com

                                            _Counsel for Lead Plaintiff and Lead Counsel
                                            for the Proposed Class_

42

## CERTIFICATE OF SERVICE

I certify that on this 4th day of June, 2018, I electronically filed the foregoing document using the Court's CM/ECF system, and a copy of this filing will be sent electronically to the registered participants as identified on the Notice of Electronic Filing. The following counsel will receive service via the Court's CM/ECF system at the email addresses listed below:

Eduard Korsinsky
Levi & Korsinsky, LLP
30 Broad Street
24th Floor
New York, NY 10004
(212) 363-7500
Fax: (212) 363-7171
Email: ek@zlk.com

James A. Holifield , Jr.
Holifield Janich Rachal & Associates, PLLC
11907 Kingston Pike
Suite 201
Knoxville, TN 37934
(865) 566-0115
Fax: (865) 566-0119
Email: aholifield@holifieldlaw.com

*Attorneys for Plaintiff Eric Weiner*

Jessica Perry Corley
Lisa R. Bugni
King & Spalding LLP (Atlanta Office)
1180 Peachtree Street NE
Atlanta, GA 30309-3521
(404) 572-4717
Email: jpcorley@kslaw.com
Email: lbugni@kslaw.com

Joseph B. Crace, Jr.
Wallace Wordsworth Dietz
Bass, Berry & Sims (Nashville Office)
150 Third Avenue South
Suite 2800
Nashville, TN 37201
(615) 742-7896

43

Fax: (615) 742-2700
Email: jcrace@bassberry.com
Email: wdietz@bassberry.com

*Attorneys for the Defendants*

/s/ J. Gerard Stranch IV
J. Gerard Stranch IV