**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

ERIC WEINER, Individually and on Behalf of
All Others Similarly Situated,

  Plaintiff,

       v.

TIVITY HEALTH, INC., DONATO
TRAMUTO, GLENN HARGREAVES and
ADAM HOLLAND,

Defendants.

Case No.: 3:17-cv-01469

Chief Judge Crenshaw
Magistrate Judge Newbern

JURY DEMAND

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

# TABLE OF CONTENTS

I.  Facts ........................................................................................................................ 2

    A.  Tivity generates most of its revenues from health plans that pay fees to provide their enrollees access to Tivity's flagship product SilverSneakers. .......... 2

    B.  UHC becomes a competitor in late 2016, before the Class Period began. ............. 3

    C.  Tivity files a misleading Form 10-K on March 6, 2017. ....................................... 4

    D.  Tivity makes misleading statements on April 27, 2017. ....................................... 5

    E.  Tivity files a misleading Form 10-Q on May 4, 2017. ......................................... 6

    F.  Tivity launches "Project Success" to combat UHC competitive threat. ................. 6

    G.  Tivity issues misleading statements on July 27 and August 4, 2017. .................... 6

    H.  Tivity implements a "chaotic" communications plan over UHC's threat. ............. 7

    I.  Tivity makes misleading statements on October 26 and November 3, 2017. ......... 7

    J.  The truth causes a $646 million loss in wealth on a single trading day ................. 8

    K.  Post-Class-Period developments confirm Defendants' foreknowledge. ................ 8

II.  Argument ................................................................................................................. 9

    A.  The FAC adequately alleges material misstatements and omissions ................... 10

        1.  The FAC adequately alleges materiality. .................................................. 10

        2.  Tivity's admittedly misleading risk disclosures are actionable. ............... 15

        3.  Tivity's cautionary words were neither "tailored" nor "meaningful." .................................................................................... 18

        4.  Tramuto's contract-renewal statements are actionable. ........................... 20

    B.  The FAC adequately alleges scienter. ................................................................ 23

    C.  The FAC adequately alleges Section 20(a) claims. ............................................ 25

III.  Conclusion ............................................................................................................. 25

i

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)....................................................................................................9

*Asher v. Baxter Int'l Inc.,*
    377 F.3d 727 (7th Cir. 2004) .................................................................................20

*Basic Inc. v. Levinson,*
    485 U.S. 224 (1988)........................................................................................ *passim*

*Blue Chip Stamps v. Manor Drug Stores,*
    421 U.S. 723 (1975)..............................................................................................16

*Bondali v. Yum! Brands, Inc.,*
    620 F. App'x 483 (6th Cir. 2015) ................................................................. *passim*

*Burges v. BancorpSouth, Inc.,*
    No. 3-14-1564, 2015 WL 4198795 (M.D. Tenn. July 10, 2015)...........................10

*Chill v. Gen. Elect. Co.,*
    101 F.3d 263 (2d Cir. 1996)..................................................................................25

*City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.,*
    880 F. Supp. 2d 1045 (N.D. Cal. 2012) .................................................................9

*Consumer Fin. Prot. Bureau v. Universal Debt & Payment Sols., LLC,*
    No. 15-cv-00859, 2015 WL 11439178 (N.D. Ga. Sept. 1, 2015)..........................16

*Cosby v. KPMG, LLP,*
    No. 16-cv-121-TAV-DCP, 2018 WL 3723712 (E.D. Tenn. Aug. 2, 2018) ...........24

*In re FBR Inc. Sec. Litig.,*
    544 F. Supp. 2d 346 (S.D.N.Y. 2008)...................................................................16

*FindWhat Inv'r Grp. v. FindWhat.com,*
    658 F.3d 1282 (11th Cir. 2011) ............................................................................22

*In re Ford Motor Co. Sec. Litig., Class Action,*
    381 F.3d 563 (6th Cir. 2004) ..........................................................................20, 22

*Frank v. Dana Corp.,*
    547 F.3d 564 (6th Cir. 2008) ..........................................................................23, 25

Case 3:17-cv-01469   Document 47   Filed 09/17/18   Page 3 of 32 PageID #: 575

*Frank v. Dana Corp.*,
   646 F.3d 954 (6th Cir. 2011) ...................................................23, 25

*Halperin v. eBanker USA.com, Inc.*,
   295 F.3d 352 (2d Cir. 2002)................................................................16

*In re Harman Int'l Indus., Inc. Sec. Litig.*,
   791 F.3d 90 (D.C. Cir. 2015)........................................................19, 22

*Helwig v. Vencor, Inc.*,
   251 F.3d 540 (6th Cir. 2001) ...................................................... *passim*

*Huddleston v. Herman & MacLean*,
   640 F.2d 534 (5th Cir. 1981) ...............................................................17

*Keweenaw Bay Indian Cmty. v. State of Michigan*,
   11 F.3d 1341 (6th Cir. 1993) ...............................................................25

*Ley v. Visteon Corp.*,
   543 F.3d 801 (6th Cir. 2008) .................................................................9

*Manavazian v. Atec Grp., Inc.*,
   160 F. Supp. 2d 468 (E.D.N.Y. 2001) ................................................10

*Matrixx Initiatives, Inc. v. Siracusano*,
   563 U.S. 27 (2011)................................................................................24

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
   540 F.3d 1049 (9th Cir. 2008) ...............................................................8

*The MJK Family LLC v. Corp. Eagle Mgmt. Servs., Inc.*,
   No. 09-cv-12613, 2009 WL 4506418 (E.D. Mich. Nov. 30, 2009).......................21

*Morse v. McWhorter*,
   290 F.3d 795 (6th Cir. 2002) ...............................................................25

*In re Mylan N.V. Sec. Litig.*,
   No. 16-CV-7926 (JPO), 2018 WL 1595985 (S.D.N.Y. Mar. 28, 2018)..........................16, 17

*No. 84 Employer-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920 (9th Cir. 2003) ....................................................11

*In re Omnicare, Inc. Sec. Litig.*,
   769 F.3d 455 (6th Cir. 2014) ...........................................................20, 21

*P. Stolz Family P'ship L.P. v. Daum*,
   355 F.3d 92 (2d Cir. 2004)....................................................................17

iii

*Pension Fund Grp. v. Tempur-Pedic Int'l, Inc.*,
614 F. App'x 237 (6th Cir. 2015) ........................................................10, 12, 13, 14

*In re Prudential Sec. Inc. Ltd. P'ships Litig.*,
930 F. Supp. 68 (S.D.N.Y. 1996) ........................................................17

*Pullins v. Klimley*,
No. 3:05-CV-082, 2008 WL 85871 (S.D. Ohio Jan. 7, 2008) ................................10

*Rombach v. Chang*,
355 F.3d 164 (2d Cir. 2004) ........................................................17

*Rubinstein v. Collins*,
20 F.3d 160 (5th Cir. 1994) ........................................................17

*Slayton v. Am. Exp. Co.*,
604 F.3d 758 (2d Cir. 2010) ........................................................20

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007) ........................................................23, 25

*TSC Indus., Inc. v. Northway, Inc.*,
426 U.S. 438 (1976) ........................................................10

*Tutor Perini Corp. v. Banc of Am. Sec. LLC*,
842 F.3d 71 (1st Cir. 2016) ........................................................23

*W. Palm Beach Firefighters' Pension Fund v. Startek, Inc.*,
No. 05-CV-01344-WDM-MEH, 2008 WL 879023 (D. Colo. Mar. 28, 2008) ......................11

*Winslow v. BancorpSouth, Inc.*,
No. 3:10-00463, 2011 WL 7090820 (M.D. Tenn. Apr. 26, 2011) ........................21

*Yi Xiang v. Inovalon Holdings, Inc.*,
254 F. Supp. 3d 635 (S.D.N.Y. 2017) ........................................................11

*Zaluski v. United Am. Healthcare Corp.*,
527 F.3d 564 (6th Cir. 2008) ........................................................10, 12, 13, 14

Case 3:17-cv-01469   Document 47   Filed 09/17/18   Page 5 of 32 PageID #: 577

Oklahoma Firefighters Pension and Retirement System ("Plaintiff"), a pension fund benefitting approximately 25,000 Oklahoma firefighters, respectfully submits this memorandum in opposition to Defendants'[1] motion to dismiss the first amended complaint, ECF No. 38, and in response to Defendants' supporting memorandum of law ("Def. Br"), ECF No. 39.

