| | | |
|---|---|---|
| **ERIC WEINER, Individually and on Behalf of All Others Similarly Situated,** | ) ) ) | |
| **Plaintiff,** | ) ) | |
| **v.** | ) ) | **Case No. 3:17-cv-01469** **Chief Judge Crenshaw** |
| **TIVITY HEALTH, INC., DONATO TRAMUTO,  GLENN HARGREAVES and ADAM HOLLAND,** | ) ) ) ) | |
| **Defendants.** | ) ) | |

## MEMORANDUM OPINION

This is a putative class action under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t(a), brought by Eric Weiner on behalf of himself and all those who purchased Tivity Health, Inc. ("Tivity") securities between March 6, 2017 and November 6, 2017.  In addition to Tivity, Defendants include Donato Tramuto, its Chief Executive Officer; Glenn Hargreaves, its interim Chief Financial Officer from March 6 until June 14, 2017; and Adam Holland, who replaced Hargreaves on June 14, 2017, and became Tivity's Chief Financial Officer. Now pending before the Court is Defendants' Motion to Dismiss (Doc. No. 38), to which Weiner has responded in opposition (Doc. No. 47) and Defendants have replied (Doc. No. 50).  For the reasons that follow, the Motion to Dismiss will be denied.

### I.  Factual Allegations

The First Amended Complaint (Doc. No. 32) alleges the following facts:

Tivity is a health services company that offers fitness and health improvement programs to its customers.  Tivity focuses on the senior population, and its flagship product called "SilverSneakers"  is responsible for 82% of Tivity's overall annual revenues.  (Doc. No. 32 ¶ 25).

SilverSneakers provides seniors enrolled in Medicare Advantage, Medicare Supplement, and Group Retiree health plans with access to a national network of approximately 15,000 fitness centers with which Tivity has formed contractual relationships. (Id.).[1] Thus, instead of offering or administering health insurance plans, Tivity generates its revenue by offering programs like SilverSneakers to health plans for a fee. In return, plan customers are given access to fitness centers as part of their coverage. (Id. ¶ 31).

One of Tivity's most important health plan customers was United Healthcare, Inc. ("UHC"). (Id.. ¶ 1). Indeed, UHC alone was responsible for more than 10% of Tivity's revenues in fiscal year 2016, and the second largest customer in terms of revenue. (Id. ¶ 2).

Tivity knew that there was a risk that health plans like UHC would seek to directly compete because of the low barriers to entry into the market, and the revenues that could be generated by offering a fitness program benefit for Medicare Advantage beneficiaries. In fact, in Security and Exchange Commission ("SEC") filings, Tivity identified "two important risks facing its business." (Id.). Those were: (1) "health plan customers like UHC were responsible for a significant percentage of its revenues" ; and (2) better-resourced entities, including its own health plan customers (although never specifically identifying which customers), might compete with Tivity's product offerings. What Tivity did not disclose to the public, and what serves as the basis for Weiner's complaint, was that this potentiality had become a reality when UHC entered the market.

In late 2016, Tivity became aware that UHC had launched (or was in the process of

---

[1]  Medicare Advantage allows Medicare beneficiaries to receive their Medicare benefits through private health plans; Medicare Supplement (or Medigap plans) are private insurance policies that help pay some of the health care costs not covered by Medicare; and group retiree plans are private group health plans that integrate with Medicare. (Id. ¶ 29). Of these three, Medicare Advantage is the target market for SilverSneakers and serves as its "bread and butter." (Id. ¶ 31)

launching) its Optum Fitness Advantage program to compete directly with SilverSneakers in select states, including Washington and New Jersey. Nevertheless, during the open enrollment period for electing health plan coverage that ran from October to the beginning of December, 2016, Tivity did not disclose that information to its shareholders. To the contrary, it touted its relationship with UHC by highlighting the parties' successful contract renewal negotiation. (Id. 4). Further, "[i]nstead of informing the investing public that one of Tivity's most important customers was becoming a competitor, [Tivity] inserted new risk language into the Company's public filings stating that there was a chance that 'health plan customers *could* attempt to offer services themselves that compete directly with our offerings or stop providing our offerings to their members.'" (Id.) (emphasis added by Weiner). The FY16 Form 10-K containing this "new" language[2] was filed on March 6, 2017, (Id. ¶ 57), some six months after UHC had already begun to offer its competing services. (Id. ¶ 59). According to Weiner, Tivity and the individual Defendants knew of UHC's entry into the field because:

(1) before and during the open enrollment period for 2017, which ran between October and December 2016, Tivity executives were forwarded an aggressive letter from UHC to a fitness center that stated that UHC was launching Optum Fitness Advantage and that suggested that the fitness center would lose all SilverSneakers members, not just those insured by UHC;

(2) before January 2017, UHC informed Tivity that it would not be renewing SilverSneakers in at least New Jersey and Washington state;

---

[2] Weiner asserts this language was "new" in the sense that it was a "sudden and subtle revision" of the 10-K. (Doc. No. 47 at 3). That is, in earlier 10Ks when discussing the risks associated in dependence on health plans, Tivity told investors that "a decision by our health plan customers to take programs in-house could adversely affect our results of operations," while the new 10-K specifically addressed risks posed by the "Competition." (Id.). The substance, however, remained unchanged: "there was a *possibility* that 'health plan customers *could* attempt to offer services themselves that compete directly with our offerings or stop providing our offerings to their members.'" (Id.) (emphasis added) (citation omitted).

