# EXHIBIT 2

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

- - - - - - - - - - - - - - - - - - - x

ERIC WEINER, Individually and on
Behalf of All Others Similarly Situated
Plaintiff

vs. CA No. 3:17-cv-01469

TIVITY HEALTH, INC., DONATO TRAMUTO,
GLENN HARGREAVES and ADAM HOLLAND
Defendants

- - - - - - - - - - - - - - - - - - - x

VIDEO DEPOSITION of PAUL A. GOMPERS, Ph.D.
Thursday, November 21, 2019 - 9:34 a.m.
Cornerstone Research
699 Boylston Street
Boston, Massachusetts

Reporter: Jill K. Ruggieri, RPR, RMR, FCRR, CRR

APPEARANCES:

Cohen Milstein Sellers & Toll PLLC
Daniel S. Sommers, Esq.
Jessica Kim, Esq.
88 Pine Street, 14th FLoor
New York, New York 10005
212.838.7797
dsommers@cohenmilstein.com
jekim@cohenmilstein.com
Counsel for plaintiff

King & Spalding LLP
Lisa R. Bugni, Esq.
Jessica Perry Corley, Esq.
101 Second Street, Suite 2300
San Francisco, California 94105
415.318.1234
lbugni@kslaw.com
jpcorley@kslaw.com
Counsel for plaintiff

Videographer: Tom Tracy

I N D E X

WITNESS:

PAUL A. GOMPERS, Ph.D.

Examination by Mr. Sommers 7

E X H I B I T S


| | | |
|---|---|---|
| Exhibit 1 | Expert Report of Paul A. Gompers, Ph.D. | 11 |
| Exhibit 2 | Exhibit 6 - Expert Report of Chad Coffman, CFA | 47 |
| Exhibit 3 | UnitedHealthcare document: Strength. Stability. Hassle Free. - 2017 Medicare Advantage Plans | 113 |
| Exhibit 4 | Archived webpage from the Wayback Machine | 119 |
| Exhibit 5 | Copy of tweet: Optum Fitness Advantage from UnitedHealthcare Accepted Here!!! | 122 |
| Exhibit 6 | Article: Optum Fitness Advantage from UnitedHealthcare will be | 124 |

| | | |
|---|---|---|
| | coming soon to this location | |
| Exhibit 7 | Bellingham Herald article | 128 |
| Exhibit 8 | Mercury Pharmacy Services - Aging Gracefully; Maintaining Vitality: Senior Fitness Series, Part One | 133 |
| Exhibit 9 | Meadowlands YMCA 2017 Spring/Summer Program Guide | 139 |
| Exhibit 10 | YMCA Facility Brochure 2017/2018 | 142 |
| Exhibit 11 | Document: Be Well, Be Strong, Belong | 146 |
| Exhibit 12 | Record of Proceedings, Prairie Township Board of Trustees, April 26, 2017 | 148 |
| Exhibit 13 | Harrison Premier Fitness: New Program Coming to HPF! - Optum Fitness Advantage | 149 |
| Exhibit 14 | Insurance Forums, UHC Bringing Back Fitness in Many States | 151 |
| Exhibit 15 | Tivity Health, Inc., Insurance-Forums.com Post, | 151 |

| | | |
|---|---|---|
| | 9/15/17 | |
| Exhibit 16 | Insurance Forums: Client Cxls Med Supp for MAPD | 155 |
| Exhibit 17 | Article: Tivity Health Comments on UnitedHealthcare Relationship | 192 |

would sort of say that unless the cost was absolutely prohibitive, you know, millions and millions of dollars for a small piece of information, that if there were either time or monetary costs that sort of were typically incurred, I'd sort of say that, generally speaking, those aren't impediments to the dissemination of information.

Q In your opinion, is any new value-relevant information that can be accessed on the Internet incorporated rapidly and efficiently into the stock price of a company trading in an efficient market?

A So is any information. I don't know if I -- again, I -- so I'd rather answer a question about sort of specifics. So if there was a piece of information on a webpage buried that no one ever looked at, I would sort of say in that particular situation, it's unlikely that that information would be incorporated into the stock price.

But as I look here, specifically for the information that relates to United Healthcare and its Optimum Health program, given the extensive nature in which

UnitedHealth was marketing that program, how many emails they sent out, brochures they sent out, the fact that fitness centers themselves were sort of marketing and sending this out, the fact that it shows up on an insurance blog, all of those things would indicate to me that this wasn't just some small piece of information hidden away on a website that nobody ever accessed, that it's far more likely than not, given that there were large institutions who were holding Tivity stock, that some investors likely knew this information.

So if you had to think about offering opinion, it's my opinion that given the nature in which this information was disseminated, that it's more likely than not that at least some investors knew about UnitedHealth's efforts.

Q Is it your opinion that in an efficient market, a stock price should rapidly and fully reflect all new value-relevant information that is available on social media?

A So again, the operative thing here

Q And, again, what is the basis for that statement?

A So, again, I haven't memorized the sources, but there are two sort of textbooks that I identify in footnote 23, and sort of provide a reference to those.

But, again, I think I spoke earlier about the other types of both theory and empirical research which sort of speak to that.

Q Are there any types of news outlets that are of a size or type that information that they would publish would not be considered publicly available?

A The only type of information that I would regard as not publicly available is the type of information that, for whatever reason, was not accessed or accessible by investors.

Q You use the phrase "widely disseminated" in your report, and what do you mean by that phrase?

A So widely disseminated are things like press releases, news stories, you know, that would be sort of the broadest type,

think given the extensive nature of the dissemination from UnitedHealth and the fitness centers and the like, that I think it's far more likely than not that some investors likely knew this information.

Q Now, you agree, do you not, that as a general matter, most of the time common stock traded on a large national exchange, such as NASDAQ, are likely to be efficient?

