# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

ERIC WEINER, Individually and on )
Behalf of All Others Similarly Situated, )
                                   )
          Plaintiff, )
                                   )
      v.                            )    Case No. 3:17-cv-01469
                                   )
TIVITY HEALTH, INC., DONATO )
TRAMUTO, GLENN HARGREAVES )
and ADAM HOLLAND, )
                                   )
          Defendants. )

## MEMORANDUM OPINION

For yet a fourth and fifth time, the Court is called upon to issue substantive rulings in this securities class action alleging that Tivity Health, Inc. intentionally failed to disclose that one of its two largest customers, United Health Care ("UHC"), intended to offer fitness and health improvement programs that would directly compete with Tivity's flagship "SilverSneakers" program. The first substantive ruling was in response to Defendants'[1] Motion to Dismiss, wherein the Court found that the Complaint met or exceeded the heightened pleading standards mandated by the Private Securities Litigation Reform Act of 1995, and rejected Defendants' assertion that they were entitled to shelter under the safe harbor provision of that Act based upon forward-looking statements. Weiner v. Tivity Health, Inc., 365 F. Supp. 3d 900 (M.D. Tenn. 2019) (Weiner I). The second was in response to Defendants' Motion to Reconsider and its assertion (among other things) that the Court overlooked controlling Sixth Circuit authority. In fact, the Court not only cited, but

---

[1] Defendants are: Tivity Health Inc., a Delaware corporation headquartered in Franklin, Tennessee; Donato Tramuto, its Chief Executive Officer; and Glenn Hargreaves and Adam Holland who alternated as Tivity's Chief Financial Officer during the relevant period. For ease of discussion, they will be referred to collectively as "Defendants," or simply as "Tivity" where more appropriate.

actually quoted the supposedly overlooked authority for the precise proposition advanced by Defendants. Weiner v, Tivity Health, Inc., No. 3:17-CV-01469, 2019 WL 2211764 (M.D. Tenn. May 22, 2019) (Weiner II). The third was in response to Plaintiffs' Motion to Certify a Class in which the Court found that the four requirements for certification – numerosity, commonality, typicality, and adequate representation – were met for a class consisting of "all those who purchased or otherwise acquired Tivity common stock between March 6, 2017 and November 6, 2017, inclusive." Weiner v. Tivity Health, Inc., 334 F.R.D. 123, 138 (M.D. Tenn. 2020) (Weiner III).

Now before the Court are Defendants' Motion to Decertify the Class (Doc. No. 118) and their Motion for Summary Judgment (Doc. No. 121). Both Motions have been exhaustively briefed by the parties (Doc. Nos. 119, 122, 133, 142, 143, 144). Indeed, those filings and the documents attached thereto run over 5,000 pages, no doubt with substantial duplication. Nevertheless, and because the underlying factual allegations have been set forth in the decisions already listed,[2] the Court finds it unnecessary to rehash them yet again. Instead, the Court proceeds directly to the pending motions.

## I. Motion to Decertify

Defendants initially challenged class certification on the grounds that Plaintiff could not satisfy the typicality and adequacy requirements of Rule 23(a)(3) and (4), and that, even he could, certification was inappropriate under Rule 23(b)(3) because common issues would not predominate over individualized ones. More specifically, Tivity argued that Plaintiff could not show that reliance could be proven on a classwide basis because (a) the information that Plaintiff alleges Defendants

---

[2] The background of this case was also discussed briefly in a shareholder's derivative action against Tivity and its Board styled In re Tivity Health, Inc., 414 F. Supp. 3d 1095, 1101 (M.D. Tenn. 2019).

2

misrepresented or concealed was publicly available long before the November 6, 2017 press release that Plaintiff alleges revealed this information to investors; and (2) Plaintiff could not rely on either the fraud-on-the-market presumption of reliance recognized in Basic Inc. v. Levinson, 485 U.S. 224 (1988), or on the presumption for cases of omission recognized in Affiliated Ute Citizens v. United States, 406 U.S. 128 (1972). (Doc. No. 93 at 2-3).

In a lengthy Memorandum Opinion and Order, the Court rejected each of Defendant's arguments. Specifically, as it related to the issue of reliance and predominance, the Court found that the presumption announced in Basic was appropriate because Tivity stock traded in an efficient market and Tivity "presented no proof that any investor knew, or likely would have known, about UHC's entry into the market prior to the corrective disclosure." Weiner III, 334 F.R.D. at 135.

Dissatisfied with this Court's ruling, Tivity filed a petition for permission to appeal under Rule 23(f). In doing so, Tivity argued that "it rebutted the presumption [of reliance] by showing that information revealing the alleged fraud was within the public domain prior to the corrective disclosure and that some investors were likely aware of such information during the putative class period." In re Tivity Health, Inc., No. 20-0501, 2020 WL 4218743, at *1 (6th Cir. July 23, 2020).

The Sixth Circuit denied permission to appeal, but observed that "we trust that the district court will attentively resolve the defendants' concerns about class members' reliance on the allegedly fraudulent statements in deciding whether to decertify the class or certify subclasses, as appropriate." Id. With that as the lead sentence in its supporting Memorandum (Doc. No. 119 at 1), Tivity requests that the Court decertify the class.