Defendants' motion is remarkable for what it concedes, including that the first amended complaint ("FAC"), ECF No. 32, adequately alleges that: (1) SilverSneakers is Tivity's most important business; (2) United Health Care, Inc. ("UHC") is Tivity's largest or second-largest customer; (3) Tivity had long warned of health-plan customers like UHC taking programs like SilverSneakers in-house posed an investment risk; (4) UHC decided to launch an in-house competitor to SilverSneakers no later than the fall of 2016, making that risk a reality; (5) UHC's decision would simultaneously decrease Tivity's revenues and increase competition; (6) Defendants had actual knowledge of UHC's decision by late 2016; (7) Tivity's internal reactions to UHC's decision included forming a special committee and launching a program called "Project Success" to implement a communications plan for dealing with the fallout; (8) despite its internal reactions, Defendants chose to conceal UHC's decision from the investing public while repeatedly *praising* the Tivity-UHC relationship in unqualifiedly positive terms; (9) when investors finally learned in November 2017 about UHC's competitive attack (and from UHC not Defendants), Tivity's stock price plummeted from $48.05 to $31.60, wiping out over $640 million in market capitalization; and (10) the cause of this massive loss of wealth was the revelation of the information concealed by Defendants.

---

[1] Defendants are Tivity Health, Inc. ("Tivity" or the "Company"), Chief Executive Officer ("CEO") Donato Tramuto ("Tramuto"), Chief Accounting Officer ("CAO") Glenn Hargreaves ("Hargreaves"), and Chief Financial Officer ("CFO") Adam Holland ("Holland," and together with Tramuto and Hargreaves, "Individual Defendants").

Nevertheless, Defendants say the FAC must be dismissed, because: UHC's decision was not important enough to require disclosure and thus "immaterial" under the securities laws; Defendants' statements and omissions about UHC were either not actionable under Sixth Circuit law and the safe-harbor provisions of the Private Securities Litigation Reform Act ("PSLRA"), or were not misleading; and Defendants did not intentionally mislead investors, and merely thought UHC's decision was a relatively minor development not worth mentioning.

These arguments fail for several reasons, as discussed below. It defies logic to think Tivity would spend years warning of a development like UHC's decision, internally react the way it did, while at the same time believe it was not worth mentioning to investors. The FAC also more than adequately alleges that a reasonable investor would have considered UHC's business decision to compete directly with Tivity altered the "total mix" of available information, thus satisfying the controlling standard for materiality set forth in *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988). Further, all the challenged statements and omissions are actionable, and Defendants do not even dispute that many of them are misleading. For these and the reasons below, Defendants' motion should be denied, and this case should proceed to discovery.

## I.    FACTS

### A.    Tivity generates most of its revenues from health plans that pay fees to provide their enrollees access to Tivity's flagship product SilverSneakers.

Tivity provides fitness and health improvement programs in the United States, and its flagship product is SilverSneakers, which gives seniors on Medicare access to fitness centers associated with Tivity. ¶ 25.[2] SilverSneakers generates more than 80% of Tivity's revenue, which in turn comes from health plans like UHC who pay Tivity fees in exchange for the ability to offer

---

[2] Citations to ¶ __ are to paragraphs in the FAC, ECF No. 32.

2

SilverSneakers to their enrollees. ¶¶ 25, 31-32. Membership in SilverSneakers is wholly dependent on health plans like UHC offering SilverSneakers to their own customers. ¶ 32.

Of the types of Medicare plans, Tivity especially relies on Medicare Advantage. ¶ 27. Tramuto has described Medicare Advantage as Tivity's "bread and butter." ¶ 30. Tivity has also repeatedly acknowledged the importance of its relationships with health plans. Tivity has said that its business would be threatened if it was unable "to retain health plan customers[,]" "to provide our products and services to such health plan customers on terms at least as favorable to us as currently provided[,]" or if there was "a reduction in the number of covered lives enrolled with our health plan customers or a decision by our health plan customers to take programs in-house." ¶ 33.

Equally important are Tivity's relationships with fitness centers. Tivity serves essentially as a middleman between fitness centers on the one hand, and health plans (and their Medicare enrollees) on the other. Because of this business model, Tivity and its investors have long been concerned that health plans like UHC would cut out the middleman and develop in-house competitors to SilverSneakers. ¶¶ 33-35. As a former senior Tivity employee ("Former High-Level Manager" or "Manager")[3] put it, "over the years we knew health plan clients wanted to start their own programs." ¶ 46. As far as investors like Plaintiff could glean from Tivity's public statements, the risk of such a development was just that—a mere possibility. And, throughout the Class Period, the market priced Tivity's stock accordingly. *E.g.*, ¶¶ 57, 68, 72, 78.

### B.    UHC becomes a competitor in late 2016, before the Class Period began.

Unbeknownst to investors, however, by the fall of 2016, that a health plan customer might develop an in-house competitor to SilverSneakers was no longer a hypothetical. UHC had done just that—and Tivity knew it. ¶¶ 41-42, 45, 47. Specifically, before and during open enrollment—

---

[3] The Manager worked at Tivity from 2005-2017, well within the Class Period.

3

the period from October to December for electing coverage for the next year—Tivity learned that, beginning January 2017, UHC would offer a program called Optum Fitness Advantage—and drop SilverSneakers—to its Medicare Advantage enrollees in at least two states. ¶¶ 41-42, 45.

As the Manager recounted, even before open enrollment began, UHC had started sending "aggressive" letters to fitness centers announcing Optum Fitness Advantage, insinuating that the fitness centers could lose all SilverSneakers members, not just those insured through UHC. ¶ 47. He or she personally saw such a letter and escalated it to Tivity senior management, and in response, they directed the Manager to coordinate outreach to assure fitness centers that UHC's competing program would only affect UHC-SilverSneakers customers. *Id.*

In all events, Defendants essentially concede that the latest Defendants would have known of UHC's Optum Fitness Advantage plans was January 2017, when UHC began operating Optum Fitness Advantage in Washington and New Jersey. ¶ 49. Defendants' knowledge of this competitive threat only grew, given that by early 2017, UHC was sending letters to fitness centers *outside* of New Jersey and Washington as well. ¶ 48.

### C. Tivity files a misleading Form 10-K on March 6, 2017.

The Class Period begins on March 6, 2017, when Tivity filed its Form 10-K for FY16. By this time, Tivity had actual knowledge that the hypothetical it had long warned about in prior Form 10-Ks—"a decision by our health plan customers to take programs in-house"—was no longer a hypothetical. *E.g.*, ¶ 33. At this juncture, Tivity had a choice: inform investors of UHC's competitive position or keep them in the dark. Tivity chose the latter.