(3) in January 2017, UHC began operating Optum Fitness Advantage in New Jersey and Washington state; and

(4) by early 2017, Tivity knew that UHC was sending letters about Optum Fitness Advantage to partners outside of New Jersey and Washington state.

(Id.).

Despite the foregoing, Defendants continued to paint a rosy picture of its relationship with UHC.  For example, in a press release issued and dated April 27, 2017 relating to First Quarter 2017 results, Tramuto was quoted as saying: "We are also pleased to announce a three-year renewal of our SilverSneakers contract with UHC Group, continuing a 20-year relationship with a partner who shares our commitment to active lifestyles."  (Id. ¶ 60).  Tramuto also spoke about an "A-B-C-D strategy" that touted the "collaborat[ion] with partners," and the "deepen[ing] relationship" with partners, even though UHC had introduced a competitive program that was necessarily causing Tivity to lose members of its SilverSneakers  program.  Shortly thereafter, in an earnings call, Tramuto reiterated that the renewal of Tivity's contract with UHC was on "favorable terms"; their relationship "continues to be very strong;" and Tivity was "very pleased with the terms that we have" with UHC.  (Id. ¶¶ 64, 65).  Responding to an analyst's question as to whether there was "any big switch between the way that contract [between Tivity and UHC] is structured," Tramuto stated, "No. And as I shared, it's favorable terms."  (Id. ¶ 66).  Likewise, in a Form 10-Q signed by Hargreaves on May 4, 2017, Tivity represented that "[t]here have been no material changes to our risk factors previously disclosed in our Annual Report on Form 10-K for the fiscal year ended December 31, 2016."  (Id. ¶ 68).  Holland made the same representation on behalf of Tivity when he became Chief Financial Officer in a Form 10-Q dated August 4, 2017 for the period ending June 30, 2017.  (Id. ¶ 70).

Allegedly to counteract the effects of UHC's rollout of a competing program, Tivity's "executive management formed a committee to develop a strategic plan" that would "combat UHC's competitive threat." (Id. ¶¶ 52, 71). The plan was referred to as "Project Success" and, among the committee members was Caroline Khalil, Vice President of Network Partnership and Programming, who communicated with a "Former High-Level Manager" and other select colleagues about the program and UHC's entry into the market. (Id. ¶¶ 52, 53). According to that unnamed Former High-Level Manager, this was a "chaotic time" at Tivity because "senior management was unable to reach a consensus on the messaging." (Id. ¶ 54). Ultimately, however, it was determined that fitness center partners could be verbally informed that UHC was coming on board as a competitor, but that information was not to be publicly disclosed until after open-enrollment began in October 2017.

Tivity continued to represent that its relationship with UHC was the same, including stating during a conference call on October 26, 2017 that there was "improved performance across [the] functional areas" and a "contract renewal rate of over 99% for 2018." (Id. ¶ 76). Also in the Form 10-Q signed by Holland for the quarter ending September 30, 2017, it was again represented that there had been "no material changes to . . . risk factors." (Id. ¶ 78).

On Monday, November 6, 2017, UHC announced that, beginning January 1, 2018, customers enrolled in its Medicare Advantage plans in 11 states could participate in its Optum Fitness Advantage program at no additional costs. When this news broke publically, Tivity's stock price plummeted by more than 34%, from a close of $48.05 per share on Friday, November 3, 2017, to a close of $31.60 per share the following Monday. This drop of $16.45 per share was based upon a trade volume of 9,034,800 shares, and was about 18 times more than the daily average of

approximately 490,000 shares. "In response to this news, Defendants tried to reassure the marked by explaining that Tivity's 2018 guidance remained unchanged *because Tivity had already factored UHC's actions into that guidance*." (Id. ¶ 84) (emphasis in original).

Weiner claims that during the proposed class period he purchased 20,658 shares of Tivity common stock, but ended up losing more than $107,000 when UHC's competing program came to light. (Id. ¶ 11). Others, however, were a lot more fortunate, particularly those alleged to be company insiders.

Hargreaves (who sold no stock during the two years prior to March 6, 2017) sold a total of 67,716 shares of Tivity common stock during the proposed class period for $2,621,401.10. These sales reduced his stake in Tivity from approximately 70,000 shares before August 3, 2017, to approximately 39,000 shares on November 2, 2017. (Id. ¶ 91).