MS. BUGNI: Object to the form.

A So I would agree that for most stocks most of the time relative to most types of information, that is true. But you have to -- you have to do the appropriate direct test, because we know that even for the largest stocks, the most liquid stocks, the most highly traded stocks, that the academic literature has shown that those stocks have traded in an inefficient market relative to particular types of information at particular points in time.

Q Now, in his report, Mr. Coffman addresses five factors set forth in a case called Cammer.

Q Okay.

And beginning in paragraph 6, he's addressing average weekly trading volume, correct?

A In 26. I believe you just said 6, but yes, in paragraph 26, he articulates what he calls -- the first Cammer factor of average weekly trading volume.

Q Okay.

And if you direct your attention to paragraph 28 of Mr. Coffman's report, do you see where he writes that the average weekly trading during the class period was 6.4 percent of shares outstanding compared to 1.81 percent for the average weekly trading volume on both the New York Stock Exchange and NASDAQ exchanges?

A Yes, I believe you misspoke. It's 6.24. You said 6.4. But yes, I sort of see that.

Q You are correct. I apologize for that. I should have read 6.24 percent.

Do you disagree with any of the assertions that he made in that sentence?

A I don't disagree with his

calculation of the percentage of average weekly volume.

Q Okay.

And later in that same paragraph, he writes that the average weekly trading volume during the class period was 2.45 million shares.

Do you see that?

A I do.

Q And do you dispute the data that he set forth in that sentence?

A Again, having replicated this, I don't disagree with the calculation of the average weekly trading volume in terms of percentage or shares.

Q And if you can direct your attention to paragraph 29 --

A Yes.

Q -- of Mr. Coffman's report, he writes, "Average turnover velocity ratio for Tivity common stock was 312 percent compared with the NYSE and NASDAQ average of 95 percent for the class period."

Do you see that?

MS. BUGNI: Object to the

form.

A I sort of see this is on page 15, so I see that calculation or see that discussion on page 15.

Q Okay.

Do you disagree with any of the data that he set forth with respect to the average turnover velocity?

A I don't disagree with the calculations.

Q Okay.

And if you could turn to Exhibit 2 of Mr. Coffman's report? Are you there?

A Yes.

Q Okay.

Is there anything within Exhibit 2 with which you disagree?

A No. I think -- I think that there's no errors in the calculation of the stock price chart or the volume chart.

Q And the volume chart is -- you're referring to is Exhibit 3?

A Well, he's got -- on Exhibit 2, he's got stock price and volume, so the

little blue bars, the narrow blue bars represent the volume.

Q Okay.

And if you could turn the page to Exhibit 3; do you see that?

A Yes.

Q And is there anything in Exhibit 3 with which you disagree?

A Again, I don't disagree with the numerical calculations of volume done by Mr. Coffman.

Q If you could direct yourself back to paragraph 33 of Mr. Coffman's report? And there he's addressing analyst coverage, correct?

A Yes.

Q And he asserts that there were at least 56 analyst reports issued during the class period.

Do you disagree with that assertion?

A Again, I don't disagree with his tabulation of the number of analyst reports or the number of individual analysts.

Q And if you could turn to Exhibit 4

of Mr. Coffman's report? Do you have that in front of you?

A I do.

Q Is there anything in Exhibit 4 of Mr. Coffman's report with which you disagree?

A Again, relative to the data he had, I think he reasonably calculates the number of reports by each individual analyst. So, again, I -- I don't -- don't have any sort of issues with it.

Q Okay.

If you could turn back to paragraph 35 of Mr. Coffman's report.

In the first sentence of that paragraph, he wrote, "Moreover, information regarding the market price, the current bid-ask spread, and the ability to trade online is available almost instantaneously via the Internet for anyone with an online brokerage account."

Do you see that?

A Yes.

Q Did I read that correctly?

A You did read that correctly.

Q And is there anything in that

sentence with which you disagree?
A Again, generally speaking, online information about market trading for a stock like Tivity is generally available very rapidly.
So, again, I have no reason to sort of disagree with his assertions in the first sentence of paragraph 35.
Q Okay.
If you could turn ahead to paragraph 37 of Mr. Coffman's report?
And there you see he's addressing number of market makers? Do you see that?
A I do.
Q And if you take a look at paragraph 41 of his report, in that paragraph he asserts that there were 72 market makers during the class period.
Do you see that?
A I do.
Q Do you disagree with that?
A Again, I don't disagree with the tabulation of the number of market makers for Tivity.

Q Okay.
And if you can turn ahead to paragraph 42 of Mr. Coffman's report? Do you have that in front of you?
A Yes.
Q Okay.
And there, he's referring to SEC Form S-3 eligibility, correct?
A Yes.
Q And Mr. Coffman asserts that he found no evidence that Tivity was not eligible for a Form S-3.
Do you see that?
A Paragraph 44 now you're talking about?
Q Yes, sir.
A You didn't direct me to 44, but I actually found it myself.
So, again, the -- this -- the regulations are fairly sort of cut and dry for the kind of firms that can do these kinds of short form registrations.
I don't disagree that based on Tivity's history and characteristics, that it couldn't file an S-3.

Again, I -- I don't disagree with the first sentence of paragraph 44.

Q Now, you also reviewed Mr. Coffman's work with respect to each of the factors set forth in the Krogman decision to determine if he made any errors, correct?

A I certainly looked at the data to make sure that there were no calculation errors in what Mr. Coffman did.

Q So if you can turn to paragraph 65 of Mr. Coffman's report, please?

Do you have that in front of you?

A I do.

Q And there, he's addressing the issue of market capitalization, correct?

A Yes.

Q And if you turn to paragraph 67, do you see that he asserts that market capitalization for Tivity common stock had an average of $1.42 billion during the class period?

Do you see that?

A I do.

Q And do you disagree with that?