At this point it is probably helpful to recall the general time-line underlying Plaintiff's allegations. In late 2016, Tivity became aware that, on January 1, 2017, UHC was going to launch

3

the Optum Fitness Advantage program to compete directly with SilverSneakers in Washington and New Jersey, with the intention of expanding to other states in later years. In March 2017 (when the class period began), Tivity told its investors that "insourcing" was just a hypothetical risk and not an active threat. The assurance that UCH's entry into the market was just a possibility continued even when Tivity learned, in late April/early May 2017, that UCH would use Optum for its individual Medicare Advantage plans in nine additional markets in 2018, as well as for its AARP-branded Medicare Supplement plans in certain markets. In an earnings call with investors on April 27, 2017, Traumuto announced the "three-year renewal of our contract with United Health" on "favorable terms," even thought Tivity knew at that point UHC might further expand its use of Optum Fitness Advantage, which potentially would cause the loss of more Silversneakers members and revenue. The truth about UHC's entry into Tivity's physical fitness market finally became public knowledge on November 6, 2017, when UHC announced in several press releases that it would be offering Optum Fitness Advantage in 11 states in 2018. The announcement caused the price of Tivity common stock to plummet 34% on extremely high trading volume, so Plaintiff alleges.

When the Court decided to certify a class, it found there was insufficient evidence to conclude that investor knowledge would predominate over the common liability issues. The Court wrote:

> Tivity has presented no proof that any investor knew, or likely would have known, about UHC's entry into the market prior to the corrective disclosure. Instead, it points to what Lead Plaintiff properly characterizes as a "hodgepodge" of information from which it is to be inferred that the information was out there and publicly available. The sources of that information, however, are not the types one would commonly expect investors to consult, such as SEC filings, Barron's, the Economist, Kiplinger's, or Investor's Business Daily. Instead, the supposed disclosures about UHC's movement could be found (if one looked) in such diverse places as "a packet

> of information" released by UHC for insurance agents, a tweet from the Deer Park
> Fitness Center in Washington, an online flyer from the West Monmouth County New
> Jersey YMCA, websites of other New Jersey YMCAs, a Harrison, Ohio fitness blog,
> another blog maintained by the Mercury Pharmacy in Washington, a user post on the
> "Insurance Forum" website, and the www.fitnessadvantage.optum.com website. It
> is little wonder that even Dr. Gompers [Defendants' expert] could only go so far as
> to say it is "likely" that "some of Tivity's institutional investors" were aware of
> Optum Fitness Advantage offerings in some states.

Weiner III, 334 F.R.D. at 135-36 (internal citations to record omitted). With discovery now closed, and the trial but months away, the evidence of investor knowledge presented by Defendants is only a bit more fulsome.

Much of what Defendants present was previously presented or at least should have been presented given Tivity's contention that UHC's entry into the market was "public knowledge." In addition to that already discussed, the Court was previously informed from Plaintiff's allegations that (1) sometime between October and December 2016, UHC "forwarded an aggressive letter . . . to a fitness center that stated that UHC was launching Optum Fitness Advantage," which "suggested that the fitness center would lose all SilverSneakers members, not just those insured by UHC"; (2) before January 2017, Tivity was informed that UHC would not be renewing SilverSneakers in at least New Jersey and Washington state; (3) in January 2017, UHC began operating Optum Fitness Advantage in New Jersey and Washington state; and (4) by early 2017, UHC was sending letters about Optum Fitness Advantage to partners outside of New Jersey and Washington state. Weiner I, 365 F. Supp. 3d at 905. Defendants now add to this body of knowledge the following.

In advance of the rollout in New Jersey and Washington, UHC and its designees communicated with fitness centers by phone, email, and in person in an effort to get them to sign up with Optum Fitness Advantage. In the process, they contacted "hundreds, if not thousands or gyms in the two test markets," and UHC "was able to contract with approximately 300-400 of them for

5

the 2017 calendar year." (Doc. No. 119 at 6). In July and August 2016, UHC also informed "thousands of brokers who sell UHC's Medicare Advantage plans about the shift to Optum Fitness Advantage for New Jersey and Washington." Id.. Then, "in late September or early October 2016, UHC sent letters to more than 130,000 individual Medicare Advantage members in Washington and New Jersey, informing them that their fitness benefit for 2017 would change to Optum Fitness Advantage." Id.

A similar process occurred in relation to the anticipated roll-out in nine additional states in 2018. In August 2017, "UHC sent promotional posters to approximately 4,000 gyms across the nine states to help advertise Optum Fitness Advantage to potential insureds during open enrollment, which began in October 2017." (Id. at 6-7). "[I]n late September or early October 2017, UHC sent . . . notification of change letters to individual Medicare Advantage members in the nine states, informing them of their new fitness benefit," and those "notifications were sent to over 875,000 UHC insureds." (Id. at 11).

Even though Defendants' numbers suggest that many individuals could have become aware that UHC intended to encroach on Tivity's cherished Silver Sneaker's program, the Court cannot say it was "public knowledge." After all, even though Tom Noel, the head of UCH's Medicare Advantage Program, testified in his deposition that information about the Optum Fitness program pertaining to the two test markets (New Jersey and Washington) "was in the public domain" and that he "would consider it public information," he also testified that the November 2017 press release was "opportunistic" because there was "something new" and "something to announce." (Doc. Nos. 119-2, 139-14; Noel Depo. at 55, 129). Noel also conceded that the e-cards sent to agent managers announcing Optum Fitness Advantage, the promotional posters sent to gyms, and the letters sent to

Medicare Advantage plan enrollees were not "developed for the purposes of informing investors about the Optum Fitness Advantage Program," nor were the materials earmarked for investors or sent to market analysts, unless the recipient just happened to be one. (Doc. No. 138-20; Noel Depo. at 105-108) (emphasis added).

Moreover, the bulk of the marketing and informational materials relating to the nine additional states was sent out towards the end of the class period and kept on the down-low. For example, while marketing materials were shipped to gyms in August 2017, the gyms were not allowed to "talk about this to the public until open enrollment" that, as already noted began in late October. (Doc. No. 138-19, Sanford Dep. at 50).[3] Similarly, while brokers were sent informational packets in the "July/August time frame," they were not allowed to discuss the program until open enrollment, after which brokers could "talk to members around [sic] different benefits, and fitness being one of them." (Doc. No. 119-6, Sanford Dep. at 23; Doc. No. 138-19, Sanford Dep. at 38). Introductory letters to UHC members were not sent until October 2017, followed by welcoming letters in January 2018, after the members had selected their health plans, (Doc. No. 17-1469, Sanford Dep. at 41), and the class period had long-since closed.