In previous Form 10-Ks, Tivity told investors that "a decision by our health plan customers to take programs in-house could adversely affect our results of operations," ¶¶ 33, 41, in a section about risks posed by depending on health plans. This time, Tivity used slightly different language, and in a different section specifically addressing risks posed by "Competition." However, the

4

substance was unchanged: there was a *possibility* that "health plan customers could attempt to offer services themselves that compete directly with our offerings or stop providing our offerings to their members." ¶ 57. This sudden and subtle revision in structure and phrasing shows Tivity well understood UHC's decision was a significant development. Unfortunately for investors, Tivity opted to continue to say only that health plan customers possibly "could attempt" to compete or stop offering SilverSneakers. ¶ 58. As the Class Period wore on, Tivity was presented with several additional opportunities to come clean with investors about UHC's plans. Each time, Tivity not only chose not to do so—it doubled and even tripled down on its deception. ¶ 56.

### D. Tivity makes misleading statements on April 27, 2017.

First, on April 27, 2017, Tivity issued a press release and held a conference call regarding 1Q17 results and, in both settings, saw fit to update investors about its ongoing contract negotiations with UHC. Incredibly, Tivity declined to tell investors the whole truth about that relationship and instead elected to *praise* the UHC-Tivity contract, which it noted had been renewed for three years, "on favorable terms"—leaving investors with the indelible impression that UHC was *not* taking Medicare Advantage business in-house. ¶¶ 60-63.

Even when presented with an opportunity to correct the record, Tivity refused. An analyst directly asked whether there were "*any* changes" or other downsides to the UHC relationship that investors should be aware of, Tramuto demurred, saying that "we don't get into the specifics," that the renewal was "on favorable terms," that Tivity was "very pleased," and that the relationship with UHC was "very strong." ¶ 64. Another analyst followed up by asking, "any big switch between the way that contract is structured?" ¶ 66. Now tripling down on the deception, Tramuto stated point blank: "No. And as I shared, it's favorable terms. And we just don't get into those specifics." *Id.* The whole truth was, of course, there *were* negative developments that investors

should have been made aware of but Tramuto's answers led investors to believe the opposite.[4]

### E. Tivity files a misleading Form 10-Q on May 4, 2017.

Tivity's deception continued into May, when, on May 4, 2017, in its Form 10-Q for 1Q17, Tivity stated that "[t]here have been no material changes to our risk factors previously disclosed in our Annual Report on Form 10-K [filed on March 6].". ¶ 68. Given that the Form 10-K was itself misleading, so too was this Form 10-Q, particularly since Tivity's knowledge of the UHC threat had only grown in the intervening months as contract negotiations concluded. ¶ 69.

### F. Tivity launches "Project Success" to combat UHC competitive threat.

Tivity's concern grew to such a level that it formed a special committee dedicated to responding to the UHC threat, and launched an effort called "Project Success." ¶ 52. At least one meeting was held at Tivity's Nashville headquarters in June 2017. ¶ 52. Analysts would later report that Tivity admitted to having been "aware of these [UHC] contract losses since June 2017." ¶ 51.

### G. Tivity issues misleading statements on July 27 and August 4, 2017.

By late summer of 2017, Tivity had known for months about the dire threat posed by UHC and its special committee worked on Project Success. Yet, Defendants continued to say nothing to and to mislead investors. On July 27, 2017, in a press release announcing 2Q17 results, Tivity told investors that there was "a tremendous long-term opportunity" to increase SilverSneakers participation, without mentioning the acute threat posed by UHC. ¶¶ 70-71. Then, in a Form 10-Q for the same quarter filed on August 4, 2017, Tivity repeated the falsehood that "[t]here have been no material changes to" the risk factors contained in its March 6, 2017 Form 10-K, despite the

---

[4] More generally, Tivity also made misleading statements of the purported success of its so-called "A-B-C-D strategy," which entailed "add[ing]" new members to its programs; "build[ing]" engagement with current members; "collaborat[ing]" with partners; and "deepen[ing]" relationships with partners, because that strategy clearly failed with respect to Tivity's relationship with UHC, which was moving in the wrong direction. ¶¶ 60-61.

6

special committee launching "Project Success" to contain the growing UHC threat. ¶¶ 72-73.

### H. Tivity implements a "chaotic" communications plan over UHC's threat.

As open enrollment for 2018 approached, Tivity began implementing the Project Success communications plan to address the UHC threat. For example, according to the Manager, in August 2017, VP Caroline Khalil held a conference call informing select colleagues that UHC was leaving SilverSneakers and starting Optum Fitness Advantage. ¶ 53. That same month, the communication plan was implemented, though in "chaotic" fashion, because Tivity's senior management could not reach a consensus on messaging. ¶ 54. VP Khalil thus aborted the original plan midstream, and a revised plan was approved by senior management in September 2017. *Id.* That plan required the Manager and other colleagues to "verbally," but never in writing, inform fitness center partners that UHC was now a competitor. *Id.* It also required that fitness centers be instructed not to make any statements regarding this information, or name the competitor, until after open enrollment began in October 2017. *Id.*

### I. Tivity makes misleading statements on October 26 and November 3, 2017.

Despite this internal "chaos," Tivity continued to let investors believe that nothing was amiss. On an October 26, 2017 investor call, Tramuto went even further, stating that 2018 would see "improved performance" in part because of "a contract renewal rate of over 99%." ¶ 76. What this left out was that, although UCH renewed, the contract failed to prevent Tivity from losing UHC's Medicare Advantage business in nearly a dozen states, losses Tivity would later admit were taken into account when issuing preliminary 2018 projections.

Then, on a November 3, 2017 Form 10-Q, Tivity again referred investors to the same risk disclosures set forth in its March 6, 2017 Form 10-K. Despite all that had happened in the interim, including "Project Success," Tivity's internal "chaos," and Tivity's taking the loss of UHC business into account when formulating earnings guidance, Tivity told investors there had been

7

"no material changes" to the risks faced by the Company.

**J.      The truth causes a $646 million loss in wealth on a single trading day.**

By this time, all the purported good news about the UHC contract renewal, and about 2018 generally, had had its intended effect—Tivity's stock had risen steadily since the beginning of the Class Period, from less than $25 per share at the beginning of the year, to reach $35 per share by June, and reaching $48.05 at the close of trading on November 3, 2017, when Tivity last reassured investors that there were "no material changes" to the risks it had described on March 6, 2017. The reality was, of course, that not only were those risks fraudulently understated at the time, the competitive landscape had dramatically shifted as a result of UHC's decision to offer an in-house program for Medicare Advantage enrollees in nearly a dozen states.

On November 6, 2017, investors were finally confronted with that reality. But, true to form, Tivity did not break the news—instead, it was UHC that issued a press release announcing Optum Fitness Advantage's availability in 11 states. ¶ 80. As the market absorbed that news, the inflation that had been embedded in Tivity's stock price as a result of Defendants' repeated falsehoods began to evaporate. By the close of trading, Tivity's stock price plummeted over 34% from $48.05 to $31.60, erasing about $646 million in market capitalization in a single day. ¶ 83.[5]

**K.      Post-Class-Period developments confirm Defendants' foreknowledge.**

After UHC's devastating press release, Tivity issued its own press release stating, among other things, "UHC's plans … are fully reflected within our preliminary 2018 financial guidance set forth in our earnings call on October 26, 2017[.]" ¶ 84. This was an admission that Defendants

---

[5] Since then, Tivity's stock price has not come close to recovering and is currently trading around the same price as it did in the days after the truth was revealed, in the $30-$35 range—a fact the Court may take judicial notice of. *E.g.*, *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1064 (9th Cir. 2008) (taking judicial notice of publicly reported stock price history).