Mary Flipse, Tivity's Chief Legal Officer and Corporate Secretary, also sold no stock during the two years prior to March 6, 2017, but sold 28,168 shares of Tivity common stock for $1,114,232.74 during the proposed class period. These sales reduced Flipse's stake in Tivity from approximately 77,000 shares before August 11, 2017, to approximately 45,000 shares on November 3, 2017. (Id. ¶ 92).[3]

Finally, Conan Laughlin ("Laughlin"), "who served as a director member of the compensation and audit committees throughout the Class Period, [and] is a significant activist investor," sold a large number of shares of Tivity stock owned by him and by entities he controlled during the proposed class period. (Id. 94). More specifically, he, along with North Tide Capital

---

[3] Only a small portion of the stock sold by Hargreaves and Flipse was made pursuant to a Rule 10b5-1 trading plan. (Id. ¶ 91, n.5; ¶ 92, n.6).

Master, LP, was the beneficial owner of 10% of Tivity's stock, and together sold 3,750,000 shares of common stock for proceeds of $122,925,000. (Id. ¶ 95).[4]

## II. Standards of Review

Generally, motions to dismiss for failure to state a claim are governed by Rule 12(b)(6). The well- known principles surrounding resolutions of such motions as been succinctly summarized as follows:

> Under Rule 12(b)(6), the complaint is viewed in the light most favorable to plaintiffs, the allegations in the complaint are accepted as true, and all reasonable inferences are drawn in favor of plaintiffs. Bassett v. Nat'l Collegiate Athletic Ass'n, 528 F.3d 426, 430 (6th Cir. 2008). However, "a legal conclusion couched as a factual allegation" need not be accepted as true. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). The factual allegations must "raise a right to relief above the speculative level." Id. The complaint must state a claim that is plausible on its face, i.e., the court must be able to draw a "reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (citation omitted). This "plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Id. (quoting Twombly, 550 U.S. at 556, 127 S.Ct. 1955). "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." Id. (quoting Twombly, 550 U.S. at 557, 127 S.Ct. 1955 (internal quotation marks and citation omitted) ).

Nwanguma v. Trump, 903 F.3d 604, 607 (6th Cir. 2018).

Where, however, a complaint alleges fraud in the purchase or sale of securities in violation of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. 240.10b-5, a heightened pleading standard is mandated by the Private Securities Litigation Reform Act of 1995 ("PSLRA"). Merrill Lynch, Pierce, Fenner &

---

[4] Before March 1, 2017, Laughlin held approximately 3,500,000 shares, which was reduced to approximately 100,000 by August 1, 2017. Like Hargreaves and Flipse, Laughlin sold no shares in the two years preceding the Class Period.

Smith Inc. v. Dabit, 547 U.S. 71, 81–82 (2006); Miller v. Champion Ents. Inc., 346 F.3d 660, 686 (6th Cir. 2003).[5]  Under the PSLRA, "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading," and shall  "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u–4(b)(2).

## III.  Application of Law

The PSLRA, as Defendants are quick to point out, can be an "elephant-sized boulder blocking [a securities fraud] suit[.]"  In re Omnicare, Inc. Sec. Litig., 769 F.3d 455, 461 (6th Cir. 2014).  But this does not mean the boulder cannot be circumnavigated, pushed aside, or at least squeezed past so as to allow a plaintiff to open the doors to discovery.  Weiner has done so in this case.

Contrary to Defendants' contention, when the allegations in the First Amended Complaint are accepted as true,[6] this litigation is not "based on nothing more than a company's announcement of bad news," nor is Weiner improperly trying to "turn news of competition Tivity would face into

---

[5] The PSLRA was intended to supersede and supplement the pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure for claims sounding in fraud.  In re Navarre Corp. Sec. Litig., 299 F.3d 735, 742 (8th Cir. 2002).  While "both provisions require facts to be pleaded 'with particularity'" the PSLRA's requirement for pleading scienter, "marks a sharp break with Rule 9(b)," because "'a plaintiff can no longer plead the requisite scienter element generally, as he previously could under Rule 9(b).'"  Institutional Inv'rs Grp. v. Avaya, Inc., 564 F.3d 242, 253 (3d Cir. 2009) (quoting Mizzaro v. Home Depot, Inc., 544 F.3d 1230, 1238 (11th Cir. 2008)); see also Wyser-Pratte Mgmt. Co. v. Telxon Corp., 413 F.3d 553, 563 (6th Cir. 2005) (observing that "Rule 9 provides that a defendant's state of mind 'may be averred generally,' while the PSLRA adopted a heightened standard for pleading scienter in federal securities fraud cases").