A I don't disagree with the calculation.

Q Okay.

And if you can then turn to Exhibit 10 of Mr. Coffman's report?

And do you see that it's entitled "Tivity Health Common Stock Market Capitalization," correct?

A I see that.

Q And is there anything in this exhibit with which you disagree?

A Again, as I sit here, I don't have any disagreements with the calculation of market cap.

Q That Mr. Coffman presented?

A That's correct.

Q Okay.

And if you can turn to the next exhibit, which is 11, which states "Tivity Health Common Stock Market Capitalization Rankings."

Do you see that?

A Yes.

Q And is there anything in Exhibit 11 with which you disagree?

A I don't have disagreement with the calculation of market cap or the percentile rank.
Q Okay.
If you can turn back to paragraph 69 of Mr. Coffman's report? And do you see there he's addressing the bid-ask spread?
A Yeah.tapu-
Q If you go ahead to paragraph -- continue, actually, in paragraph 69, Mr. Coffman asserts that the time-weighted average percentage bid-ask spread for Tivity common stock in each month was between 0.091 and 0.178 percent.
Do you see that?
A I see it. It's in paragraph 70, not paragraph 69, but yes, I see it.
Q I apologize for that error.
And is there anything in that assertion with which you disagree?
A Again, I -- I have no disagreement with the calculation of the average bid-ask spread.
Q And further along in that

paragraph, he asserts that Tivity had a monthly average bid-ask spread of 0.178 in April 2017.

Do you see that?

A Yes, I see that. It says mid-sentence -- yes, I see that in the mid-sentence, yes.

Q And do you have any disagreement with that assertion?

A I have no disagreement with the calculation.

Q And if you could turn ahead to Exhibit 12 to Mr. Coffman's report?

Do you have that in front of you?

A I do.

Q Is there anything in that report with -- in that exhibit, excuse me, with which you disagree?

A Again, I don't have any disagreement with the calculation of bid-ask spreads.

Q Okay.

And if you can turn back in Mr. Coffman's report to paragraph 71, where

he addresses float and institutional ownership, correct?

A That's correct.

Q And in that paragraph, Mr. Coffman asserts that during the class period insiders held on average five percent of all outstanding shares of Tivity common stock.

Do you see that?

A Yes.

Q And do you disagree with that?

A I have no disagreement with the calculation of how many shares or what -- what fraction of shares were held by insiders.

Q Okay.

And further in that paragraph, he asserts that 331 institutional investors reported owning Tivity common stock during the class period.

Do you see that?

MS. BUGNI: Object to the form.

Q You know what, I'm going to restate that question, because I had the paragraph wrong once again, Professor Gompers.

Paragraph 72.
A Yes.
Q My apologies.
Mr. Coffman asserts that 331 institutions reported owning Tivity common stock during the class period.
Do you see that?
A I do.
Q And do you disagree with that assertion?
A Again, I don't have a disagreement with the calculation of the number of institutions that had held Tivity stock.
Q And if you can turn ahead to Exhibit 13 to Mr. Coffman's report?
Is there anything in that exhibit with which you disagree?
A I have no disagreement with the calculations in Exhibit 13.
Q If you'd please turn back to paragraph 71 of Mr. Coffman's report.
And you see there he's addressing float -- excuse me. Going backwards.
I meant to direct you, sir, to

paragraph 77, where he's addressing options listing.

A Yes.

Q You don't dispute that there were options trading in Tivity common stock during the class period, correct?

A There were -- yes, there were options that were written on Tivity stock.

Q And if you look in paragraph 77, Mr. Coffman states that there were 5,642 Tivity common stock put contracts and 6,797 Tivity common stock call contracts that traded during the class period.

Do you see that?

A So he tabulates from a particular source in footnote 79, and, again, I have no reason to disagree with that count.

Q Okay.

So, Professor Gompers, am I correct that in your opinion, Cammer 5 is the only relevant factor in demonstrating that a market is efficient?

MS. BUGNI: Object to the form.

A So as it would relate to

inefficiently incorporated into the Tivity stock price.

And so, again, I just want to make clear that when we're talking about Mr. Coffman's Cammer Factor 5 analysis, that we're narrowly focused on exactly what he did and not whether or not his event study is appropriate for testing market efficiency which is relevant to the Tivity case.

Q So let me try to approach it a different way.

Have you set forth in your report all of the reasons you believe support your opinion that Mr. Coffman's market efficiency analysis is flawed?

A I believe taking it as a whole, my report sets forth the -- the issues that identify the flaws in his market efficiency analysis.

So yes, this report is complete and stands on its own.

Q So am I correct that you do not challenge Mr. Coffman's selection of the market and industry indices for which to control?

A So I'll be very precise.

So I'm not saying that this is the market and the industry that I would have chosen, but that for the purposes of my -- of my report, I'm not arguing with the regression results.

Q And am I correct that you're not disputing Mr. Coffman's identification of the earnings announcements dates?

A That is correct.

Q Okay.

And am I correct that you're not disputing how Mr. Coffman calculated the unexpected firm-specific return on each date that he analyzed?

A For the -- so, again, I may have chosen different market and industry index, but as it relates to my report and my opinions, I'm not contesting that.

It's not -- it's not the important set of issues that go to the heart of whether or not what he's doing can affirmatively -- can affirmatively demonstrate that Tivity stock was efficient.

Q And am I correct you're not

challenging Mr. Coffman's conclusions as to whether each day he analyzed exhibited a statistically significant return?

A Again, I'm not challenging the -- I'm not challenging the calculation of individual abnormal returns.

Q And as part of the work you did in this engagement, you reviewed Mr. Coffman's event study, correct?

A I did.

Q And did you find any statistical errors in his event study?

A I haven't found any sort of programming errors or statistical errors in his calculation of daily abnormal returns, no.