In denying permission to appeal, the Sixth Circuit observed that this Court "ruled as it did because it found no evidence to support Tivity's assertion that investors were likely to have known about the entry of its competitor into the market prior to the actual disclosure."" In re Tivity Health, Inc., No. 20-0501, 2020 WL 4218743, at *1 (6th Cir. July 23, 2020). The Sixth Circuit also made clear that "[s]peculation alone does not defeat predominance." Id. (citing Bridging Cmtys. Inc. v.

---

[3] Brett Sanford was the Vice President of Personal Health and the Rule 30(b)(6) representative for Optum, a subsidiary of UHC that ran Optum Fitness Advantage.

7

Top Flite Fin. Inc., 843 F.3d 1119, 1125 (6th Cir. 2016); In re HCA Holdings, Inc., No. 14-0511, 2015 WL 10575861, at *1–2 (6th Cir. Feb. 26, 2015)). Its citation to both Bridging Communities and HCA Holdings for this proposition is illuminating.

In Bridging Communities, the Sixth Circuit stated that "plaintiffs seeking class certification need not prove that each element of a claim can be established by classwide proof: What the rule does require is that common questions predominate over any questions affecting only individual [class] members." 843 F.3d at 1124 (citations omitted) (emphasis in original). The court went on to observe that (1) it has "recognized repeatedly that the fact that a defense may arise and may affect different class members differently does not compel a finding that individual issues predominate over common ones"; (2) its "precedent is clear that a possible defense, standing alone, does not automatically defeat predominance"; and (3) it was "unwilling to allow . . . speculation and surmise to tip the decisional scales in a class certification ruling." Id. at 1125. Similarly, in In re HCA Holdings, the Sixth Circuit observed that "[t]o meet the predominance requirement, a plaintiff must establish that issues subject to generalized proof and applicable to the class as a whole predominate over those issues that are subject to only individualized proof," and that "an affirmative defense, standing alone, does not compel a finding that common liability issues do not predominate." 2015 WL 10575861, at *1-2.

The Court recognizes that In re HCA Holdings and Schuh v. HCA Holdings, Inc., No. 3:11-01033, 2014 471 66231 (M.D. Tenn Sept. 22, 2014) on which this Court relied in certifying the class both involved claims under Section 11 of the Securities Act of 1933 for which the defendant had the burden of showing lack of reliance as an affirmative defense. In contrast, this case is brought under Section 10(b) and 20(a) of the Securities Exchange Act of 1934 that places upon the plaintiff

8

the burden to show reliance. The Court also acknowledges Defendants' argument that it "bear[s] no burden of proof on that issue" and, "[i]nstead, Plaintiff must actually prove that it can establish reliance on a classwide basis for a class to be certified under Rule 23." (Doc. No. 17 at 20). Fair enough, but Plaintiff has already made that showing utilizing the <u>Basic</u> presumption because, very simply put, Tivity traded in volume on NASDAQ and its stock plummeted (-34%) on heavy trading immediately following HCA's announcement. Plaintiff's proof of reliance remains important on Defendants' motion to decertify.

More than that, Plaintiff has presented evidence suggesting that investors who closely followed Tivity were caught unawares by HCA's announcement. Thomas Vail of American Capital Management, Inc., an institutional investor with over $3.4 billion in assets under management, emailed Tivity the very day of UHC's announcement to express surprise, given Tramuto's statement during an April 28, 2017 conference call that Tivity had renewed its contract with UHC for an additional three years. (Doc. No. 138, Ex. 10, Dep. Ex. 743). That same day, Dave Styblo, vice president of Jefferies LLC, an institutional investor with over $5.6 billion in assets under management, emailed Tivity expressing possible investor "fear" that Optum Fitness Advantage was intended to replace SilverSneakers. (<u>Id.</u> Ex. 11). Matt DeCicco, Portfolio Manager for Lord Abbett with more that than $210 billion in assets under management, testified in his deposition that UHC entry into the SilverSneakers' marked was " new to me" and "new to the market." (<u>Id.</u> Ex. 12, DeCicco Dep. at 94). Even Tramuto, Tivity's CEO, admitted in his deposition that he fielded a "good number" of call from investors expressing concern about UHC's entry into the SilverSneakers' market in the days following UHC's press announcements. (<u>Id.</u> Ex. 16, Tramuto Dep. at 263). This persuasive proof significantly weakens Defendants' argument that UHC's

9

entrance into the fitness market was public information.

"The Basic presumption is a strong one," with "[t]he Supreme Court not[ing] that it's 'hard to imagine that there ever is a buyer or seller who does not rely on market integrity. Who would knowingly roll the dice in a crooked crap game?'" Glickenhaus & Co. v. Household Int'l, Inc., 787 F.3d 408, 429 (7th Cir. 2015) (quoting Basic, 485 U.S. at 246–47). Nevertheless, the presumption can be rebutted by "[a]ny showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price.'" Basic, 485 U.S. at 248. Basic "allows defendants to show that their alleged misrepresentations did not actually affect the market price in two ways that are difficult to distinguish from the merits of the plaintiff's claims. First, if the 'market makers were privy to the truth about information allegedly concealed,' or second, if 'news of [the allegedly concealed truth] credibly entered the market and dissipated the effects of the misstatement,' the causal connection between the alleged fraud and the market price would be broken." In re Allstate Corp. Sec. Litig., 966 F.3d 595, 606 (7th Cir. 2020) (quoting Basic, 458 U.S. at 248–49).