8

had long known of UHC's plans and failed to tell investors. Indeed, analysts reported conversations with Tivity in which "[m]anagement indicated that they were aware of UNH's intention and that under the current contract … UNH was allowed to pursue these activities in certain markets," ¶ 85, and that "management stated that they have been aware of these contract losses since June 2017[.]" ¶ 86. Tivity finally told the whole truth in its FY17 Form 10-K, filed on February 28, 2018, admitting that "[i]n 2018, United Healthcare discontinued offering SilverSneakers to its individual Medicare Advantage beneficiaries in nine states and instead provided … [and] … may discontinue offering SilverSneakers to its Medicare Advantage beneficiaries in additional states in 2019 or 2020[.]" ¶ 87.[6]

## II.    ARGUMENT

Rule 12(b)(6) requires only that a complaint allege "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "When an allegation is capable of more than one inference, it must be construed in the plaintiff's favor." *Helwig v. Vencor, Inc.*, 251 F.3d 540, 553 (6th Cir. 2001). "[T]o state a claim under Section 10(b) of the [Exchange Act] … a plaintiff must allege: (1) a misrepresentation or omission; (2) of a material fact that the defendant had a duty to disclose; (3) made with scienter; (4) justifiably relied on by plaintiffs; and (5) proximately causing them injury." *Ley v. Visteon Corp.*, 543 F.3d 801, 806 (6th Cir. 2008). Defendants seek dismissal of all claims for failure to

---

[6] Additional facts since the filing of the FAC further confirm the significance of UHC competition. For example, during an August 5, 2018 investor call, Tivity disclosed that "UnitedHealthcare will take away 11 additional states in 2019 for individual Medicare Advantage lives only. We anticipate these changes will adversely impact 2019 revenue by approximately ***$19 million to $21 million***." *See* Tivity Health, Inc., 2Q18 Earnings Call Transcript, (Aug. 2, 2018) *available at* https://goo.gl/rT7mRz. The Court may also take judicial notice of this publicly available transcript. *E.g. City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*, 880 F. Supp. 2d 1045, 1058 (N.D. Cal. 2012) (taking judicial notice of earnings calls).

9

plead the second and third elements (materiality and scienter); dismissal of certain statements for failure to plead falsity; and dismissal of other statements as categorically inactionable or as protected the PSLRA safe harbor. For the reasons below, these arguments fail.

### A. The FAC adequately alleges material misstatements and omissions.

#### 1. The FAC adequately alleges materiality.

Materiality is satisfied where there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.'" *Basic*, 485 U.S. at 231-32 (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 448-49 (1976)).[7] As courts have repeatedly noted, "whether or not a statement is 'material' turns on a fact-intensive test," *Burges v. BancorpSouth, Inc.*, No. 3-14-1564, 2015 WL 4198795, at *2 n.3 (M.D. Tenn. July 10, 2015), such that a court "may not dismiss a complaint on the ground that the alleged statements or omissions were not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Id.*[8]

"A dramatic change in the value of a company's stock following a[n] … announcement … supports the materiality of the announcement." *Manavazian v. Atec Grp., Inc.*, 160 F. Supp. 2d 468, 483 (E.D.N.Y. 2001). Here, Tivity's stock lost more than a third of its value on a single day

---

[7] *See also Pension Fund Grp. v. Tempur-Pedic Int'l, Inc.*, 614 F. App'x 237, 242 (6th Cir. 2015) (citing "total mix" standard); *Zaluski v. United Am. Healthcare Corp.*, 527 F.3d 564, 571 (6th Cir. 2008) (same).

[8] *See also Pullins v. Klimley*, No. 3:05-CV-082, 2008 WL 85871, at *21 (S.D. Ohio Jan. 7, 2008) ("Whether or not a statement is material turns upon a 'fact-intensive test.' Therefore, materiality is a mixed question of law and fact and … in most instances, disputes over the materiality of allegedly false or misleading statements are determined by the trier of fact.") (citations omitted).

following UHC's announcement. That alone demonstrates materiality.[9]

Moreover, UHC is Tivity's largest or second-largest customer, responsible for more than 10% of Tivity's overall revenues, and it was threatening Tivity's "bread and butter" Medicare Advantage target population. This cannot be described as anything other than something a reasonable investor would have viewed as significantly altering the "total mix" of available information. Defendants' own statements confirm as much. Tivity has acknowledged that "'a decision by our health plan customers to take programs in-house could adversely affect our results of operations,'" and that such a decision, as well as competition in general from "'[o]ther entities, whose financial, research, staff and marketing resources may exceed our resources," including 'health plans,'" were important risks. ¶ 41 (quoting Tivity's Form 10-Ks). It is nonsensical for Defendants to now argue that when these very risks came to pass, it was "so obviously unimportant to a reasonable investor" that materiality is inadequately alleged.[10] Materiality is further confirmed by Defendants' admission after the November 2017 stock drop that *the Company adjusted its 2018 financial projections downward in October 2017 as a result of UHC's plans*. ¶ 84.[11] All this further confirms UHC's decision was not so "obviously unimportant" to investors as to permit dismissal.

Nevertheless, Defendants argue that, under a trio of Sixth Circuit cases, materiality requires

---

[9] *See also Yi Xiang v. Inovalon Holdings, Inc.*, 254 F. Supp. 3d 635, 643 (S.D.N.Y. 2017) (stock drop supports materiality); *No. 84 Employer-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 935 (9th Cir. 2003) (same).

[10] *E.g.*, *W. Palm Beach Firefighters' Pension Fund v. Startek, Inc.*, No. 05-CV-01344-WDM-MEH, 2008 WL 879023, at *18 (D. Colo. Mar. 28, 2008) ("[T]he best evidence that these statements are arguably material … is to simply quote from defendants' own cautionary statement … : 'a material reduction in the amount of business we receive from a principal client … would harm our business[.]' Many of the alleged misleading statements relate to these very subjects. Thus, by defendants' own words, [they] … may well be found to be material.") (citation omitted).

[11] It is also confirmed by the fact that Tivity recently estimated the cost of losing 11 states to UHC and UHC's Medicare Advantage patients at *over $20 million* in 2019. *See supra* at n.6.

"a 'financial loss' or impact to the 'bottom line' to sustain a failure-to-disclose theory." Def. Br. at 8-11 (citing *Tempur-Pedic.*, 614 F. App'x 237, *Zaluski*, 527 F.3d 564, and *Bondali v. Yum! Brands, Inc.*, 620 F. App'x 483 (6th Cir. 2015)). They say the FAC fails because "[i]t does not allege any facts from which to infer that UHC's competing Optum program had any impact, much less a material impact, on Tivity's business or sales." Def. Br. at 10. Defendants are wrong.

There is no support for the proposition that materiality requires an allegation of a financial loss, and Defendants' argument misrepresents the law. Bafflingly, Defendants do not even *mention Basic*'s "total mix" test—despite it being the controlling standard. And *Basic* expressly rejected bright-line materiality tests, like the "financial loss" standard Defendants propose, in favor of a "fact-specific inquiry," "to be determined on the basis of the particular facts of each case." *Basic*, 485 U.S. 238-40. Defendants' materiality argument fails for this reason alone.