[6] Even with the heightened pleading standards applicable to a securities case under §10(b), the allegations in the complaint are accepted as true, Frank v. Dana Corp., 547 F.3d 564, 570 (6th Cir. 2008) (Frank I), and all reasonable inferences are drawn in plaintiff's favor,  Lormand v. US Unwired, Inc., 565 F.3d 228, 232 (5th Cir. 2009).

a securities fraud complaint." (Doc. No. 39 at 6). Instead, Weiner alleges that Tivity thought it important enough over the years to warn there would be an investment risk if one of its health-plan customers chose to develop its competing program, yet when one of its largest customers made that possibility a reality, Tivity actively concealed that information from its investors and suggested that the relationship with that customer was as good as it had been in the past.

## A. Materiality and Actionable Statements or Omissions

Tivity first moves to dismiss on the grounds that the "Complaint fails to allege that UHC's competing Optum program was material to Tivity's bottom line, and, thus, as the Sixth Circuit holds, the Complaint fails to state a claim and should be dismissed." (Doc. No. 39 at 13). As support, Tivity discusses three Sixth Circuit cases that it deems to be "particularly instructive" on the issue of materiality. (Id.).

Pension Fund Group v. Tempur-Pedic International, Inc., 614 F. App'x 237 (6th Cir. 2015) involved a securities complaint filed against Tempur-Pedic after stock prices dropped precipitously when its competitor Serta made significant inroads into the viscoelastic (memory-foam) bed and pillow market. While Tivity claims Tempur-Pedic "alleged a similar theory to the one at issue here," (Doc. No. 39), that theory was based on an entirely different factual pattern.

Like here, Tempur-Pedic disclosed that competition was a known "risk factor," and the Sixth Circuit affirmed dismissal at least in part because "Tempur–Pedic was not required to disclose its internal analyses of how a specific competitor affected sales," nor were "Tempur–Pedic's risk disclosures inadequate merely because the company's growth appeared to slow – but not reverse – due to competition[.]" Id. at 244. Unlike here, however, Tempur-Pedic acknowledged that competition was already taking place. Specifically, in a January 2011 Press Release, Tempur-Pedic

informed the investing public that "[d]uring the past several years, a number of our competitors, including Sealy, Serta and Simmons, have offered viscoelastic mattress and pillow products." Id. at 243. This is a critical difference as evidenced by the Sixth Circuit's distinguishing cases where dismissal was denied "when defendants risk disclosures treat[ed] currently existing conditions as mere possibilities" and "where the warnings clearly misrepresented facts." Id. In this regard, the Sixth Circuit quoted In re Compuware Sec. Litig., 301 F. Supp.2d 672, 685 (E.D. Mich. 2004) (emphasis added), in which the district court observed that "Defendants' statement that 'there can be no assurance that IBM will not choose to offer significant competing products in the future,' implied that IBM's development of competing software was a possibility as opposed to an actuality, and therefore, this statement does not qualify as *meaningful* cautionary language." Likewise here, Weiner is complaining about Defendants intentionally ignoring or distorting reality. See Berson v. Applied Signal Tech., Inc., 527 F.3d 982, 986 (9th Cir. 2008) (observing statement that "speaks entirely of as-yet-unrealized risks and contingencies" does not "alert[] the reader that some of these risks may already have come to fruition); In re Snap Inc. Sec. Litig., No. 217CV03679SVWAGR, 2018 WL 2972528, at *6 (C.D. Cal. June 7, 2018) (finding that "hypothetical risk disclosures – *e.g.*, Instagram Stories 'may be directly competitive,' – do not absolve Defendants of their duty to disclose known material adverse trends currently affecting Snap's user growth").

Next, Tivity cites Zaluski v. United American Healthcare Corp., 527 F.3d 564 (6th Cir. 2008) as holding that there is "no duty to disclose information that might put a contract at risk," and a complaint fails when it is "devoid of allegations *that the company thought that the [illegal] payment put the contract at risk otherwise would have a negative impact.*" (Doc. No. 39 at 14) (emphasis in original). That precise language, however, appears nowhere in Zaluski. What the

Sixth Circuit actually said, in the context of the potential loss of a contract based upon the payment of bribes, was that there was no duty to disclose where there was no "evidence of internal investigations and reports that gave rise to a duty to disclose" and there was "no evidence that [the company] anticipated that the . . payments would lead to a termination or modification of its contract." 527 F.3d at 574. Here, of course, the allegations are that Tivity was hardly nonplussed when it learned of UHC's competing program. It formed a committee specifically to address the problem, and implemented a communication plan for those who it actually chose to inform.