Q And do you have any criticism of Mr. Coffman's regression analysis?

A So his regression analysis that specifically relate to his calculation of abnormal returns as opposed to his autocorrelation, I don't have any -- I -- I'm not sort of offering any opinions that there's errors in those calculations of those daily abnormal returns.

Q So for purposes of your work on this engagement, are you relying on Mr. Coffman's event study regression analysis?

A I'm not disputing the daily abnormal returns, yeah.

So we could -- we can sort of nominally agree that that's -- that those were the correct abnormal returns. It's not -- it's not the important reason why his event study analysis is flawed.

Q Okay.

So let's go to the -- some of the flaws that you identified.

You have criticized Mr. Coffman for use of a broader analysis period, correct?

A That's correct.

Q And it's your opinion that he should not have looked at data outside of the class period, right?

A That's correct. The question of market efficiency really is about a particular time period. And as I think I've testified a couple of times already, that

well.

The other -- the other references are largely -- have largely to do with sort of statistical and empirical methods in finance.

Q Is it in your opinion ever appropriate in doing a market efficiency analysis to analyze data from outside of the class period?

A I don't know what you mean by "analyze."

But in this context of an event study, one should generally look, or one should specifically look at -- at information during the class period given the fact that the market may be efficient at certain times and inefficient at other times.

Q What if the class period were one month in duration? Would it then still be inappropriate to look at any data outside of the class period?

MS. BUGNI: Object to the form.

A So the only relevant data to whether or not that month was efficient would

be information that came to market during that month and whether it was incorporated in that month.

So outside -- the -- the events outside of that wouldn't provide evidence that that month itself was efficient.

Q And would your answer be the same if the class period were one week in duration?

MS. BUGNI: Object to the form.

A It would generally be the same, yes, that the data outside of that week wouldn't tell you whether that week was efficient. And, in particular, if there were specific pieces of information.

Q And will your answer still be the same if the class period were a single day in duration?

MS. BUGNI: Object to the form.

A Again, without analyzing the information that was released on that day specifically, the other information -- the

other -- the analysis of other days wouldn't tell you whether that day's information was efficiently incorporated, which is -- which is -- again, a big flaw as well that I'm sure we'll have a chance to talk about, is that Mr. Coffman does no analysis of whether or not the UnitedHealth information was -- was being efficiently incorporated.

And so it's clear -- I mean, we had this discussion this morning, that even --

So let's hypothetically say that Mr. Coffman had done a properly specified earnings announcement analysis which -- where he would have said this earnings announcement was surprisingly positive, the stock went up, or was surprisingly negative, the stock went down, and the movements were always appropriate relative to the information.

And so there, if you did that kind of analysis, you could say the market was efficiently incorporating these earnings announcements.

That tells you nothing about

efficiently at some periods of time and inefficiently at others.

Is that -- do I have that correct?

A Yes.

Q Okay.

Can you point to any specific underlying economic reason why the market for Tivity stock would be less efficient during the class period than it was during the broader analysis period?

A So I can't -- I can't -- I can't point to a specific characteristic of the market or Tivity at the time, but what I can certainly tell you is that based on -- based on my review of the economic evidence, it certainly would be the case that a financial economist would conclude that it's more likely than not that it was inefficient, at least as it would relate to incorporating the UnitedHealth information about their -- their entry into the sort of Medicare Advantage fitness market in the 11 states in which plaintiff alleged was withheld.

Q And can you explain why you believe

A I can certainly look them up and give them to you, yes.

I haven't memorized them. I myself have written a number of these papers. I've got papers on the expiration of underwriter lockups. I've got papers on distributions of equity. I have papers on seasoned equity offerings, so I can cite my own work on this.

Q Do you agree, Professor Gompers, that earnings announcements are appropriate events to consider in evaluating market efficiency?

A If the test is appropriately done, yes.

Q And do you agree one can objectively determine the dates on which earnings announcements were made?

A Yes.

Q How does one go about determining whether news is value-relevant?

A So the fundamental definition of value within finance is based on the premise that value-relevant information should change our expectation for future revenue and cash

that's called Table of Contents.

Q Mm-hmm.

So you didn't read the entire document, correct?

A That's correct.

Q Okay.

Did you review the text at the bottom of the front page of the document?

A On the cover page here?

Q Yes, sir.

A I don't believe I read it. I'm not even sure that even with my reading glasses I can read it. But I mean, I see there's text at the bottom.

Q Can you read it?

(The deponent read the document.)

A "Plan" -- yeah, I can read it now, yes.

Q Can you read it into the record?

A Sure.

"Plan designs and service areas described in this document are pending government approval and are subject to change. Benefits reflect pending in-network

cost sharing. This information may not be" -- "may not be a complete description of benefits. Limitations, co-payments, and restrictions may apply. Benefits, premium and/or co-payment" -- "co-payments/ co-insurance may change on January 1 of each year. Renew by UnitedHealthcare is not available on all plans. Rx usage based on 2016 year to date claims data. Star ratings are current as of July 2016 and are subject to change in October. Confidential property of UnitedHealth Group. For Agent use only. Not intended for use as marketing material for the general public. Do not distribute, reproduce, edit or delete any portion without the express permission of United Healthcare" -- "UnitedHealth Group. © 2016 United Healthcare Services, Inc."

Q And you did not consider this language before you included the document in your report, correct?

A Yes.

Q Do you agree that the language is inconsistent with a document that was publicly available?

MS. BUGNI: Object to the form.

A Again, it's certainly possible that some investor would have found or had access to this.

Q Do you know, Professor Gompers, how many views the website where this document resided got in 2016?

A I do not.

Q Do you know how many views it got in 2017?

A I do not.

Q Do you know how many people actually saw it in 2016?

A I do not.

Q Do you know how many people actually saw it in 2017?

A I do not.