The evidence discussed so far is insufficient for the Court to conclude that investors knew, or reasonably should have known, that UHC intended to enter into the SilverSneakers market before that information became public knowledge by way of the UHC's press releases. The evidence on which Tivity relies calls for speculation, and the Sixth Circuit has stated that is not enough. In an effort to get beyond speculation, Tivity points to three other items that it claims show investors actually knew of UHC's intended entry into the market prior to the press releases.

First, after Leonard Green & Partners expressed an interest in acquiring it, Tivity hired JP Morgan and SunTrust as financial advisors to assist in merger discussions. In advance of an initial

meeting with Tivity, Leonard Green sent JP Morgan a list of topics it wanted to discuss at the meeting, among them, "the rollout of Optum Fitness Advantage – impact on long-term relationship with UnitedHealth." (Doc. No. 119 at 8-9). Because Craig Smart, a JP Morgan banker, testified in his deposition that he had been sent the list of topics by Leonard Green before JP Morgan had provided Leonard Green information about Tivity, Leonard Green had to have become "aware of the rollout of Optum Fitness Advantage through sources other than Tivity." (Id. at 9). Maybe so, or maybe not because Smart also testified that he believed representatives of Leonard Green and Tivity management met before the meeting for which this list of conversation topics was created, and he could not rule out whether Tivity management had previously disclosed UHC's competition to Leonard Green. (Doc. No. 138, Ex. 23, Smart Dep. at 58, 62-63).

Moreover, the efficacy of this evidence in terms of the propriety of class certification is questionable because Leonard Green did not purchase Tivity common stock during the class period and is therefore not a member of the class. Basic instructs that "[r]eliance provides the requisite causal connection between a defendant's misrepresentation and a *plaintiff's* injury," and "[a]ny showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the *plaintiff*, or *his* decision to trade at a fair market price, will be sufficient to rebut the presumption of reliance." Basic, 485 U.S. 224, 243, 248 (emphasis added); see also, Fed. R. Civ. P. 23(b)(3) (stating that a class action may be maintained if the requirements of rule 23(a) are met and the court finds that the *questions* of law or fact *common to class members* predominate over any questions affecting only *individual members*") (emphasis added).

Second, after an investor trip in August 2017, Tivity's CFO Adam Holland emailed others at Tivity asking, "Who could tell me more about the rumors Optum is offering PLs [participating

11

locations or fitness centers] $5 per visit up to $40 maximum? We had a lot of questions regarding Optum on our investor trip this week." (Doc. No. 119, Ex. 16). Tivity insists this proves general investor awareness of Optum Fitness Advantage at least by August 2017. Again, maybe so or maybe not because, in his deposition, Holland could not recall anything about the conversations or who they might have been with. (Doc. No. 138, Ex. 26, Holland Depo. at 219). Holland could not identify a single investor or class member who raised questions about UHC. And, he could not say whether the supposed knowledge related to UHC having already replaced SilverSneakers in New Jersey and Washington State, or whether the investors (whoever they were) were asking Tivity about whether UCH was planning to offer Optum Fitness Advantage in additional states in 2018. Id.

Third, Tivity points to Plaintiff's expert Chad Coffman's deposition testimony that Tivity claims "Coffman conceded what was obvious – these document [the Holland email exchange] indicate at least some investors were aware of Optum Fitness Advantage prior to November 6, 2017." (Doc. No. 119 at 2). Actually, the relevant deposition questions and answers are as follows:

Q. Okay. Do you see that Adam Holland references in this e-mail on August 20, 2017, that he had a lot of questions regarding Optum on his investor trip this week?

A. I see that, yes.

Q. Does that indicate to you that investors knew about Optum prior to November 6, 2017?

A. I mean, the e-mail says what it says. I mean, it's – you know, I don't know what aspects of the company Optum they were asking about, whether it was about specific competing – potential competing plan – I just have no idea what exactly that's referring to. But it seems to suggest that certain investors at least knew of the existence of Optum.

Q. And does that influence your opinions in any way?

A. Not without the context of what the questions were or what they knew or why it was important to them.

12

Q.  So investors asking questions prior to  November 6, 2017, about Optum and its network of gyms is not relevant to your opinion?

A.  I'm not saying it's totally irrelevant, I'm saying I don't – based just on this e-mail there's no conclusion I can draw from it.

Q.  That you can draw zero conclusions from this e-mail?

A.  I'm not willing to draw any specific  expert conclusions from this e-mail, no.

Q.  Is it reasonable to conclude from this e-mail that investors knew about Optum and its fitness offering prior to November 6, 2017?

A.  It clearly suggests they were getting questions from certain investors about what they referred to as Optum, and what [sic] they may have been offering fitness locations.  But beyond that, I don't understand the full context of what other potential relevance that may or may not have, or who the investors are, or how widely disseminated the information was. I'm just not willing to draw any specific conclusion from this document.

(Doc. No. 119, Ex. 5, Coffman Dep. at 126-133).  Coffman's deposition testimony is no more enlightening on the issue of investor knowledge than is Holland's email.

In their briefing, Defendants note that, in granting class certification, the Court stated, "Tivity has presented no proof that any investor knew, or likely would have known, about UHC's entry into the market prior to the corrective disclosure."  Weiner III, 334 F.R.D. 123, 135 (M.D. Tenn. 2020). They go on to argue now that "[t]he Court's expressed reason for rejecting Defendant's prior argument against class certification no longer applies," (Doc. No. 119 at 2), decertification is appropriate.  Those two concepts do not necessarily follow from one another.

At the time the Court made the statement, it was remarking on the evidence that was then presented, and said nothing about how much additional evidence of investor knowledge would be required to deny certification.  Certainly some investor knowledge is allowable in a securities class

13

action under Section 10(b).  The Supreme Court itself has acknowledged as much:

> Basic does afford defendants an opportunity to rebut the presumption of reliance with respect to an individual plaintiff by showing that he did not rely on the integrity of the market price in trading stock. While this has the effect of "leav[ing] individualized questions of reliance in the case," there is no reason to think that these questions will overwhelm common ones and render class certification inappropriate under Rule 23(b)(3). That the defendant might attempt to pick off the occasional class member here or there through individualized rebuttal does not cause individual questions to predominate.