Even if Defendants' proposed standard is correct—and it is not—the FAC easily meets it, because the FAC alleges numerous facts from which to infer that UHC's competing program had a material impact on Tivity's financial results. First, as mentioned, the FAC alleges that by *Tivity's own admission UHC's program had an impact on the Company's financial projections for 2018.* ¶¶ 84-86. Second, the FAC alleges that "competition by UHC threatened Tivity in two directions, by introducing competition for market share and simultaneously eliminating a significant source of revenue." ¶ 43. Third, the FAC quotes *Tivity's own statement* that the "restructuring of a contract with … United Healthcare … *could have a material adverse effect on our business and results of*

*operations*." ¶ 58 (emphasis added). Defendants do not grapple with any of these allegations.[12,13]

Nor do the trio of cited cases help Defendants, as the portions relied on *are not about materiality*. *Tempur-Pedic* is about the meaningfulness of cautionary language and held that because an undisclosed negative trend had "not yet affected [the defendant's] bottom line," the defendant's competitive risk warnings were sufficiently specific to trigger safe-harbor protection. 614 Fed. Appx. at 244-45. Critically, it did *not* hold that the negative trend was immaterial. *Zaluski* held that various statements about the TennCare contract were not rendered misleading by a failure to disclose illegal payments to a politician, because "there is no evidence that UAHC internally thought that the contract with TennCare was subject to termination as a result of the payments to Ford." *Zaluski,* 527 F.3d at 575. Importantly, it did *not* hold that the payments were *immaterial*.[14] And, *Bondali* held that statements that food safety issues "have occurred in the past, and could occur in the future" were not rendered misleading by a failure to disclose current food safety issues because there was no indication those issues were "so severe that they would have resulted financial loss for Yum," *i.e.*, there was no indication that at the time of the warning, the "investment

---

[12] Also, contrary to Defendants' claim that the FAC alleges solely a "failure-to-disclose" theory, the FAC also alleges affirmative misstatements. Thus, even if Defendants' proposed "financial loss" standard was correct, and even if the FAC did not allege facts supporting a financial impact, the FAC cannot be dismissed on this basis.

[13] Furthermore, to the extent Defendants' argument is that a business must start to experience actual financial losses before materiality can attach, it makes no sense. That view wrongly implies, for example, that a company would not have to disclose an important customer's decision to terminate its contract until the day of termination, or even later because there is no financial loss until after the changes go into effect. This is not and cannot be the law.

[14] *Zaluski* did hold that certain statements were immaterial, *see id.* at 573-74 (holding certain statements "not material, as they were 'loosely optimistic statements' that are not the type that are relied on by investors," and others were "immaterial puffery"), but Defendants do not expressly cite or rely on those holdings. Instead, Defendants rely on the holdings about the failure to disclose illegal payments, which turn on a lack of a duty to disclose—*i.e.*, a lack of falsity.

13

risk had already materialized." *Bondali*, 620 F. App'x at 490-91. Again, it did *not* hold that the food safety issues were *immaterial*. *See also id.* at 489 (affirming dismissal for failure to show statements were "objectively false or misleading in light of the information now known").[15]

Finally, Defendants' argument that UHC's decision was immaterial because it applied only to Medicare Advantage enrollees in two states also fails. Even if it were true that UHC's plans applied only to two states—and it is not—reasonable investors would have viewed UHC going from competing in *zero* states to launching a competitive program in two, as having altered the "total mix" of available information for two significant reasons: (i) UHC was Tivity's largest or second-largest customer, and going from zero to two can reasonably be interpreted as the beginning of a momentous trend given UHC's resources; and (ii) the FAC alleges that by early 2017, UHC had already indicated that it intended to expand competition beyond New Jersey and Washington, and was sending letters to fitness centers in other states. *E.g.*, ¶¶ 42, 47-48. Thus, it

---

[15] These cases are also distinguishable on their facts. In *Tempur-Pedic*, the company frankly acknowledged to investors, without conditional or hypothetical language, and in the present tense: "[A] number of our significant competitors offer non-innerspring mattress and viscoelastic pillow products." 614 Fed. Appx. at 244. (alteration in *Tempur-Pedic*). Here, Tivity repeatedly represented that health plan competition was a mere possibility deep into the Class Period, even though competition had been a reality for months. In *Zaluski*, the Sixth Circuit noted that "the evidence of internal investigations and reports that gave rise to a duty to disclose" in other cases was absent, as there was no internal indication "that UAHC anticipated that the Ford payments would lead to a termination or modification of its contract with TennCare." *Zaluski*, 527 F.3d at 574. Here, there were *numerous* internal indications that UHC's decision was a significant development, including the formation of a dedicated committee and the launch of "Project Success," the implementation of a communication plan, and "chaos" surrounding that plan. Finally, in *Bondali*, statements and omissions by KFC's parent company about food safety were not misleading because "eight batches of chicken testing positive for drug and antibiotic residues is hardly a companywide food safety epidemic, and the plaintiffs allege no facts to suggest otherwise[.]"620 F. App'x at 491. Here, a decision by Tivity's largest or second-largest customer to aggressively compete with Tivity is, on its face, far more significant than the mere "eight batches" of chicken in *Bondali*. Moreover, the company in *Bondali* had at least warned that "food safety issues *have occurred in the past*, and could occur in the future." *Id.* at 487 (emphasis added). Here, Tivity did not even do that much.

14

is simply not true that UHC's plans were limited to two states.[16] The argument that limiting competition to Medicare Advantage enrollees rendered UHC's decision immaterial also fails, given that Tivity itself has described Medicare Advantage enrollees as its "bread and butter." ¶ 30.

For all these reasons, Defendants' materiality arguments should be rejected.

### 2. Tivity's admittedly misleading risk disclosures are actionable.

Defendants also seek dismissal of a subset of claims on the basis that they cannot be sued for statements couched as risk disclosures. Relying on *Bondali*, Defendants boldly but wrongly declare that it "unambiguously and definitively" held that "cautionary statements are 'not actionable to the extent plaintiffs contend defendants should have disclosed risk factors 'are' affecting financial results rather than 'may' affect financial results.'" Def. Br. at 11 (citing *Bondali* at 491).[17] The opposite is true: *Bondali* went out of its way to make clear that it was *not* announcing a rule holding risk disclosures categorically inactionable, and expressly limited its holding by noting that "there may be circumstances under which a risk disclosure might support Section 10(b) liability." 620 F. App'x at 491. This alone is fatal to Defendants' argument.

---

[16] Defendants also seem to support this argument with a suggestion that investors overreacted when UHC's decision was revealed, by pointing to the fact that revenues and membership increased during the Class Period. *E.g.*, Def. Br. at 4, 10, 18. But even if true, Defendants tellingly do not assert that those increases occurred in states where UHC was competing, because they presumably did not. More to the point, Tivity investors obviously cared about more than just short-term results when pricing Tivity's stock, with competition from key customers being a critical variable. And even if Defendants were concerned about market overreaction, that is no defense under the securities laws, because "[d]isclosure, and not paternalistic withholding of accurate information, is the policy chosen and expressed by Congress." *Basic*, 485 U.S. at 234.

[17] Note that Plaintiff's complaint is not that Tivity said UHC's plans "may affect Tivity's financial results" when they should have said "are." Rather, Plaintiff's complaint is that *Tivity never disclosed those plans in the first place*. Indeed, had Tivity's risk language been that "UHC's launch of Optum Fitness Advantage may affect our financial results," investors would have adjusted their outlook accordingly, and Tivity's stock price would not have reached the heights it did. But Tivity only said unnamed health plan customers "could" become competitors, depriving investors of that opportunity, and its unqualified assurances that the UHC contract was renewed on "favorable terms" only deepened the deception.

15

Defendants' argument should also be rejected because they do not dispute, and thus concede, that Tivity's risk disclosures were *misleading*, and there is no support for the perverse notion that even *misleading* risk disclosures should be immune from liability. *Bondali* certainly does not support that proposition, and indeed, both it and the main case it relied on make clear that the only reason certain risk disclosures might not be actionable is that they *are incapable of misleading* a reasonable investor. *See id.* (noting that "a reasonable investor would be *unlikely to infer* anything regarding the current state of a corporation's compliance, safety, or other operations from a statement intended to educate the investor on *future* harms") (first emphasis added, second in original); *see also In re FBR Inc. Sec. Litig.*, 544 F. Supp. 2d 346, 362 (S.D.N.Y. 2008) (noting that courts have held certain types of cautionary statements inactionable "because such cautionary language *is not misleading*") (emphasis added).