Finally, Defendants rely on Bondali v. Yum-A Brands, Inc., 620 F. App'x 483 (6th Cir. 2015), a case involving Kentucky Fried Chicken's failure to inform its investors that batches of chicken being supplied to a China subsidiary had tested positive for drug and antibiotic residues. Defendants claim that "the Sixth Circuit has unambiguously and definitively foreclosed the type of risk disclosure at issue in this case" (Doc. No. 39 at 16) because "cautionary statements are 'not actionable to the extent plaintiffs contend defendants should have disclosed risk factors 'are' affecting financial results rather than 'may' affect financial results," 620 F. App'x at 491. However, Bondali is unpublished and therefore not "binding precedent" or "binding authority," (Doc. No. 50 at 6), as Defendants claim in their reply brief. See Chevalier v. Estate of Barnhart, 803 F.3d 789, 796 n.4 (6th Cir. 2015) (observing that unpublished decisions are "binding only on the parties"); Crump v. Lafler, 657 F.3d 393, 405 (6th Cir. 2011) stating that "[u]npublished decisions in the Sixth Circuit are, of course, not binding precedent on subsequent panels"); Sheets v. Moore, 97 F.3d 164, 167 (6th Cir. 1996) (noting that unpublished opinions "carry no precedential weight . . . [and] have no binding effect on anyone other than the parties to the action"). Besides, the court in Bondali explicitly recognized that "there may be circumstances under which [such] a risk disclosure might

support Section 10(b) liability." <u>Bondali</u>, 620 F. App'x at 491. Thus, it can hardly be said, as Defendants claim, that "<u>Bondali</u> requires dismissal." (Doc. No. 39 at 16).

Regardless of what distinctions there may be between this case and the ones relied upon by Defendants, none of those cases suggested a change in the law surrounding materiality. To the contrary, both <u>Tempur-Pedic</u>, 614 F. App'x at 242 and <u>Zaluski</u>, 527 F.3d at 571 reaffirm the "total mix" standard articulated by the Supreme Court in <u>Basic Inc. v. Levinson</u>, 485 U.S. 224, 240 (1988).[7]

**B. Safe Harbor**

Defendants next seek shelter in the safe harbor provisions of the PSLRA for three allegedly forward looking statements. Those statements are (1) the April 27, 2017 Press Release in which Tramuto is quoted as saying that "[t]hrough our A-B-C-D strategy . . . we believe we are well positioned to strengthen our market leadership program in serving the 50-plus market"; (2) a July 27, 2017 Press Release that stated, "[w]e believe we have a tremendous long-term opportunity to increase participation in both our SilverSneakers and Prime programs[8] within each program's existing base of millions of members who are already eligible to enroll and participate"; and (3) an October 26, 2017 conference call in which Tramuto stated that, "[w]e expect to benefit from improved performance across our functional areas. For example, we achieved a contract renewal rate of over 99% for last fall." (Doc. No. 39 First Amended Complaint ¶¶ 60, 70, 76).

The PSLRA contains a safe-harbor provision for a forward-looking statement whereby a

---

[7] <u>Bondali</u> does not discuss the applicable standard.

[8] The Prime program was similar to SilverSneakers, but was directed at the 18 to 64-year old population and was offered through commercial health plans and employers. (Doc. No. 32, Amended Complaint ¶ 25, n. 4).

defendant "is liable for such statements only if they were material; if the defendant 'had actual knowledge that the statements were false or misleading'; and if the defendant did not identify the statements as forward-looking or insulate them with 'meaningful cautionary language.'" In re Ford, 381 F.3d at 568. "[F]or 'forward-looking statements' that are accompanied by meaningful cautionary language, the . . . the safe harbor provided for in the PSLRA makes the state of mind irrelevant." Miller, 346 F.3d at 672 (citing 15 U.S.C. § 78u–5(c)(1)(A)). "In other words, if the statement qualifies as 'forward-looking' and is accompanied by sufficient cautionary language, a defendant's statement is protected regardless of the actual state of mind." Id.[9]

A company that chooses to speak, therefore, is protected against failed projections provided it identifies "'important factors that could cause actual results to differ materially from those in the forward-looking statements.'" Helwig v. Vencor, Inc., 251 F.3d 540, 551 (6th Cir. 2001) (quoting 15 U.S.C. § 78u–5(c)(1)(A)(i)). While "a company need not list all factors, [t]he cautionary statements must convey substantive information about factors that realistically could cause results to differ materially from those projected in the forward-looking statements[.]" Id. at 558-9. In observations worthy of repeating in some detail, the United States Court of Appeals for the District of Columbia has recently observed:

> [C]autionary language cannot be "meaningful" if it is "misleading in light of historical fact[s]," . . . "that were established at the time the statement was made[.]" Such statements are neither "significant" nor of "useful quality or purpose." Indeed, the Conference Report [to the PSLRA] states that "[a] cautionary statement that

---

[9]Under the PSLRA, a "forward-looking statement" is defined as: "(A) a statement containing a projection of revenues . . . or other financial items; (B) a statement of the plans and objectives of management for future operations . . . ; (C) a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management; [and] (D) any statement of the assumptions underlying or relating to any statement described in subparagraph (A), (B), or (C)[.]" 15 U.S.C. § 78u–5(i)(1).

misstates historical facts is not covered by the safe harbor." A warning that identifies a potential risk, but "impl[ies] that no such problems were on the horizon even if a precipice was in sight," would not meet the statutory standard for safe harbor protection. If a company were to warn of the potential deterioration of one line of its business, when in fact it was established that that line of business had already deteriorated, then, as the Second Circuit explained, its cautionary language would be inadequate to meet the safe harbor standard. By analogy, the safe harbor would not protect from liability a person "'who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away.'" . . . "As this court [has] noted, there is an important difference between warning that something "might" occur and that something "actually had" occurred.