Q Does this document make any mention of Tivity?

A No, but neither does the corrective disclosure.

Q Are you aware of any evidence that any investor in Tivity stock during the class period was aware of this document?

direct evidence of that.

Q Did you see any mention of the document in any analyst report that you reviewed?

A No.

Q You can put that document aside.

MR. SOMMERS: Mark this as 4.

(Exhibit 4 marked for identification.)

BY MR. SOMMERS:

Q Professor Gompers, I put in front of you what we've marked as Exhibit 4.

Do you recognize this document?

A Yes, it's an archived webpage from the Wayback Machine.

Q And this was a document that you referenced in your -- in your report, correct?

A Yes. I haven't put them all to memory, but certainly there are archived webpages that I reference in my report.

Q Okay.

And, again, you'd agree there's no mention in this document of

Tivity, correct?

A Same, as there wasn't in the corrective disclosure.

Q And the process by which you located this was the same as you described earlier in your testimony, correct?

A Correct. This was -- this -- this, in particular, is from the Wayback Machine.

Q Okay.

And am I correct that the process that you used to locate all of the materials identified in paragraphs 44 to 57 of your report were as you testified to earlier, the methods that you testified to earlier, correct?

A Correct.

Q Okay.

Now, you would agree that this is not the type of document that's typically directed to institutional investors, correct?

MS. BUGNI: Object to the form.

A Well, it's a webpage, so -- typically -- typically, companies don't email links to webpages to people.

Q Okay.
Do you have any evidence that this flier was actually utilized?
A It was certainly publicly available. I don't know what you mean by "utilized."
Q You'd agree this document doesn't make any mention of Tivity, correct?
A That's correct. Nor did the corrective disclosure.
Q Do you know how many people, if any, viewed this document prior to the class period?
A I don't know how many people viewed it prior to the class period or during the class period.
Q Am I right that you don't recall which organization you believe utilized this document?
A As I sit here, I don't remember which -- which health club was -- this was from.
MS. BUGNI: It's referenced in footnote 66 of your report.
A That would be footnote 66, so it's

And as a financial economist, can you express your opinion of "more likely than not" in terms of a percentage?

A Greater than 51 percent. Where it would fall on that scale, I don't know, but certainly given the breadth of this, it's far more likely than not that some investor knew.

Q And to arrive at the percentage of greater than 51 percent, you've based that on what?

A Just the breadth of where it was identified, the number of places and the number of types of entities that were disseminating that information and how it was discussed.

So all of those lead me to believe that if you're an institutional investor managing billions of dollars, holding a position in Tivity -- certainly given that a large number of institutions held both Tivity and UnitedHealth, that some investor more likely than not identified this information during the class period.

Q And at arriving at the 51 percent or more statistic, did you employ some

scientific methodology to arrive at that calculation?

A I used expert judgment, knowing the investment management world, knowing the way they try to get information, the way they execute investment strategies, that expert judgment was used to make that assessment based on the places that we saw in the exhibit in which this information was publicly available.

Q Do you believe that different experts in the area of financial economics could arrive at a different percentage?

MS. BUGNI: Object to the form.

A Potentially. But I think that most academics -- most financial economists would come to the conclusion that it's more likely than not that some investors knew this information.

Q And what do you base that on?

A Thirty years as a financial economist, writing and doing research and knowing leading academics, having myself written five books, dozens of articles,

this document?

A So I would --

MS. BUGNI: Object to the form. Go ahead.

A Again, I would assume that this offering is meant to inform members and potential members about the types of programs that they were offering.

Q Can you agree that this document is not directed towards institutional investors, correct?

A This would not be the kind of document that would be emailed or sent directly to investors. Yet, again, freely available and certainly to the extent that some investment manager in New York belonged to the Meadowlands YMCA, she or he may have directly got access to this from -- from having been a member.

But the point, again, is that this is -- this is another place in which the information was publicly available.

Q And you'd agree there's no mention of Tivity in this document, correct?

A That's correct.

you?

A I do.

Q And do you recognize it?

A It's the -- it's -- again, it's a similar type of brochure that was about the offerings of the Randolph YMCA, which I believe is -- I believe it's a YMCA in New Jersey.

Q And can you direct me to the portion or portions of the document that you contend supports your opinion that it was publicly known that Optum Fitness Advantage was being launched by UnitedHealth in New Jersey?

A So if we go to page 25 --

Q Okay.

A -- on page 25, it lists sort of plans which are covered by insurance carriers. It says it doesn't offer Silver Sneakers, but at the -- on the second column of that list, it lists Optum Fitness Advantage through UnitedHealthcare.

Q Okay.

And you agree this document doesn't mention Tivity anywhere, correct?

A Nor did the corrective disclosure, but that's true, yes.

Q Did you read this entire document before you included it in your expert report?

A No, I did not, it's not necessary for me to look at all the other information and the class schedule or the like to understand whether or not information about UnitedHealth offering Optum Fitness in New Jersey was publicly available in this -- in this document.

Q So you recognize that there's information in this brochure that's completely irrelevant to Optum Fitness or Tivity, correct?

A There's information that doesn't concern Optum Fitness or Tivity, yes.

Q And just like the prior documents that you looked at that you pointed out programs that are irrelevant to those issues, there are -- in this document also are things that are irrelevant to Optum Fitness Advantage and Tivity, correct?

A Yes.

Q Like birthday parties and programs

for children and the like?

A That's correct.

Q Okay.

And do you have an understanding of the intended audience of this document?

MS. BUGNI: Object to the form.

A Again, I would surmise that this was likely sent out to members or prospective members of the Randolph YMCA.

Q And you agree it wasn't intended to be communicated to institutional investors?

MS. BUGNI: Object to the form.

A Again, you -- you've asked me this on every piece of information. I'll give the same answer, which is this is not the type of information that a company would typically email to investors, but it was certainly publicly available, and certainly indicates that UnitedHealth was offering Optum Fitness in New Jersey.