Halliburton Co. v. Erica P. John Fund, Inc., 573 U.S. 258, 276, 134 S. Ct. 2398, 2412, 189 L. Ed. 2d 339 (2014) (internal citation omitted); see also In re Nexium Antitrust Litig., 777 F.3d 9, 24 (1st Cir. 2015) (stating that "the Halliburton Court contemplated that a class with uninjured members could be certified if the presence of a de minimus number of uninjured members did not overwhelm the common issues for the class"); Torres v. S.G.E. Mgmt., L.L.C., 838 F.3d 629, 645 (5th Cir. 2016) (stating that "the focus must remain on the predominance inquiry" and recognizing that "even if conjecture alone is sufficient to establish that a few class members might have knowingly joined a fraudulent pyramid scheme, this will not necessarily cause individualized issues of reliance to predominate at trial"); Steginsky v. Xcelera, Inc., No. 3:12-CV-188 SRU, 2015 WL 1036985, at *10 (D. Conn. Mar. 10, 2015)(citing Halliburton for the proposition that "[e]ven if some investors were not deceived, the potential for rebuttal of the presumption of reliance with respect to some class members does not necessarily defeat the predominance requirement").

Accordingly, the Court will not decertify the class and Defendants' Motion (Doc. No. 118) will be denied.

## II.  Motion for Summary Judgment

"To succeed on [] claims under § 10(b) of the 1934 Act . . . , Plaintiff[] must prove six elements: "'(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a

14

connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'" Dougherty v. Esperion Therapeutics, Inc., 905 F.3d 971, 979 (6th Cir. 2018) (quoting Matrixx Initiatives, Inc. v. Siracusano, 563 U.S. 27, 37-38 (2011)). Defendants argue that a trial is unnecessary because Plaintiff cannot prove the first two elements – materiality and scienter. They also argue that Tramuto's statements about the UCH contract were objectively true. Given the standards governing summary judgment and the applicable substantive law, the Court disagrees.

**A. Summary Judgment Standards**

The standards governing summary judgment have been repeated on so many occasion that it would be easy to dismiss them as pablum. They are not. They serve the important purpose of providing the analytical prism to identify those cases that require a trial, and those that do not.

A trial is unnecessary only in cases where the record establishes the nonexistence of a "genuine dispute as to any material fact" and the moving party "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). This occurs when the party bringing the motion identifies the pertinent portion(s) of the record establishing that his or her opponent cannot establish one or more elements of a claim and/or by demonstrating that the "affirmative evidence negates an element of the non-moving party's claim." See Rodgers v. Banks, 344 F.3d 587, 595 (6th Cir. 2003).

In deciding a motion for summary judgment, the Court does not weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). Rather, the Court considers the facts and the inferences to be drawn therefrom in the light most favorable to the non-moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). With that prism, there must be evidence from which the jury

15

(or judge in a bench trial) could reasonably find for the non-moving party; a mere scintilla of evidence to support a claim will not suffice. Rodgers, 344 F.3d at 595.

**B. Materiality**

"To prevail on a § 10(b) claim, a plaintiff must show that the defendant made a statement that was 'misleading as to a material fact.'" Matrixx, 563 U.S. at 38 (quoting Basic, 485 U.S. at 238). This is accomplished by showing that there is "'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.'" Basic at 231-32 (quoting, TSC Industries, Inc. v. Northway, Inc. 426 U.S. 438, 44 (1976). In identifying this as the proper standard, the Supreme Court was "'careful not to set too low a standard of materiality,' for fear that management would 'bury the shareholders in an avalanche of trivial information.'" Matrixx, 563 U.S. at 38 (quoting Basic, 485 U.S., at 231).

The parties spend many pages in their briefs trying to show why Tivity's alleged omissions were or were not material to a reasonable investor. Those briefs are accompanied by 240 paragraphs of supposedly material facts: Plaintiff's 102-paragraph "Statement of *Disputed* Facts" ("PSOF")(Doc. No. 135); and Defendants' 138-paragraph "Statement of *Undisputed* Facts" ("DSOF") (Doc. No. 123). As it turns out, one need not dig into the minutiae of facts provided by the parties in order to quickly discover that materiality is clearly a question for the jury in this case.

Defendants argue that Plaintiff cannot show any materially false or misleading statements because, "[b]y any measure, UHC's offering of a pilot fitness program was immaterial to Tivity's business during the time period that matters." (Doc. No. 122 at 2). This argument is supported by the following undisputed facts.

16

During the eight month class period running from March 6, to November 6, 2017 (and for all of 2017 for that matter) Optum Fitness Advantage was available only to UHC's individual Medicare Advantage members in New Jersey and Washington state. All the while, UHC continued to offer Tivity's SilverSneakers program as the fitness benefit for its Group Retiree members in these two states, as well as to UHC insureds in all other states.

When UHC decided to offer Optum Fitness Advantage in the two test states, Tivity estimated it would lose somewhere between 132,696 and 151,228 SilverSneakers members, with the latter figure representing approximately $3.7 million in lost revenue. (DSOF ¶ 38). This worked out to less than 1% of Tivity's estimated revenue of $540 to $550 million for the year. (Id. ¶ 39). Moreover, the number of UCH insureds that were eligible to use SilverSneakers actually increased by more than 600,000 members in 2017. (Id. 116).