In fact, substantial authority indicates otherwise. As noted by the Second Circuit—widely recognized for its expertise in securities law[18]—there are an "enormous number of different settings in which securities fraud litigation arises," such that, "[i]n all cases," the question is whether "a reasonable investor could have been misled about the nature of the risk when he invested." *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 359 (2d Cir. 2002) (emphasis omitted). "The question, therefore, is not whether a statement of risk is *per se* actionable, but rather whether [Tivity's] statement of risk could have misled a reasonable investor." *In re Mylan N.V. Sec. Litig.*, No. 16-CV-7926 (JPO), 2018 WL 1595985, at *9 (S.D.N.Y. Mar. 28, 2018).

In *Mylan*, for example, the question was whether Mylan's warning that regulator "may"

---

[18] *E.g., Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 762 (1975) (Blackmun, J., dissenting) (Second Circuit is "regarded as the 'Mother Court' in this area of the law"); *Consumer Fin. Prot. Bureau v. Universal Debt & Payment Sols., LLC*, No. 15-cv-00859, 2015 WL 11439178, at *12 n.7 (N.D. Ga. Sept. 1, 2015) ("While the Court emphasizes that Second Circuit case law does not bind this Court, it acknowledges that court's special expertise in the area of securities.").

16

disagree with Mylan's categorization of certain drugs for Medicare purposes, and that Mylan "could" be subject to a government investigation, when such disagreement and investigations had already occurred, were misleading. The court began its analysis by explaining:

> In many cases, general or boilerplate disclosures of future regulatory risk would not cause a reasonable investor to believe that the company faced no current regulatory risks … However, the more specific the caution, the more likely it is to mislead a reasonable investor. For example, a caution that "input prices may rise next quarter" would not cause a reasonable investor to conclude that the prices of all inputs had remained flat or declined in the previous quarter … But a caution that "the price of our primary input may rise above $5 next quarter" could certainly cause a reasonable investor to conclude that the price was, at present, $4.99 or less.

*Id*. Applying this reasoning, the court held that Mylan's statements "fall on the potentially misleading side of the line" because "[a] reasonable investor could have concluded from Mylan's statement[s]" that "such unfavorable events," namely government disagreement and investigations, "had not yet occurred." *Id.* at *10.

Here, Tivity's statements about health-plan competition and about the UHC contract being renewed on "favorable terms" also could have led a reasonable investor to conclude that UHC was not yet a competitor. On these facts, and as in *Mylan*, "'[t]o warn that the untoward may occur when the event is contingent is prudent; to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit.'" *Rubinstein v. Collins*, 20 F.3d 160, 171 (5th Cir. 1994) (quoting *Huddleston v. Herman & MacLean,* 640 F.2d 534, 543 (5th Cir. 1981), *rev'd in part on other grounds*, 459 U.S. 375 (1983)).[19] That Tivity's statements

---

[19] *See also Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004) ("Cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired."); *P. Stolz Family P'ship L.P. v. Daum*, 355 F.3d 92, 97 (2d Cir. 2004) ("It would be perverse indeed if an offeror could knowingly misrepresent historical facts but at the same time disclaim those misrepresented facts with cautionary language."); *In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996) ("The doctrine of bespeaks caution provides no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away.").

about the possibility of health-plan competition are actionable is reinforced by the fact that, despite all of Defendants' protestations, not *once* in their papers do they argue that these statements should be dismissed for lack of *falsity*. In other words, Defendants fail to dispute— and thus concede—that Tivity's risk disclosures were *misleading*. Thus, this case presents precisely the "circumstances under which a risk disclosure might support Section 10(b) liability," *Bondali*, 620 F. App'x at 491, and the statements in Tivity's Form 10-K, later reaffirmed in several Form 10-Qs, cannot be dismissed on the basis that they purport to be risk disclosures.

### 3. Tivity's cautionary words were neither "tailored" nor "meaningful."

Defendants also seek dismissal of three statements on the ground that they are forward-looking statements accompanied by cautionary language "sufficient to warn investors about the risks posed to revenue by potential actions taken by health plan customers," Def. Br. at 14, and thus covered by the PSLRA safe harbor.[20] Notably, Defendants do *not* argue that these statements were *not misleading*, or that they should be dismissed for lack of *falsity*. Instead, Defendants argue they should be dismissed because they were accompanied by "meaningful cautionary language" contained in Tivity's March 6, 2017 Form 10-K and point to general warnings about Tivity's "ability to renew and/or maintain contracts," its ability "to enroll participants and to accurately forecast their level of enrollment," "the risks associated with deriving a significant concentration of revenues from a limited number of customers," and its "ability to effectively compete against

---

[20] The first was made on April 27, 2017, and relates to Tivity's "A-B-C-D strategy," which entailed "add[ing]" members, "build[ing]" engagement, "collaborat[ing]" with partners, and "deepen[ing]" relationships," and which Tivity said made it "well positioned to strengthen our market leadership position in serving the age 50-plus market." ¶ 60. The second was in a July 27, 2017 press release stating that "We believe we have a tremendous long-term opportunity to increase participation in … SilverSneakers." ¶ 70. The third was Tramuto's statement on an October 26, 2017 investor call that: "We expect 2018 to benefit from improved performance across our functional areas. For example, we achieved a contract renewal rate of over 99% for 2018." ¶ 76.

18

other entities, whose … resources may exceed" Tivity's. Def. Br. at 14.

Putting aside that the forward-looking nature of these statements is at best debatable, the deeper problem is that the cautionary statements Defendants rely on were boilerplate and not "meaningful," 15 U.S.C. § 78u-5(c)(1)(A)(i), in light of the historical fact that UHC had *already entered the market at the time the cautionary statements were first made* on March 6, 2017. Nor were the cautionary statements, as the Sixth Circuit requires, "substantive and tailored," *Helwig*, 251 F.3d at 559. Instead, Defendants repeated the same, inadequate, March 6, 2017 language for all three challenged statements, which were made over the course of the Class Period, despite dramatically worsening circumstances.

"[C]autionary language cannot be meaningful if it is misleading in light of historical facts that were established at the time the statement was made." *In re Harman Int'l Indus., Inc. Sec. Litig.*, 791 F.3d 90, 102 (D.C. Cir. 2015) (modifications, quotation marks, and citations omitted).[21] By March 6, 2017, UHC had already: (1) started operating Optum Fitness Advantage in New Jersey and Washington; and (2) sent letters to fitness centers in *other* states. *E.g.*, ¶¶ 42, 47-49. Given these historical facts—which Defendants ignore—later warnings about "*potential* actions" that might be "taken by health plan customers," *see* Def. Br. at 14, are not "meaningful."

Moreover, the inadequacy of Tivity's language only increased over time. By the time of the July 27, 2017 press release, Tivity knew UHC would expand competition in at least nine additional states, and was so concerned that it formed a special committee, and initiated "Project Success." ¶¶ 51-52. Yet, instead of updating its risk disclosures to match these realities, Tivity simply referred investors to the same March 6, 2017 language, ¶¶ 68, 72, 78, further highlighting

---

[21] As Congress made clear in enacting the PSLRA, "[a] cautionary statement that misstates historical facts is not covered by the safe harbor." H.R. REP. NO. 104-369, at 44 (1995).