Because Congress required that cautionary statements warn of "important factors that could cause actual results to differ," the cautionary language need not necessarily "mention the factor that ultimately belies a forward-looking statement." That is, Congress did not require the cautionary statement warn of "all" important factors, so long as "an investor has been warned of risks of a significance similar to that actually realized," such that the investor "is sufficiently on notice of the danger of the investment to make an intelligent decision about it according to her own preferences for risk and reward." Perfect clairvoyance may be impossible because of events beyond a company's control of which it was unaware. Congress required that a company must warn of factors that "[h]av[e] much import or significance" and "carry[ ] with [them] great or serious consequences," and which are "likely to have a profound effect on success[.]"

We join our sister circuits' reasoned analysis of the safe harbor requirement that forward-looking statements be accompanied by "meaningful cautionary statements." The words Congress chose provide instructive guidance and the remaining ambiguity in application is informed by and resolved in view of Congress's purpose to protect companies from "[a]busive litigation," while still providing investors the information they require to make reasoned decisions[.]

The question, then, is whether the Company's statements . . . were accompanied by warnings specific to the Company and tailored to the specific forward-looking statements, not mere boilerplate, and consistent with the historical facts when the statements were made, thereby carrying out Congress's purpose to ensure that investors have the information they need to make an informed decision on whether or not to invest, or remain invested, in the Company.

In re Harman Int'l Indus., Inc. Sec. Litig., 791 F.3d 90, 102–03 (D.C. Cir. 2015).

Accepting the allegations in the Amended Complaint as true, the Court must answer the

question posed in <u>In re Harman</u> in the negative. Notwithstanding Tivity's arguments to the contrary, the forward-looking statements at issue[10] were provided in the context of cautionary statements that were boilerplate, not meaningful, and inconsistent with the historical facts.

Tivity argues that its April 27, 2017, July 27, 2017, and October 26, 2017 press releases all cautioned investors that its forward-looking statements could be "affected by certain risks and uncertainties," including: (1)"the Company's ability to renew and/or maintain contracts with its customers under existing terms or restructure these contracts on terms that would not have a material negative impact on the Company's results of operations"; (2) "the Company's ability and/or the ability of its customers to enroll participants and to accurately forecast their level of enrollment and participation in the Company's programs in a manner and within the time-frame anticipated by the Company"; (3) "the risks associated with deriving a significant concentration of revenues from a limited number of customers" (4) "the Company's ability to effectively compete against other entities, whose financial, research, staffing, and marketing resources may exceed the Company's resources." (Doc. No. 39 at 19). These statements, coupled with its 2016 Annual Report, Tivity submits, "were certainly sufficient to warn investors about the risks posed to revenue by potential actions taken by health plan customers." <u>Id.</u>

Tivity's argument may be valid to an extent, but, as previously noted, cautionary statements must be substantive and tailored. <u>In re Harmon</u>, 791 F.3d at 103; <u>OFI Asset Mgmt. v. Cooper Tire & Rubber</u>, 834 F.3d 481, 491 (3d Cir. 2016); <u>Helwig</u>, 251 F.3d at 559. This "calls for 'substantive

---

[10] Unlike Weiner, the Court does not find it "debatable" whether the statements at issue were (at least in part) forward-looking. The April 2017 press-release spoke about strengthening market leadership going forward, the July 2017 press release suggested a long-term opportunity, and Tramuto talked about the expected benefit from improving performance in the October 2017 conference call.

company-specific warnings based on a realistic description of the risks applicable to the particular circumstances, not merely a boilerplate litany of generally applicable risk factors.'" Slayton v. Am. Exp. Co., 604 F.3d 758, 772 (2d Cir. 2010) (quoting Southland Secs. Corp. v. INSpire Ins. Sols., Inc., 365 F.3d 353, 372 (5th Cir. 2004)).

According to the allegations in the Amended Complaint, before the FY16 Form 10-K was filed on March 6, 2017 and the first Press Release on April 27, 2017, UHC had already: (1) started operating Optum Fitness Advantage in New Jersey and Washington; and (2) sent letters to fitness centers in other states. Then, by the time of the July 27, 2017 press release, Tivity allegedly knew UHC would expand competition in at least nine other states, and formed a special committee to address the problem. And, by the time of the October 26, 2017 conference call, Tivity developed and implemented a communications plan to attempt to contain the UHC threat, informed its fitness centers not to make any statements about UHC's entry into the market, or even identify UHC as the competitor. Given these historical facts, warnings about potential actions that might be taken in the future by health plan customers were not meaningful.