And, as I said, the totality of the -- the places where this information

Q Do you have an understanding of the intended audience for this document?
A So, again, I believe this -- this webpage is likely directed at members or potential members of the Gateway Family YMCA.
Q And do you agree that the document was not directed to institutional investors?
MS. BUGNI: Object to the form.
A Again, it's my understanding that this isn't the kind of link that would have been emailed out to investors, but it certainly was publicly available information which could have been accessed by investors, indicating that UnitedHealth was offering Optum Fitness.
Q You'd agree there's no mention of Tivity in this document, correct?
A Again, same answer, that there is no mention of Tivity, but nor was there in the alleged corrective disclosure.
Q How many members did the Gateway YMCA have in 2017?
A I don't know.
Q And how many people saw this

republication did have an impact on sort of the stock price.

He speculates about what some of the underlying mechanisms for the inefficiency are, but -- but the article is quite clear that the reaction -- the market price reaction to the republication of old news is strong evidence of inefficiency.

Q My question is going to whether Professor Tetlock made any conclusions about whether institutional investors and individual investors react differently to stale news.

A So I don't recall that exact piece of information. I actually have a paper with Randy Cohen and Tuomo Vuolteenaho where we actually look -- I'll have to give you the spelling, because I don't even remember how to spell Tuomo's name. It's V-O, and I can give you the exact spelling.

So Tuomo's name, last name is spelled V-U-O-L-T-E-E-N-A-H-O. So -- and the title of the paper is "Who Underreacts to Cash-Flow News?"

And so essentially what we do

qualifications of the analysts who issued reports from these firms?

A That's correct.

Q Okay.

Now, how did you come to select the analyst reports that you chose to review and consider?

A So I looked at those analysts who issued a report immediately follow the UnitedHealthcare press releases, and then compared it to what was in the analyst report immediately prior, the last analyst report which was issued prior to that November 6th set of press releases.

Q Was there anything in any of the analyst reports that you reviewed that indicated that any of the analysts were aware of UnitedHealthcare's expansion of Optum Fitness Advantage into the 11 states before November 6th of 2017?

A So I didn't see any indication that they were aware of that specific information, but certainly the value implication of it, I think there's a lot of evidence that they were aware of that -- of that information.

So -- so we talked earlier, Mr. Sommers, that information is relevant -- value-relevant only if it changes your expectation for future revenue and cash flows of the business.

Tivity came out at the end of the day and said that they had already incorporated those changes into their guidance.

So they didn't change their recommendation -- they didn't change their forecasts for future revenue and earnings. Only one of the analysts -- only one of the seven changed their price target. Everybody else kept their price target the same.

And third, these analysts said that the market reaction was way overdone. Even -- you know, that the worst-case scenario in which UnitedHealthcare went away tomorrow, the maximum you could expect it to have in terms of impact on value is 10 to 12 percent.

There's just no way that a rational price would fall by more than that if UnitedHealth only accounted for 10 to

12 percent of earnings.

And it wasn't like -- nobody expected UnitedHealthcare to go away tomorrow. The contract went through 2020. I've actually seen a press release today that the contract was extended through 2022.

So it's clear that a roughly 30 percent stock price decline is totally overbaked. They saw that. And it makes no sense from rational economics.

Q Let's switch gears for a moment back to autocorrelation.

Is it your opinion that autocorrelation was present in Tivity's common stock trading during the class period such that there were arbitrage opportunities for investors?

A So I haven't tried to implement a trading model, but what's clear is that the size of the autocorrelation is incredibly large in this case.

A coefficient of -- a correlation coefficient of .32 -- excuse me, negative .32 is very, very large. I would expect that accounting for the sort of

lines up with the other economic evidence.

Q Mr. Coffman asserted that the autocorrelation during the class period was transient.

Do you agree or disagree with that?

A So it is certainly the case that -- that the artifact of Mr. Coffman running his autocorrelation a year before to a year after the class period makes the coefficient -- the correlation coefficient insignificant.

During the class period itself, it's not transient. In fact, if we go to my exhibit -- I think it's 4 -- yeah, it's Exhibit 4.

So you can sort of see that if you go all the way down to plus or minus six months, you still get significant autocorrelation in sort of Tivity's -- in Tivity's stock at the 99 percent level.

So I would not call that sort of transient. Certainly it's the case that you can get autocorrelation in some periods and not others. Back to the discussion we had this morning, that we can find periods of

A So overreaction is when the market moves by more than the value implications of the particular pieces of news.

Q And where do you derive that definition from?

A The academic literature. People -- there's a large literature on market overreaction.

So there's things like the post-earnings announcement drift. What happens after stock splits?

The -- the -- there's theoretical papers on sort of overreaction. And so the -- the -- the general notion of market overreaction is that the market moves in an appropriate direction, but by too much in response to that information.

Q So am I correct that it is not your opinion that the market overreacted to the November 6th UHC, UnitedHealth, press release, correct?

A So, again, I haven't been asked to offer an affirmative opinion.

If you're asking me, I think the evidence is pretty clear that, again,

it's far more likely than not that November 6th was an overreaction to the information, both because the -- the information regarding -- the economic implications of the information were already in the earnings forecast, the earnings guidance of Tivity, so there was no change in the future projected sort of earnings activity.

Secondly, the analysts themselves didn't -- except for one analyst didn't change their price targets for Tivity.

Third, the majority of the analysts explicitly said it was an overreaction.

And fourth, by fundamental economic principles, it indicates an overreaction, which is that as a matter of first principles, if -- if one particular flow of earnings represents 10 to 12 percent of a company's earnings, there is no way that an elimination of that stream completely could cause more than a 10 to 12 percent decline in the value of that.