The plan to offer Optum Fitness Advantage to UHC individual Medicare Advantage members in nine additional states in 2018 also only marginally affected Tivity's business. By Tivity's estimate, the plan to add those states could result "in losing approximately 800,000 eligible SilverSneakers members," and a corresponding loss of approximately $22 million in revenue. Id.. 69). This, however, was "the worst case scenario." (Doc. No. 122 at 2). Even then, the loss was a mere drop in the bucket (approximately 3.5%) because Tivity projected that it would have approximately $637 million in revenues in 2018. (DSOF ¶¶70, 71).

Quantitatively, the Court agrees with Defendants that the omissions regarding UHC's entry into the Silversneakers market may not have been material based on Tivity's numbers. However, "[m]ateriality has both a quantitative and a qualitative component, and it is error to rely exclusively on a single numerical or percentage benchmark to determine materiality." S.E.C. v. Escala Grp.,

17

Inc., No. 09CIV2646DLC, 2009 WL 2365548, at *9 (S.D.N.Y. July 31, 2009) (citations omitted).

The Securities and Exchange Commission ("SEC") has provided guidance in determining materiality through Staff Accounting Bulletin No. 99 ("SAB No. 99"), 64 Fed. Reg. 45150 (Aug. 1, 1999), which uses both quantitative and qualitative factors. "SAB No. 99 begins the analysis with the quantitative factor," under which, "the SEC considers the financial magnitude of the misstatement" and "suggests a percentage threshold below which the amount is presumptively immaterial." ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co., 553 F.3d 187, 205 (2d Cir. 2009). SAB No. 99 states that "[t]he use of a percentage as a numerical threshold, such as 5%, may provide the basis for a preliminary assumption" that a deviation below this "specified percentage with respect to a particular item . . . is unlikely to be material." 64 Fed. Reg. 45151. The estimated losses to Tivity presented by UHC's departure squarely fall within the "percentage threshold" of immateriality.

Nevertheless, the SEC recognizes that "there are numerous circumstances in which misstatements below 5% could well be material." Id. The "qualitative factors [that] may cause misstatements of quantitatively small amounts to be material," include whether the misstatement: (1) arises from an item capable of precise measurement or whether it arises from an estimate; (2) masks a change in earnings or other trends; (3) hides a failure to meet analysts' consensus expectations for the enterprise; (4) changes a loss into income or vice versa; (5) concerns a segment or other portion of the registrant's business that has been identified as playing a significant role in the registrant's operations or profitability; (6) affects the registrant's compliance with regulatory requirements; (7) affects the registrant's compliance with loan covenants or other contractual requirements; (8) has the effect of increasing management's compensation; and/or (9) involves

18

concealment of an unlawful transaction. Id. at 45152. "This is not an exhaustive list of the circumstances that may affect the materiality of a quantitatively small misstatement," id., nor is SAB No. 99 a litmus test. See Higginbotham v. Baxter Int'l, Inc., 495 F.3d 753, 759 n.1 (7th Cir. 2007) (noting that SAB No. 99 has "potential utility [as a] yardstick," but "only as a rule of thumb and not as a rule of law"); Ronnie v. Acxiom, 296 F.3d 701-11 (8th Cir. 2002) (stating "[i]t not carry the force of law, although it may be persuasive").

When the facts and inferences are drawn in Plaintiff's favor as they must be for summary judgment purposes, the Court cannot say, as a matter of law, that Tivity's failure to disclose UHC's intended competition was immaterial. Other factors suggest that a reasonable investor would view Tivity's omission as significantly altering the "total mix of information made available.'" In re Omnicare Sec. Litig., 769 F.3d 455, 472(6th Cir. 2014) (citation omitted).

"[T]he demonstrated volatility of the price of a registrant's securities in response to certain types of disclosures may provide guidance as to whether investors regard quantitatively small misstatements as material." SAB No. 99, 64 Fed. Reg. 45153. Here, Tivity stock dropped 34% in a single day following UHC's press releases. While any reasonable investor would consider this alarming, SAB No. 99 does not recognize a precipitous price-drop alone to be sufficient. It states that "[c]onsideration of potential market reaction to disclosure of a misstatement is by itself too blunt an instrument to be depended on in considering whether a fact is material." Id. 45152-02. Instead, "SAB No. 99 limits the usefulness of this factor to instances where management expects 'that a known misstatement may result in a significant positive or negative market reaction.'" J.P. Morgan, 553 F.3d at 205.

Here, on summary judgment, a mosaic of facts and inferences paint a picture of Tivity fully

expecting that UHC's announcements would dramatically affect the price of Tivity shares. After all, SilverSneakers was responsible for more than 80% of Tivity's annual revenue, and the Board of Directors spent most of its resources trying to enhance the SilverSneaker brand. (PSOF ¶¶ 1-4). Not only that, UHC was one of Tivity's two major customers, accounting for approximately 15% of Tivity's revenue. In other words, and loosely in the words of factor five identified above, UHC's anticipated departure concerned a segment Tivity's business that was identified as playing a significant role in Tivity's operations and profitability.

Because of UHC's importance to Tivity's bottom line, "client insourcing" was listed at the top of the lists of threats to Silversneakers during a presentation to the Board of Directors on February 1, 2017. (Id. ¶ 39). This was no mere idle threat given UHC's "stated goal" of replacing Silversneakers with Optum Fitness Advantage "'in a couple of states in 2017 and more in 2018' to possibly 'full replacement.'" (Id. ¶ 31).

By the fall of 2016 if not earlier, Tivity recognized competitive threats to Silversneakers, including the one presented by Optum Fitness Advantage. For example, an Executive Summary prepared in late 2016 for Steve Janicak, Tivity's Chief Growth Officer, described that program as a "client challenge." Similarly, a January 2017 document prepared for the Executive Leadership Team ("ELT") meeting the following month identified Optum Fitness Advantage as a "direct competitor today in all three of our solutions offering for 50+ members!" (Id. Ex. 63 at 3). Even more pointedly, on May 22, 2017, CEO Tramuto described UHC's replacement of Silversneakers with Optum Fitness Advantage as the "single most challenging risk to our business since it also involves AARP." (Id. Ex. 38, at 2). Acknowledging the threat, Tramuto also stated "we are tirelessly working to fill the left pocket via new win backs" through plans such as Aetna and Medica.