19

its inadequacy. *E.g.*, *Helwig*, 251 F.3d at 559 (holding defendant's warnings inadequate in part because "[even] as the Budget Act neared enactment and as the warning signs flared," defendant employed "[s]ubstantially similar language" in Form 10-K filings from 1993 through 1995).[22] And, by the time Tramuto made his October 26, 2017 statement, Tivity's reliance on that language was even less justified. By then, Tivity had developed and implemented a communications plan to attempt to contain the UHC threat and had determined internally that UHC's plans had a downward effect on projected 2018 earnings. ¶¶ 53-54, 84. Given these facts, it strains credulity to say that, when Tramuto made his October 26, 2017 statement, language in Tivity's March 6, 2017 Form 10-K was "tailored" to that statement, or that such language "meaningfully" "warn[ed] investors," *see* Def. Br. at 14, about the risks posed by UHC's plans.

For these reasons, Defendants' reliance on the PSLRA safe harbor should be rejected.

### 4. Tramuto's contract-renewal statements are actionable.

Defendants also seek dismissal of three statements about renewal of the UHC contract on "favorable terms" for lack of falsity. Def. Br. at 15. Defendants first suggest (although they do not explicitly argue) that the favorability of the renewed UHC contract was "hard information," *i.e.*, "typically historical information or other factual information that is objectively verifiable," *see id.* (citing *Omnicare* for definition of "hard information"), as opposed to "soft information," such as "information that is uncertain and not objectively verifiable such as 'predictions, matters of opinion, and asset appraisals.'" *In re Ford Motor Co. Sec. Litig., Class Action*, 381 F.3d 563, 569 (6th Cir. 2004). Because statements about "hard information" are only false if they are "objectively

---

[22] *See also Slayton v. Am. Exp. Co.*, 604 F.3d 758, 773 (2d Cir. 2010) ("The consistency of the defendants' language over time despite the new information they received in early May 2001 belies any contention that the cautionary language was 'tailored to the specific future projection.'"); *Asher v. Baxter Int'l Inc.*, 377 F.3d 727, 734 (7th Cir. 2004) ("Moreover, the cautionary language remained fixed even as the risks changed.").

20

false or misleading," and because the FAC fails to allege the renewed UHC contract was *unfavorable*, these statements are not false. Or so their argument goes—though it fails.

First, the FAC repeatedly alleges that the renewed contract was "*not* favorable" or at least "*less* favorable" than before, *e.g.*, ¶¶ 67, 69, 73, 77, 79, given that it provided that "SilverSneakers would be offered in fewer UHC Medicare Advantage markets," "confirmed that the competitive threat posed by UHC was increasing," would lead to "decrease[d] revenues derived from SilverSneakers," and "permitted UHC to offer a competitive product in certain markets," all of which was "decidedly *not* favorable to Tivity." ¶¶ 67, 77. These allegations, which Defendants ignore, defeat their claim that the FAC fails to allege the statements were "objectively false."

Second, regardless of whether the contract's favorability was "hard" or "soft" information, "'[t]he veracity of a statement or omission is measured not by its literal truth, but by its ability to accurately inform rather than mislead prospective buyers.'" *Winslow v. BancorpSouth, Inc.*, No. 3:10-00463, 2011 WL 7090820, at *16 (M.D. Tenn. Apr. 26, 2011), report and recommendation approved, No. 10-cv-00463, 2012 WL 214635 (M.D. Tenn. Jan. 24, 2012) (citation omitted).[23] "Thus, a court must not 'pluck' disclosures out of their context and analyze their truth in a vacuum, but must look at the statements in light of the circumstances and events that create the context in which they were made." *The MJK Family LLC v. Corp. Eagle Mgmt. Servs., Inc.*, No. 09-cv-12613, 2009 WL 4506418, at *7 (E.D. Mich. Nov. 30, 2009).

Here, the context includes that Tramuto made the contract-renewal statements against the backdrop of: (1) Tivity's own longstanding concerns that UHC and other health plans would take

---

[23] *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 479 (6th Cir. 2014) (even if "literal import of the company's statements" could not be disproven, a "hypertextualist argument is for naught," with the salient question being "whether a reasonable jury could find that [certain undisclosed developments] render Omnicare's [statement of legal compliance] misleading").

21

SilverSneakers in house; and (2) Tivity explicitly telling investors, in several Form 10-Ks, that such a development was an important risk. ¶¶ 33, 41. It also includes the fact that, by the time Tramuto made these statements, UHC had begun competing in two states with definite plans to expand. ¶¶ 42, 47-49. But perhaps most damning is the fact that, even when he was specifically asked about potential downsides to the UHC relationship—*twice*—Tramuto said nothing *each time*, and each time merely insisted that the contract was "favorable" while refusing to give "specifics" on how the contract was favorable. ¶¶ 63-64, 66. *E.g.*, *In re Harman*, 791 F.3d at 105 ("[W]hen viewed in context," statements about projections were misleading, because "[w]hen asked whether, even having only sold less than half of its projected year-end total through three quarters of the fiscal year, the Company could still hit its target, CEO Harman responded unequivocally that it could."). Here, regardless of the contract's objective "favorability," and when viewed in context, Tramuto's unqualified statements cannot be seen as anything other than patently misleading, given that they implied that there were *no* materially negative developments in the UHC relationship worth mentioning, when the truth was the opposite.

Third, rather than constituting "objectively verifiable" "hard information," the contract's favorability is more akin to "information that is uncertain and not objectively verifiable such as 'predictions, matters of opinion, and asset appraisals.'" *In re Ford*, 381 F.3d at 569. And, with such information, "a defendant may choose silence or speech based on the then-known factual basis, but it cannot choose half-truths." *Id.*; *Helwig*, 251 F.3d at 564 ("If, however, the company chooses to make projections and issue estimates despite the uncertainty of that information, … the company "cannot duck liability by pointing to the 'soft' nature of the information it volunteered."); *FindWhat Inv'r Grp. v. FindWhat.com*, 658 F.3d 1282, 1305 (11th Cir. 2011) ("By voluntarily revealing one fact about its operations, a duty arises for the corporation to disclose such other facts,

22

if any, as are necessary to ensure that what was revealed is not 'so incomplete as to mislead.'") (quotation omitted). Thus, *even if* the UHC contract was favorable, Tramuto *still* "sp[oke] misleading half-truths—*i.e.*, offering truthful comments but omitting unfavorable info[mation]." *Tutor Perini Corp. v. Banc of Am. Sec. LLC*, 842 F.3d 71, 86 (1st Cir. 2016).

### B. The FAC adequately alleges scienter.

Scienter is adequately pleaded when "all of the facts alleged, taken collectively, give rise to a strong inference," *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007), that a defendant acted with "knowing and deliberate intent to manipulate, deceive, or defraud, [or] recklessness." *Frank v. Dana Corp.*, 646 F.3d 954, 959 (6th Cir. 2011) ("*Frank II*") (citation omitted). And, while earlier Sixth Circuit law required that the culpable inference be more compelling than any non-culpable inference, *Tellabs* established a less stringent standard, whereby the inference of "scienter need not be irrefutable, *i.e.*, of the 'smoking gun' genre, or even the most 'plausible of competing inferences,'" *Tellabs*, 551 U.S. at 324, but merely as compelling as any opposing one. And, if equally strong inferences exist for and against scienter, the "draw [now goes] to the plaintiff." *Frank v. Dana Corp.*, 547 F.3d 564, 571 (6th Cir. 2008) ("*Frank I*"); *cf. Helwig*, 251 F.3d at 553 (requiring the culpable inference be "the most plausible of competing inferences").