## C. Falsity

Outside of the safe harbor, Tivity briefly argues that the three statements Tramuto made on April 27, 2017 regarding contract renewal are not actionable. That is, "the Complaint's failure to allege any facts demonstrating the falsity of the statements regarding the new UHC contract requires dismissal of these statements from the Complaint." (Doc. No. 39 at 20). Though not entirely clear, this argument appears be based upon the premise that the statements about contract renewal were "hard," and not "soft" information.

"[A] company has a duty to disclose hard information but not soft information unless other

16

criteria are met." Zaluski, 527 F.3d at 572. "Hard information is typically historical information or other factual information that is objectively verifiable. Such information is to be contrasted with 'soft' information, which includes predications and matters of opinion." Id. (quoting In re Sofamor Danek Group, Inc., 123 F.3d 394, 401 (6th Cir. 1997)).

Contrary to Tivity's assertion, the Amended Complaint does allege that the renewed contract terms with UHC were less favorable than before because SilverSneakers would be offered in fewer UHC Medicare Advantage markets. (Doc. No. 32, Amended Complaint ¶ 67). Besides, Tramuto's statements – to wit, " a renewal that was completed on favorable terms," "we renewed on favorable terms, we "are very pleased with the terms," and "it's favorable terms" – are more likely matters of opinion than hard information and "a defendant may choose silence or speech based on the then-known factual basis, but it cannot choose half-truths." In re Ford Motor Co. Sec. Litig., Class Action, 381 F.3d 563, 569 (6th Cir. 2004). Thus, "[o]nce a company has chosen to speak on an issue – even an issue it had no independent obligation to address – it cannot omit material facts related to that issue so as to make its disclosure misleading." Williams v. Globus Med., Inc., 869 F.3d 235, 241 (3d Cir. 2017). Here, not only did Tramuto fail to disclose UHC's entry into the marketplace, he twice deflected inquiry into the matter from an analysts during the conference call.

**D. Scienter**

Finally, Tivity argues that the Amended Complaint fails to sufficiently allege scienter. Its argument here is two-fold: (1) viewed holistically, the allegations fail to establish the requisite strong inference of scienter, and (2) the First Amended Complaint fails to plead the Helwig factors.

Turning to the latter point first, the Sixth Circuit in Helwig held that the facts alleged in a securities complaint must present a "strong inference" of reckless behavior or knowing conduct,

"meaning that scienter must be the most plausible inference that could be drawn from the facts."

Frank v. Dana Corp., 646 F.3d 954, 957 (6th Cir. 2011) (Frank II).  The court then identified

"several factors usually relevant to scienter."  Helwig, 251 F.3d at 552.  These "non-exhaustive list

of factors" include:

> (1) insider trading at a suspicious time or in an unusual amount;
>
> (2) divergence between internal reports and external statements on the same subject;
>
> (3) closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information;
>
> (4) evidence of bribery by a top company official;
>
> (5) existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit;
>
> (6) disregard of the most current factual information before making statements;
>
> (7) disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication;
>
> (8) the personal interest of certain directors in not informing disinterested directors of an impending sale of stock; and
>
> (9) the self-interested motivation of defendants in the form of saving their salaries or jobs

.

Id. (quoting  Greebel v. FTP Software, Inc., 194 F.3d 185, 194 (1st Cir. 1999)).  Because Weiner

focuses almost exclusively on the unusual trading that occurred before UHC's entry into the market

was announced, Defendants assert that his Amended Complaint is subject to dismissal.

Helwig, however, preceded Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308

(2007).  There, the Supreme Court noted that "Congress left the key term 'strong inference'

undefined" in the PSLRA, and concluded that "the court must take into account plausible opposing

inferences" explaining:

The strength of an inference cannot be decided in a vacuum. The inquiry is inherently comparative: How likely is it that one conclusion, as compared to others, follows from the underlying facts? To determine whether the plaintiff has alleged facts that give rise to the requisite "strong inference" of scienter, a court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff. The inference that the defendant acted with scienter need not be irrefutable, i.e., of the "smoking-gun" genre, or even the "most plausible of competing inferences[.]". . . Yet the inference of scienter must be more than merely "reasonable" or "permissible"—it must be cogent and compelling, thus strong in light of other explanations.

551 U.S. 308, 323–24 (2007) (internal citation omitted). Accordingly, a securities "complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Id. at 324. In making that determination, "the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically." Id. at 325.