So this is why the analysts

say, worst-case scenario, this stock price reaction is just way overdone.

So all of those -- all of those pieces of evidence, those individual pieces of evidence indicate that it's likely that this was an overreaction.

Q I appreciate your answer, Professor Gompers, but my question is simply whether you are offering an affirmative opinion that the market overreacted to the November 6th UnitedHealth press release?

A So I wasn't asked to offer that affirmative opinion. I was asked to offer rebuttal opinions.

If you want to ask me do I -- is it my opinion that, examining the evidence, that the market is more likely than not to have overreacted to the information, my answer to that question is yes.

Q I appreciate that. So in the heading on page 26 of your report, you don't -- you don't assert an affirmative opinion. You state "Evidence suggests that the market potentially overreacted following the UHC press release," correct?

A That's correct.
Q So I just want to clarify that you are not in fact offering an opinion that the market did overreact following the UHC press release?
A In my report, I do not offer that opinion.
Q So you agree, therefore, that it's possible that the market did not overreact to the UHC press release?
A I see no evidence of that. There's nothing that I've seen on the record that would indicate that November 6th is an appropriate reaction.
So while it's possible, I guess it's possible we could be hit by an asteroid in the next hour, but it's so unlikely as to not -- not sort of be a credible conclusion.
Q And, again, the standard that you're using, as you used when we discussed market efficiency, is that it's more likely than not?
A Correct.
Q Okay.

Isn't it correct that describing a stock price movement as an overreaction is at least in part a subjective judgment?

A It could be, but in this case, we have quantitative evidence.

So, again, I get back to value only changes to the extent that future revenue and cash flows change.

Given -- given -- given that the company's guidance didn't change, given that only one analyst changed price targets and they didn't change the forecasted revenue and earnings, and given that -- that the -- the percentage of earnings that UnitedHealthcare represented was only something like 10 to 12 percent, that is quantitative evidence that the size of the stock price reaction of roughly 30 percent appears to be an overreaction.

That quantitative analysis is consistent with an overreaction.

Q In your years of experience as a financial economist, have you ever observed the situation where one analyst describes a

MS. BUGNI: Object to the form.

A As I said, I think it's -- it's a reaction that the market overreacted to the series of press releases on November 6th.

Q Okay.

Let's switch our attention to what we discussed earlier on today about your so-called Comcast opinion.

Would you agree, Professor Gompers, with the principle that damages in a securities class action are generally measured as the difference between the amount of inflation at the time of purchase and the amount of inflation at the time of sale?

A Yes.

Q And in your report at paragraph 77, you stated that there were likely some investors that were previously aware of the Optum Fitness Advantage offerings in New Jersey and/or Washington at the time they made their investment decisions to purchase Tivity stock during the class period.

Do you see that?

A Correct.

extent that there -- that a large institution holds -- holds shares or stakes in both Tivity and Optimum Fitness, again, it's likely that -- given the specialization of investment managers, it's very likely that the individual portfolio manager in charge of making decisions about UnitedHealth is also the same person making decisions about Tivity.

And to the extent that their research on UnitedHealth uncovers this information, it informs their investments in Tivity.

So the fact that large investors are holding stakes in both, again, goes to -- goes to speak of the likelihood that the information about UnitedHealth gets picked up by the Tivity shareholders.

Q So you would agree that the overlap in stock ownership does not provide any direct evidence that any institutional investor was in fact aware of the Optum Fitness Advantage offerings in some or all of the 11 states prior to any purchase of Tivity stock, right?

A That's correct. That's why we would need to ask them, which is --

But, again, back to my earlier statement, that based on my review of just how extensive this information was disseminated by UnitedHealthcare, it's my opinion that it's far more likely than not that institutional investors in Tivity, at least some of them knew this information.

Q Now, the data that you reviewed shows holders of Tivity common stock and UnitedHealthcare common stock, correct?

A That is correct.

Q So would you agree that that does not necessarily reflect investors who purchased Tivity common stock during the class period, right?

A So I don't believe that I've looked at the changes in the 13F filings.

So the way you identify holders is to look -- institutions which hold an aggregate over 100 million of equities have to report their holdings on a Form 13F.

That data then gets -- gets sort of tabulated in a database, which is

where we pull the information.

As I sit here, I don't recall having tabulated the quarter-to-quarter changes and the correlation between quarter-to-quarter changes in Tivity and UnitedHealth.

But generally speaking, the point here is that if you hold the stock and you find the information, there's the profit-making incentive to trade in the stock.

So what I'm saying here is that if you hold the position in Tivity and you find this information, let's say hypothetically because you hold UnitedHealth and you learned it, if you believed it was value-relevant, you would have an incentive to trade your Tivity stock, and that's how the information gets in the market.

Q Now, it's your opinion that plaintiff's theory of liability in this case implies that inflation was not constant throughout the class period, right?

A Correct.

Q And you've stated that Mr. Coffman

develop a damages theory that can be applied on a classwide basis?

A In some cases, yes. The question I was asked is whether or not the discussion that Mr. Coffman has in his expert report demonstrates that he can deal specifically with this particular litigation, the facts of Tivity and the -- the alleged misstatements and omissions, the theory of liability.

Q Is it your opinion that it is not possible in this case to develop a damages methodology that properly addresses time-varying inflation?

A So no, I don't know whether it's possible. I haven't been asked to opine on whether it's possible or impossible. I've been asked to opine whether or not Mr. Coffman has demonstrated that he can develop such a model.

Q Do you believe that you would be capable of developing such a model in this case?