(Id.).

Tramuto's recognition of the challenge was also made known to the Board of Directors. During a regularly scheduled meeting on May 24, 2017, the Board was informed about the "UHC loss" in nine additional markets, which posed a "high threat level" and required Tivity "to Act with Urgency." (PSOF ¶ 57). Two days later, Tramuto ordered that "a 'strategic plan' be developed 'ASAP,'" and gave Janicak the task who, in turn, promised a plan within three weeks. (PSOF ¶¶ 57, 58).

Janicak assembled a 23-member team and was provided a $600,000 budget. Code-named "Operation Torpedo" and later renamed "Operation Success," the plan was to "develop [an] all in, ultra-aggressive marketing campaign to attack United in the affected markets with the goal of protecting the members, the brand and the revenue." The initial plan outline was provided to Tramuto on June 9, 2017, and included a bullet-point list of "intense messaging" with catchphrases such as "Optum is an inferior product"; "Optum has no class"; "Opt-out of Optum"; and "SilverSneakers Cares. United Doesn't." (Id. ¶¶ 59, 60). Six days later, Janicak presented the Project Torpedo/Success formal plan to Tramuto and the entire ELT.

The Project Torpedo/Success Plan recognized that Optum Fitness Advantage and the expansion of it beyond the test markets changed the "landscape." The plan stated:

> UnitedHealth Group (UHG) has notified Tivity Health (TVTY) of its intention to replace SilverSneakers with Optum for their individual business in Medicare Advantage markets. Affected markets include Arizona, Florida, Kentucky, New York, Ohio, Wisconsin, Oklahoma, Oregon and parts of Texas. Nearly 800,000 members would no longer be eligible for SilverSneakers (SSF), jeopardizing $22M-$23M in TVTY revenue . . . . Just as important as the immediate impact of UHG's decision is the signal it could send about the future of SSF. Should UHG successfully transition a high percentage of SSF members to Optum, it will embolden the insurer to continue to transition away from SSF and potentially open the floodgates for other clients to do the same. This is a battle[.]

21

(Id. 61).

Because of UHC's importance to Tivity and Tivity's response to the news about UHC's intended encroachment on the Silversneakers program, it is hard for the Court to believe that Tivity would not expect a significant market reaction once the news was announced. It is even more difficult for the Court to believe that UHC's intention would not "have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." Basic 485 US. at 231. But it is easy for the Court to conclude that a reasonable jury might find Defendant's omission material at trial.

In any event, the Court need go no further on this issue. The Supreme Court has stated:

> The issue of materiality may be characterized as a mixed question of law and fact, involving as it does the application of a legal standard to a particular set of facts. In considering whether summary judgment on the issue is appropriate, we must bear in mind that the underlying objective facts, which will often be free from dispute, are merely the starting point for the ultimate determination of materiality. The determination requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact. Only if the established omissions are "so obviously important to an investor, that reasonable minds cannot differ on the question of materiality" is the ultimate issue of materiality appropriately resolved "as a matter of law" by summary judgment.

TSC Indus., 426 U.S. at 450. Consequently, "[c]ourts generally reserve such questions for the trier of fact," Helwig v. Vencor, Inc., 251 F.3d 540, 563 (6th Cir. 2001), just as this Court does here.

## C. Scienter

Scienter is an intention "to deceive, manipulate, or defraud." Ernst & Ernst v. Hochfelder, 425 U.S. 185, 194, and n. 12 (1976). "'In securities fraud claims, . . .scienter consists of knowledge or recklessness.'" Brown v. Earthboard Sports USA, Inc., 481 F.3d 901, 918 (6th Cir. 2007) (quoting PR Diamonds, Inc. v. Chandler, 364 F.3d 671, 681 (6th Cir.2004)). "'[R]ecklessness [is] highly

22

unreasonable conduct which is an extreme departure from the standards of ordinary care. While the danger need not be known, it must at least be so obvious that any reasonable man would have known of it.'" In re Ford Motor Co. Sec. Litig., Class Action, 381 F.3d 563, 568 (6th Cir. 2004) (quoting In re Comshare Inc. Sec. Litig., 183 F.3d 542, 548 (6th Cir. 1999))

Like materiality, scienter involves "[m]ixed questions of law and fact," and is "peculiarly within the province of the trier of fact[.]" S.E.C. v. Merch. Cap., LLC, 483 F.3d 747, 766 (11th Cir. 2007) (citation omitted). And, just like with the question of materiality, "summary judgment is appropriate [only] if no reasonable jury could find that a defendant acted without scienter." SEC v. Watkins Pencor, LLC, 810 F. App'x 823, 830 (11th Cir. 2020) (citing SEC v. Lyttle, 538 F.3d 601, 603–04 (7th Cir. 2008)). For this reason, "it is unusual to grant summary judgment," unless, "the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation," S.E.C. v. Ficken, 546 F.3d 45, 51 (1st Cir. 2008), which Plaintiff has not done in this case.

Defendants insist that "the evidence does not support a finding of scienter as to any of the three individual Defendants, which is fatal to all of Plaintiff's claims." (Doc. No. 122 at 19). The Court disagrees.