Here, the inference that Defendants acted with reckless disregard for, if not knowledge of, the misleading nature of their statements is at least as compelling as any innocent inference. Indeed, that Defendants knew of but concealed from investors UHC's decision is essentially undisputed. *E.g.*, Def. Br. at 17 (admitting that the FAC "give[s] rise to an inference that Defendants knew about UHC's Optum program."). Given that, the only scienter argument Defendants can muster is that they kept this information from investors because they "did not believe that UHC's actions had materially impacted the Company's business or operations such that this information must be disclosed." *Id*. This disingenuous argument must fail.

First, even if Defendants subjectively believed UHC's actions were immaterial, that does not preclude liability because recklessness suffices.[24] Given Tivity's longstanding warnings about health plans taking competitive programs in-house, the scope and importance of the UHC contract, the fact that Medicare Advantage was Tivity's "bread and butter," Tivity's internal panic at UHC's plans, and Tivity's awareness that this was just the beginning of UHC's market penetration, for Defendants to believe that UHC's actions were unimportant cannot reasonably be described as anything but extremely reckless. Defendants do not attempt to explain why ignoring these facts was not at least reckless. For this reason alone, Defendants' scienter argument fails.

Defendants' suggestion that they did not think UHC's plans were material is also simply not credible, belied by a series of unchallenged allegations about Defendants' own conduct showing otherwise. For example, Defendants do not dispute that Tivity formed a special committee, launched "Project Success," and implemented a communications plan, all to combat the UHC threat. ¶¶ 52-54. Defendants' suggestion is further belied by the facts that it was Tivity itself who for years warned of health plans taking program in-house, and that when UHC did so, Tivity suddenly altered risk language that for years had gone unchanged. ¶ 57. Moreover, Defendants admitted to revising Tivity's 2018 projections downward to account for UHC's decision. ¶¶ 84-86. Put simply, viewing the FAC holistically, the inference that Defendants knew that UHC's decision would be important to, and viewed negatively by, investors, but decided to keep it from them anyway, is the *only* plausible inference.[25] Thus, Defendants' suggested inference

---

[24] *E.g.*, *Cosby v. KPMG, LLP*, No. 16-cv-121-TAV-DCP, 2018 WL 3723712, at *4 (E.D. Tenn. Aug. 2, 2018) (noting that "recklessness can also satisfy the scienter requirement" and finding scienter adequately alleged because "defendant deliberately ignored highly suspicious facts.") (internal quotation marks and citation omitted).

[25] *E.g.*, *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 49-50 (2011) ("taken collectively," allegations that defendant was "sufficiently concerned" about a causal link between its drug and

24

fails not only because Defendants would still have been reckless, but because it is not nearly as compelling as the culpable inference, much less *more* compelling, as required for dismissal. Thus, the FAC adequately pleads scienter.[26]

## C. The FAC adequately alleges Section 20(a) claims.

Defendants' sole dismissal argument for the Section 20(a) claims is the alleged failure of the Section 10(b) claims. Since the Section 10(b) claims survive, so do the Section 20(a) claims.

## III. CONCLUSION

For the above reasons, Defendants' motion should be denied.[27]

---

loss of a sense of smell that it took a series of internal steps to review that link, but made positive public statements suggesting such a link had not been proven, "give rise to a 'cogent and compelling' inference that Matrixx elected not to disclose the reports of adverse events not because it believed they were meaningless but because it understood their likely effect on the market.")

[26] Defendants wrongly claim that the FAC "attempts to plead only one" of the *Helwig* factors. It alleges at least four: voluminous unusual stock sales by insiders (first factor), ¶¶ 89-96; internal behavior divergent from public statements (second factor), ¶¶ 52-54; UHC's November 2017 press release coming in same fiscal year as the misstatements and omissions, indicating a "closeness in time" (third factor); and blatant disregard for current information about UHC's plans before making public statements (sixth factor). More to the point, Defendants' *Helwig* argument ignores the drastic change in Sixth Circuit scienter law after *Tellabs*. *E.g.*, *Frank I*, 547 F.3d at 571 ("After *Tellabs*, however, the ['most plausible'] standard adopted in *Helwig* is no longer good law."); *Frank II*, 646 F.3d at 961 ("In the past, we have conducted our scienter analysis in section 10(b) cases by sorting through each allegation individually before concluding with a collective approach…. [This approach] risks losing the forest for the trees. Furthermore, after *Tellabs*, conducting an individual review of myriad allegations is an unnecessary inefficiency."). Thus, in *Frank II*, despite making a passing reference *Helwig*'s "non-exhaustive list of factors that do not necessarily establish scienter," *id.* at 958 n.2, the Sixth Circuit went on to find scienter adequately alleged without citing to *Helwig* or those factors *at all*. *See Frank II* at 960-62 (finding scienter adequately alleged, with no citation to particular *Helwig* factor). For this additional reason, Defendants' reliance on the *Helwig* factors is unavailing.

[27] Should the Court dismiss the FAC, Plaintiff respectfully requests leave to amend. "Generally, leave to amend is 'freely given when justice so requires.'" *Morse v. McWhorter*, 290 F.3d 795, 799-800 (6th Cir. 2002) (quoting *Keweenaw Bay Indian Cmty. v. State of Michigan*, 11 F.3d 1341, 1348 (6th Cir. 1993)). "In the securities litigation context, leave to amend is particularly appropriate[.]" *Id.* (citing *Chill v. Gen. Elect. Co.*, 101 F.3d 263, 271 (2d Cir. 1996)).

25

Dated: September 17, 2018

Respectfully submitted,

/s/ J. Gerard Stranch IV
J. Gerard Stranch IV

**BRANSTETTER, STRANCH & JENNINGS, PLLC**
J. Gerard Stranch IV
223 Rosa L. Parks Avenue
Suite 200
Nashville, TN 37203
Telephone: (615) 254-8801
Facsimile: (615) 255-5419
gerards@bsjfirm.com

*Liaison Counsel*

**COHEN MILSTEIN SELLERS & TOLL PLLC**
Steven J. Toll
Times Wang
1100 New York Avenue N.W.
Suite 500
Washington, D.C. 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
stoll@cohenmilstien.com
twang@cohenmilstein.com

Christina D. Saler
Three Logan Square, 1717 Arch Street
Suite 3610
Philadelphia, PA 19103
Telephone: (267) 479-5707
Facsimile: (267) 479-5701
csaler@cohenmilstein.com

*Counsel for Lead Plaintiff and Lead Counsel for the*
*Proposed Class*

# CERTIFICATE OF SERVICE

I certify that on this 17th day of September, 2018, I electronically filed the foregoing document using the Court's CM/ECF system, and a copy of this filing will be sent electronically to the registered participants as identified on the Notice of Electronic Filing. The following counsel will receive service via the Court's CM/ECF system at the email addresses listed below:

Eduard Korsinsky
Levi & Korsinsky, LLP
30 Broad Street, 24th Floor
New York, NY 10004
(212) 363-7500
ek@zlk.com

James A. Holifield , Jr.
Holifield Janich Rachal & Associates,
    PLLC
11907 Kingston Pike, Suite 201
Knoxville, TN 37934
(865) 566-0115
aholifield@holifieldlaw.com

Jessica Perry Corley
Lisa R. Bugni
King & Spalding LLP
1180 Peachtree Street NE
Atlanta, GA 30309-3521
(404) 572-4600
jpcorley@kslaw.com
lbugni@kslaw.com

Joseph B. Crace, Jr.
Wallace Wordsworth Dietz
Bass, Berry & Sims PLC
150 Third Avenue South, Suite 2800
Nashville, TN 37201
(615) 742-7896
jcrace@bassberry.com
wdietz@bassberry.com


*/s/ J. Gerard Stranch IV*
J. Gerard Stranch IV