Because the Supreme Court in Tellabs rejected the "most plausible requirement" utilized in Helwig, Wiener argues that "reliance on the Helwig factors is unavailing." (Doc. No. 47 at 25, n. 26). As support, he cites Frank II, wherein the Sixth Circuit observed:

In the past, we have conducted our scienter analysis in section 10(b) cases by sorting through each allegation individually before concluding with a collective approach. Cf. Konkol, 590 F.3d at 397–404; Ley v. Visteon Corp., 543 F.3d 801, 809–14 (6th Cir.2008); PR Diamonds, Inc., 364 F.3d at 684. However, we decline to follow that approach in light of the Supreme Court's recent decision in Matrixx Initiatives, Inc. v. Siracusano, —U.S. —, 131 S.Ct. 1309, 179 L.Ed.2d 398 (2011). There, the Court provided for us a post-Tellabs example of how to consider scienter pleadings "holistically" in section 10(b) cases. Id. at 1323–25 (quoting Tellabs, 551 U.S. at 326, 127 S.Ct. 2499) (internal quotation marks omitted). Writing for the Court, Justice Sotomayor expertly addressed the allegations collectively, did so quickly, and, importantly, did not parse out the allegations for individual analysis. Id. at 1324–25. This is the only appropriate approach following Tellabs's mandate to review scienter pleadings based on the collective view of the facts, not the facts individually. Tellabs, 551 U.S. at 322–23, 127 S.Ct. 2499 ("The inquiry . . . is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."). Our former method of reviewing each allegation individually before

> reviewing them holistically risks losing the forest for the trees. Furthermore, after Tellabs, conducting an individual review of myriad allegations is an unnecessary inefficiency. Consequently, we will address the Plaintiffs' claims holistically.

Frank II, 646 F.3d at 961.  Although sorting through each allegation is time-consuming and likely unnecessary in light of Tellabs, the Court does not read Franks II as pretermitting consideration of the Helwig factors when determining whether the facts alleged, taken collectively, give rise to a strong inference of scienter that is at least as compelling as any opposing inference.  Indeed, post-Tellabs, some Sixth Circuit decisions have specifically addressed the Helwig factors in securities fraud cases. See Dougherty v. Esperion Therapeutics, Inc., 905 F.3d 971, 981 (6th Cir. 2018) (noting that "three of the Helwig factors weigh in Plaintiffs' favor" and "[n]one of the other Helwig factors apply in this case");  Doshi v. Gen. Cable Corp., 823 F.3d 1032, 1041 (6th Cir. 2016) ("Considering all pleaded allegations holistically, Tellabs, . . . and applying the Helwig factors"); Konkol v. Diebold, Inc., 590 F.3d 390, 399 (6th Cir. 2009) (post-Tellabs addressing each of the Helwig factors) Here, when the factual allegations are considered collectively and holistically, there is a strong inference that Defendants acted with at least reckless disregard for, if not knowledge of, the misleading nature of their statements that is at least as compelling as any innocent inference.  This is true even when considering the Helwig factors.

The parties' arguments for and against scienter are not elaborate.  On the one hand, Defendants argue that, assuming that Tivity had knowledge about UHC's Optum Fitness Advantage program because of the importance of the relationship between the two companies, UHC initially rolled out this program in only two states.  Even then, UHC continued to offer Tivity's SilverSneakers program to at least its Group Medicare Advantage members. Furthermore, the Amended Complaint does not allege that UHC's Optum Fitness Advantage program caused or

threatened to cause Tivity to lose a significant number of members, or even that it had any impact on Tivity's revenues. From this, the only compelling inference to be drawn (according to Defendants) is that Tivity believed that UHC's actions were having little or no effect on Tivity's business or operations and that, therefore, Tivity had no duty to disclose it.

On the other hand, Weiner argues the compelling inference of knowledge or recklessness can be derived from the fact that Tivity had long warned about health plans taking competitive programs in-house and, recognizing that UHC was a top customer, panicked once UHC actually began to compete. Not only were their suspicious stock sales by Defendants Hargreaves, and by Tivity's Chief Legal Office and a director member of the compensation in large amounts during the class period that significantly reduced their respective shares in the company, Tivity formed a special committee, and implemented a communications plan, to combat the UHC threat.[11]

In the Court's view, the competing, plausible inferences are equally compelling. "[W]here two equally compelling inferences can be drawn, one demonstrating scienter and the other supporting a nonculpable explanation, Tellabs instructs that the complaint should be permitted to move forward." Frank I, 547 F.3d at 571. That is, in such circumstances, "'Tellabs now awards the draw to the plaintiff.'" Id. (quoting ACA Fin. Guar. Corp. v. Advest, Inc., 512 F.3d 46, 59 (1st Cir. 2008)).

## IV. Conclusion

On the basis of the foregoing, Defendants' Motion to Dismiss (Doc. No. 38) will be denied,

---

[11] At a minimum, these allegations encompass the first, second, third, and sixth Helwig factors.

and this case will be returned to Magistrate Judge Newbern for further pretrial case management.[12]

An appropriate Order will enter.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE

---

[12] Because Defendants seek dismissal of the Section 20(a) claims for secondary liability against the individual Defendants solely on the grounds that the Amended Complaint fails to adequately allege a Section 10(b) violation, the Section 20(a) claims likewise will not be dismissed.