A I -- I haven't thought about it. I have not -- I haven't been asked at least at this stage to try and articulate what method

I would use, if any, that could deal with it.
Q Okay. We're going to kind of go back to a topic we talked about just a little bit earlier about market overreaction.
In your report at paragraph 113, you write, in part, that, "Any measure of damages must exclude the portion of Tivity's stock price decline on November 6, 2017, resulting from investor overreaction."
A Yes.
Q I read that correctly?
A Yes.
Q And you further go on to state that "Mr. Coffman does not specify how he would account for potential overreaction in Tivity's stock price following the UHC press release," and you go on.
A Yes.
Q Now, why do you cite this as a factor relevant to your Comcast opinion?
A So it's my understanding that the damages which can be ascribed are only damages which stem from the value implications of the information which is

Q When did you begin offering expert opinions in securities class action cases?
A 2001-2002.
Q And in how many securities class action cases have you offered an expert opinion?
A Probably several dozen. Again, I haven't counted, but certainly -- certainly a number.
Q Several dozen since 2001?
A Correct.
Q And how many of the securities class action cases where you've been an expert witness have you given an opinion on behalf of the plaintiff?
A Never. I've never been asked.
Q And on how many occasions have you offered opinions in securities class action cases on the subject of whether the market in a particular security was efficient?
A I would say less than half of all of the cases, because certainly I've been an expert at both class cert and the merits phase. Not always in the same case. And in fact sometimes just the merits phase.

And certainly not all of the class cert analysis I've done has -- has looked at the issues of market efficiency.

So -- so it's certainly less than half of the number of class action securities matters I've been involved with.

Q And in how many of those securities class action cases did you opine that the market was efficient?

A So there have been matters in which when I do the analysis, it sort of lines up. The -- the expert -- the expert on the other side has done a complete job of doing it.

And in those cases, I don't offer an opinion, because given that I'm working for the defendants, at this stage, again, it's my understanding that it wouldn't make strategic sense for them to spend the money to argue for market efficiency given that it's a burden for the plaintiff to show market efficiency.

Q So is it correct that you have never offered an opinion in a securities class action case where your expert report was filed with the court that the market was

efficient?

A That is correct, but there are certainly circumstances where I've analyzed the stock and the work that's been done and come to the conclusion that the stock was efficient.

Q On how many occasions have you offered an opinion in a securities class action on the subject of whether another expert witness provided sufficient evidence to demonstrate that a security traded in an efficient market?

A Again, of the several dozen securities matters, less -- again -- I don't know, less than half. Let's say a third of the time.

Q And in how many of those securities class action cases did you include that the opposing expert provided sufficient evidence to demonstrate that a security traded in an efficient market?

A It's the same answer as before, that given -- my understanding of given the burden is that a defendant in this matter wouldn't want to pay for the expense of

having their expert write a report that the opposing expert had demonstrated market efficiency.

So, again, I've never been asked to offer opinions for plaintiffs, so I've not offered that opinion.

But there have certainly been times in which experts on the other side have done sufficient analysis that I found credible to conclude that the market was efficient.

Q So just to be clear, the answer to my question was none?

A That is correct, for the following reasons which I stated.

Q On how many occasions have you offered an opinion in a securities class action as to whether sufficient evidence has been provided to demonstrate that a classwide damages model could be developed that is consistent with plaintiff's theory of liability?

A How many times have I offered that it could or could not? So I -- I'm just trying to --

How many times have I offered an opinion that the plaintiffs can or that the plaintiffs cannot?

Q Why don't I reread the question, because maybe I misread it.

A No, no, no, it's --

Q No, please, let me.

On how many occasions have you offered an opinion in a securities class action as to whether sufficient evidence has been provided to demonstrate that a classwide damages model could be developed that is consistent with the plaintiff's theory of liability?

A It's certainly a smaller number of them. Again, whether -- again, exact number, I -- I don't know whether it's a quarter or less.

But it's a -- it's a smaller number than address issues related to market efficiency.

Q And in how many of those cases did you express an opinion that sufficient evidence was in fact provided to demonstrate that a classwide damages model could be

developed that is consistent with the plaintiff's theory of liability?

A Again, for the same reasons, that given that I've never been asked to work for the plaintiff, and that from the defendant's perspective it's my understanding that it doesn't make sense financially to pay for their expert to write that, I haven't offered those opinions.

Q Professor Gompers, are you amenable to testifying on behalf of plaintiffs in securities class action cases?

A Yes.

Q You are aware that your opinions about market efficiency have been considered by judges in federal district courts around the country, right?

A Yes.

Q And do you keep yourself informed as to what federal judges have to say about your market efficiency opinions?

A No.

Q And why not?

A Well, because I'm a financial economist, and I would hope that offering

opinions which are grounded in my field will help judges make legal decisions for whatever legal reasons she or he might be making a decision.

But what a particular judge rules about her or his standards on market efficiency or her or his standards on a particular economic matter don't influence my opinions.

Or to put it another way, the judge knows far more about the law than I do. I think it's reasonable to say that I know far more about financial economics than the judge does.

And so to that extent, given that I'm offering financial economics opinions, I continue to offer what I believe are sort of unbiased, well-reasoned opinions based in the financial literature in which I'm an expert.

Q And you are -- are you aware on multiple occasions, courts have not accepted your opinions about market efficiency?

A So, again, I don't keep tabs. Certainly I know there are times in which

classes have been certified and the judges have determined the market's efficient. And I know there are other times in which judges have determined that the market's inefficient and the class hasn't been certified.

I -- you know, I -- I do follow the Patriots. I keep score there. I don't keep score here.

Q Can you identify any cases that you're aware of where your market efficiency opinions have not been accepted?

A Again, you know, I don't keep -- I don't keep tabs.

Certainly I'm aware that -- that some courts have determined that based on the plaintiff expert work that -- that I believe wasn't sufficient, they've determined that the market is efficient.

I know that there's some other cases in which the -- again, I'm not a lawyer, but there's some -- some opinions that I understand are essentially that the judge has -- the judge basically says the plaintiffs have met their burden and that they're not going to adjudicate the issue of