"The state(s) of mind of any of the following are probative for purposes of determining whether a misrepresentation made by a corporation was made by it with the requisite scienter under Section 10(b): a. The individual agent who uttered or issued the misrepresentation; b. Any individual agent who authorized, requested, commanded, furnished information for, prepared (including suggesting or contributing language for inclusion therein or omission therefrom), reviewed, or approved the statement in which the misrepresentation was made before its utterance

23

or issuance; c. Any high managerial agent or member of the board of directors who ratified, recklessly disregarded, or tolerated the misrepresentation after its utterance or issuance[.]" In re Omnicare, Inc. Sec. Litig., 769 F.3d at 476. Each of the individual defendants fall into one or more of those camps , or so a jury could easily find given that Tramuto was the CEO, and Hargreaves and Holland were CFOs during the class period.[4] The unpublished, table decision on which Defendants rely does not alter this conclusion.

In Stavroff v. Meyo, 129 F.3d 1265 (6th Cir. 1997) (table) plaintiffs alleged that defendants (the CEO and CFO and COO of the company) knew about the company's faltering financial status and failed to disclose such knowledge. As proof, plaintiffs relied on the company's "internal forecasting tools, which typically are not released to the public" and "contend[ed] that these forecasting tools made defendants aware that the company was doing poorly, yet defendants failed to disclose this knowledge." Id. at *5. However, there was "no indication that these forecasting tools were anything more than internal planning documents, and no indication that these documents were evidence of defendants' knowledge that the company was failing, which they failed to disclose." Id. Additionally, "as soon as defendants had definitive information regarding the decrease in the earnings projections, defendants released that information to the public." Id.

Here, in contrast, Tivity's "internal forecasting tool" suggested the opposite – it would remain in the black notwithstanding UCH's anticipated departure. This is really beside the point, however, because the accuracy of Tivity's projection is not at issue. Rather the allegation is, and a

---

[4] The Court recognizes that Holland may be the least culpable of the three because he did not join Tivity until he was hired as CFO on June 15, 2017, he was not at the forefront of planning and making statements as Tramuto was, and he did not sell shares of Tivity during the class period, as Hargreaves did. However, a plausible argument can be made that he should have done more to inform himself and update the risk disclosures, particularly because, as Defendants concede, he signed Form 10Qs in August and November 2017 that stated there had "been no material changes to [Tivity's] risk factors." (Doc. No. 122 at 24).

24

jury could find from the evidence in this record, that Defendants misled investors about a threat affecting how much Tivity would grow and downplayed a threat that could impact Tivity's revenue and maybe unleash a flood of other customers doing the same thing as UHC. This is a distinction with a difference because "[w]hether a statement is "misleading" depends on the perspective of a reasonable investor." Zwick Partners, LP v. Quorum Health Corp., No. 3:16-CV-2475, 2018 WL 2933406, at *5 (M.D. Tenn. Apr. 19, 2018) (citing In re Omnicare, 135 S. Ct. 1327). Moreover, the Sixth Circuit in Stavroff stated that "a company's overall conduct is relevant in determining the existence of the scienter necessary for a failure to disclose information in violation of Section 10(b) and Rule 10b-5." 129 F.3d 1265. Here, not only did Tivity mobilize a task force, it dissimulated when inquiries were made about its relationship with UHC.

## D. Misleading Statements

Defendants argue that "summary judgment is warranted as to Tramuto's challenged statements that the renewal of Tivity's contract with UHC was done 'on favorable terms' that he was 'pleased with'" because they are not false or misleading. (Doc No. 122 at 25). The Court rejected virtually the same argument in the context of Tivity's Motion to Dismiss, writing in relevant part:

> "[A] company has a duty to disclose hard information but not soft information unless other criteria are met." Zaluski, 527 F.3d at 572.[5] "Hard information is typically historical information or other factual information that is objectively verifiable. Such information is to be contrasted with 'soft' information, which includes predications and matters of opinion." Id. (quoting In re Sofamor Danek Group, Inc., 123 F.3d 394, 401 (6th Cir. 1997)).
>
> Contrary to Tivity's assertion, the Amended Complaint does allege that the renewed contract terms with UHC were less favorable than before because SilverSneakers would be offered in fewer UHC Medicare Advantage markets. (Doc. No. 32, Amended Complaint ¶ 67). Besides, Tramuto's statements – to wit, "a renewal that

---

[5] Zaluski v. United Am. Healthcare Corp., 527 F.3d 564, 572 (6th Cir. 2008).

was completed on favorable terms," "we renewed on favorable terms, we "are very pleased with the terms," and "it's favorable terms" – are more likely matters of opinion than hard information and "a defendant may choose silence or speech based on the then-known factual basis, but it cannot choose half-truths." In re Ford Motor Co. Sec. Litig., Class Action, 381 F.3d 563, 569 (6th Cir. 2004). Thus, "[o]nce a company has chosen to speak on an issue – even an issue it had no independent obligation to address – it cannot omit material facts related to that issue so as to make its disclosure misleading." Williams v. Globus Med., Inc., 869 F.3d 235, 241 (3d Cir. 2017). Here, not only did Tramuto fail to disclose UHC's entry into the marketplace, he twice deflected inquiry into the matter from an analysts during the conference call.

Weiner I, 365 F. Supp. 3d at 913-14. Defendants present nothing in the summary judgment record that would change that conclusion.

**E. Recap**

Defendants' Motion for Summary Judgment fails on the basics, both procedurally and substantively. Procedurally, the basic facts are relatively undisputed, but Defendants have not shown they are entitled to judgment as a matter of law on those facts. Substantively, Basic teaches that "materiality depends on the significance the reasonable investor would place on the withheld or misrepresented information," this is generally a "fact-specific inquiry," and the "'fundamental purpose'" underlying the Securities and Exchange Act of 1934 was to " implement[] a 'philosophy of full disclosure.'" 485 U.S. at 230, 240 (citation omitted). A jury could find that the omissions related to UHC were material to a reasonable investor, and that Defendants knowingly withheld that information with a culpable state of mind.

### III.  Conclusion

For the foregoing reasons, Defendants Motion to Decertify Class and Motion for Summary Judgment will both be denied.

26

An appropriate Order will enter.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE

27