# Exhibit 1

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | |
|---|---|
| ERIC WEINER, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>TIVITY HEALTH, INC., DONATO TRAMUTO, GLENN HARGREAVES and ADAM HOLLAND,<br><br>Defendants. | Case No.: 3:17-cv-01469<br><br>Chief Judge Crenshaw<br>Magistrate Judge Newbern |

# Expert Report of Paul A. Gompers, Ph.D.

October 8, 2019

# Table of Contents


I. Qualifications ........ 1

II. Assignment ........ 2

III. Summary of Opinions ........ 2

IV. Background and Allegations ........ 5

A. Tivity ........ 5

B. Plaintiff's Allegations ........ 6

V. Market Efficiency in Securities Class Actions ........ 8

A. Definition of Efficient Markets ........ 8

B. Market Efficiency and Class Certification ........ 11

VI. Mr. Coffman's Analysis Does Not Demonstrate Market Efficiency and He Fails to Consider Evidence That Is Inconsistent with Market Efficiency ........ 11

A. Mr. Coffman Does Not Provide Sufficient Evidence to Demonstrate That Tivity's Stock Traded in an Efficient Market During the Putative Class Period ........ 12

B. Information Regarding Optum Fitness Advantage was Publicly Available Prior to the UHC Press Release ........ 16

1. Before the Putative Class Period, Information Was Publicly Available that Fitness Centers in New Jersey and Washington Were Offering Optum Fitness Advantage ........ 17

2. During the Putative Class Period, Information Regarding Optum Fitness Advantage Offerings Continued to Be Disseminated ........ 19

3. During the Putative Class Period, It Was Publicly Known that UHC Would Be Offering Optum Fitness Advantage in Nine Additional States ........ 20

4. A Stock Price Response to Stale Information is Inconsistent with an Efficient Market ........ 22

C. Mr. Coffman's Analysis Shows Evidence of Autocorrelation during the Putative Class Period ........ 23

D. Evidence Suggests the Market Potentially Overreacted Following the UHC Press Release ........ 26

E. The Collective Evidence Presented Undermines Mr. Coffman's Conclusion That Tivity's Stock Traded in an Efficient Market ........ 29

VII. Mr. Coffman Fails to Specify a Class-Wide Damages Methodology That is Consistent with Plaintiff's Theory of Liability ........ 29

A. Damages in Securities Class Actions and Mr. Coffman's Damages Methodology ........ 31

B. Mr. Coffman Fails to Consider Evidence That Some Investors Were Likely Aware of Allegedly Corrective Information ........ 33

1. Mr. Coffman's Damages Methodology Does Not Account for Investors with Different Information about Optum Fitness Advantage Offerings ........ 35

2. Mr. Coffman's Damages Methodology Does Not Account for Investors That Were Aware of the Public Information Regarding the Optum Fitness Advantage Rollout in New Jersey and Washington Prior to or During the Putative Class Period........ 37

3. Mr. Coffman's Damages Methodology Does Not Account for Investors That Were Aware of the Public Information Regarding Optum Fitness Advantage Offerings in 11 States Prior to the UHC Press Release ........ 38

4. Even Assuming that Tivity's Stock Traded in an Efficient Market, Mr. Coffman Still Has Not Specified a Class-Wide Damages Methodology that is Consistent with Plaintiff's Theory of Liability........ 39

C. Mr. Coffman's Damages Methodology Does Not Specify How He Would Account for Time-Varying Inflation Consistent with Plaintiff's Theory of Liability ........ 41

D. Mr. Coffman's Damages Methodology Does Not Specify How He Would Account for Potential Market Overreaction Following the UHC Press Release ........ 43

## I. Qualifications

1. I am the Eugene Holman Professor of Business Administration at the Harvard Business School. I teach courses and conduct research in corporate finance, the structure and governance of public and private companies, valuation of companies and the behavior of institutional investors, as well as entrepreneurial finance and management, including the venture capital and private equity industry, young start-ups, and high-growth-potential firms. I teach these courses to Ph.D., M.B.A., and Executive Education students. Before joining the Harvard faculty in 1995, I was a member of the faculty at the University of Chicago Graduate School of Business, where I taught entrepreneurial finance from 1993 to 1995. I received an A.B. in Biology from Harvard College in 1987, an M.Sc. in Economics from Oxford University in 1989, and a Ph.D. in Business Economics from Harvard University in 1993.

2. In my career as an academic, I have written numerous case studies and technical notes, and published numerous articles in peer-reviewed finance and economics journals on valuation, venture capital and private equity industries, and entrepreneurial finance. Many of these case studies, notes, and research articles have directly examined financial and valuation issues of companies. I am the coauthor of three books: The Venture Capital Cycle (editions 1 and 2), published by MIT Press, The Money of Invention, published by Harvard Business School Press, and Entrepreneurial Finance: A Casebook, published by John Wiley & Sons, Inc. I am an Associate Editor of the *Journal of Finance*, *Small Business Economics*, and the *Journal of Private Equity*, and a referee for a number of academic journals, including the *Journal of Financial Economics*, the *Journal of Political Economy*, the *Quarterly Journal of Economics*, the *Review of Financial Studies*, and the *Journal of Law and Economics*. I have also served on the boards of directors of several companies, including ZEFER, Mercanteo, and OnTheFrontier.com. My CV is attached as Appendix A to this report.

3. I have served as an expert in a number of legal matters. In these disputes, I have served as an expert on, among other things, whether securities markets were efficient, the valuation of public and private companies, and the factors affecting public company securities prices. These include matters in which I have been asked to analyze alleged damages, as well as numerous matters involving class certification issues. Appendix B contains a list of my testimony over the last four years.

## II. Assignment

4. I have been retained by counsel for Tivity Health, Inc. ("Tivity" or the "Company") to review and comment on certain analyses provided in the Expert Report of Chad Coffman filed on July 1, 2019 ("Coffman Report"). Specifically, I have been asked to evaluate Mr. Coffman's market efficiency analysis and whether Mr. Coffman provides sufficient evidence to demonstrate that he could develop a class-wide damages model that is consistent with Plaintiff's theory of liability.

5. For this matter, I am being compensated at my regular hourly rate of $1,200. In addition, under my direction, Cornerstone Research has performed research and other support work for me on this matter. My analyses, opinions, and conclusions are based solely on the work performed by me and those under my direction. I have received compensation, and anticipate that I may receive future compensation, from Cornerstone Research that reflects, among other things, my relationship with that firm as an expert on this and other corporate and client matters. My compensation is not contingent upon the conclusions I reach or on the outcome of this matter.

6. In formulating the conclusions and opinions set forth in this report, I have relied on my knowledge, my prior experience, my academic research on relevant topics, and my formal training in economics and finance. A list of documents, data, and other information that I have considered in forming the opinions set forth in this report is attached hereto as Appendix C. I reserve the right to revise my opinions in light of my ongoing review of the materials I have considered, as well as additional materials, including data, documents, and deposition or other testimony that may subsequently come to light, or if I am asked to perform further research or analysis.

## III. Summary of Opinions

7. Based on my review of the Coffman Report and my own independent analysis, I have reached the following conclusions:

8. Mr. Coffman does not provide sufficient economic evidence to conclude that Tivity's stock traded in an efficient market during the putative Class Period. Nine of the ten "efficiency" factors he considers do not provide direct evidence of market efficiency, while Mr. Coffman's analysis of the remaining factor (*Cammer* Factor 5) is flawed and does not

demonstrate that Tivity's stock price consistently reacted to new information quickly and completely during the putative Class Period.

9. Moreover, Mr. Coffman ignores at least three pieces of evidence that undermine his conclusion that Tivity's stock traded in an efficient market.

a. First, Mr. Coffman ignores that information in the November 6, 2017 9:00 a.m. UnitedHealthcare ("UHC") press release ("UHC Press Release") about Optum Fitness Advantage being offered in the 11 states, *i.e.*, information Plaintiff alleges to be corrective, was publicly available weeks and even months prior to November 6, 2017. If Tivity's stock price declined on November 6, 2017 as a result of the disclosure of previously available or stale information, then this evidence is inconsistent with Mr. Coffman's conclusion that Tivity's stock traded in an efficient market.

b. Second, Mr. Coffman's autocorrelation analysis is flawed, and he ignores his own finding of statistically significant autocorrelation in Tivity's stock returns during the putative Class Period. A finding of autocorrelation in stock price returns is inconsistent with an efficient market.

c. Third, Mr. Coffman ignores evidence that suggests Tivity's stock price decline following the UHC Press Release was an overreaction. Specifically, analyst commentary suggests that investors may have overreacted to the UHC announcement. Further, Tivity's stock price increased after the UHC Press Release, which is consistent with an overreaction. A stock price overreaction to news is inconsistent with an efficient market.

10. I understand that in securities cases at the class certification stage, plaintiffs can invoke the presumption of class-wide reliance on the alleged misrepresentations and/or omissions if they demonstrate that the security at issue traded in an efficient market. If the market is not efficient, different investors may have different information about the underlying company, including different information regarding the alleged misrepresentations and/or omissions, and all available information will not be reflected in the stock price. Thus, if the market is not efficient, one cannot assume that all investors relied on the same information when making their investment decisions.

11. I also understand that, in securities cases at the class certification stage, plaintiffs need to specify a methodology for calculating damages on a class-wide basis that is consistent with their theory of liability. Given evidence inconsistent with an efficient market for Tivity's

stock, Mr. Coffman has not demonstrated that he can develop a damages methodology consistent with Plaintiff's theory of liability that can be applied on a class-wide basis. Specifically, if Tivity's stock price decline on November 6, 2017 was in response to stale information in the UHC Press Release—information that was previously publicly available and that Plaintiff alleges was withheld from investors—then Mr. Coffman will have to explain how his damages methodology can measure damages for investors with different information regarding the Optum Fitness Advantage offerings in 11 states. In particular:

a. There were likely some investors that were previously aware of Optum Fitness Advantage offerings in New Jersey and/or Washington[1] and for which the UHC Press Release would represent the materialization of a known risk. If investors formed expectations about the risk of increased competition from UHC (based on information about Optum Fitness Advantage offerings in New Jersey and/or Washington) at the time they made their investment decision to purchase Tivity's stock, then Mr. Coffman's damages methodology would potentially compensate those investors for a risk they knowingly assumed.

b. There were likely some investors that were previously aware of the Optum Fitness Advantage plan offerings in all 11 states at the time they made their investment decision to purchase Tivity's stock. Mr. Coffman's damages methodology would potentially provide a "windfall" gain to those investors who were previously aware of the Optum Fitness Advantage plan offerings in 11 states.

12. Even assuming, for the sake of argument, that Tivity's stock traded in an efficient market, then using the November 6, 2017 stock price decline to measure damages would provide a "windfall" gain to all putative Class members if they purchased Tivity's stock at a price that incorporated the information that Plaintiff alleges was withheld from investors, *i.e.*, information about the Optum Fitness Advantage offerings in 11 states that was publicly available as early as September 2017. Mr. Coffman does not account for this and, as a result, he fails to specify a class-wide damages methodology that is consistent with Plaintiff's theory of liability.

---

[1] More generally, there were likely some investors that were previously aware of Optum Fitness Advantage offerings in some or all 11 states referred to in the UHC Press Release.

13. In addition, Mr. Coffman does not account for at least two other issues pertinent to this case that cause him to fail to specify a class-wide damages model that is consistent with Plaintiff's theory of liability.

a. First, Mr. Coffman ignores that Plaintiff's allegations described in the Complaint suggest that both the nature of Tivity's relationship with UHC and Tivity's knowledge about UHC's actions related to Optum Fitness Advantage changed during the putative Class Period. That means the amount of alleged inflation in Tivity's stock price also changed during the putative Class Period. However, Mr. Coffman's damages methodology fails to specify how he would account for time-varying inflation consistent with Plaintiff's theory of liability.

b. Second, Mr. Coffman does not specify how his damages methodology would account for the potential market overreaction to the UHC press releases on November 6, 2017 discussed by analysts, which is a confounding factor consistent with market inefficiency and unrelated to the alleged misrepresentations and omissions.

## IV. Background and Allegations

### A. Tivity

14. Tivity was founded in 1981 and is a health and fitness company based in Franklin, Tennessee.[2] During the relevant period, Tivity's primary source of revenue was a program called "SilverSneakers."[3] SilverSneakers connects a network of more than 13,000 fitness centers to enrollees in health insurance programs such as Medicare Advantage, Medicare Supplement, and Group Retiree programs.[4] The insurance companies that sell these insurance programs are Tivity's customers. One of Tivity's largest customers was UHC, which contributed more than 10% of Tivity's overall revenue in FY 2016.[5] In late 2017, UHC issued a series of press releases regarding its own program called Optum Fitness

---

[2] Tivity Health, Inc. Form 10-K for Fiscal Year ("FY") 2016, filed March 6, 2017 ("Tivity 2016 10-K") p. 4.
[3] *See e.g.*, "The Road to 5 Million Enrolled Members," Tivity Health Investor Day 2018 Presentation, June 1, 2018, pp. 76–77.
[4] Tivity 2016 10-K, pp. 4–5.
[5] Tivity 2016 10-K, p. 5.

Advantage.[6] Optum Fitness Advantage offered similar fitness benefits as SilverSneakers and allowed UHC to provide fitness benefits in-house instead of through Tivity for certain insurance customers.[7]

### B. Plaintiff's Allegations

15. Plaintiff in this case alleges that Tivity made misstatements and omissions regarding its relationship with UHC and its knowledge of UHC's actions related to the Optum Fitness Advantage offerings.[8] Specifically, Plaintiff alleges that Tivity made false representations to the market throughout the putative Class Period—from March 6, 2017 to November 6, 2017, inclusive[9]—about its contractual relationship with UHC.[10] According to Plaintiff, Tivity continued to disclose in its SEC filings that its health plan customers, such as UHC, "***might*** compete with its product offerings" even as Tivity learned by late 2016 that "UHC began to launch its Optum Fitness Advantage Program[—a competing product—]… in select states, including Washington and New Jersey."[11] Plaintiff further alleges that Tivity concealed information based on "active contract renewal negotiations with UHC" that "UHC would escalate its competition with SilverSneakers by reducing the number of markets in which UHC would offer SilverSneakers to its members."[12] Tivity allegedly formed "Project Success," which was "a strategic plan to retain customers in light of UHC's roll out of Optum Fitness Advantage in multiple states," but did not disclose this or other counter efforts to investors.[13] Plaintiff alleges that Tivity's actions "misled the investing public,"[14] particularly

---

[6] *See, e.g.,* UnitedHealthcare Press Release, "UnitedHealthcare Adds New Fitness Benefit to Medicare Advantage Plans in New York," November 6, 2017.
[7] "Tivity Shares Crushed As Relationship with UnitedHealth Comes Into Question," Barrington Research, November 7, 2017, p. 1.
[8] First Amended Complaint, *Eric Weiner, et al. v. Tivity Health, Inc., et al.*, United States District Court for the Middle District of Tennessee, Nashville Division, Case No. 3:17-cv-01469, June 4, 2018 ("Complaint"). *See, e.g.*, ¶¶ 1–6.
[9] Plaintiff alleges the putative Class Period starts on March 6, 2017, the date Tivity filed its Form 10-K for 2016. Complaint, ¶¶ 1, 57–59. However, I understand that Tivity filed this Form 10-K after market close on March 6, 2017. (*See*, "Filing Detail," SEC, https://www.sec.gov/Archives/edgar/data/704415/000070441517000012/0000704415-17-000012-index.htm, accessed October 2, 2019.) Further, the UHC Press Release, which Plaintiff alleges was the corrective disclosure, was released before market open on November 6, 2017. Complaint, ¶¶ 80–81. As such, the alleged period of inflation in the stock price would be March 7, 2017 to November 5, 2017.
[10] Complaint, ¶ 1.
[11] Complaint, ¶¶ 2–3 (emphasis in original).
[12] Complaint, ¶ 50.
[13] Complaint, ¶¶ 52, 55.
[14] Complaint, ¶ 5.

given that UHC was "one of Tivity's most important customers."[15] Exhibits 1A–1B summarize the alleged misrepresentations and omissions in the Complaint.

16. Plaintiff alleges that the "truth [was] revealed" on November 6, 2017, when UHC announced in a 9:00 a.m. press release that it "had launched Optum Fitness Advantage to replace and compete with SilverSneakers in what would be a total of 11 states beginning in January 2018."[16] Specifically, the UHC Press Release disclosed the following:

> People enrolled in UnitedHealthcare Medicare Advantage plans in New York will soon have a new fitness benefit that offers access to exercise classes, workout equipment and social activities at participating fitness locations.
>
> In January 2018, Optum Fitness Advantage will be available at no additional cost to people enrolled in eligible UnitedHealthcare Medicare Advantage plans in 11 states through a large network of participating fitness centers. Plan participants will have access to the same services, privileges, classes and programs as the fitness centers' standard members, including waiver of all enrollment fees.
>
> "Optum Fitness Advantage offers people enrolled in UnitedHealthcare Medicare Advantage plans an opportunity to stay active and engaged in their communities in a way that supports their overall health and well-being," said Phillip Franz, CEO of UnitedHealthcare Medicare & Retirement in New York.
>
> Fitness centers participating in the Optum Fitness Advantage program in New York include participating locations of 24 Hour Fitness, Anytime Fitness, LA

---

[15] Complaint, ¶ 4.

[16] Complaint, ¶ 80. Plaintiff cites to a 9:00 a.m. press release issued by UHC on November 6, 2017 as the alleged corrective disclosure. This press release was addressed to individuals enrolled in Medicare Advantage plans in New York. I note that UHC issued a series of press releases that day between 9:15 a.m. and 11:45 a.m. disclosing the same information but addressed to Medicare Advantage plan participants in eight additional states, namely, Arizona, Florida, Kentucky, Ohio, Oklahoma, Oregon, Wisconsin, and Texas (specifically, San Antonio, Houston, and Austin). UnitedHealthcare Press Release, "UnitedHealthcare Adds New Fitness Benefit to Medicare Advantage Plans in Arizona," November 6, 2017; UnitedHealthcare Press Release, "UnitedHealthcare Adds New Fitness Benefit to Medicare Advantage Plans in Austin," November 6, 2017; UnitedHealthcare Press Release, "UnitedHealthcare Adds New Fitness Benefit to Medicare Advantage Plans in Florida," November 6, 2017; UnitedHealthcare Press Release, "UnitedHealthcare Adds New Fitness Benefit to Medicare Advantage Plans in Houston," November 6, 2017; UnitedHealthcare Press Release, "UnitedHealthcare Adds New Fitness Benefit to Medicare Advantage Plans in Kentucky," November 6, 2017; UnitedHealthcare Press Release, "UnitedHealthcare Adds New Fitness Benefit to Medicare Advantage Plans in New York," November 6, 2017; UnitedHealthcare Press Release, "UnitedHealthcare Adds New Fitness Benefit to Medicare Advantage Plans in Ohio," November 6, 2017; UnitedHealthcare Press Release, "UnitedHealthcare Adds New Fitness Benefit to Medicare Advantage Plans in Oklahoma," November 6, 2017; UnitedHealthcare Press Release, "UnitedHealthcare Adds New Fitness Benefit to Medicare Advantage Plans in Oregon," November 6, 2017; UnitedHealthcare Press Release, "UnitedHealthcare Adds New Fitness Benefit to Medicare Advantage Plans in San Antonio," November 6, 2017; UnitedHealthcare Press Release, "UnitedHealthcare Adds New Fitness Benefit to Medicare Advantage Plans in Wisconsin," November 6, 2017.

> Fitness, New York Sports Clubs and Snap Fitness. Locations also include local participating YMCAs.
>
> The Optum Fitness Advantage program, launched by UnitedHealthcare in Washington state and New Jersey in January 2017, has been well received by local Medicare Advantage plan participants…[17]

17. In summary, Plaintiff claims that the alleged misrepresentations and omissions "artificially inflated and/or maintained the price of Tivity securities at an artificially high level" and when the "truth about the Company was revealed," Tivity's stock price declined—resulting in the removal of inflation from the stock price and causing "economic loss, *i.e.*, damages" to investors that purchased Tivity's stock during the putative Class Period.[18]

## V. Market Efficiency in Securities Class Actions

### A. Definition of Efficient Markets

18. An efficient market is one in which stock prices incorporate all publicly available information quickly and completely.[19,20] This means that the stock price at all times reflects the underlying present value of expected future cash flows, given all information that is available to investors. Professor Eugene Fama of the University of Chicago, a principal developer of the Efficient Markets Hypothesis, states:

> An efficient capital market is a market that is efficient in processing information. The prices of securities observed at any time are based on "correct" evaluation of all information available at that time. In an efficient market, prices "fully reflect" available information.[21]

---

[17] UnitedHealthcare Press Release, "UnitedHealthcare Adds New Fitness Benefit to Medicare Advantage Plans in New York," November 6, 2017.

[18] Complaint, ¶¶ 97–100 (emphasis in original).

[19] Ross, Stephen A., Randolph W. Westerfield, and Jeffrey Jaffe, *Corporate Finance*, 7th ed. (Boston, MA: McGraw-Hill/Irwin), 2005, pp. 355–356. Three forms of market efficiency are distinguished: the strong form, the semi-strong form, and the weak form. The strong form holds that market prices of securities reflect all available information, whether public or not. The semi-strong form holds that prices reflect all publicly available information. The weak form holds that prices reflect all information related to the trading history of securities.

[20] This definition is consistent with the economic definition of market efficiency adopted by Mr. Coffman. Mr. Coffman states that security prices should "adjust to new publicly available information rapidly and in an unbiased fashion." Coffman Report, ¶ 18.

[21] Fama, Eugene F., *Foundations of Finance: Portfolio Decisions and Securities Prices* (New York, NY: Basic Books), 1976, p. 133. Throughout this report, I use the term "efficient market" or "market efficiency" as short-hand for the semi-strong form of market efficiency, *i.e.*, that market prices reflect all publicly available information.

19. The underlying rationale for the efficient market hypothesis is the presence of competition among investors, which eliminates opportunities to trade and profit on information. Competition between investors for profitable trading opportunities implies that stock prices react nearly instantaneously to new value-relevant information. Consequently, stock prices in an efficient market respond quickly and completely to new information once it is publicly available and in a manner commensurate with the value-implications of the new information.

20. A widely-used corporate finance textbook highlights research demonstrating the nearly immediate stock price response to new information:

> A study by Patell and Wolfson shows just how fast prices move when new information becomes available. They found that, when a firm publishes its latest earnings or announces a dividend change, the major part of the adjustment in price occurs within 5 to 10 minutes of the announcement.[22]

21. It is important to note that information need not be published in a major news outlet or widely disseminated to be considered publicly available. Public information includes information that is accessible to market participants or information that is in the public domain.[23] This is because, under the efficient market hypothesis, informed investors will immediately act on profitable trading opportunities, such as when they perceive that new and value-relevant information is not reflected in the current price of a stock, and will continue to trade until any perceived mispricing is eliminated.

22. Accordingly, if the market is efficient, an individual investor can rely on the stock price to incorporate all available information.[24] Also, the investor cannot make trading profits (or avoid losses) from trading based on publicly available information because any value-relevant information would already have been incorporated in the current stock price. As further explained in a corporate finance textbook:

> Because information is reflected in prices immediately, investors should only expect to obtain a normal rate of return. Awareness of information when it is

---

[22] Brealey, Richard A., Stewart C. Myers, and Franklin Allen, *Principles of Corporate Finance*, 8th ed. (New York, NY: McGraw-Hill/Irwin), 2006, p. 339 (internal footnote omitted).

[23] Bodie, Zvi, Alex Kane, and Alan J. Marcus, *Investments*, 9th ed. (New York, NY: McGraw-Hill/Irwin), 2011, pp. 347–348; Mishkin, Frederic S., *The Economics of Money, Banking, and Financial Markets*, 6th ed. (Boston, MA: Addison-Wesley), 2001, pp. 699–700.

[24] Brealey, Richard A., Stewart C. Myers, and Franklin Allen, *Principles of Corporate Finance*, 8th ed. (New York, NY: McGraw-Hill/Irwin), 2006, p. 350.

> released does an investor no good. The price adjusts before the investor has time to trade on it.[25]

23. Conversely, if a market is not efficient and publicly available information is not quickly and completely incorporated in the stock price, investors have an opportunity to take advantage of the available information to predict future price changes and make trading profits. If this is the case, one cannot assume that the stock price completely reflects all publicly available information at all times.

24. In addition to reacting quickly, an efficient market implies that security prices should reflect the underlying economic value of the security. This means that not only do security prices react quickly to news in an efficient market, they also react in a manner commensurate with the value-implication of the news. If security prices under- or overreact to value-relevant information, an investor could design a trading strategy to take advantage of the under- or overreaction and earn trading profits.[26]

25. Further, from the perspective of economics, an efficient market is not one that *generally* incorporates information quickly and completely, but rather one that *always* incorporates information quickly and completely.[27] In a market in which security prices always incorporate all publicly available information quickly and completely, those prices reflect the underlying expected cash flows of the security. Individual investors are able to rely on security prices as already reflecting all public information. They do not need to individually research the value of the security in order to make an investment decision since the price of the security reflects its underlying value.[28] In summary, stock prices in an efficient market reflect expectations of future cash flows and incorporate new and value-relevant information quickly and completely once that new information is publicly available.

---

[25] Ross, Stephen A., Randolph W. Westerfield, and Jeffrey Jaffe, *Corporate Finance*, 7th ed. (Boston, MA: McGraw-Hill/Irwin), 2005, p. 352.

[26] "Efficient capital markets are those in which market prices reflect available information. This means that market prices reflect the underlying present value of securities, and there is no way to make unusual or excess profits by using the available information." Ross, Stephen A., Randolph W. Westerfield, and Jeffrey Jaffe, *Corporate Finance*, 7th ed. (Boston, MA: McGraw-Hill/Irwin), 2005, p. 349.

[27] Ross, Stephen A., Randolph W. Westerfield, and Jeffrey Jaffe, *Corporate Finance*, 7th ed. (Boston, MA: McGraw-Hill/Irwin), 2005, pp. 352–353.

[28] "What [market] efficiency does say is that the price that a firm obtains when it sells a share of its stock is a fair price in the sense that it reflects the value of that stock given the information that is available about it. Shareholders need not worry that they are paying too much for a stock with a low dividend or some other characteristic, because the market has already incorporated it into the price." Ross, Stephen A., Randolph W. Westerfield, and Jeffrey Jaffe, *Corporate Finance*, 7th ed. (Boston, MA: McGraw-Hill/Irwin), 2005, p. 358.

### B. Market Efficiency and Class Certification

26. It is my understanding that in securities cases at the class certification stage, plaintiffs can invoke the presumption of class-wide reliance on the alleged misrepresentations and/or omissions if they demonstrate that the security at issue traded in an efficient market. In an efficient market, the price of a security reflects all publicly available information that is value-relevant to the security, including any misrepresentations and/or omissions alleged by plaintiffs. Thus, investors can rely on the market price of the security when making investment decisions rather than having to review and analyze every disclosure pertinent to the security.[29] From an economic perspective, reliance on the market price in an efficient market implies all investors relied on the same information when making their investment decisions.

27. However, if a market is not efficient, publicly available information will not be completely reflected in the price of the security. Thus, investors cannot simply rely on the market price of the security to reflect all publicly available information when making investment decisions. Instead, each investor will have to review and analyze whatever information they have about the security. Since different investors may have different information about the underlying company, including different information about the alleged misrepresentations and/or omissions, one cannot assume that all investors relied on the same information when making their investment decisions.

## VI. Mr. Coffman's Analysis Does Not Demonstrate Market Efficiency and He Fails to Consider Evidence That Is Inconsistent with Market Efficiency

28. Based on the analyses presented in the Coffman Report, Mr. Coffman concludes that "empirical evidence supports a finding that Tivity Common Stock traded in an efficient market."[30] However, Mr. Coffman's market efficiency analysis is flawed and he does not provide sufficient evidence to demonstrate that Tivity's stock traded in an efficient market. Moreover, Mr. Coffman appears to have overlooked other evidence that undermines his conclusion of market efficiency. This evidence includes: (i) publicly available information prior to and during the putative Class Period regarding Optum Fitness Advantage offerings in

---

[29] *Basic v. Levinson*, 485 U.S. 224, 241 (1988), p. 225; *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2418 (2014), p. 3.
[30] Coffman Report, ¶ 24.

New Jersey and Washington in 2017 and in nine additional states in 2018; (ii) Mr. Coffman's own finding of autocorrelation during the putative Class Period; and (iii) potential market overreaction following the UHC Press Release. I discuss these in detail below.

### A. Mr. Coffman Does Not Provide Sufficient Evidence to Demonstrate That Tivity's Stock Traded in an Efficient Market During the Putative Class Period

29. In support of Plaintiff's Motion for Class Certification, Mr. Coffman has attempted to demonstrate that the market for Tivity's stock was efficient during the putative Class Period by citing a set of ten market characteristics for the stock. Many of these characteristics have been cited by courts as being consistent with efficient markets.[31] These factors cited by Mr. Coffman include the five *Cammer* factors and five "Additional Factors."[32]

30. Eight of these factors, namely, the first four *Cammer* factors (average weekly trading volume, analyst coverage, number of market makers, and eligibility for SEC Form S-3 registration), Mr. Coffman's first three Additional Factors (market capitalization, float, bid-ask spread—also referred to as the *Krogman* factors), and Mr. Coffman's fifth Additional Factor (option listings), reflect market conditions that are likely to be present in an efficient market. However, these factors do not provide direct evidence of market efficiency. As Mr. Coffman acknowledged during his deposition, it is plausible for a stock to have the same characteristics as Tivity's stock with respect to these factors and still trade in an inefficient market.[33] In fact, academic literature is replete with examples of securities that traded inefficiently and were "flagrantly mispriced" even when many of the *Cammer* and *Krogman* factors were present.[34]

31. Mr. Coffman's fourth Additional Factor, the absence of autocorrelation in stock returns, does not demonstrate market efficiency by itself, but the presence of autocorrelation

---

[31] *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989), pp. 1285–1287; *Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001), pp. 477–478; *Unger v. Amedisys Inc.*, 401 F.3d 316 (5th Cir. 2005), p. 323.

[32] Coffman Report, ¶¶ 20, 23.

[33] *See, e.g.*, Deposition of Chad William Coffman, September 4, 2019 ("Coffman Deposition"), 53:18–24, 54:10–17, 56:14–18, 57:5–10, 64:5–18, 65:4–16, 66:2–6. Mr. Coffman did not directly address whether it was possible to observe the volume of stock options that Tivity had during the putative Class Period and still have the stock trade in an inefficient market.

[34] *See, e.g.*, the 3Com and Royal Dutch/Shell Group examples discussed in Lamont, Owen A., and Richard H. Thaler, "Anomalies: The Law of One Price in Financial Markets," *Journal of Economic Perspectives*, Vol. 17, No. 4, 2003, pp. 191–202 at pp. 195–200. *See also,* Huberman, Gur, and Tomer Regev, "Contagious Speculation and a Cure for Cancer: A Nonevent That Made Stock Prices Soar," *The Journal of Finance*, Vol. 56, No. 1, 2001, pp. 387–396.

is evidence contrary to market efficiency. I discuss Mr. Coffman's flawed autocorrelation analysis in Section VI.C below.

32. Out of the ten factors cited by Mr. Coffman, the fifth *Cammer* factor is the sole factor that he states provides "convincing evidence of market efficiency."[35] According to Mr. Coffman, this evidence is shown by "[e]stablishing a causal connection between new company-specific events and movements in the market price."[36] I understand that the importance of this factor has been recognized by courts because it addresses "the essence of an efficient market and the foundation for the fraud on the market theory."[37]

33. To satisfy the fifth *Cammer* factor, plaintiffs must provide empirical evidence showing the existence of a **consistent** "cause and effect relationship" between unexpected value-relevant news and an immediate response in the stock price throughout the alleged class period.[38] This requires a thorough analysis of all news affecting a company's stock price, and whether stock price changes in response to the news are statistically significant after controlling for the effect of market and industry factors. Identifying a few examples when the stock price changes following releases of new information is not sufficient support for the conclusion that the stock traded in an efficient market throughout the alleged class period. Similarly, identifying examples of stock price changes following releases of new information that occurred *outside* of the alleged class period is not sufficient support for the conclusion that the stock traded in an efficient market *during* the alleged class period.[39] Plaintiffs must demonstrate that throughout the entire alleged class period, the stock price consistently reacted to new information quickly and completely.

34. Mr. Coffman concludes that "there was a strong cause-and-effect relationship between new Company-specific information and the market price of Tivity Common Stock during the Class Period."[40] However, Mr. Coffman has not demonstrated this since his *Cammer* Factor 5 analysis of Tivity's stock price movements is based on a sample of trading days that (i) is largely outside the putative Class Period and (ii) excludes a large number of

---

[35] Coffman Report, ¶¶ 45–46.
[36] Coffman Report, ¶¶ 45–46.
[37] *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989), p. 1287; *In re PolyMedica Corporation Securities Litigation*, 453 F. Supp. 2d 260 (D. Mass. 2006), p. 266.
[38] *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989), p. 1287; *In re PolyMedica Corporation Securities Litigation*, 453 F. Supp. 2d 260 (D. Mass. 2006), pp. 269–270.
[39] As described in Section VI.B.4 of this report, academic literature has shown that, in certain situations, stock prices respond to news in an inefficient manner. Thus, evidence of a stock trading efficiently during one period is not necessarily evidence of the stock trading efficiently during another period.
[40] Coffman Report, ¶ 25.

days during the putative Class Period. As a result, he has not shown that Tivity's stock price consistently reacted to new information quickly and completely during the putative Class Period, which I explain below.

35. To purportedly test whether there is a cause-and-effect relationship between new information and stock price changes during the putative Class Period, Mr. Coffman analyzes Tivity's stock price movements during an "Analysis Period"—the period from one year before the start of the putative Class Period to one year after the end of the putative Class Period (March 7, 2016 – November 6, 2018).[41] Using a statistical technique called an event study,[42] Mr. Coffman estimates Tivity's abnormal returns (also referred to as residual returns) or the firm-specific component of Tivity's daily stock returns after controlling for market and industry index movements for each day of his Analysis Period.[43] Mr. Coffman then compares (i) the relative frequency of statistically significant abnormal returns, (ii) the average absolute abnormal returns, and (iii) the average trading volumes between 11 Tivity earnings announcement days and 168 "no-news" days,[44] which he defines as trading days with "no Tivity-related news from the Factiva database and when there were no analyst reports or SEC filings issued" during his Analysis Period.[45]

36. Mr. Coffman's analysis is flawed for at least three reasons. First, he uses a broader Analysis Period to opine that Tivity's stock traded in an efficient market during the putative Class Period. In using this broader Analysis Period, Mr. Coffman ignores that only 25% (172 out of 675) of the trading days during his Analysis Period are part of the putative Class

---

[41] Coffman Report, ¶ 25 and fn. 27.

[42] Event studies are often used by economists to measure the effect of an economic event on company stock prices. It is a widely used methodology for determining whether a particular event or news regarding a company is associated with a significant change in the company's stock price. The change in the company's stock price that can be associated with the particular event is estimated by calculating the stock's residual return. The residual return is the difference between the company's observed stock return on a given date (typically the event date) and the portion of the stock return on that date that is associated with market-wide and/or industry-wide information and unrelated to firm-specific information. Statistical analysis is then conducted to determine whether the residual return is statistically significant. An inference of whether the particular event or news affected the stock price is typically made based on a finding of statistical significance of the residual return and analysis of the total mix of information available in the market around the event date. (*See, e.g.*, Campbell, John Y., Andrew W. Lo, and A. Craig MacKinlay, *The Econometrics of Financial Markets* (Princeton, NJ: Princeton University Press), 1997, p. 149–150.)

[43] Coffman Report, ¶¶ 45–52. My analysis of Mr. Coffman's event study results does not constitute an endorsement of his event study methodology.

[44] Mr. Coffman states in his report that there are 176 days in his Analysis Period with "no Tivity-related news from the Factiva database" and "no analyst reports or SEC filings issued." However, my review of Mr. Coffman's production materials indicates there are only 168 such days. *See* Coffman Report, ¶ 59; Coffman Production Materials, OFP-TVTY-00006613_Confidential.xlsx.

[45] Coffman Report, ¶¶ 48–59 and Exhibit 9.

Period. Indeed, his conclusions are drawn from a sample in which the majority of days occur outside the putative Class Period. Of the 11 earnings announcements that he investigates, only three (27%) occurred during the putative Class Period and out of the 168 "no-news" trading days that he identified, only 69 (41%) occurred during the putative Class Period.[46]

37. Second, Mr. Coffman excludes from his analysis days with "Tivity-related news from the Factiva database" and/or days where "analyst reports or SEC filings [were] issued,"[47] presumably because those days do not qualify as either earnings announcements or "no-news" days. In doing so, Mr. Coffman excludes 100 trading days,[48] or 58%, of the 172 trading days in the putative Class Period from his analysis of the fifth *Cammer* factor and he has not determined whether there may have been new and value-relevant information disclosed on those days. Mr. Coffman himself states that "[n]ew information may include, for example, press releases, earnings reports, SEC filings, and news reports or analyst reports"[49] but he has not evaluated precisely those days during the putative Class Period that he associates with Tivity-related public press, analyst reports, or SEC filings. As a result, he has not shown that Tivity's stock consistently reacted to new information quickly and completely during the putative Class Period.

38. Third, Mr. Coffman does not identify all Tivity-related disclosures during his Analysis Period (including the putative Class Period). He overlooks that Plaintiff alleges information about Optum Fitness Advantage is relevant for Tivity and, as a result, his criteria for identifying days on which potentially value-relevant Tivity-related news was disclosed is incomplete. In his analysis, Mr. Coffman identified news articles by doing a search "with the company field 'Tivity Health, Inc.' or keyword field 'Tivity Health.'"[50] If there was value-relevant information related to Optum Fitness Advantage that did not directly mention Tivity Health, Mr. Coffman's search would not have identified it. As Mr. Coffman stated during his deposition, he did not "even consider running Optum Fitness Advantage as a search [in Factiva]."[51] Therefore, even if Mr. Coffman had evaluated the days during his Analysis Period that he associates with Tivity-related public press, analyst reports, or SEC filings for

---

[46] Coffman Report ¶ 55 and Exhibit 9, Coffman Production Materials, OFP-TVTY-00006613_Confidential.xlsx.
[47] Coffman Report, ¶¶ 57–59 and Exhibit 9.
[48] 172 trading days during the putative Class Period minus 72 trading days (3 earnings announcements + 69 no-news days).
[49] Coffman Report, ¶ 47.
[50] Mr. Coffman also performed a Factiva search "with the company field 'Tivity Health, Inc.' or keyword field 'Healthways'" for the period before Tivity changed its name from Healthways, Inc. in January 2017. Coffman Report, Appendix A.
[51] Coffman Deposition, 24:21–25:20.

potentially value-relevant Tivity-related disclosures, that analysis would be incomplete because he only identifies news and other public disclosures that mentioned Tivity directly and overlooks news and other public disclosures pertaining to Optum Fitness Advantage.

39. Overall, Mr. Coffman has not provided sufficient evidence to demonstrate that Tivity's stock traded in an efficient market during the putative Class Period. Moreover, Mr. Coffman ignores evidence that is inconsistent with an efficient market for Tivity's stock, which I explain below.

### B. Information Regarding Optum Fitness Advantage was Publicly Available Prior to the UHC Press Release

40. As discussed in Section V above, from the perspective of economics, in an efficient market, stock prices quickly and completely reflect all publicly available information. Further, in an efficient market, a significant change in the stock price would not be expected in the absence of new value-relevant information. Thus, the stock price should not react to repeated disclosures of information that was already made public at an earlier date.

41. Plaintiff claims that investors suffered losses when the "truth [was] revealed" in the UHC Press Release.[52] Specifically, Plaintiff appears to point to two statements within the UHC Press Release as allegedly corrective of all the alleged misrepresentations and omissions:

> 'In January 2018, Optum Fitness Advantage will be available at no additional cost to people enrolled in eligible UnitedHealthcare Medicare Advantage plans in 11 states through a large network of participating fitness centers. Plan participants will have access to the same services, privileges, classes and programs as the fitness centers' standard members, including waiver of all enrollment fees….
>
> [T]he Optum Fitness Advantage program, launched by UnitedHealthcare in Washington state and New Jersey in January 2017, has been well received by local Medicare Advantage plan participants.'[53]

[52] Complaint ¶¶ 80–83.
[53] Complaint, ¶¶ 81–82.

42. Similar to the allegations in the Complaint, Mr. Coffman testified that he understood that the "substance of what's alleged to be corrective information" was that the "Optum Fitness Advantage program would be available in 11 states."[54]

43. Yet, Mr. Coffman ignores evidence showing this information was publicly available weeks and even months before the UHC Press Release, as described below and summarized in Exhibit 2.[55] If Tivity's stock price declined on November 6, 2017 as a result of the disclosure of this stale information, then this decline is evidence that is inconsistent with Mr. Coffman's finding that Tivity's stock traded in an efficient market.

#### 1. Before the Putative Class Period, Information Was Publicly Available that Fitness Centers in New Jersey and Washington Were Offering Optum Fitness Advantage

44. It is my understanding that in order to launch Optum Fitness Advantage in New Jersey and Washington in January 2017, UHC had to market the product to Medicare recipients and build a network of fitness centers prior to its launch. In turn, these fitness centers marketed the membership benefits of Optum Fitness Advantage to their existing and potential members. In fact, Plaintiff acknowledges that UHC conducted such marketing efforts before the putative Class Period. For example, Plaintiff claims that, by December 2016, UHC sent "an aggressive letter...to a fitness center that stated that UHC was launching Optum Fitness Advantage."[56] Mr. Coffman ignores that these were public outreach efforts and appears to not have made an effort to search for information on Optum Fitness Advantage entering the market.

45. For example, UHC released a packet for insurance agents that described its plan offerings in 38 states at least as early as July 2016.[57] In this packet, SilverSneakers was mentioned as the fitness benefit for most geographic areas.[58] However, for New Jersey and Washington, instead of SilverSneakers, the packet mentioned Optum Fitness Advantage.[59]

---

[54] Coffman Deposition, 8:20–9:5.

[55] As discussed above, for his cause and effect test, Mr. Coffman did not consider or search for information about Optum Fitness Advantage that may have been in the public domain during his Analysis Period, including during the putative Class Period prior to the UHC Press Release.

[56] Complaint, ¶ 59.

[57] "Strength. Stability. Hassle Free. The Advantage of UnitedHealthcare 2017 Medicare Advantage Plans," UnitedHealthcare, https://www.agentpipeline.com/wp-content/uploads/2015/07/National-Packet_0720_Low-Res.pdf ("UHC Packet"), accessed September 27, 2019.

[58] See the "Market Overview" page for each geographic location. *See e.g.*, UHC Packet, p. 7.

[59] UHC Packet, pp. 62, 65, 168.

Additionally, in the detailed breakdown of the individual plans offered in Seattle, Spokane, and New Jersey, Optum Fitness Advantage was highlighted as "Improved for 2017" in certain plans.[60]

46. In addition to marketing through insurance agents, it appears that UHC marketed directly to participants and fitness centers. At least as early as October 2016, UHC maintained a website that marketed Optum Fitness Advantage to participants and gyms. The website advertised to participants that "[w]ith Optum® Fitness Advantage you can visit any participating fitness center or YMCA at no additional cost to you as part of your UnitedHealthcare Medicare Advantage plan."[61] The website also advertised the YMCA, LA Fitness, Anytime Fitness, Snap Fitness 24-7, Curves, and New York Sports Clubs as partners. One page of the same website that existed as early as February 2017 also encouraged other fitness centers to "Become a Fitness Center or YMCA Partner" and stated "[t]his program reaches eligible members 65 years and older throughout your community with marketing and awareness building activities."[62]

47. Fitness centers themselves were also marketing Optum Fitness Advantage. For example, Deer Park Fitness in Washington[63] tweeted, "Yes, we accept Optum Fitness Advantage!! #unitedhealthcare #beactive #stayhealthy" and attached a photo that showed it would be accepting Optum Fitness Advantage beginning January 1, 2017.[64] Similarly, in late 2016 the YMCA of Western Monmouth County[65] in New Jersey posted a flyer that advertised "Optum® Fitness Advantage from UnitedHealthcare will be coming soon to this location."[66]

48. This evidence indicates that before the start of the putative Class Period, it was publicly known that UHC was launching Optum Fitness Advantage in New Jersey and Washington.

---

[60] UHC Packet, pp. 64, 66, 169.
[61] "Coming Soon!" Optum Fitness Advantage, https://web.archive.org/web/20161007221246/http://fitnessadvantage.optum.com, accessed September 16, 2019.
[62] "Become a Fitness Center or YMCA Partner," Optum Fitness Advantage, https://web.archive.org/web/20170211165532/http://fitnessadvantage.optum.com/gym-partner, accessed September 1, 2019.
[63] Twitter – Deer Park Fitness, https://twitter.com/deerparkfitness, accessed October 5, 2019.
[64] "Yes, We Accept Optum Fitness Advantage!!" Twitter – Deer Park Fitness, https://twitter.com/DeerParkFitness/status/798164042439426048, accessed September 1, 2019.
[65] YMCA of Western Monmouth County, https://web.archive.org/web/20161128150417/http://ymcanj.org/, accessed October 5, 2019.
[66] "Good news: Optum® Fitness Advantage from UnitedHealthcare Will Be Coming Soon to This Location," YMCA New Jersey, https://ymcanj.org/wp-content/uploads/2016/12/flyer.pdf, accessed September 1, 2019.

### 2. During the Putative Class Period, Information Regarding Optum Fitness Advantage Offerings Continued to Be Disseminated

49. During the putative Class Period, public press and blog posts that discussed fitness options for seniors included information on Optum Fitness Advantage. Two days after the start of the putative Class Period, the Bellingham Herald in Washington published an article titled "No matter how old you are, the YMCA has got an exercise program perfect for you."[67] The article noted that "[t]he SilverSneakers program is accessible through some Medicare plans. The YMCA also offers Silver & Fit, Prime, At Your Best and Optum Fitness Advantage to help with senior memberships."[68] The Bellingham Herald's website received more than 650,000 unique monthly visitors in 2017 and over 4 million page views per month.[69]

50. On July 10, 2017, a blog post by Mercury Pharmacy Services (a pharmacy that serves the state of Washington[70]), titled "Aging Gracefully; Maintaining Vitality: Senior Fitness Series Part One," stated that many Medicare plans cover fitness center memberships and it specifically mentioned Silver & Fit, SilverSneakers, and Optum Fitness Advantage.[71]

51. Further, fitness centers also advertised Optum Fitness Advantage during the putative Class Period. The Meadowlands YMCA in East Rutherford, New Jersey[72] advertised "Optum® Fitness" and "SilverSneakers™" under its "Insurance-Based Membership" options in its 2017 Spring/Summer program guide.[73] Similarly the Randolph YMCA in Randolph, New Jersey noted that it does not participate in SilverSneakers, but that it did participate in other insurance-based programs including "Optum Fitness Advantage through United Health Care."[74] In addition, at least some YMCAs advertised Optum Fitness Advantage as a

---

[67] "No Matter How Old You Are, the YMCA Has Got an Exercise Program Perfect for You," *The Bellingham Herald*, March 8, 2017.
[68] "No Matter How Old You Are, the YMCA Has Got an Exercise Program Perfect for You," *The Bellingham Herald*, March 8, 2017.
[69] "About Us," *The Bellingham Herald*, https://www.bellinghamherald.com/customer-service/about-us/article22204962.html, accessed September 1, 2019.
[70] "About Us," Mercury Pharmacy Services, https://www.mercuryrx.com/our-story, accessed October 5, 2019.
[71] "Aging Gracefully; Maintaining Vitality: Senior Fitness Series, Part One," Mercury Pharmacy Services, July 10, 2017.
[72] Meadowlands YMCA, https://www.meadowlandsymca.org, accessed October 5, 2019.
[73] "2017 Spring/Summer Program Guide May 22nd–August 27th," Meadowlands YMCA, https://www.meadowlandsymca.org/clientuploads/pdf/2017/2017MeadowlandsYMCASpringSummerProgGuide.pdf, accessed September 1, 2019.
[74] "2017 Fall Program & Membership Guide," Randolph YMCA, https://www.randolphymca.org/sites/default/files/Fall%20Brochure%202017.pdf, accessed September 2, 2019.

membership option on their website. For example, the Gateway Family YMCA in Elizabeth, New Jersey advertised Optum Fitness Advantage under its "Special Membership Programs."[75]

52. Thus, during the putative Class Period, information that Optum Fitness Advantage was being offered in New Jersey and Washington continued to be disseminated to the public.

### 3. During the Putative Class Period, It Was Publicly Known that UHC Would Be Offering Optum Fitness Advantage in Nine Additional States

53. Evidence indicates that the offerings of Optum Fitness Advantage beyond New Jersey and Washington were also publicly known during the putative Class Period. Publicly available meeting minutes from an April 26, 2017 meeting of the Prairie Township Board of Trustees in Columbus, Ohio noted that Optum Fitness Advantage is "almost identical to Silver Sneakers and Silver N Fit programs" with two differences being that Optum Fitness Advantage "will pay more per person per visit and the two programs work with different insurance carriers."[76] Similarly, a blog post on October 9, 2017 by Harrison Premier Fitness, a fitness center in Harrison, Ohio[77], indicated "Optum® Fitness Advantage from UnitedHealthcare will be coming soon to this location."[78]

54. Furthermore, during the putative Class Period, there was information in the public domain that mirrored the information in the alleged corrective disclosure (UHC Press Release). On September 15, 2017, seven weeks before the alleged corrective disclosure, a user post on a site called "Insurance-Forums.com," which markets itself as "the world's

---

[75] "Membership," The Gateway Family YMCA, https://web.archive.org/web/20170910064502/https://tgfymca.org/membership, accessed September 18, 2019. Both the Randolph YMCA and Meadowlands YMCA also advertised Optum Fitness Advantage under their membership options. "Insurance Coverage," Randolph YMCA, https://web.archive.org/web/20170301231456/https://www.randolphymca.org/join/insurance-coverage, accessed September 18, 2019; "Insurance-Based Memberships," Meadowlands YMCA, https://web.archive.org/web/20170430034435/https://www.meadowlandsymca.org/membership/insurance-based-memberships/, accessed September 18, 2019.

[76] "Record of Proceedings," Prairie Township Board of Trustees, Columbus, Ohio, April 26, 2017, https://www.prairietownship.org/AgendaCenter/ViewFile/Minutes/_04252018-494, accessed September 16, 2019.

[77] "About," Harrison Premier Fitness, https://www.harrisonpremierfitness.com/about-us/, accessed October 7, 2019.

[78] "New Program Coming to HPF! - Optum Fitness Advantage," Harrison Premier Fitness, October 9, 2017, https://www.harrisonpremierfitness.com/2017/10/09/new-program-coming-to-hpf-optum-fitness-advantage/, accessed September 2, 2019.

largest insurance community" and had over 70,000 members at that time,[79] revealed the following information:

> Just received an email from UHC that they are bringing back fitness as part of [Medicare Advantage Prescription Drug plans] in a [sic] 9 states (including Florida) for 2018.
>
> It won't be Silver Sneakers, it's called-
>
> *Optum Fitness Advantage… Optum Fitness Advantage will be available with many UnitedHealthcare Medicare Advantage (MA) plans in nine new states (Arizona, Florida, Kentucky, Ohio, Oklahoma, Oregon, New York, Texas (specifically Austin, Houston and San Antonio) and Wisconsin) for 2018.* Members will have access to a variety of fitness clubs at no additional cost in line with their previous fitness benefit. The good news is that we will continue to build this benefit for consumers over the next few years to provide a superior experience with UnitedHealthcare… The nine states mentioned join New Jersey and Washington, which rolled out Optum Fitness Advantage benefits in 2017. Optum Fitness Advantage contributed to higher health and wellness benefit Net Promoter Scores (NPS) this year.*[80]

55. This post contained two pieces of information from the UHC Press Release that Plaintiff alleges were corrective.[81] First, it stated that Optum Fitness Advantage would be available in nine new states. Second, it stated that Optum Fitness Advantage had already been offered in New Jersey and Washington in 2017. Furthermore, the post indicated Optum Fitness Advantage contributed to higher "Net Promoter Scores," which I understand is a measure of customer experience.[82] Similar to the UHC Press Release, this seems to suggest that Optum Fitness Advantage was "well received" in New Jersey and Washington.[83]

---

[79] "The World's Largest Insurance Community – Insurance Forums," Insurance Forums, http://web.archive.org/web/20171101020459/https://insurance-forums.com/, accessed September 2, 2019.
[80] I have included the entire forum post in Exhibit 3. "UHC Bringing Back Fitness in Many States," Insurance Forums, September 15, 2017, https://insurance-forums.com/community/threads/uhc-bringing-back-fitness-in-many-states.90204/, accessed September 2, 2019.
[81] Complaint, ¶¶ 80–83.
[82] I understand that Net Promoter Score is a widely used management tool and is calculated based on responses on a scale of 0–10 to a single question, "How likely is it that you would recommend [brand] to a friend or colleague?" The percentage of people who answer 0–6 are subtracted from the percentage of people who answer 9 or 10 and the result is the "Net Promoter Score." "What Is Net Promoter?" Satmetrix Systems, https://www.netpromoter.com/know/, accessed September 2, 2019.
[83] UnitedHealthcare Press Release, "UnitedHealthcare Adds New Fitness Benefit to Medicare Advantage Plans in New York," November 6, 2017.

56. In addition, a few weeks later, there were posts on the same forum that specifically related to the Optum Fitness Advantage offering in other states. On October 4, 2017 a user wrote, in part:

> At least in Ohio, UHC is pulling out of SilverSneakers and starting Optum Fitness Advantage. Not sure about Georgia.[84]

On October 6, 2017, another user wrote on the same thread:

> In Texas as of January 2018, UHC will no longer offer Silversneakers for the [Medicare Supplement]. Instead clients will get UHC's new product through Optum that gives discounts to gyms and online health and wellness content.[85]

57. Thus, prior to the UHC Press Release, it was public information that Optum Fitness Advantage was replacing SilverSneakers in some states.

### 4. A Stock Price Response to Stale Information is Inconsistent with an Efficient Market

58. Academic literature has shown that, in certain situations, stock prices respond to news in an inefficient manner, such as when stocks respond to stale news. For example, Tetlock (2011) conducts a systematic analysis of stale news events and finds evidence of stocks that trade inefficiently, as evidenced by the stock prices responding to the publication of stale news.[86] The Tetlock study uses a database of news articles and quantitative measures of news staleness to show that "individual investors overreact to stale information, leading to

---

[84] "Client Cxls Med Supp for MAPD," Insurance Forums, October 4, 2017, https://insurance-forums.com/community/threads/client-cxls-med-supp-for-mapd.90436/page-2, accessed September 2, 2019.

[85] "Client Cxls Med Supp for MAPD," Insurance Forums, October 4, 2017, https://insurance-forums.com/community/threads/client-cxls-med-supp-for-mapd.90436/page-2, accessed September 2, 2019.

[86] "In an efficient market where firms' stock prices rapidly incorporate all value-relevant signals, new information becomes stale information almost instantly…. The proliferation of news increases the speed and quantity of information dissemination, which could enhance informational efficiency. On the other hand, some readers of a news story may not realize the extent to which other market participants have already traded on similar previously released information, leading them to overreact to stale information." Tetlock, Paul C., "All the News That's Fit to Reprint: Do Investors React to Stale Information?" *The Review of Financial Studies*, Vol. 24, No. 5, 2011, pp. 1481–1512 at p. 1481.

temporary movements in firms' stock prices."[87] In conclusion, the author suggests that investors who react to stale news "make prices less efficient in the short run."[88]

59. If Tivity's stock price decline on November 6, 2017 was due to the alleged corrective information disclosed in the UHC Press Release as Plaintiff alleges, then this decline, given the evidence presented above, is inconsistent with an efficient market for Tivity's stock. As discussed above, in an efficient market, the stock price would (i) reflect all publicly available and value-relevant information regarding the stock and (ii) respond to the disclosure of new, value-relevant information at the time the information is disclosed. However, information that Plaintiff alleges caused Tivity's stock price to decline on November 6, 2017 was already in the public domain weeks and even months prior to the alleged corrective disclosure event. Mr. Coffman ignores this evidence, which undermines his conclusion that Tivity's stock traded in an efficient market.

### C. Mr. Coffman's Analysis Shows Evidence of Autocorrelation during the Putative Class Period

60. As part of the empirical evidence that he presents in support of his finding that Tivity's stock traded in an efficient market, Mr. Coffman tests whether previous stock price movements can predict future stock price movements.[89] Economists call this relationship "autocorrelation."[90] As I explained above, if a market is not efficient and publicly available information is not quickly and completely incorporated in the stock price, investors have the opportunity to take advantage of the available information (which would include past price

---

[87] The Tetlock study measures the staleness of a news story by "its average textual similarity to the previous ten news stories. This measure identifies news stories that contain a greater proportion of textual information that overlaps with previously known facts." The study focuses on Dow Jones ("DJ") Newswire articles published during November 1996–October 2008. As the author explains, the news articles examined are already stale to some degree: "Although DJ articles are usually reasonably timely, most public news events coincide with the release of information that is stale to some degree. Before writing their stories, reporters often obtain facts from non-exclusive sources of information that many investors can directly access." Tetlock, Paul C., "All the News That's Fit to Reprint: Do Investors React to Stale Information?" *The Review of Financial Studies*, Vol. 24, No. 5, 2011, pp. 1481–1512 at pp. 1481–1485.

[88] Tetlock, Paul C., "All the News That's Fit to Reprint: Do Investors React to Stale Information?" *The Review of Financial Studies*, Vol. 24, No. 5, 2011, pp. 1481–1512 at pp. 1505–1508. *See also*, Huberman, Gur, and Tomer Regev, "Contagious Speculation and a Cure for Cancer: A Nonevent That Made Stock Prices Soar," *The Journal of Finance*, Vol. 56, No. 1, 2001, pp. 387–396.

[89] Coffman Report, ¶¶ 73–76.

[90] Greene, William H., *Econometric Analysis*, 4th ed. (Upper Saddle River, NJ: Prentice Hall), 2000, p. 525.

changes) to predict future price changes and make trading profits. Thus, a finding of autocorrelation in stock price changes (returns) is inconsistent with an efficient market.[91]

61. Mr. Coffman conducts his test for autocorrelation over the same Analysis Period that he uses for his *Cammer* Factor 5 analysis. He states that "there is no evidence of autocorrelation …. during the Analysis Period" and concludes that his test "also supports the conclusion that Tivity Common Stock traded in an efficient market throughout the *Analysis Period*."[92] As described above, Mr. Coffman defines his Analysis Period as the period from one year before the start of the putative Class Period to one year after the end of the putative Class Period.[93] In a footnote, however, he notes that "the autocorrelation coefficient *was* statistically significant during the *Class Period*" but claims "the results over the longer Analysis Period show that the autocorrelation during the Class Period was not systematic."[94]

62. Mr. Coffman appears to dismiss his own finding of autocorrelation during the putative Class Period. He opines that "[i]f the previous day's abnormal return has no statistically significant predictive power [for today's abnormal return], then there is no evidence of autocorrelation."[95] However, his test shows statistical evidence that past price movements in Tivity's stock can predict future price movements in Tivity's stock during the putative Class Period.[96]

63. Further, Mr. Coffman's autocorrelation analysis is flawed and unscientific. As described above, there are 172 trading days in the putative Class Period and approximately four times as many trading days (675 days) in Mr. Coffman's broader Analysis Period.[97] His use of a broader analysis period for his autocorrelation test is arbitrary and without economic basis. Importantly, his finding of statistically insignificant autocorrelation depends on his choice of analysis period. Had Mr. Coffman chosen a shorter analysis period, *e.g.*, starting

---

[91] Mr. Coffman opines that the market for Tivity's stock is "semi-strong" form efficient, while his autocorrelation test analyzes the less stringent "weak" form market efficiency, i.e., a finding of statistically significant autocorrelation during the putative Class Period suggests that Tivity's stock was not weak form efficient during the putative Class Period. If a market is not weak form efficient then it cannot be semi-strong form efficient. See, Coffman Report, ¶¶ 18–19; Ross, Stephen A., Randolph W. Westerfield, and Jeffrey Jaffe, Corporate Finance, 7th ed. (Boston, MA: McGraw-Hill/Irwin), 2005, p. 356. ("[S]trong-form efficiency implies semistrong-form efficiency, and semistrong-form efficiency implies weak-form efficiency.")

[92] Coffman Report, ¶ 76 (emphasis added).

[93] Coffman Report, fn. 27.

[94] Coffman Report, fn. 78 (emphasis added).

[95] Coffman Report, ¶ 75.

[96] As noted above, Mr. Coffman finds a statistically significant autocorrelation coefficient during the putative Class Period. Coffman Report, fn. 78.

[97] Coffman Production Materials, OFP-TVTY-00006613.xlsx; Coffman Report, fn. 27.

six months prior to and ending six months after the putative Class Period, he would have found statistically significant autocorrelation. I explain this below.

64. In his deposition, Mr. Coffman explained that his Analysis Period was chosen "in order to have sufficient statistical power[98] of the cause and effect test,"[99] *i.e.*, his *Cammer* Factor 5 analysis. Mr. Coffman seems to overlook that he used stock returns over a period of 172 trading days in his autocorrelation test for the putative Class Period, which is sufficient data to alleviate the statistical power concerns Mr. Coffman may have had with his cause and effect test. Indeed, in his cause and effect test, Mr. Coffman estimated "rolling regressions" using stock returns over 120 trading days, which indicates a sample of 120 trading days was sufficient for that analysis.[100] Mr. Coffman does not provide any economic basis for why 120 trading days is sufficient for his cause and effect test, but 172 trading days is not sufficient for his autocorrelation test.

65. The arbitrary nature of Mr. Coffman's choice of analysis period for his autocorrelation test is demonstrated in Exhibit 4, which shows the results of Mr. Coffman's autocorrelation test using different estimation periods. In particular, the estimation periods are constructed starting with the putative Class Period and extending the period up to 12 months prior to the putative Class Period and 12 months after, in one-month increments. Exhibit 4 shows that Mr. Coffman would have found statistically significant autocorrelation if he used an estimation period of up to six months before and after the putative Class Period and statistically insignificant autocorrelation if he used an estimation period of 7 to 12 months before and after the putative Class Period. In other words, his finding regarding autocorrelation depends on his choice of analysis period, and, importantly, his finding of insignificant autocorrelation is driven by his arbitrary choice of a longer estimation period that includes data more than six months away from the putative Class Period.

66. Mr. Coffman also opines that his findings over the longer Analysis Period show that "the autocorrelation during the Class Period was not systemic" and explains that his analysis shows that "over a longer time horizon the autocorrelation coefficient was close to zero, not statistically significant, and switched from positive to negative and vice versa on multiple

---

[98] In statistical tests, the power of a test refers to the probability of correctly rejecting the null hypothesis when it is false. All else equal, a larger sample size increases the power of a test. Greene, William H., *Econometric Analysis*, 4th ed. (Upper Saddle River, NJ: Prentice Hall), 2000, p. 148.
[99] Coffman Deposition, 72:16–73:4. (internal citation added)
[100] Coffman Report, ¶ 50.

occasions."[101] Mr. Coffman ignores that his estimated autocorrelation coefficients that are close to zero and/or that switched from positive to negative (or vice versa) pertain to periods *outside* of the putative Class Period and/or that are more than six months away from the putative Class Period.[102] In fact, as shown in Exhibit 4, unless one uses an estimation period of greater than six months before and after the putative Class Period, Mr. Coffman's test would always result in statistically significant autocorrelation.

67. In summary, Mr. Coffman's autocorrelation analysis is flawed, and he ignores that his own test provides evidence that is inconsistent with his conclusion that "every factor [he] analyzed supports [his] opinion that Tivity Common Stock traded in an efficient market during the Class Period."[103]

### D. Evidence Suggests the Market Potentially Overreacted Following the UHC Press Release

68. As discussed earlier, security prices should reflect the underlying value of the security in an efficient market.[104] This means that not only do prices react quickly to new, value-relevant information in an efficient market, but also prices react in a manner commensurate with the value-implication of the news. Stock price under- or overreaction to news is inconsistent with efficient markets. However, Mr. Coffman ignores analyst commentary stating that Tivity's stock price overreacted to the UHC Press Release, *i.e.*, the alleged corrective disclosure, and the other UHC press releases on November 6, 2017.

69. Exhibit 5 illustrates analyst sentiment that the market overreacted to the UHC press releases. Of the seven analysts that published reports on November 6 or 7, 2017, only one changed its price target to a value different from that of its previous report. This indicates that six out of the seven analysts did not think the information in the UHC press releases

---

[101] Coffman Report, fn. 78.
[102] Coffman Report, Exhibit 14.
[103] Coffman Report, ¶ 80.
[104] "Efficient capital markets are those in which market prices reflect available information. This means that market prices reflect the underlying present value of securities, and there is no way to make unusual or excess profits by using the available information." Ross, Stephen A., Randolph W. Westerfield, and Jeffrey Jaffe, *Corporate Finance*, 7th ed. (Boston, MA: McGraw-Hill/Irwin), 2005, p. 349.

affected Tivity's overall business fundamentals.[105] Further, four of those analysts suggested that the stock price reaction was "overdone:"[106]

- Based on our estimates (assuming that UNH does not renew in 2020), **the shares now trade below our worst case scenario and are undervalued at current levels**. It is far from certain that UNH will not renew in 2020.
  – Cantor Fitzgerald, November 6, 2017 (emphasis added)

- We have estimated that TVTY generates about 15% of its revenue from UnitedHealth and probably a slightly lower earnings contribution. **Today's ~30% pullback is pricing in more than a worst case scenario for 2021**, which is when the UnitedHealth contract is up for renewal.
  – Jefferies, November 6, 2017 (emphasis added)

- **[W]e view the stock reaction as overdone**, but we acknowledge that this will remain an overhang on the stock, and investors will look to see what Tivity can do to prove their value in these markets.
  – William Blair, November 6, 2017 (emphasis added)

- **We view the sell-off as overdone**, remain bullish on the business model/underlying trends and view the stock move as an opportunity. We reiterate our Buy rating.
  – SunTrust Robinson Humphrey, November 7, 2017 (emphasis added)

70. Two of the other analysts did not believe the announcements would impact Tivity's 2018 financials, but would increase future risk. Both analysts maintained their ratings.[107]

- In our view, this news does not impact FY18 numbers; however, it does represent an incremental risk to TVTY's pricing power in the market. Reiterate OW rating and $49 price target as we see no reason to change numbers on this announcement… Since TVTY has become a

---

[105] William Blair released two reports for eight reports in total that were published following the UHC press releases. In its second report, William Blair further stated that "the [UHC] announcement has no bearing on our financial forecasts." "Taking a Deeper Dive into UnitedHealth's Proprietary Fitness Program and Its Impact on Tivity Health," William Blair, November 7, 2017, p. 1.

[106] "Shares Off on UNH Announcement; Too Early to Worry about 2020; Overweight," Cantor Fitzgerald, November 6, 2017, p. 1; "TVTY Pullback Today Pricing In More Than Worst Case Scenario With UnitedHealth," Jefferies, November 6, 2017, p. 1; "Sell-Off on UnitedHealth News Seems Markedly Overdone; We Are Buyers on Weakness," William Blair, November 6, 2017, p. 1; "Everybody Take A Deep Breath - Offering A Little Perspective," SunTrust Robinson Humphrey, November 7, 2017, p. 1.

[107] "Defending TVTY on Sell-Off after Optum News," Piper Jaffray, November 6, 2017, p. 1; "Tivity Shares Crushed As Relationship with UnitedHealth Comes Into Question," Barrington Research, November 7, 2017, p. 1.

pure-play Silver Sneakers company, the profitability profile has become more transparent. It's not a surprise that other competitors in the market are forming copycat programs. We view Optum's expansion of the Optum Fitness Advantage represents a strengthening of the competitive landscape, but Silver Sneakers remains the top tier player in the space, in our view.

– Piper Jaffray, November 6, 2017

- [W]e suspect that UnitedHealth will continue to be a material customer of Tivity through at least the end of the contract in 2020. That said, we have no real clarity on how much additional business could transition to United's internal offering beyond 2018.

  – Barrington Research, November 7, 2017

71. The final analyst, Chardan Capital Markets, did not change its price target but stated they "are less confident in [their] estimates for the company and [] are putting [their] estimates under review."[108]

72. In total, no analyst suggested that the stock price underreacted to UHC's announcements and several suggested that it overreacted, *i.e.*, the stock price reaction was not commensurate with the value-implication of the news and the stock was undervalued as a result.[109] Consistent with a potential overreaction to the UHC press releases, Tivity's stock price trended upwards in the trading days following UHC's announcement. On November 6, 2017, the day of the alleged corrective disclosure, Tivity's stock price closed at $31.60.[110] Five trading days later, on November 13, 2017, Tivity's stock price closed at $34.00—an increase of 7.6% since the UHC press releases. Ten trading days later, on November 20, 2017, it closed at $34.95—an increase of 10.6% since the UHC press releases.[111]

---

[108] "UNH Expands Senior Benefit, Less Confident in Our TVTY Estimates," Chardan Capital Markets, November 6, 2017, p. 1. Chardan Capital Markets did not publish a subsequent report until approximately four months later, on February 23, 2018. At that time, Chardan Capital Markets lowered its price target from $44 to $41. *See*, "4Q Beat & Strong '18 Guide; Reit. Neutral, PT to $41," Chardan Capital Markets, February 23, 2018, p. 1.

[109] Analysts further explained their views regarding the overreaction. For example, Jefferies analysts commented that "**United Isn't Necessarily Going To Replace TVTY.** It seems the Optum Fitness Advantage solution provides access to gyms, but doesn't have instructor led programs like the SilverSneakers program. We would also note SilverSneakers has very strong brand reputation and has taken share from competitors. Thus, while UnitedHealth's new solution could create disruption, SilverSneakers is a trusted brand [that] program seniors have come to love. The market seems to be reacting to a scenario whereby Fitness Advantage has already proven it is as popular with seniors as SilverSneakers." "TVTY Pullback Today Pricing In More Than Worst Case Scenario With UnitedHealth," Jefferies, November 6, 2017, p. 1 (emphasis in original).

[110] CRSP.

[111] CRSP. These price movements are not driven by market and/or industry effects. The market and industry indices used by Mr. Coffman in his *Cammer* Factor 5 analysis fell by 0.2% and 1.3%, respectively, in the ten trading days following the UHC Press Release. OFP-TVTY-00006608_Confidential.xlsx. Further, following the UHC Press Release on November 6, 2017, only one analyst changed its price target and EPS forecast.

73. In the situation described here, if the market overreacted, an investor could have purchased Tivity's stock and expected to make excess profits, which would be inconsistent with market efficiency.

### E. The Collective Evidence Presented Undermines Mr. Coffman's Conclusion That Tivity's Stock Traded in an Efficient Market

74. Mr. Coffman's definition of market efficiency implies that "all publicly available information is reflected in the security's current market price," and that prices reacted "rapidly and in an unbiased fashion" to new publicly available information.[112] Mr. Coffman's analysis ignores at least three critical pieces of evidence that undermine his conclusion that Tivity's stock traded in an efficient market. First, he ignores that the information content of the alleged misrepresentations and omissions was in the public domain. Second, he appears to dismiss his own finding of the presence of autocorrelation during the putative Class Period. Third, he ignores analyst commentary suggesting that Tivity's stock price overreacted to the alleged corrective disclosure. Consistent with a potential overreaction, Tivity's stock price increased following the UHC Press Release. Each of these provide evidence inconsistent with an efficient market.

## VII. Mr. Coffman Fails to Specify a Class-Wide Damages Methodology That is Consistent with Plaintiff's Theory of Liability

75. Mr. Coffman has not demonstrated that he can develop a class-wide damages model that is consistent with Plaintiff's theory of liability. As an initial matter, the collective evidence presented in Section VI—evidence that undermines Mr. Coffman's conclusion that Tivity's stock traded in an efficient market—has important economic implications for calculating damages on a class-wide basis given Plaintiff's theory of liability.

76. As explained in Section V, if the market is not efficient, different investors may have different information about the underlying company, including different information regarding the alleged misrepresentations and/or omissions, and all available information will

---

Specifically, on November 7, 2017, Barrington Research reduced its price target from $46 to $40 and FY 2019 EPS forecast from $1.92 to $1.78. "Tivity Shares Crushed As Relationship with UnitedHealth Comes Into Question," Barrington Research, November 7, 2017, p. 1. No other analysts with active price targets and EPS forecasts for FY 2018 and FY 2019 revised their estimates during November 6, 2017 – November 20, 2017. Refinitiv I/B/E/S Detailed Estimates Data.

[112] Coffman Report, ¶ 18.

not be reflected in the stock price. Thus, if a market is not efficient, one cannot assume that all investors relied on the same information when making their investment decisions.

77. Moreover, if Tivity's stock price decline on November 6, 2017 was in response to stale information about the Optum Fitness Advantage offerings in 11 states—information that was previously publicly available and that Plaintiff alleges was withheld from investors—then Mr. Coffman does not explain how his damages methodology can measure *both* (i) damages, if any, for investors that were *not* aware of this allegedly corrective information, and (ii) damages, if any, for investors, that were previously aware of this allegedly corrective information. Specifically:

a. There were likely some investors that were previously aware of Optum Fitness Advantage offerings in New Jersey and/or Washington[113] and for which the UHC Press Release would represent the materialization of a known risk. If investors formed expectations about the risk of increased competition from UHC (based on information about Optum Fitness Advantage offerings in New Jersey and/or Washington) at the time they made their investment decision to purchase Tivity's stock, then Mr. Coffman's damages methodology would potentially compensate those investors for a risk they knowingly assumed.

b. There were likely some investors that were previously aware of the Optum Fitness Advantage plan offerings in all 11 states at the time they made their investment decision to purchase Tivity's stock. Mr. Coffman's damages methodology would potentially provide a "windfall" gain to those investors who were previously aware of Optum Fitness Advantage offerings in 11 states.

78. Thus, given the collective evidence presented in Section VI of this report, Mr. Coffman has not demonstrated that he can develop a damages methodology consistent with Plaintiff's theory of liability that can be applied on a class-wide basis.

79. Even assuming, for the sake of argument, that Tivity's stock traded in an efficient market, then using the November 6, 2017 stock price decline to measure damages would provide a "windfall" gain to all putative Class members if they purchased Tivity's stock at a price that incorporated the information that Plaintiff alleges was withheld from investors, *i.e.*,

[113] As noted above, more generally, there were likely some investors that were previously aware of the Optum Fitness Advantage offerings in some or all 11 states referred to in the UHC Press Release.

information about the Optum Fitness Advantage offerings in 11 states that was publicly available as early as September 2017.

80. In addition, Mr. Coffman does not account for at least two other issues pertinent to this case that cause him to fail to specify a class-wide damages model that is consistent with Plaintiff's theory of liability.

a. First, Mr. Coffman ignores that Plaintiff's allegations described in the Complaint suggest that both the nature of Tivity's relationship with UHC and Tivity's knowledge about UHC's actions related to Optum Fitness Advantage changed during the putative Class Period. That means the amount of alleged inflation in Tivity's stock price also changed during the putative Class Period. However, Mr. Coffman's damages methodology fails to specify how he would account for time-varying inflation consistent with Plaintiff's theory of liability.

b. Second, as explained in Section VI.D, Mr. Coffman ignores potential market overreaction to the November 6, 2017 UHC Press Release. Mr. Coffman's damages methodology does not specify how he would account for such potential overreaction, which is a confounding factor consistent with market inefficiency and unrelated to the alleged misrepresentations and omissions.

81. I explain each of these in detail below.

### A. Damages in Securities Class Actions and Mr. Coffman's Damages Methodology

82. It is my understanding that in securities cases at the class certification stage, plaintiffs need to specify a methodology for calculating damages on a class-wide basis that is consistent with their theory of liability.[114] A damages model should measure investor losses attributable to the alleged misrepresentations and/or omissions for which plaintiffs claim defendants are liable, while excluding any loss attributable to other causes (*i.e.*, confounding factors unrelated to the alleged misrepresentations and/or omissions).

83. While I understand that plaintiffs are not required to calculate per-share damages at this stage, in my experience, an analysis of plaintiffs' theory of liability and the facts of a case is necessary to demonstrate that it is possible to develop a damages model that is economically sound and can be used to estimate damages on a class-wide basis.

---

[114] *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1431 (2013), p. 7.

84. In his expert report, Mr. Coffman claims that "it is clear that damages in this matter can be calculated using a methodology common to the Class."[115] He outlines three steps for this methodology:

- First, Mr. Coffman claims that "damages for each class member [is] artificial inflation per share at the time of purchase less the artificial inflation at the time of sale…subject to the Private Securities Litigation Reform Act of 1995's ('PSLRA's') '90-day lookback' provision."[116]
- Second, he claims that "the most common methodology to quantify artificial inflation is to perform an event study that measures price reactions to disclosures that revealed the relevant truth concealed by the alleged material omissions and/or misrepresentations."[117]
- Third, he claims that "[d]amages for any individual class member could then be calculated formulaically based upon the information collected in the claims process."[118]

85. Mr. Coffman offers a general framework for calculating damages that would use as a "starting point" an event study "that measures price reactions to disclosures that revealed the relevant truth"—in this case, the UHC Press Release—to quantify inflation.[119] Inflation is the difference between the observed market price of the stock and the stock's "true" value, *i.e.*, the price at which the stock would have traded had it reflected the allegedly concealed information—also referred to as the "but-for price."[120] Based on my experience (consistent with typical plaintiff approaches to estimating damages), Mr. Coffman would calculate inflation by estimating Tivity's residual stock price change following the UHC Press Release using an event study, *i.e.*, Mr. Coffman's inflation calculation would be based on Tivity's stock price decline on November 6, 2017.[121]

86. In my experience, when event studies are used by plaintiffs to calculate damages, plaintiffs' experts, including Mr. Coffman, generally employ a "back-casting" methodology to determine inflation on each day of the class period. Under a back-casting methodology with a single alleged corrective disclosure, the residual stock price change associated with the

---

[115] Coffman Report, ¶ 78.
[116] Coffman Report, ¶ 78.
[117] Coffman Report, ¶ 79.
[118] Coffman Report, ¶ 79.
[119] Coffman Report, ¶ 79; Coffman Deposition, 8:8–9:21, 13:16–14:14.
[120] A but-for price is also referred to as the "equivalent disclosure" price. *See, e.g.*, Cornell, Bradford, and R. Gregory Morgan, "Using Finance Theory to Measure Damages in Fraud on the Market Cases," *UCLA Law Review*, Vol. 37, No. 5, 1990, pp. 883–924 at p. 894.
[121] As mentioned above, I understand that during his deposition, Mr. Coffman explained that an event study analysis of the alleged corrective disclosure would be his starting point.

alleged corrective disclosure (a singular number) is "back-cast" or applied as the measure of inflation on each day of the class period.[122]

87. A back-casting methodology is consistent with the general damages framework described by Mr. Coffman. The implication of such a methodology is that stock price inflation in this matter would be assumed *constant* throughout the putative Class Period since there is only one estimate of inflation as a result of the single corrective disclosure event alleged by Plaintiff in this case.[123] Further, as described by Mr. Coffman, damages is the difference between the amount of inflation at the time of purchase and at the time of sale. Thus, Mr. Coffman's proposed damages methodology implies that every putative Class member who purchased shares on the same day and subsequently sold shares on the same day following the UHC Press Release would receive the same damages on a per-share basis.

### B. Mr. Coffman Fails to Consider Evidence That Some Investors Were Likely Aware of Allegedly Corrective Information

88. As shown in Exhibit 2 and discussed in Section VI.B, Mr. Coffman ignores evidence that information about Optum Fitness Advantage being offered in the 11 states was in the public domain prior to and during the putative Class Period. Mr. Coffman's own data and deposition testimony suggest it is plausible that some of Tivity's investors during the putative Class Period were aware of this information.

89. Specifically, Mr. Coffman finds that institutional investors held "virtually the entirety of [Tivity's] public float" during the putative Class Period.[124] Some of those institutions have large research departments. For example, according to Mr. Coffman's data, Blackrock purchased (on net) about 150,000 shares of Tivity's stock between March 31, 2017 and September 30, 2017.[125] In 2017, Blackrock had about 14,000 employees and managed more than $6 trillion across a variety of investment strategies.[126] Similarly, Jennison Associates, an investment advisor based out of Boston and New York, purchased (on net) approximately

---

[122] If there are multiple alleged corrective disclosure dates, the cumulative price reaction is back-cast to estimate inflation on each day of the class period.

[123] Based on my experience, plaintiffs typically assume a *constant dollar inflation band* model when back-casting inflation estimated from an event study with a single alleged corrective disclosure event. In a *constant dollar inflation band* model, stock price inflation is assumed to be a constant dollar amount throughout the class period.

[124] Coffman Report, ¶ 72.

[125] Coffman Production Materials, OFP-TVTY-00006612_Confidential.xlsx.

[126] BlackRock, Inc. Form 10-K for FY 2017, filed February 28, 2018, p. 1.

210,000 shares of Tivity's stock from March 31, 2017 to September 30, 2017.[127] It manages about $180 billion across several investment strategies with the majority of its assets invested in equities.[128] Jennison publicizes that it "build[s] portfolios from the bottom up, based on fundamental-research-supported convictions" and that its "research coverage is broad and deep, and [its] investment professionals are respected and experienced."[129] Further, one type of investment manager that traditionally invests heavily in gaining an informational advantage is a hedge fund. *Pensions & Investments*, an industry publication for investment managers, ranks hedge funds according to assets under management. Two of the largest 15 hedge funds as of June 30, 2017, Millennium Management and D.E. Shaw, purchased Tivity's stock (on net) between March 31, 2017 and September 30, 2017.[130]

90. Moreover, Mr. Coffman opined that "[i]nstitutional investors are considered to be sophisticated and well-informed with access to most publicly available information for the stocks that they own," and that "[t]hese investors…have substantial resources to analyze the securities they purchase for their portfolios."[131] Additionally, at his deposition, Mr. Coffman explained that some institutional investors have dedicated employees who do research on companies they invest in[132] and that some institutions, "especially those that have…deep research departments," have more information available to them than individual investors.[133] Mr. Coffman also stated that institutional investors would have access to the Internet and news sources such as those where the allegedly corrective information appeared. Specifically, Mr. Coffman acknowledged that it is possible institutional investors would have access to Factiva, a data source that contained the March 8, 2017 Bellingham Herald article described in Section VI.B.2 that noted the YMCA in Bellingham, Washington was offering Optum Fitness Advantage.[134]

91. Additional evidence indicates it is likely that some of Tivity's institutional investors were aware of the Optum Fitness Advantage offerings in some or all of the 11 states. In

---

[127] Coffman Production Materials, OFP-TVTY-00006612_Confidential.xlsx.
[128] "Welcome to Jennison Associates," Jennison Associates, https://www.jennison.com, accessed September 12, 2019.
[129] "Welcome to Jennison Associates," Jennison Associates, https://www.jennison.com, accessed September 12, 2019.
[130] Coffman Production Materials, OFP-TVTY-00006612_Confidential.xlsx; "The Largest Managers of Hedge Funds," *Pensions & Investments*, September 18, 2017.
[131] Coffman Report, ¶ 72.
[132] Coffman Deposition, 67:1–8.
[133] Coffman Deposition, 69:12–70:1.
[134] Coffman Deposition, 70:2–6; Factiva.

particular, during the putative Class Period, there is significant overlap in the institutional investors that held common stock in Tivity and United Health Group, UnitedHealthcare's parent company.[135] As of March 31, 2017, over 85 percent of Tivity's float was held by institutional investors that also held stock in UnitedHealth Group. As of September 30, 2017, over 95 percent of Tivity's float was held by institutional investors that also held stock in UnitedHealth Group.[136]

### 1. Mr. Coffman's Damages Methodology Does Not Account for Investors with Different Information about Optum Fitness Advantage Offerings

92. The above evidence documents that before and during the putative Class Period, there was publicly available information regarding the alleged corrective information and it is likely that some of Tivity's investors were aware of this information at the time. The implication of this evidence is that different members of the putative Class potentially had different information regarding Optum Fitness Advantage—and as a result, potentially different expectations about the risk of increased competition from UHC[137]—that may have affected their investment decision to purchase Tivity's stock.[138]

93. If some investors purchased Tivity's stock during the putative Class Period prior to the UHC Press Release and were aware that UHC had rolled out Optum Fitness Advantage in New Jersey and/or Washington or that UHC was planning to offer Optum Fitness Advantage in nine additional states, then Mr. Coffman will have to explain how his damages methodology can be applied to *both* (i) investors that were *not* aware of this allegedly corrective information, and (ii) investors that were aware of this allegedly corrective

---

[135] UnitedHealth Group consists of two divisions, UnitedHealthcare and Optum. UnitedHealthcare provides health care benefits to customers while Optum is a health services business. Optum Fitness Advantage was a benefit offered to UnitedHealthcare customers. UnitedHealth Group, Inc. Form 10-K for FY 2017, filed February 13, 2018, p. 1; UnitedHealthcare Press Release, "UnitedHealthcare Adds New Fitness Benefit to Medicare Advantage Plans in New York," November 6, 2017.

[136] Thomson Reuters. Float estimates are taken from Mr. Coffman's Exhibit 13. Coffman Production Materials, OFP-TVTY-00006612_Confidential.xlsx.

[137] Plaintiff claims that the nature of Tivity's relationship with UHC deteriorated during the putative Class Period as a result of an "increasing" competitive threat from UHC. For example, Plaintiff claims that "Defendants learned later in the Class Period that UHC would be *intensifying* its competitive efforts by expanding its competing program beyond New Jersey and Washington to nine additional states" but that Defendants continued to withhold this information from investors. Complaint, ¶¶ 5, 77 (emphasis added).

[138] *See, e.g.*, Coffman Deposition, 45:22–46:2. ["Q. And even though it might not affect the market price, if an investor did come across this information, it would affect their particular investment choice, right? MR. SOMMERS: Object to the form. THE WITNESS: That's plausible."]

information. This distinction is important in light of the collective evidence presented in Section VI that undermines Mr. Coffman's conclusion that Tivity's stock traded in an efficient market. If the market is not efficient, one cannot simply assume that all investors relied on the same information when making their investment decisions.

94. Mr. Coffman referred in his expert report and at his deposition to "the standard and well-settled formula for assessing damages for each class member," in which damages is equal to "artificial inflation per share at the time of purchase less the artificial inflation at the time of sale," also referred to as "out-of-pocket losses."[139] As discussed above, the general damages framework described by Mr. Coffman implies that stock price inflation would be assumed *constant* throughout the putative Class Period and, as a result, all investors that purchased Tivity's stock on the same day and subsequently also sold Tivity's stock on the same day would incur the same per share damages (equal to inflation at purchase minus inflation at sale). This methodology, however, is problematic if some of those investors had different information relating to Optum Fitness Advantage offerings in the 11 states referred to in the UHC Press Release.

95. This issue with Mr. Coffman's damages methodology is best illustrated by a stylized example. Suppose there are three different customers that each purchase a pair of pants that costs $20 from an online retailer. On the retailer's website, the pants are advertised as high-quality. However, these particular pants are not well made and are certain to rip after two weeks of wear. Of the three different customers that purchase the pants, the first customer trusts the company and assumes the pants are high quality. The second customer does some research and discovers that some of the products this company sells are not high quality and determines there is a 50% chance this product may rip in two weeks. The third customer does extensive research and realizes that these pants are certain to rip in two weeks. From an economic perspective, inflation in the purchase price for each customer is different because each customer's decision to purchase the pants was based on different information. Inflation for the first customer is $20 since they believed the product was high quality and got something (essentially) worthless that they paid $20 for. Inflation for the second customer is $10 since they determined there was a 50% chance that the pants would rip in two weeks, but, in truth, there was a 100% chance that the pants would rip in two weeks. There is no inflation for the third customer since they knew the truth and decided to purchase the pants

[139] Coffman Report, ¶ 78; Coffman Deposition, 12:23–13:2.

anyway, *i.e.*, the customer viewed $20 as a fair price with full knowledge that the pants would rip in two weeks. Depending on what each customer knew, inflation—the amount each customer overpaid—would be different.

96. Mr. Coffman's methodology would assign the same amount of inflation at purchase to each putative Class member regardless of the information they had about Optum Fitness Advantage at the time they purchased Tivity's stock. In the above example, this is the same as assigning the same amount of inflation to each customer who purchased the pants. Mr. Coffman's damages methodology does not account for the allegedly corrective information that each investor was aware of in light of the evidence presented in Section VI.B above that undermines his conclusion of market efficiency for Tivity's stock.

#### 2. Mr. Coffman's Damages Methodology Does Not Account for Investors That Were Aware of the Public Information Regarding the Optum Fitness Advantage Rollout in New Jersey and Washington Prior to or During the Putative Class Period

97. As Plaintiff acknowledges, UHC introduced Optum Fitness Advantage in New Jersey and Washington in January 2017, two months prior to the beginning of the putative Class Period.[140] Further, as shown in Exhibit 2 and discussed above, evidence from multiple sources shows that this information was in the public domain as early as mid-2016 and continued to be disseminated during the putative Class Period.

98. If investors had information about these Optum Fitness Advantage offerings, they would likely update their expectations about the "competitive threat" posed by UHC. For example, earlier in the putative Class Period, some investors may have adopted the view that the introduction of Optum Fitness Advantage in New Jersey and/or Washington increased the likelihood that UHC would introduce Optum Fitness Advantage in additional states.[141] Those investors may have placed a higher likelihood on UHC expanding its offerings compared to investors that did not have information about the Optum Fitness Advantage offerings in New Jersey and/or Washington. For those investors that were aware of Optum Fitness Advantage offerings in New Jersey and/or Washington, the Optum Fitness Advantage offerings in nine additional states that was disclosed in the UHC Press Release potentially represents the

---

[140] Complaint, ¶ 59.

[141] In a similar manner, Plaintiff alleges that the competitive threat posed by UHC was "increasing" during the putative Class Period as UHC's rollout of Optum Fitness Advantage evolved. Complaint, ¶ 77.

materialization of a known risk. This means those investors' expectations that UHC could introduce Optum Fitness Advantage in additional states was actually realized.[142] Put another way, those investors knew about the possibility that UHC would introduce Optum Fitness Advantage beyond New Jersey and Washington. For those investors, the announcement in the UHC Press Release that Optum Fitness Advantage was indeed going to be offered in states beyond New Jersey and Washington reflected the materialization of that possibility rather than a revelation of concealed information.

99. The materialization of a known risk is a confounding factor unrelated to the alleged misrepresentations or omissions. An investor that purchased Tivity's stock earlier in the putative Class Period with information about the introduction of Optum Fitness Advantage in New Jersey and/or Washington would have knowingly assumed the risk of more severe (increased) competition from UHC. As illustrated in my stylized example above, inflation for such an investor depends on the risk the investor knowingly assumed.[143] If different investors had different information about Optum Fitness Advantage, they would likely have adopted different views about the severity of competition from UHC and assumed varying levels of this risk at the time they purchased Tivity's stock. As a result, inflation for each of those investors would be different.

100. In contrast, Mr. Coffman's general damages framework would assume constant inflation and would potentially compensate some investors for a risk they knowingly assumed—not for the alleged fraud. As such, Mr. Coffman's general damages framework cannot be applied class-wide if some investors were previously aware of the Optum Fitness Advantage offerings in New Jersey and/or Washington and assumed the risk of more severe competition from UHC when they purchased Tivity's stock.

### 3. Mr. Coffman's Damages Methodology Does Not Account for Investors That Were Aware of the Public Information Regarding

[142] The scenario is similar if some investors were aware of the Optum Fitness Advantage offerings in any (or a subset) of the 11 states referred to in the UHC Press Release. If those investors formed expectations of a higher likelihood that UHC would introduce Optum Fitness Advantage in additional states given this information, then the event of the UHC Press Release potentially represents the materialization of a known risk.

[143] This scenario would be analogous to the second customer that purchased the pants from the online retailer after determining there is a 50% chance the pants may rip in two weeks.

**Optum Fitness Advantage Offerings in 11 States Prior to the UHC Press Release**

101. As discussed above, Exhibit 2 also shows that as early as September 2017, information about Optum Fitness Advantage competing with SilverSneakers in a total of 11 states in 2018 was publicly available. (See, for example, the posts from Insurance-Forums.com described in Section VI.B which discussed the Optum Fitness Advantage offerings in 11 states and that Optum Fitness Advantage was replacing SilverSneakers in at least some states.) If investors were aware of this information and purchased Tivity's stock during the putative Class Period, such investors would have been in possession of information in the UHC Press Release that Plaintiff alleges was corrective and which Mr. Coffman understands was "the substance of what's alleged to be corrective."[144] Referring back to my stylized example above, this scenario would be analogous to the third customer that purchased the pants from the online retailer knowing that the pants would rip in two weeks. Inflation at purchase, if any, for investors that were previously aware of this allegedly corrective information, would be different from inflation for those that did not have information about Optum Fitness Advantage offerings in all 11 states. Moreover, Mr. Coffman's damages methodology (based on an event study analysis of the UHC Press Release) would potentially provide a "windfall" gain to those investors with information about Optum Fitness Advantage offerings in 11 states.

102. In summary, Mr. Coffman's damages methodology does not account for the aforementioned implications of public information regarding Optum Fitness Advantage prior to and during the putative Class Period, and as a result, he has not presented a damages methodology consistent with Plaintiff's theory of liability and the facts in this case that can be applied on a class-wide basis.

**4. Even Assuming that Tivity's Stock Traded in an Efficient Market, Mr. Coffman Still Has Not Specified a Class-Wide Damages Methodology that is Consistent with Plaintiff's Theory of Liability**

103. Above, I discussed that Mr. Coffman has not specified a class-wide damages methodology consistent with Plaintiff's theory of liability given that (i) information about Optum Fitness Advantage offerings in 11 states was in the public domain and (ii) Mr.

---

[144] Coffman Deposition, 8:20–9:5.

Coffman fails to demonstrate that Tivity's stock traded in an efficient market. Even assuming, for the sake of argument, that Tivity's stock traded in an efficient market, then Mr. Coffman still has not specified a class-wide damages methodology that is consistent with Plaintiff's theory of liability.

104. In an efficient market, the stock price would (i) reflect all publicly available and value-relevant information regarding the stock and (ii) respond to the disclosure of new, value-relevant information at the time the information is disclosed. If Tivity's stock traded in an efficient market and investors purchased the stock at a price that incorporated prior publicly available information about UHC offering a competing product in 11 states, then the stock price decline following the UHC Press Release would be related to some other information. For example, it could be the case that UHC's action of issuing a series of 12 press releases shifted the market's expectations about UHC expanding its Optum Fitness Advantage offerings in the future.[145] In this example, the shift in the market's expectation about UHC's future offerings of Optum Fitness Advantage is a result of the issuance of the press releases and not due to the revelation of UHC offering competing products in the 11 states.[146] Thus, Mr. Coffman's damages methodology (based on an event study of the UHC Press Release) would provide a "windfall" gain to all putative Class members if information

---

[145] UnitedHealthcare Press Release, "UnitedHealthcare Adds New Fitness Benefit to Medicare Advantage Plans in Arizona," November 6, 2017; UnitedHealthcare Press Release, "UnitedHealthcare Adds New Fitness Benefit to Medicare Advantage Plans in Austin," November 6, 2017; UnitedHealthcare Press Release, "UnitedHealthcare Adds New Fitness Benefit to Medicare Advantage Plans in Florida," November 6, 2017 [issued at 9:15 ET]; UnitedHealthcare Press Release, "UnitedHealthcare Adds New Fitness Benefit to Medicare Advantage Plans in Florida," November 6, 2017 [issued at 10:00 ET]; UnitedHealthcare Press Release, "UnitedHealthcare Adds New Fitness Benefit to Medicare Advantage Plans in Houston," November 6, 2017; UnitedHealthcare Press Release, "UnitedHealthcare Adds New Fitness Benefit to Medicare Advantage Plans in Kentucky," November 6, 2017; UnitedHealthcare Press Release, "UnitedHealthcare Adds New Fitness Benefit to Medicare Advantage Plans in New York," November 6, 2017; UnitedHealthcare Press Release, "UnitedHealthcare Adds New Fitness Benefit to Medicare Advantage Plans in Ohio," November 6, 2017; UnitedHealthcare Press Release, "UnitedHealthcare Adds New Fitness Benefit to Medicare Advantage Plans in Oklahoma," November 6, 2017; UnitedHealthcare Press Release, "UnitedHealthcare Adds New Fitness Benefit to Medicare Advantage Plans in Oregon," November 6, 2017; UnitedHealthcare Press Release, "UnitedHealthcare Adds New Fitness Benefit to Medicare Advantage Plans in San Antonio," November 6, 2017; UnitedHealthcare Press Release, "UnitedHealthcare Adds New Fitness Benefit to Medicare Advantage Plans in Wisconsin," November 6, 2017. UnitedHealthcare issued two separate press releases on November 6, 2017 that were both titled "UnitedHealthcare Adds New Fitness Benefit to Medicare Advantage Plans in Florida."

[146] Analyst commentary is consistent with market participants potentially updating their expectations about UHC's future offerings. For example, a Jefferies analyst stated "[i]t seems UnitedHealth could be testing its Fitness Advantage offering to see how well it competes with TVTY's SilverSneakers over the next 3 years. If successful, UnitedHealth could choose to scale down or terminate its contract with TVTY." "TVTY Pullback Today Pricing In More Than Worst Case Scenario With UnitedHealth," Jefferies, November 6, 2017, p. 1.

about UHC offering a competing product in 11 states was already incorporated in Tivity's stock price prior to the UHC Press Release.

### C. Mr. Coffman's Damages Methodology Does Not Specify How He Would Account for Time-Varying Inflation Consistent with Plaintiff's Theory of Liability

105. Mr. Coffman contends that "on each day during the Class Period…the most common methodology to quantify artificial inflation is to perform an event study that measures price reactions to disclosures that revealed the relevant truth."[147] The "relevant truth" in this case is alleged to be information disclosed in a single event, the UHC Press Release. I explained above that under the general damages framework proposed by Mr. Coffman, inflation would be assumed *constant* throughout the putative Class Period because there is only one estimate of inflation as a result of the single corrective disclosure event alleged by Plaintiff in this case. Plaintiff's theory of liability, however, implies that inflation was *not* constant during the putative Class Period. Mr. Coffman's damages methodology does not specify how he would account for time-varying inflation consistent with Plaintiff's theory of liability.

106. As discussed above, inflation should represent the difference between the observed market price of a stock and the but-for stock price, *i.e.*, what the stock price would have been but for any alleged misrepresentations or omissions. Consequently, the but-for stock price would reflect information that was known or knowable to the defendants earlier in the alleged class period. Such information constitutes what could have been disclosed and available to investors but for the alleged misrepresentations or omissions (the "but-for disclosure").

107. Plaintiff alleges that Tivity misrepresented and/or omitted to disclose the nature of its contractual relationship with UHC and its knowledge of UHC's actions related to the launch of Optum Fitness Advantage.[148] Importantly, as shown in Exhibits 1A–1B, *both* the alleged misrepresentations and omissions regarding Tivity's relationship with UHC and Tivity's knowledge related to UHC's launch of Optum Fitness Advantage that Plaintiff alleges was withheld from investors were *changing* during the putative Class Period. This has important implications for measuring inflation. For example, at the start of the putative Class Period, Plaintiff alleges that Tivity knew UHC "would not be renewing SilverSneakers in at least

[147] Coffman Report, ¶ 79.
[148] Complaint, ¶¶ 1–6.

New Jersey and Washington State."[149] Later in the putative Class Period, Plaintiff alleges that Tivity knew of—presumably additional—"contract losses arising from UHC as early as June 2017."[150] (*See*, Exhibit 1A.) At the start of the putative Class Period, inflation would have to reflect the allegedly concealed information at that time, namely that UHC was offering competing products in New Jersey and Washington. If later in the putative Class Period, Plaintiff alleges that Tivity concealed additional contract losses, then inflation later in the putative Class Period would have to reflect that additional information allegedly concealed from investors. As such, the information content of appropriate but-for disclosures (what Tivity could have disclosed earlier in the putative Class Period absent the alleged misrepresentations or omissions) would be different at different times during the putative Class Period.

108. Indeed, Plaintiff acknowledges that Tivity learned of developments *during* the putative Class Period regarding UHC's actions related to Optum Fitness Advantage. For example, Plaintiff alleges that "Defendants learned *later in the Class Period* that UHC would be *intensifying* its competitive efforts by expanding its competing program beyond New Jersey and Washington to nine additional states" but that Defendants continued to withhold this information from investors.[151] Plaintiff further alleges that despite the renewal of Tivity's contract with UHC—which occurred *during* the putative Class Period[152]—"the actual terms of the renewed UHC contract confirmed that the competitive threat posed by UHC was increasing since in certain markets it was replacing SilverSneakers with Optum Fitness Advantage, all of which represented a *deterioration* in Tivity's relationship with UHC…."[153] (*See*, Exhibit 1B.) Thus, according to Plaintiff, the nature of Tivity's relationship with UHC "deteriorated" during the putative Class Period as a result of an "increasing" competitive threat from UHC.

109. In this case, developing a model to measure changing inflation is complicated due to the nature of the alleged misrepresentations and omissions. As shown in Exhibit 1B, Plaintiff alleges 16 different alleged misstatements that are initially alleged on four different dates. However, Mr. Coffman's general damages framework would provide only one estimate of inflation as a result of the single corrective disclosure event alleged by Plaintiff in this case.

---

[149] Complaint, ¶ 59.
[150] Complaint, ¶ 77.
[151] Complaint, ¶ 5 (emphasis added).
[152] Complaint, ¶¶ 37, 55.
[153] Complaint, ¶ 77 (emphasis in original).

Mr. Coffman will have to specify how he would apportion inflation throughout the putative Class Period in a manner that would be consistent with the value-implications of the changing nature of the allegations and of Tivity's knowledge of UHC's actions.

110. From an economic perspective, if the nature and value-relevance of information that is alleged to have been withheld from investors were changing during the putative Class Period, then inflation will also vary. Mr. Coffman's damages methodology is silent on the potential time-varying nature of any alleged inflation in this case and he does not specify how his damages methodology would account for time-variation in alleged inflation.

### D. Mr. Coffman's Damages Methodology Does Not Specify How He Would Account for Potential Market Overreaction Following the UHC Press Release

111. As explained above, damages in securities class actions should measure the effect of the alleged misrepresentations and/or omissions on the company's stock price and exclude any economic loss attributable to other causes unrelated to the alleged misrepresentations and/or omissions. Consequently, a class-wide damages methodology must be able to provide a measure of alleged inflation in the stock price throughout the alleged class period that reflects the economic value of the allegedly concealed information.

112. In this matter, and discussed in further detail in Section VI.D above, several analysts indicated that the market overreacted to the November 6, 2017 UHC press releases. As Cantor Fitzgerald stated, Tivity's stock price was "undervalued at current levels."[154] In other words, the Cantor Fitzgerald analyst and others were of the view that the stock price decline following the UHC Press Release was not commensurate with, and in fact overstated, the value-implications of the alleged corrective information. This implies that Tivity's stock price decline on November 6, 2017 would potentially overstate the economic value of the allegedly concealed information, *i.e.*, alleged inflation.

113. If Tivity's stock price following the UHC Press Release was undervalued as a result of investor overreaction, then any measure of damages must exclude the portion of Tivity's stock price decline on November 6, 2017 resulting from the investor overreaction. This is because any such overreaction would be a confounding factor unrelated to the alleged misrepresentations and omissions. Mr. Coffman does not specify how he would account for

---

[154] "Shares Off on UNH Announcement; Too Early to Worry About 2020; Overweight," Cantor Fitzgerald, November 6, 2017, p. 1.

potential overreaction in Tivity's stock price following the UHC Press Release and thus, he has not specified a damages methodology consistent with Plaintiff's theory of liability.

Executed this 8th of October, 2019

Paul A. Gompers

# Paul A. Gompers CV

Baker Library 263
Graduate School of Business Administration
Harvard University
Boston, MA 02163

(617) 495-6297 (ph)
(617) 496-8443 (fax)
pgompers@hbs.edu
http://www.people.hbs.edu/pgompers

## ACADEMIC POSITIONS

2000–present HARVARD BUSINESS SCHOOL BOSTON, MA
Eugene Holman Professor of Business Administration. Research interests include venture capital, private equity, entrepreneurial finance, institutional investors, corporate governance, optimal security design, dynamic capital structure, long-run performance of firms, and sources of financing for start-up businesses.

1998–2000 HARVARD BUSINESS SCHOOL BOSTON, MA
Associate Professor of Business Administration.

1995–1998 HARVARD BUSINESS SCHOOL BOSTON, MA
Assistant Professor of Business Administration.

1993–1995 UNIVERSITY OF CHICAGO CHICAGO, IL
Assistant Professor of Finance and Policy at the Graduate School of Business. Created new course on the financing of start-up companies.

1995–present NATIONAL BUREAU OF ECONOMIC RESEARCH CAMBRIDGE, MA
Research Associate. Appointed as an NBER affiliate in corporate finance.

## EDUCATION

1989–1993 HARVARD UNIVERSITY CAMBRIDGE, MA
Received Ph.D. in Business Economics, June 1993.

1987–1989 OXFORD UNIVERSITY OXFORD, UK
Graduated *summa cum laude* with a M.Sc. in economics, July 1989.

1982–1987 HARVARD COLLEGE CAMBRIDGE, MA
Graduated *summa cum laude* with an A.B. in biology.

## PUBLICATIONS

### Books

The Venture Capital Cycle, (MIT Press, Cambridge) October 1999. (Joint with Josh Lerner.) First Edition.

The Money of Invention, (Harvard Business School Press, Boston) November 2001. (Joint with Josh Lerner.)

Entrepreneurial Finance: A Casebook, (John Wiley, New York) December 2001. (Joint with William Sahlman.)

The Venture Capital Cycle, (MIT Press, Cambridge) October 1999. (Joint with Josh Lerner.) Second Edition. 2004.

Private Equity Finance, (Anthem Press, London). March 2019. (Joint with Victoria Ivashina and Richard Ruback.)

### Articles in Refereed Journals

"Optimal Investment, Monitoring, and the Staging of Venture Capital," *Journal of Finance* 50, 1461-1489. December 1995. Reprinted in Michael Wright and Ken Robbie, editors, Venture Capital (International Library of Management) (Aldershot: Dartmouth Publishing, 1997.)

"Grandstanding in the Venture Capital Industry," *Journal of Financial Economics* 42, 133–156. July 1996.

"The Rise and Fall of Venture Capital," Business and Economic History 23, 1–24. Winter 1994. Awarded Newcomen Prize essay for best paper in business history.

"The Use of Covenants: An Empirical Analysis of Venture Partnership Agreements," *Journal of Law and Economics* 39, 463–498. October 1996. (with Josh Lerner.)

"Myth or Reality? The Long-Run Underperformance of Initial Public Offerings: Evidence from Venture and Nonventure Capital-backed Companies." *Journal of Finance* 52, 1791–1821. December 1997. (with Alon Brav.) Awarded the Smith-Breeden Distinguished Paper Award.

"Venture Capital Growing Pains: Should the Market Diet?" *Journal of Banking and Finance* 22, 1089–1104. August 1998.

"An Analysis of Compensation in the US Venture Capital Partnership," *Journal of Financial Economics* 51, 3–44. January 1999. (with Josh Lerner.)

"Venture Capital Distributions: Short-Run and Long-Run Reactions," *Journal of Finance* 53, 2161–2184. December 1998. (with Josh Lerner.)

"Conflict of Interest in the Issuance of Public Securities: Evidence from Venture Capital," *Journal of Law and Economics* 42, 1-28. April 1999. (with Josh Lerner.)

"What Drives Venture Capital Fundraising?" *Brookings Proceedings on Microeconomic Activity*, 149-192. August 1998. (with Josh Lerner.)

"Money Chasing Deals? The Impact of Fund Inflows on Private Equity Valuations," *Journal of Financial Economics* 55, 281-325. February 2000. (with Josh Lerner.)

"Is the Abnormal Return Following Equity Issuances Anomalous?" *Journal of Financial Economics* 56, 209–250. May 2000. (with Alon Brav and Chris Geczy.)

"Institutional Investors and Equity Prices," *Quarterly Journal of Economics* 114, 229–260. 2001. (with Andrew Metrick.)

"The Venture Capital Revolution," *Journal of Economic Perspectives* 15, 145–168. Spring 2001. (with Josh Lerner.)

"Who Underreacts to Cash Flow News?" *Journal of Financial Economics* 66, 409–462. 2002. (with Randy Cohen and Tuomo Vuolteenaho.)

"The Role of Lock-ups in Initial Public Offerings Provisions," *Review of Financial Studies* 16, 1–29. Spring 2003. (with Alon Brav.)

"Corporate Governance and Equity Prices," *Quarterly Journal of Economics* 118, 107-156. February 2003. (with Joy Ishii and Andrew Metrick.)

"The Really Long-Run Performance of Initial Public Offerings: Evidence from the Pre-Nasdaq Period, 1933–1972," *Journal of Finance* 56, 1355–1392. August 2003. (with Josh Lerner.)

"The Determinants of Board Structure and Function in Entrepreneurial Firms," *Journal of Law and Economics* 46, 569–598. October 2003. (with Malcolm Baker.)
"Entrepreneurial Spawning: Corporations and the Genesis of New Ventures, 1986–1999," *Journal of Finance* 60, 577-614. April 2005. (with Josh Lerner and David Scharfstein.)
"Large Blocks of Stock: Prevalence, Size, and Measurement," *Journal of Corporate Finance* 12, 594-618. June 2006. (with Rudiger Fahlenbrach, Jennifer Dlugosz, and Andrew Metrick.)
"Venture Capital Investment Cycles: The Impact of Public Markets," *Journal of Financial Economics*, 1–23. 2008. (with Anna Kovner, Josh Lerner, and David Scharfstein.)
"Specialization and Success: Evidence from Venture Capital," *Journal of Economic and Management Strategy* 18, 817–845. 2009. (with Anna Kovner, Josh Lerner, and David Scharfstein.)
"Extreme Governance: An Analysis of Dual-Class Firms in the United States," *Review of Financial Studies* 23, 1051–1088. 2010. (with Joy Ishii and Andrew Metrick.)
"Performance Persistence in Entrepreneurship and Venture Capital," *Journal of Financial Economics* 96, 18–32. 2010. (with Anna Kovner, Josh Lerner, and David Scharfstein.)
"Buy Local? The Geography of Successful Venture Capital Expansion," *Journal of Urban Economics* 67, 90–102. 2010. (with Henry Chen, Anna Kovner, and Josh Lerner.)
"The Cost of Friendship," *Journal of Financial Economics* 119, 626–644. March 2016. (with Vladimir Mukharlyamov and Yuhai Xuan.)
"What Do Private Equity Firms Say They Do?" *Journal of Financial Economics* 121, 449–476. September 2016. (with Steven N. Kaplan and Vladimir Mukharlyamov.)
"More than Money: Venture Capitalists on Boards." Forthcoming in *Journal of Law, Economics, and Organizations.* May 2018. (with Natee Amornsiripanitch and Yuhai Xuan.)
"The Other Diversity Dividend," *Harvard Business Review.* July 2018. (with Silpa Kovvali.)
"How Do Venture Capitalists Make Decisions," December 2017. Forthcoming in the *Journal of Financial Economics.* (joint with Will Gornall, Steve Kaplan, and Ilya Strebulaev.)
"Gender Effects in Venture Capital," March 2018. Forthcoming in the *Journal of Financial and Quantitative Analysis.* Joint with Vladimir Muhkarlyamov, Emily Weisburst, and Yuhai Xuan.)

**Other Articles**

"Venture Capital and the Creation of Public Companies: Do Venture Capitalists Really Bring More than Money?" *Journal of Private Equity* 1, 15-32. Fall 1997. (with Josh Lerner.)
"Risk and Reward in Private Equity Investments: The Challenge of Performance Assessment," *Journal of Private Equity* 1, 5-12. Winter 1997. (with Josh Lerner.)
"Resource Allocation, Incentives, and Control: The Importance of Venture Capital in Financing Entrepreneurial Firms," *Entrepreneurship, SMEs, and the Macroeconomy* (Cambridge University Press, Cambridge), 206-238. February 1997.
"Venture Capital," *The Handbook of Technology Management* (Richard Dorf, Editor-in-Chief). January 1997. (with Josh Lerner.)
"The Determinants of Corporate Venture Capital Success: Organizational Structure, Incentives, and Complementarities," NBER Conference Volume on Concentrated Corporate Ownership, 17-54. September 1998.
"Capital Formation and Investment in Venture Markets: An Assessment of Market Imperfections," *The Economic Evaluation of Technological Change* (Richard Spivack, Editor). June 1998.
"Corporations and the Financing of Innovation: The Corporate Venturing Experience," *The Atlanta Federal Reserve Bank Conference Volume*, 1-17. 2002.
"Venture Capital and Private Equity," *The Handbook of Corporate Finance* (Espen Eckbo, Editor) (North-Holland Press, New York). 2002.
"Short-Term America Revisited? Boom and Bust in the Venture Capital Industry and the Impact on Innovation," *Innovation Policy and the Economy* 3, 1-28. March 2002. (with Josh Lerner.)
"Venture Capital," Chap. D5 of *The Handbook of Modern Finance* (Dennis Lougue, Editor). 2007. (with Josh Lerner.)
"Equity Financing," *Handbook of Entrepreneurship Research: An Interdisciplinary Survey and*

introduction (Zoltan Acs and David B. Audretsch, Editor). 2010. (with Josh Lerner.)

"The Role of Venture Capitalists in the Acquisition of Private Companies." In *Research Handbook on International Banking and Governance*, edited by James Barth, Chen Lin, and Clas Wihlborg. Cheltenham, UK: Edward Elgar Publishing, 2012. (with Yuhai Xuan).

**Working Papers**

"Diversity in Innovation," January 2019. (with Sophie Calder-Wang.)

"Homophily in Entrepreneurial Team Formation," January 2019. (with Sophie Calder-Wang and Kevin Huang.)

"And the Children Shall Lead: Gender Diversity and Performance in Venture Capital," May 2018. (with Sophie Calder-Wang.)

"Gender Effects in Venture Capital," March 2018. Joint with Vladimir Muhkarlyamov, Emily Weisburst, and Yuhai Xuan.)

"To Err is Human, To Forgive is a Mistake: Evidence from Venture Capital Hiring," December 2013. (with Vladimir Mukharlyamov and Yuhai Xuan.)

"Bridge Building in Venture Capital: Evidence from Acquisitions of Venture Capital-backed Companies," December 2011. Revise and resubmit at *Review of Financial Studies* (with Yuhai Xuan.)

"Reputation and Contractual Flexibility: Evidence from Venture Capital Distribution Pricing Policies," August 2011. (with Timothy Dore and Andrew Metrick.)

"Why Experienced Venture Capitalists Leave Money on the Table: Evidence from Initial Public Offerings," July 2009. (with Alon Brav and Tim Dore.)

"Institutions, Capital Constraints and Entrepreneurial Firm Dynamics: Evidence from Europe," November 2006. (with Mihir Desai and Josh Lerner.)

"Skill vs. Luck in Entrepreneurship and Venture Capital: Evidence from Serial Entrepreneurs," December 2006. (with Anna Kovner, Josh Lerner, and David Scharfstein.)

"The Role of Venture Capitalists in the Acquisition of Private Companies," October 2005. (with Yuhai Xian.)

"Incentives vs. Control: An Analysis of U.S. Dual-class Companies," April 2004. (with Andrew Metrick and Joy Ishii.)

"Ownership and Control in Entrepreneurial Firms: An Examination of Convertible Securities in Venture Capital Investment," January 2000.

"An Analysis of Executive Compensation, Ownership, and Control in Entrepreneurial Firms," May 2000. (with Malcolm Baker.)

**Opinion — Editorials**

"This Tax Cut Will Pay Dividends," *Wall Street Journal,* August 13, 2002. (with Andrew Metrick and Jeremy Siegel.)

**Projects in Process**

- "The Evolution of Ownership and Control in Entrepreneurial Firms." (with Malcolm Baker.)
- "Dual Class IPOs." (with Malcolm Baker.)
- "Pre-public Financing in Entrepreneurial Ventures."
- "Institutional Ownership and Corporate Governance." (with Andrew Metrick and Joy Ishii.)
- "The Dynamics of Global Entrepreneurship." (with Mihir Desai and Josh Lerner.)
- "The Determinants of Venture Capital Acquisitions." (with Yuhai Xuan.)
- "The Determinants of Entrepreneurial Success." (with Anna Kovner, Josh Lerner, and David Scharfstein.)
- "Risk and Return in Private Equity." (with Leslie Jeng, Josh Lerner, and Andrew Metrick.)
- "Corporate Governance through Time." (with Martijn Cremers, Allen Ferrell, and Andrew Metrick.)

**COURSE MATERIALS**

**Cases**

- "Abraaj Capital and Acibadem Healthcare Invesetment (A)." Harvard Business School Case 214-021.
- "Abraaj Capital and Acibadem Healthcare Invesetment (B)." Harvard Business School Case 214-022.
- "Advantage Partners: Dia Kanri (A)." Harvard Business School Case 214-016.
- "Advantage Partners: Dia Kanri (B)." Harvard Business School Case 214-017.
- "The Advent Israel Venture Capital Program." Harvard Business School Case 298–072.
- "ALWAYSi." Harvard Business School Case 201–075.
- "APV Technology Partners II, L.P." Harvard Business School Case 298–048.
- "Ardian: The Sale of Diana." Harvard Business School Case 215-033.
- "Aspect Ventures." Harvard Business School Case 217-046.
- "Bain Capital: Outback Steakhouse." Harvard Business School Case 212-087.
- "Bang Networks, Inc." Harvard Business School Case 201–074.
- "BioTransplant, Inc.: Initial Public Offering, January 1996." Harvard Business School Case 297–095.
- "Cachet Technologies." Harvard Business School Case 200–031.
- "Cambridge Technology Partners: 1991 Start Up." Harvard Business School Case 298–044.
- "Cambridge Technology Partners: Corporate Venturing (August 1996)." Harvard Business School Case 297–033.
- "Car Wash Partners, Inc." Harvard Business School Case 299–034.
- "Charles River Velocity." Harvard Business School Case 201–092.
- "Charter Communication Bankruptcy." Harvard Business School Case 211-035.
- "Clover Food Lab." Harvard Business School Case Study 818-073.
- "Dell Ventures." Harvard Business School Case 200–062.
- "Digital Everywhere, Inc." Harvard Business School Case 298–099.
- "edocs, Inc. (A)." Harvard Business School Case 200–015.
- "edocs, Inc. (B-1): Kevin Laracey." Harvard Business School Case 200–020.
- "edocs, Inc. (B-2): Jonathon Guerster." Harvard Business School Case 200–021.
- "Efficient Market Services: August 1993 (A)." Harvard Business School Case 298–009.
- "Efficient Market Services: August 1993 (B1), EMS Management." Harvard Business School Case 298–010.
- "Efficient Market Services: August 1993 (B2), Comdisco Ventures." Harvard Business School Case 298–011.
- "Elliot Lebowitz." Harvard Business School Case 297–094.
- "Endeca: New Growth Opportunities." Harvard Business School Case 206–041.
- "First Mark Capital." Harvard Business School Case 212-041.
- "Fitzpatrick Hotel Group (A)." Harvard Business School Case 298–002.
- "Fitzpatrick Hotel Group (B1): Niall Carroll." Harvard Business School Case 298–003.
- "Fitzpatrick Hotel Group (B2): Paddy Fitzpatrick." Harvard Business School Case 298–004.
- "Founders Fund." Harvard Business School Case 211-040.
- "Genset Initial Public Offering (A)." Harvard Business School Case 297–096.
- "Genset Initial Public Offering (B)." Harvard Business School Case 297–097.
- "Genset: 1989." Harvard Business School Case 298–070.
- "Global Digital Utilities Corp." Harvard Business School Case 297–065.
- "Globant: Going Public." Harvard Business School Case 215-021.
- "Harrah's Entertainment LBO." Harvard Business School Case13-054.
- "HgCapital and the Visma Transaction: (A)." Harvard Business School Case 214-018.
- "HgCapital and the Visma Transaction: (B)." Harvard Business School Case 214-019.
- "HgCapital and the Visma Transaction: (C)." Harvard Business School Case 214-020.
- "Honest Tea." Harvard Business School Case 201–076.
- "Hudson Manufacturing." Harvard Business School Case 203–064.
- "ICSGroup." Harvard Business School Case 819-097.
- "Knightsbridge Advisers, Inc." Harvard Business School Case 296–054.

- "Knoll Furniture: Going Public." Harvard Business School Case 202–114.
- "Loma Vista Medical." Harvard Business School Case 819-050.
- "MSE, Inc. Privatization: August 1997." Harvard Business School Case 298–135.
- "MSE, Inc. Privatization: August 1997 (Abridged)." Harvard Business School Case 298–136.
- "New Oriental." Harvard Business School Case.
- "New York Bagel: Hungary, April 1994." Harvard Business School Case 297–078.
- "NSK Software Technologies Ltd." Harvard Business School Case 298–071.
- "Nykaa.com: A Passion for Beauty." Harvard Business School Case 218-049.
- "Ocular." Harvard Business School Case 202–118.
- "Panoramic Power." Harvard Business School Case 818-072.
- "Pet Doctors: 1999." Harvard Business School Case 200–016 "The Prague Post." Harvard Business School Case 299–033.
- "Private Equity Finance Vignettes: 2016." Harvard Business School Case 216-005.
- "Private Equity Vignettes: 2014." Harvard Business School Case 213-026.
- "Rapid7." Harvard Business School Case 817-077.
- "Sarvega." Harvard Business School Case 204–137.
- "Shenzhen Capital Group: A Pioneer in China's VC Industry" Harvard Business School Case 211-029.
- "Sky Air, Inc." Harvard Business School Case 297–110.
- "TaskRabbit." Harvard Business School Case 217-047.
- "Torrent Systems." Harvard Business School Case 298–084.
- "Tutor Time (A)." Harvard Business School Case 297–064.
- "Tutor Time (B)." Harvard Business School Case 297–074.
- "United Capital Partners (A)." Harvard Business School Case 213-044.
- "United Capital Partners (B)." Harvard Business School Case 213-045.
- "Venture Capital in Ireland: Getting Their ACT Together." Harvard Business School Case 298–001.
- "Vueling Airlines." Havard Business School Case.
- "Xedia and Silicon Valley Bank (A)." Harvard Business School Case 298–119.
- "Xedia and Silicon Valley Bank (B1): The Bank's Perspective." Harvard Business School Case 298–120.
- "Xedia and Silicon Valley Bank (B2): The Company's Perspective." Harvard Business School Case 298–121.
- "Xedia and Silicon Valley Bank (C): The Final Agreement." Harvard Business School Case 298–122.
- "Yo-Yo Ma and Silkroad." Harvard Business School Case 818-110.
- "ZEFER: November 1998." Harvard Business School Case 299–032.

**<u>Course Notes and Teaching Notes</u>**

- "Advent Israel Venture Capital Program TN." Harvard Business School Teaching Note 299–054.
- "APV Technology Partners II, L.P. TN." Harvard Business School Teaching Note 299–053.
- "Beta Golf." Harvard Business School Teaching Note 202–062.
- "BioTransplant Inc.: Initial Public Offering, January 1996 TN." Harvard Business School Teaching Note 299–055.
- "Cachet Technologies." Harvard Business School Teaching Note 202–068.
- "Cambridge Technology Partners —1991 Start Up TN." Harvard Business School Teaching Note 299–057.
- "Cambridge Technology Partners: Corporate Venturing (August 1996) TN." Harvard Business School Teaching Note 299–056.
- "Carlton Polish Co." Harvard Business School Teaching Note 202–076.
- "Car Wash Partners, Inc. TN." Harvard Business School Teaching Note 299–058.
- "Contracting and Control in Venture Capital." Harvard Business School Note 298–067.
- "Dell Ventures." Harvard Business School Teaching Note 202–072.
- "Digital Everywhere, Inc. TN." Harvard Business School Teaching Note 299–059.

- “edocs, Inc. Series.” Harvard Business School Teaching Note 202–064.
- “Elliot Lebowitz TN.” Harvard Business School Teaching Note 299–060.
- “Emergence of Silicon Wadi.” Harvard Business School Note 204–156.
- “Fenchel Lampshade Company.” Harvard Business School Teaching Note 202–063.
- “Efficient Market Services: August 1993 Series TN.” Harvard Business School Teaching Note 299–061.
- “The Entrepreneurial Manager: Course Overview, Harvard Business School Case.” 818-080
- “The Entrepreneurial Manager, Module I: Defining and Developing the Business Model.” Harvard Business School Case 817-108.
- “The Entrepreneurial Manager, Module 2 Part 1: Resourcing the Business Model.” Harvard Business School Case 817-109.
- “The Entrepreneurial Manager, Module 2 Part 2: Resourcing the Business Model.” Harvard Business School Case 817-110.
- “Fitzpatrick Hotel Group Series TN.” Harvard Business School Teaching Note 299–062.
- “Genset: 1989 TN.” Harvard Business School Teaching Note 299–063.
- “Genset Initial Public Offering (A) & (B) TN.” Harvard Business School Teaching Note 299–064.
- “Global Digital Utilities Corporation TN.” Harvard Business School Teaching Note 299–065.
- “HIMSCORP, Inc.” Harvard Business School Teaching Note 202–073.
- “Honest Tea.” Harvard Business School Teaching Note 202–069.
- “Introduction to Entrepreneurial Finance.” Harvard Business School Note 298–061.
- “Introduction to Private Equity Finance.” Harvard Business School Note 213-026.
- “Knightsbridge Advisers, Inc. TN.” Harvard Business School Teaching Note 299–066.
- “Knot, The.” Harvard Business School Teaching Note 202–070.
- “MSE, Inc. Privatization: August 1997 & MSE, Inc. Privatization: August 1997 (Abridged) TN.” Harvard Business School Teaching Note 299–067.
- “Nantucket Nectars.” Harvard Business School Teaching Note 202–074.
- “New York Bagel: Hungary, April 1994 TN.” Harvard Business School Teaching Note 299–068.
- “A Note on Angel Financing.” Harvard Business School Note 298–083.
- “A Note on LBO Capital Structure.” Harvard Business School Note 213-091.
- “A Note on Franchising.” Harvard Business School Note 297–108.
- “A Note on Government Sources of Financing for Small Businesses.” Harvard Business School Note 298–015.
- “Note on Strategic Alliances, A.” Harvard Business School Note 298–047.
- “A Note on the Internet.” Harvard Business School Note 297–109.
- “A Note on Private Equity Exits.” Harvard Business School Note 213-112.
- “A Note on the Venture Capital Industry.” Harvard Business School Note 295–065.
- “A Note on Valuation in Entrepreneurial Ventures.” Harvard Business School Note 298–082.
- “A Note on Valuation in Private Equity.” Harvard Business School Note 213-034.
- “NSK Software Technologies Ltd. TN.” Harvard Business School Teaching Note 299–069.
- “Parenting Magazine TN.” Harvard Business School Teaching Note 202–065.
- “Penelope’s Personal Pocket Phones TN.” Harvard Business School Teaching Note 299–070.
- “Prague Post, The TN.” Harvard Business School Teaching Note 299–071.
- “Private Equity Valuation in Emerging Markets.” Harvard Business School Note 213-043.
- “Record Masters.” Harvard Business School Teaching Note 202–075.
- “Penelope’s Personal Pocket Phones.” Harvard Business School Case 299–004.
- “Sky Air, Inc. TN.” Harvard Business School Teaching Note 299–072.
- “Torrent Systems TN.” Harvard Business School Teaching Note 299–073.
- “Tutor Time (A) TN.” Harvard Business School Teaching Note 299–074.
- “Tutor Time (B) TN.” Harvard Business School Teaching Note 299–078.
- “Venture Capital in Ireland: Getting Their ACT Together TN.” Harvard Business School Teaching Note 299–075.

- "Xedia and Silicon Valley Bank Series TN." Harvard Business School Teaching Note 299–076.
- "ZEFER: November 1998 TN." Harvard Business School Teaching Note 299–077.

**SEMINARS AND CONFERENCE PRESENTATIONS — Academic**

American Economic Association: Annual Meeting, January 1995, "Optimal Investment, Monitoring, and the Staging of Venture Capital."

American Finance Association: Annual Meeting, January 1995, "An Analysis of Compensation in the U.S. Venture Capital Partnership."

American Finance Association: Annual Meeting, January 1996, "Myth or Reality? The Long-Run Underperformance of Initial Public Offerings: Evidence from Venture and Nonventure-backed Companies."

American Finance Association: Annual Meeting, January 1999, "What Drives Venture Capital Fundraising."

American Finance Association: Annual Meeting, January 2000, "An Analysis of Executive Compensation, Ownership, and Control in Entrepreneurial Firms."

American Finance Association: Annual Meeting, January 2004, "Incentives vs. Control: An Analysis of U.S. Dual-class companies."

American Finance Association: Annual Meeting, January 2015, "Cost of Friendship."

American Finance Association: Annual Meeting, January 2015, "What Do Private Equity Firms (Say) They Do?"

American Law and Economics Association: Annual Meeting, May 1996, "The Use of Covenants: An Empirical Analysis of Venture Partnership Agreements."

Association of Financial Economists: Annual Meeting, January 2001, "The Determinants of Board Structure and Function in Entrepreneurial Firms."

Association of Financial Economists: Annual Meeting, January 2006, "Skill vs. Luck: An Analysis of Serial Entrepreneurs."

Arizona State University School of Business: Finance Seminar, December 1995, "Venture Capital Distributions: Short-Run and Long-Run Reactions."

Boston University: Finance Seminar, December 1996, "Myth or Reality? The Long-Run Underperformance of Initial Public Offerings: Evidence from Venture and Nonventure-backed Companies."

Brandeis University: Entrepreneurship Conference, April 2014, "The Next Big Question in Entrepreneurship Research."

Brookings Institute: Microeconomic Conference, June 1998, "What Drives Venture Fundraising?"

Business and Economic History: Annual Meeting, March 1994, "The Rise and Fall of Venture Capital."

Cambridge University, Finance Seminar, May 2019, "And the Children Shall Lead: Gender Diversity and Performance in Venture Capital."

Center for Research on Security Prices: Biannual Meeting, March 1995, "Myth or Reality? The Long-Run Underperformance of Initial Public Offerings: Evidence from Venture and Nonventure-backed Companies."

Center for Research on Security Prices: Biannual Meeting, November 1994, "Venture Capital Distributions: Short-Run and Long-Run Reactions."

Center for Economic and Policy Research: European Finance Conference on Financing Innovation, November 1998, "What Drives Venture Capital Fundraising?"

Columbia Law School: Law and Economics Seminar, November 1995, "An Analysis of Compensation in the U.S. Venture Capital Partnership."

Columbia Law School: Law and Economics Seminar, November 1995, "The Use of Covenants: An Empirical Analysis of Venture Partnership Agreements."

Columbia Law School: Financing Innovation Conference, December 1997, "An Analysis of Covenants in Venture Capital Investments."

Columbia University School of Business: Finance Seminar, January 1993, "Grandstanding in the Venture

Capital Industry."
Copenhagen Business School: Finance Seminar, May 1999, "An Analysis of Executive Compensation, Ownership, and Control in Closely Held Firms."
Cornell Business School: Finance Seminar, October 2001, "Corporate Governance and Equity Prices."
Federal Reserve Bank of Chicago: January 1994, "Optimal Investment, Monitoring, and the Staging of Venture Capital."
Duke University Fuqua Business School: Finance Seminar, January 1993, "Grandstanding in the Venture Capital Industry."
Georgetown Law School: April 2003, "Corporate Governance and Equity Prices."
Harvard Business School: Business History Seminar, December 2000, "The History of Silicon Valley."
Harvard Business School: Entrepreneurship Conference, December 2000, "The Really Long-run Performance of Initial Public Offerings."
Harvard Business School: Financial Decision and Control Workshop, July 1994, "Optimal Investment, Monitoring, and the Staging of Venture Capital."
Harvard Business School: Financial Decision and Control Workshop, July 1996, "Myth or Reality? The Long-Run Underperformance of Initial Public Offerings: Evidence from Venture and Nonventure- backed Companies."
Harvard Business School: Financial Decision and Control Workshop, July 1997, "Reputation and Conflict of Interest in the Issuance of Public Securities: Evidence from Venture Capital."
Harvard Business School: Financial Decision and Control Workshop, July 1998, "How are Large Institutions Different From Other Investors? Why Do These Differences Matter for Equity Prices and Returns?"
Harvard Business School: Finance Seminar, February 1994, "An Analysis of Compensation in the U.S. Venture Capital Partnership."
Harvard Business School: Finance Seminar, January 1993, "Grandstanding in the Venture Capital Industry."
Harvard Business School: Finance Seminar, October 1996, "Venture Capital Distributions: Short-Run and Long-Run Reactions."
Harvard Business School: Finance Seminar, May 1999, "An Analysis of CEO Compensation, Ownership, and Control in Closely Held Firms."
Harvard Business School: Finance Seminar, October 2011, "The Cost of Friendship."
Harvard Business School: Research Symposium, May 2018, "Diversity in the Innovation Sector."
Harvard Business School: Organizations and Markets Seminar, May 1999, "An Analysis of CEO Compensation, Ownership, and Control in Closely Held Firms."
Harvard Business School: Finance Seminar, November 2000, "The Venture Capital Revolution."
Harvard Business School: Finance Seminar, March 2006, "Skill vs. Luck: An Analysis of Serial Entrepreneurs."
Harvard Business School: Finance Seminar, December 2008, "Bridge Building in Venture Capital: Evidence from Acquisitions."
Harvard Business School: Finance Seminar, December 2014, "More than Money: Venture Capitalists on Boards."
Harvard Business School: Finance Seminar, February 2015, "What do Private Equity Firms (Say) They Do?"
Harvard Business School: Organizational Behavior Seminar, February 2012, "The Role of Social Ties in Venture Capital."
Harvard Kennedy School: Gender Diversity Conference, June 2018, "And the Children Shall Lead: Gender Diversity and Performance in Venture Capital."
Harvard University Department of Economics: Workshop, December 1992, "Optimal Investment, Monitoring, and the Staging of Venture Capital."
Harvard University Department of Economics: Organizations Workshop, December 1996, "Reputation and Conflict of Interest in the Issuance of Public Securities: Evidence from Venture Capital."

Harvard University Department of Economics: Organizations Workshop, December 2002, "Entrepreneurial Spawning."
Harvard University Department of Economics: Organizations Workshop, December 1998, "Are the Hundred-Million-Dollar Managers Just Like Everyone Else? An Analysis of the Stock Ownership of Large Institutions."
Harvard University Department of Economics: Organizations Workshop, September 2003, "Entrepreneurial Spawning: Corporations and the Genesis of New Ventures, 1986–1999."
Hebrew University School of Business: Finance Seminar, March 1994, "An Analysis of Compensation in the U.S. Venture Capital Partnership."
Hebrew University School of Business: Finance Seminar, March 1995, "Venture Capital Distributions: Short-Run and Long-Run Reactions."
Hebrew University School of Business: Distinguished Lecture: December 2014, "What Do Private Equity Firms (Say) They Do?"
London School of Economics: Venture Capital Conference, October 1998, "How You Get There Matters: The Path Dependency of Executive Compensation in Closely Held Firms."
Massachusetts Institute of Technology: Organizations Workshop, March 1996, "The Use of Covenants: An Empirical Analysis of Venture Partnership Agreements."
Massachusetts Institute of Technology and Harvard University: Public Finance Workshop, March 1998, "What Drives Venture Fundraising?"
National Bureau of Economic Research: Corporate Finance Group, April 1994, "Optimal Investment, Monitoring, and the Staging of Venture Capital
National Bureau of Economic Research: Entrepreneurship Group, July 2017, "How do Venture Capitalists Make Decisions."
National Bureau of Economic Research: Summer Institute, July 1994, "An Analysis of Compensation in the U.S. Venture Partnership Agreement."
National Bureau of Economic Research: Summer Institute, July 1995, "Myth or Reality? The Long-Run Underperformance of Initial Public Offerings: Evidence from Venture and Nonventure-backed Companies."
National Bureau of Economic Research: Summer Institute, July 1996, "Venture Capital Distributions: Short-Run and Long-Run Reactions."
National Bureau of Economic Research: Finance Series, December 1997, "Are the Hundred-Million-Dollar Managers Just Like Everyone Else? An Analysis of the Stock Ownership of Large Institutions."
National Bureau of Economic Research: Finance Series, November 1998, "How You Get There Matters: The Path Dependency of Executive Compensation in Closely-Held Firms."
National Bureau of Economic Research: Summer Institute, July 2001, "Corporate Governance and Equity Prices."
New York Federal Reserve Bank: May 2000, "The Determinants of Board Structure and Function in Entrepreneurial Firms."
New York University, Stern School of Business: Finance Seminar, January 1993, "Grandstanding in the Venture Capital Industry."
New York University, Stern School of Business: Finance Seminar, February 1999, "How You Get There Matters: The Path Dependency of Executive Compensation in Closely-Held Firms."
New York University, Stern School of Business: Finance Seminar, October 2006, "Skill vs. Luck: An Analysis of Serial Entrepreneurs."
Northwestern University, Kellogg Business School: Finance Seminar, January 1993, "Grandstanding in the Venture Capital Industry."
Northwestern University, Kellogg Business School: Finance Seminar, October 1997, "Money Chasing Deals? The Impact of Fund Inflows on Private Equity Valuations."
Norwegian School of Management: Finance Seminar, May 1999, "An Analysis of Executive Compensation, Ownership, and Control in Closely Held Firms."
Ohio State University: Finance Seminar, October 1998, "How You Get There Matters: The Path Dependency of Corporate Governance in Closely Held Firms."

Oxford University: Graduate Student Seminar, May 1989.
Oxford University: Finance Seminar, May 1999, "An Analysis of Executive Compensation, Ownership, and Control in Closely Held Firms."
Oxford University, Finance Seminar, May 2019, "And the Children Shall Lead: Gender Diversity and Performance in Venture Capital."
Queens University (Kingston, Ontario) School of Business: Finance Seminar, November 1996, "Myth or Reality? The Long-Run Underperformance of Initial Public Offerings: Evidence from Venture and Nonventure-backed Companies."
Rutgers University: Finance Seminar, October 1997, "Money Chasing Deals? The Impact of Fund Inflows on Private Equity Valuations."
Stanford University Graduate School of Business: Strategy Workshop, January 1993, "Grandstanding in the Venture Capital Industry."
Stanford University Graduate School of Business: Center for Economic and Political Research, March 1997, "The Valuation of Private Equity Investments."
Stanford University: Finance Seminar, October 2012, "The Cost of Friendship."
Stanford University: Financing Innovation Conference, November 2018, "And the Children Shall Lead: Gender Diversity and Performance in Venture Capital."
Stockholm Business School: September 2003, "Entrepreneurial Spawning: Corporations and the Genesis of New Ventures, 1986–1999."
Tel Aviv University School of Business: Finance Seminar, March 1994, "An Analysis of Compensation in the U.S. Venture Capital Partnership."
Tel Aviv University School of Business: Finance Seminar, March 1995, "Venture Capital Distributions: Short-Run and Long-Run Reactions."
Tel Aviv University School of Business: Finance Seminar, December 2014, "What Do Private Equity Firms (Say) They Do?"
University of Arizona School of Business: Finance Seminar, December 1995, "Venture Capital Distributions: Short-Run and Long-Run Reactions."
University of California, Davis: Diversity Conference, December 2017, "And the Children Shall Lead: Gender Diversity and Performance in Venture Capital."
University of California at Berkeley, Haas School of Business: Finance Seminar, April 1993, "Grandstanding in the Venture Capital Industry."
University of California at Los Angeles: Finance Seminar, May 1997, "The Valuation of Private Equity Investments."
University of California at Los Angeles: Behavioral Finance Conference, April 1998, "Are the Hundred-Million-Dollar Managers Just Like Everyone Else? An Analysis of the Stock Ownership of Large Institutions."
University of Chicago Graduate School of Business: Finance Seminar, January 1993, "Grandstanding in the Venture Capital Industry."
University of Chicago Graduate School of Business: Information and Uncertainty Seminar, April 1995, "Venture Capital Distributions: Short-Run and Long-Run Reactions."
University of Chicago Graduate School of Business: Finance Seminar, May 2006, "Skill vs. Luck: An Analysis of Serial Entrepreneurs."
University of Chicago Economics Department: Economic and Legal Organization Workshop, February 1994, "The Use of Covenants: An Empirical Analysis of Venture Partnership Agreements."
University of Chicago Economics Department: Economic and Legal Organization Workshop, October 1997, "Reputation and Conflict of Interest in the Issuance of Public Securities: Evidence from Venture Capital."
University of Georgia School of Business: Finance Seminar, "Myth or Reality? The Long-Run Underperformance of Initial Public Offerings: Evidence from Venture and Nonventure-backed Companies."
University of Illinois School of Business: Finance Seminar, October 1994, "Optimal Investment, Monitoring, and the Staging of Venture Capital."
University of Michigan School of Business: Finance Seminar, November 1995, "Venture Capital

Distributions: Short-Run and Long-Run Reactions."
University of North Carolina School of Business: Finance Seminar, November 1995, "Venture Capital Distributions: Short-Run and Long-Run Reactions."
University of Pennsylvania Wharton School: Finance Workshop, March 1998, "Money Chasing Deals? The Impact of Venture Inflows of Private Equity Prices."
University of Rochester Simon School of Business: Finance Seminar, December 1996, "Myth or Reality? The Long-Run Underperformance of Initial Public Offerings: Evidence from Venture and Nonventure-backed Companies."
University of Rochester Simon School of Business: Organizations Seminar, February 1993, "Grandstanding in the Venture Capital Industry."
University of Washington: Finance Seminar, November 2018, "And the Children Shall Lead: Gender Diversity and Performance in Venture Capital."
Virginia Tech University School of Business: Finance Seminar, October 1995, "Myth or Reality? The Long-Run Underperformance of Initial Public Offerings: Evidence from Venture and Nonventure-backed Companies."
Warwick University, Finance Seminar, May 2019, "And the Children Shall Lead: Gender Diversity and Performance in Venture Capital."
Western Finance Association: Annual Meeting, June 1994, "Optimal Investment, Monitoring, and the Staging of Venture Capital."
Western Finance Association: Annual Meeting, June 1995, "The Long-run Underperformance of Seasoned Equity Offerings Revisited."
Western Finance Association: Annual Meeting, June 1996, "The Use of Covenants: An Empirical Analysis of Venture Partnership Agreements."
Western Finance Association: Annual Meeting, June 1997, "Reputation and Conflict of Interest in the Issuance of Public Securities: Evidence from Venture Capital."
Western Finance Association: Annual Meeting, June 1998, "How are Large Institutions Different from Other Investors? Why These Differences Matter for Equity Prices and Returns?"
World Bank: Finance Seminar, May 1999, "An Analysis of CEO Compensation, Ownership, and Control in Closely Held Firms."
Yale University, School of Management: Finance Seminar, January 1993, "Grandstanding in the Venture Capital Industry."

**SPEECHES AND CONFERENCE PRESENTATIONS — Practitioner**

Advanced Technology Program, National Institute for Standards and Technology and NBER Conference on Financing Innovation, June 1998.
Amsterdam Institute of Finance, October 1994, "Venture Capital and the Finance of Emerging Companies."
American Friends of the Technion, October 1998, "The Development of High Technology and Venture Capital in Israel."
AT&T Small Business Conference, April 1994, "Venture Capital: The Road Ahead."
Center for Economic Policy Research, Venture Capital Conference, March 1997, "The Pricing of Private Equity Investments: A Window on the Returns of Tomorrow."
Deloitte and Touche, May 2003, "Entrepreneurial Leadership."
Ernst and Young Silicon Valley Venture Capital Conference, 2002, "The Future of Venture Capital."
Ernst and Young Buyout Roundtable, 2002, "Corporate Governance and Private Equity."
Greenwich Roundtable, 2015, "Skill in Private Equity."
Harvard Business School Venture Capital Conference, December 1995, "Myth or Reality? The Long-Run Underperformance of Initial Public Offerings: Evidence from Venture and Nonventure-backed Companies" and "Venture Capital Distributions: Short-run and Long-run Reactions."
Harvard Business School Alumni Series, May 2000 and May 2003, "The Future of Private Equity."
Harvard Business School European Conference, June 2003, "European Private Equity."
Harvard Business School Global Alumni Conference, June 1998, "Consolidation Buy-outs."

Harvard Business School Global Alumni Conference, May 2001, "Venture Capital 2001: Boom or Bust?"
Harvard Business School Centennial Celebration, February 2010, "Private Equity at the Crossroads."
Harvard Business School Global Alumni Venture Capital Conference, May 2012, "New Venture Capital Models"
Harvard Business School Global Alumni Venture Capital Conference, October 2014, "Lessons from the Trenches."

Hambrecht and Quist, Post-Venture Forum, March 1999, "Venture and Post-Venture Opportunities: Insightsfrom Research."

Iceland Pension Conference, May 2018, "The Opportunity in Venture Capital."

Institutional Limited Partner's Association, September 1997, "Risk and Return in Private Equity."

Institutional Limited Partner's Association, April 2002, "New Tools for Assessing Private Equity Valuation and Asset Allocation."

International Business Forum, June 1999, "Venture Capitalists and the Public Markets." Investors' Press Alpha Roundtable, October 1996, "The Future of Private Equity." Israel Business Forum, March 1994.

Israeli Venture Capital and High Technology Conference, 2002, "The Future of Venture Capital and Its Implication for Israel."

Japanese Private Equity Forum, July 1997, "Corporations and Venture Capital: Old and New Challenges."

Latin American Chamber of Commerce, February 1995, "Capital for Entrepreneurial Companies: A Look Ahead."

Massachusetts Public Pension Fund Investment Forum, October 1998, "Venture Capital: Investing in Start-up and Newly Public Firms."

National Venture Capital Association, March 2003, "The Future of Venture Capital." Nova Pharmaceuticals, September 2009, "Venture Capital after the Downturn."

OPAL Institutional Investors Conference, December 2000, "The Future of Private Equity." Rocky Mountain Venture Capital Association, March 2003, "Venture Capital: Challenges and

Opportunities."

Russell Capital Private Equity Conference, March 1997, "The Pricing of Private Equity Investments: A Window on the Returns of Tomorrow."

Russell Capital Private Equity Conference, November 1998, "Advent Israel Venture Capital Program."
Salomon Smith Barney Private Equity Conference, March 2000, "The Future of Private Equity."
Salomon Smith Barney Consulting Group, March 2001, "Risk and Return in Private Equity."
Samsung Venture Capital Group, October 1997, "Corporations and Venture Capital: Old and New Challenges."
Seeking Alpha, March 2015, "What's Hot in Venture Capital Fundraising?"
Silicon Valley Bank, May 2003, "Venture Capital: Challenges and Opportunity."
SuperReturn Conference US, May 2009, "Insights from Private Equity Academic Research at the Harvard Business School."
SuperReturn Conference Europe, February 20011, "Insights from Private Equity Academic Research at the Harvard Business School."
SuperReturn Conference US, May 2013, "The Future of Private Equity."
University of Chicago Business Forum, May 1995, "The Next Ten Years in Venture Capital." (Organized and moderated panel.)
Venture Economics Venture Forum, November 1994, "The Venture Cycle." (Keynote Address.)
Venture Economics Venture Forum, November 1994, Panelist for IPO performance issues.
Venture Economics Venture Forum, November 1996, Plenary session speaker on venture capital returns.
VentureOne / Ernst and Young Venture Capital Conference, July 2002, "The Future of Venture Capital."
VentureOne / Ernst and Young Venture Capital Conference, July 2003, "The Future of European Venture Capital."
Young Presidents' Organization Conference, November 1998, "Entrepreneurial Opportunities in Crisis

Situations."
Young Presidents' Organization Conference, January 2003, "The Future of Venture Capital."
Young Presidents' Organization Conference, January 2010, "New Models in Venture Capital."
Young Presidents' Organization Conference, January 2013, "Private Equity Trends."
In addition, made presentations of research findings for several institutional investors and investment managers who contributed data for the project on interactions between venture organizations and institutional investors.

## TEACHING

### University of Chicago

Developed and taught course "Entrepreneurial Finance and Management," a second-year MBA elective, 1993–1995.

### Harvard Business School

Taught "First-Year Finance," in Required Curriculum, 1995–1997.

Taught "Entrepreneurial Finance," in Elective Curriculum, 1997–2003.

Taught "The Entrepreneurial Manager," in Required Curriculum, 2003–2008.

Taught "Venture Capital and Private Equity," in Elective Curriculum, 2009–2012.

Co-developed and taught, "Private Equity Finance," in Elective Curriculum, 2012-2017. Developed and taught, "Private Equity Field," in Elective Curriculum, 2013.

Developed and taught, "Immersive Field Couse: Israel. Startup Nation." 2017-2018.

Course Head for "The Entrepreneurial Manager" in Required Curriculum 2005–2008.

Course Head for "The Entrepreneurial Manager" in Required Curriculum 2016–2019.

Co-developed and co-taught Ph.D. course "Empirical Topics in Corporate Finance," 1999–2015. (with Josh Lerner.)

Co-developed and partially taught three-day executive courses on venture capital and private equity: "Conflict and Evolution in Private Equity" (1996), "Corporate Venture Capital: The Third Wave" (1997), "The Internationalization of Private Equity" (1998), "Structuring Effective Private Equity Organizations" (1999, 2000), "Optimizing Corporate Investments" (2000), "Doing Private Equity Deals" (2001, 2003), "Private Equity in a Downturn" (2002), "Private Equity Deals" (2004), "Private Equity and Corporate Governance" (2005), "Venture Capital and Private Equity" (2006), "Internationalization of Private Equity" (2007), "Private Equity and Venture Capital" (2008), and "Private Equity after the Downturn" (2009), "Venture Capital and Private Equity" (2010-2011). "Private Equity and Venture Capital: After the Financial Crisis" (2012), Private Equity and Venture Capital: The Future" (2013). "Private Equity and Venture Capital: At the Crossroads" (2014). "Private Equity and Venture Capital: Changing Market Power." (2015), Private Equity and Venture Capital (2016-2018.) (all with Josh Lerner.)
Co-developed and taught "Economics of Markets," in Elective Curriculum, 1997.
Partially taught in a variety of programs including:
General Management Program / START, August 1996.
HBS / CIEBA Pension Workshop, April 1996.
YPO Conference, February 1997, February 2003, February 2006, February 2008.
Strategic Finance for Small Business, February 1998, March 1999, March 2000.
Entrepreneur's Toolkit, June 1997, June 1998, June 1999.

**PROFESSIONAL SERVICE AND EXPERIENCE**

1985–1986 BAYER CHEMICAL CO. LEVERKUSEN, GERMANY
Researcher. Performed biochemical analysis on locust flight muscle metabolism.

1997–present Associate Editor for *Small Business Economics*.

1997–present Associate Editor for *Journal of Private Equity.*

1997–2016 Associate Editor for *Journal of Finance*.

1997–2018 Western Finance Association Meetings Program Committee.

1998 Program Committee, *Journal of Financial Economics* conference on research methodologies in finance.

2006–2014 Associate Editor for Journal of Economic Literature.

2010–present Associate Editor for Journal of Economics and Management Strategy.

Referee for the Journal of Financial Economics, Journal of Finance, Journal of Political Economy, Quarterly Journal of Economics, Journal of Economic Theory, Rand Journal of Economics, Review of Financial Studies, American Economic Review, Journal of Public Economics, Journal of Corporate Finance, Journal of Small Business Management, Economic Letter, Small Business Economics, Journal of Business Venturing, Journal of Small Business Finance, Journal of Business, Journal of Law, Economics, and Organizations, and Journal of Law and Economics, Review of Economic and Statistics.

Reviewer for reports and proposals for the National Science Foundation. Reviewer for reports and proposals for the Securities and Exchange Commission.

**COMMUNTY SERVICE**

Board Member, Beth Israel Deaconess Hospital, (2014-present).
Board member, Friends of Harvard Track, (2014-2018).
Board Member, USA Triathlon Foundation, (2015-present)
Beth Israel Deaconess Wellness Center Advisory Board (2013-present)
Vice President, Treasurer, and Executive Board Member, Harvard Hillel (1995–2010).
Board Member, Camp Yavneh (2007–2010).
Ivy League Eikeden Committee (1997–2010)
Young Israel of Brookline, Internet Advisory Board (2000–2001).
Technion Institute of Management: Boston Advisory Board (2000).
Board Member, Anshe Shalom B'nei Israel Congregation (1993–1995).

**CONSULTING PROJECTS**

Apax Venture Partners, 2003.
Bain Capital, 2008-2010.
Battery Venture Partners, 2001.
Bessemer Venture Partners, 1998.
Deloitte and Touche, 2003.
Department of Energy, Idaho Falls National Laboratory, 1994–1995.

Department of Energy, Savannah River National Laboratory, 1995–1997.
Department of Energy, Butte, Montana National Laboratory, 1997–1998.
E.M. Warburg, Pincus, 1997.
Ernst and Young, 2002.
GTCR Golder Rauner, 1999.
Jerusalem Venture Partners, 2001.
Kleiner Perkins, 2014.
Montana Science and Engineering, Inc., 1997.
Patricoff & Co., 1995.
Phillip's Petroleum, 1998, 2000, 2001, 2002.
PriceWaterhouse Coopers, 2001.
RogersCasey Investment Advisors, 1994.
Salomon Smith Barney, 1999–2003.
TA Associates, 2015.
Thermo Electron Corporation, 1994–1997.
VentureOne, 1995.

## BOARDS OF DIRECTORS AND ADVISORY BOARDS

Beth Israel Deaconess Hospital, 2016-Present.
Evergreen Partners, 2005–2015.
Gemini Venture Capital, 2003–2015.
Highland Capital Consumer Fund, 2007–Present.
Khosla Ventures, 2009-Present.
Knightsbridge Investment Advisers, 1995–2012.
Mercanteo, 1999.
New Capital Partners, 2000–2001.
Onpoint Technology Ventures, 2003–2017.
OnTheFrontier.com, 2000–2001.
Spur Capital Partners, 2002–Present.
Triple Point Capital, 2003.
USA Triathlon Foundation, 2016-Present.
ZEFER, 1998.

## GRANTS AND AWARDS

National Science Foundation Grant, 1994–1997, "Financing New Business Formation."
National Science Foundation Grant, 2002–2005, "Corporate Governance and Firm Performance."
National Institute of Standards and Technology, Advanced Technology Program, 1996–1997, "Venture Capital and the Financing of Emerging Technologies."
Newcomen Business History Paper Prize, 1994.
American Association of Individual Investors Award for Best Paper on Investments, at the Western Finance Association Meeting, 1998.
Journal of Financial Economics, Fama-DFA Price, Second Prize, 2008.
Journal of Finance, Smith Breeden Distinguished Paper Prize, 1998.
Rodney White Center for Financial Research, Best Paper Prize, 2002.
MBA Class of 1961 Fellow, 1997–1998.

## ATHLETICS

Alternate on the 1988 Olympic team in the marathon. Finished fourth in the Olympic trials. Qualified for

1984, 1988, 1992 Olympic marathon trials. Cross-Country All-American. Academic All-American. Set World Junior Record in the marathon (1983). Bronze medalist in 1985 World University Games in Japan (marathon). Qualified for two US cross-country teams and competed in the World Championships. Set Harvard Records in the 5,000 and 10,000 meters. Triathlon Age Group All-American 2007, 2009, 2010, 2013, 2014. Ranked second in the world by World Triathlon Corporation in Age Group at the Ironman 70.3 distance in 2014. Competed in ITU Age Group World Championships (2007, 2015). Competed in Ironman 70.3 World Championship (2007, 2016, 2017). Competed in Ironman World Championships in Kailua Kona (2009, 2010, 2018).

# Paul A. Gompers
# Expert Depositions and Testimony for Prior Four Years

Deposition of Paul A. Gompers in In Re Intercept Pharmaceuticals, Inc. Securities Litigation, on behalf of Intercept Pharmaceuticals, Inc., United States District Court for the Southern District of New York, Civil Action No. 1:14-cv-01123-NRB (October 2, 2015).

Deposition of Paul A. Gompers in In Re NII Holdings, Inc. Securities Litigation, on behalf of NII Holdings, Inc., United States District Court for the Eastern District of Virginia, Alexandria Division, Case No. 1:14-cv-00227-LMB-JFA (October 23, 2015).

Deposition of Paul A. Gompers in David M. Loritz, et al. v. Exide Technologies, et al., on behalf of the individual defendants, United States District Court for the Central District of California, Master File No. 2:13-cv-02607-SVW-E (November 3, 2015).

Deposition of Paul A. Gompers in Första AP-Fonden and Danske Invest Management A/S, Individually and on Behalf of All Others Similarly Situated v. St. Jude Medical, Inc., et al., on behalf of St. Jude Medical, Inc., United States District Court for the District of Minnesota, Civil No. 12-3070 (JNE/HB) (November 6, 2015).

Deposition of Paul A. Gompers in In Re Petrobras Securities Litigation, on behalf of the individual defendants, United States District Court for the Southern District of New York, Case No. 14-cv-9662 (November 11, 2015).

Testimony of Paul A. Gompers in Andrew Segal, M.D. v. Genitrix, LLC, H. Fisk Johnson, III and Stephen Rose, on behalf of the individual defendants, Commonwealth of Massachusetts Superior Court Department, Civil Action No. 09-776-G (November 18, 2015).

Deposition of Paul A. Gompers in In Re Montage Technology Group Limited Securities Litigation, on behalf of Montage Technology Group Limited, United States District Court for the Northern District of California, Case No. 3:14-cv-00722-SI (January 20, 2016).

Deposition of Paul A. Gompers in In Re Symbol Technologies, Inc. Securities Litigation, on behalf of Symbol Technologies, Inc. and the individual defendants, United States District Court for the Eastern District of New York, Civil Action No. 05-CV-3923-DRH (January 27, 2016).

Deposition of Paul A. Gompers in In Re Amgen, Inc. Securities Litigation, on behalf of Amgen, Inc., United States District Court for the Central District of California, Western Division, Case No. CV 07-2536 PSG (PLAx) (February 25, 2016).

Deposition of Paul A. Gompers in In Re Comverge, Inc. Shareholders Litigation, on behalf of the Comverge directors, Court of Chancery of the State of Delaware, Consolidated C.A. No. 7368-VCP (March 24, 2016).

Deposition of Paul A. Gompers in Musashi, L.L.C. and W.R. Huff Asset Management Co., L.L.C. v. Virgin Media Inc., on behalf of Musashi, L.L.C. and W.R. Huff Asset Management Co., L.L.C., Superior Court of New Jersey, Law Division: Morris County, Civil Action No. MRS-L-734-13 (June 1, 2016).

Deposition of Paul A. Gompers in Spin Master Ltd. v. Bureau Veritas Consumer Products Services, Inc. and Eurofins Product safety Labs, Inc., on behalf of Bureau Veritas Consumer Products Services,

# Paul A. Gompers
# Expert Depositions and Testimony for Prior Four Years

Inc., United States District Court for the Western District of New York, Civil Action No. 08 CV 0923 (August 8, 2016).

Arbitration Testimony of Paul A. Gompers in Todd M. Rainville v. Symmetric Capital, LLC, et al., on behalf of Symmetric Capital, LLC, et al., American Arbitration Association, Arbitration No. 01-15-003-8498 (August 2016).

Deposition of Paul A. Gompers in Alan Willis, Individually and on Behalf of All Others Similarly Situated v. Big Lots, Inc., et al., on behalf of Big Lots, Inc. and the individual defendants, United States District Court for the Southern District of Ohio, Eastern Division, Case No. 2:12-cv-00604-MHW-NMK (August 25, 2016).

Arbitration Testimony of Paul A. Gompers in Michael Christopher v. ArcLight Capital Holdings, LLC, et al., on behalf of Michael Christopher, Judicial Arbitration and Mediation Services, Arbitration No. 1400015869 (October 6, 2016).

Deposition of Paul A. Gompers in ITW Global Investments Inc. v. American Industrial Partners Capital Fund IV, L.P., et al., on behalf of ITW Global Investments Inc., Superior Court of the State of Delaware in and for New Castle County, C.A. No. N14C-10-236 (JRJ) (November 3, 2016).

Deposition of Paul A. Gompers in Keith Thomas, Richard Hayes, Herb Smith, and Oklahoma Police Pension & Retirement System v. Magnachip Semiconductor Corp., Sang Park, Tae Young Hwang, Margaret Sakai, R. Douglas Norby, Ilbok Lee, Nader Tavakoli, Randal Klein, Michel Elkins, Avenue Capital Management II, L.P., Barclays Capital Inc., Deutsche Bank Securities Inc., Citigroup Global Markets Inc., UBS Securities LLC, and Needham and Company, LLC, on behalf of Avenue Capital Management II, L.P., United States District Court for the Northern District of California, Case No. 3:14-cv-01160-JST (November 16, 2016).

Deposition of Paul A. Gompers in Dr. Joseph F. Kasper v. AAC Holdings, Inc. et al., on behalf of AAC Holdings, Inc. and the individual defendants, United States District Court for the Middle District of Tennessee, Case No. 3:15-cv-00923 (January 23, 2017).

Deposition of Paul A. Gompers in In Re Facebook, Inc. IPO Securities and Derivative Litigation, on behalf of Facebook, Inc. and its officers and directors named in the suit, United States District Court for the Southern District of New York, MDL No. 12-2389 (March 28, 2017).

Deposition of Paul A. Gompers in Louisiana Municipal Police Employees' Retirement System, et al. v. Green Mountain Coffee Roasters, Inc. et al., on behalf of Green Mountain Coffee Roasters, Inc., United States District Court for the District of Vermont, Civil Action No. 2011-CV-00289 (August 3, 2017).

Deposition of Paul A. Gompers in Ohio Public Employees Retirement System, On Behalf of Itself and All Others Similarly Situated v. Federal Home Loan Mortgage Corporation a/k/a Freddie Mac, et al., on behalf of Federal Home Loan Mortgage Corporation, United States District Court for the Northern District of Ohio, Eastern Division, Civil Action No. 4:08-CV-00160 (September 15, 2017).

Deposition of Paul A. Gompers in Hudson Bay Master Fund Ltd. v. Patriot National, Inc. and Steven M.

# Paul A. Gompers
# Expert Depositions and Testimony for Prior Four Years

Mariano and CVI Investments, Inc. v. Patriot National, Inc., on behalf of Patriot National, Inc. and Steven M. Mariano, United States District Court for the Southern District of New York, Case Nos. 16-cv-2767 (GBD) (RLE) and 16-cv-2787 (GBD) (RLE) (October 4, 2017).

Testimony of Paul A. Gompers in Musashi, L.L.C. and W.R. Huff Asset Management Co., L.L.C. v. Virgin Media Inc., on behalf of Musashi, L.L.C. and W.R. Huff Asset Management Co., L.L.C., Superior Court of New Jersey, Law Division: Morris County, Civil Action No. MRS-L-734-13 (October 18, 2017).

Deposition of Paul A. Gompers in Winson Tang v. Lindsay Rosenwald, Michael Weiss, Opus Point Partners, LLC, Mustang Bio, Inc. (aka Mustang Therapeutics, Inc.), City of Hope, and Fortress Biotech, Inc. (f/k/a Coronado Biosciences, Inc.), on behalf of Opus Point Partners, LLC, Mustang Therapeutics, Inc., Fortress Biotech, Inc., Lindsay Rosenwald, and Michael Weiss, Superior Court of the State of California, County of Los Angeles, Case No. BC 607346 (October 23, 2017).

Deposition of Paul A. Gompers in EWC Holdings, Inc. v. Princeton Ventures II, LLC and Brazos/EWC, LLC, on behalf of EWC Holdings, Inc., Court of Chancery of the State of Delaware, C.A. No. 12519-VCL (November 7, 2017).

Deposition of Paul A. Gompers in Securities and Exchange Commission v. AVEO Pharmaceuticals, Inc., Tuan Ha-Ngoc, David Johnston, and William Slichenmeyer, on behalf of the individual defendants, United States District Court for the District of Massachusetts, Case No. 1:16-cv-10607-NMG (December 13, 2017).

Deposition of Paul A. Gompers in Ralph S. Janvey, In His Capacity as Court-Appointed Receiver for the Stanford Receivership Estate, and the Official Stanford Investors Committee v. Proskauer Rose, LLP, Chadbourne & Parke, LLP, and Thomas V. Sjoblom, on behalf of Proskauer Rose, LLP and Thomas V. Sjoblom, United States District Court for the Northern District of Texas, Dallas Division, Civil Action No. 3:13-cv-00477-N (January 22, 2018).

Arbitration Testimony of Paul A. Gompers in Credit Agricole Corporate and Investment Bank (f/k/a Calyon Bank New York Branch), et al. v. Black Diamond Capital Management LLC, et al., on behalf of Black Diamond Capital Management LLC, BDC Finance LLC, and Black Diamond CLO 2006-1, American Arbitration Association, Arbitration No. 01-17-0007-1196 (February 6, 2018).

Deposition of Paul A. Gompers in Michael J. Angley, Individually and on Behalf of All Others Similarly Situated v. UTi Worldwide Inc., et al., on behalf of UTi Worldwide Inc. and the individual defendants, United States District Court for the Central District of California, Western Division, Case No. 2:14-cv-02066-CBM-E (February 27, 2018).

Deposition of Paul A. Gompers in Gary Koopmann, Timothy Kidd, and Victor Pirnik, Individually and on Behalf of All Others Similarly Situated v. Fiat Chrysler Automobiles N.V., et al., on behalf of Fiat Chrysler Automobiles N.V., United States District Court for the Southern District of New York, Case No. 1:15-cv-07199-JMF (March 5, 2018).

Deposition of Paul A. Gompers in Kortright Capital Partners LP, et al. v. Investcorp Investment Advisers Limited, on behalf of Kortright Capital Partners LP, Matthew Taylor, and Ty Popplewell, United States District Court for the Southern District of New York, Case No. 16-cv-7619 (March 27,

# Paul A. Gompers
# Expert Depositions and Testimony for Prior Four Years

2018).

Deposition of Paul A. Gompers in In Re Medtronic, Inc. Securities Litigation, on behalf of Medtronic, Inc. and the individual defendants, United States District Court for the District of Minnesota, Master File No. 0:13-cv-01686-JRT-FLN (May 10, 2018).

Deposition of Paul A. Gompers in Hsingching Hsu, Individually and on Behalf of All Others Similarly Situated v. Puma Biotechnology, Inc., et al., on behalf of Puma Biotechnology, Inc., United States District Court for the Central District of California, Southern Division, Case No. 8:15-cv-00865-AG-JCG (June 5, 2018).

Deposition of Paul A. Gompers in Akorn, Inc. v. Fresenius Kabi AG, Quercus Acquisition, Inc., and Fresenius SE & Co. KGaA, on behalf of Akorn, Inc., Court of Chancery of the State of Delaware, C.A. No. 2018-0300-JTL (June 28, 2018).

Evidentiary Hearing Testimony of Paul A. Gompers in In Re Goldman Sachs Group, Inc. Securities Litigation, on behalf of The Goldman Sachs Group, Inc., United States District Court for the Southern District of New York, Case No. 1:10-cv-03461-PAC (July 25, 2018).

Deposition of Paul A. Gompers in Gary Koopmann, Timothy Kidd, and Victor Pirnik, Individually and on Behalf of All Others Similarly Situated v. Fiat Chrysler Automobiles N.V., et al., on behalf of Fiat Chrysler Automobiles N.V., United States District Court for the Southern District of New York, Case No. 1:15-cv-07199-JMF (October 19, 2018).

Testimony of Paul A. Gompers in Securities and Exchange Commission v. AVEO Pharmaceuticals, Inc., Tuan Ha-Ngoc, David Johnston, and William Slichenmeyer, on behalf of the individual defendants, United States District Court for the District of Massachusetts, Case No. 1:16-cv-10607-NMG (November 16, 2018).

Testimony of Paul A. Gompers in Kortright Capital Partners LP, et al. v. Investcorp Investment Advisers Limited, on behalf of Kortright Capital Partners LP, Matthew Taylor, and Ty Popplewell, United States District Court for the Southern District of New York, Case No. 16-cv-7619 (December 17, 2018).

Testimony of Paul A. Gompers in Hsingching Hsu, Individually and on Behalf of All Others Similarly Situated v. Puma Biotechnology, Inc., et al., on behalf of Puma Biotechnology, Inc., United States District Court for the Central District of California, Southern Division, Case No. 8:15-cv-00865-AG-JCG (January 24, 2019).

Deposition of Paul A. Gompers in Oaktree Principal Fund V, LP, et al. v. Warburg Pincus LLC, et al., on behalf of Warburg Pincus LLC, Warburg Pincus Private Equity X, L.P., and Sean Carney, United States District Court for the Central District of California, Western Division, Case No. 2:15-CV-08574-PSG-MRWx (February 1, 2019).

Deposition of Paul A. Gompers in Monroe County Employees' Retirement System and Roofers Local No. 149 Pension Fund, Individually and on Behalf of All Others Similarly Situated v. The Southern Company, et al., on behalf of The Southern Company, United States District Court for the Northern District of Georgia, Atlanta Division, Civil Action No. 1:17-cv-00241-MHC (March 15, 2019).

# Paul A. Gompers
# Expert Depositions and Testimony for Prior Four Years

Deposition of Paul A. Gompers in Reynolds American, Inc. v. Third Motion Equities Master Fund Ltd, et al., on behalf of Reynolds American, Inc., State of North Carolina, Forsyth County, In the General Court of Justice, Superior Court Division, Case No. 17-CVS-7086 (April 24, 2019).

Deposition of Paul A. Gompers in Roofers' Pension Fund, Individually and on Behalf of All Others Similarly Situated v. Perrigo Co., PLC, et al., on behalf of Perrigo Co., PLC, United States District Court for the District of New Jersey, Case No. 2:16-cv-02805-MCA-LDW (May 16, 2019).

Hearing Testimony of Paul A. Gompers in Monroe County Employees' Retirement System and Roofers Local No. 149 Pension Fund, Individually and on Behalf of All Others Similarly Situated v. The Southern Company, et al., on behalf of The Southern Company, United States District Court for the Northern District of Georgia, Atlanta Division, Civil Action No. 1:17-cv-00241-MHC (May 21, 2019).

Testimony of Paul A. Gompers in Reynolds American, Inc. v. Third Motion Equities Master Fund Ltd, et al., on behalf of Reynolds American, Inc., State of North Carolina, Forsyth County, In the General Court of Justice, Superior Court Division, Case No. 17-CVS-7086 (June 13, 2019).

Deposition of Paul A. Gompers in United States Securities and Exchange Commission v. Daniel C. Ustian, on behalf of Daniel C. Ustian, United States District Court for the Northern District of Illinois, Eastern Division, Case No. 16-cv-03885 (July 10, 2019).

Deposition of Paul A. Gompers in In Re Twitter, Inc. Securities Litigation, on behalf of Twitter, Inc., Richard Costolo, and Anthony Noto, United States District Court for the Northern District of California, Case No. 3:16-cv-05314-JST (September 10, 2019).

Deposition of Paul A. Gompers in Kevin L. Dougherty, Individually and on Behalf of All Others Similarly Situated v. Esperion Therapeutics, Inc., et al., on behalf of Esperion Therapeutics, Inc. and Tim Mayleben, United States District Court for the Eastern District of Michigan, Civil Action No. 2:16-cv-10089-AJT-RSW (September 16, 2019).

# List of Documents Considered

Academic Articles

- Cornell, Bradford, and R. Gregory Morgan, "Using Finance Theory to Measure Damages in Fraud on the Market Cases," *UCLA Law Review*, Vol. 37, No. 5, 1990, pp. 883–924
- Huberman, Gur, and Tomer Regev, "Contagious Speculation and a Cure for Cancer: A Nonevent That Made Stock Prices Soar," *The Journal of Finance*, Vol. 56, No. 1, 2001, pp. 387–396
- Lamont, Owen A., and Richard H. Thaler, "Anomalies: The Law of One Price in Financial Markets," *Journal of Economic Perspectives*, Vol. 17, No. 4, 2003, pp. 191–202
- Tetlock, Paul C., "All the News That's Fit to Reprint: Do Investors React to Stale Information?" *The Review of Financial Studies*, Vol. 24, No. 5, 2011, pp. 1481–1512

Analyst Reports

- "3Q Beat & Raise, Mgmt Confident for '18, Reit. Neutral, PT to $44," Chardan Capital Markets, October 27, 2017 (OFP-TVTY-00005293–301)
- "3Q Well Ahead, 2018 Shaping up to Be a Big Year. Reiterate Buy, Raising Target," SunTrust Robinson Humphrey, October 27, 2017 (OFP-TVTY-00005314–20)
- "4Q Beat & Strong '18 Guide; Reit. Neutral, PT to $41," Chardan Capital Markets, February 23, 2018
- "Big EPS Beat, 2017 Guidance Increased; Price Target Now $46," Barrington Research, October 27, 2017 (OFP-TVTY-00005321–7)
- "Defending TVTY on Sell-Off after Optum News," Piper Jaffray, November 6, 2017
- "Early Halloween Candy: 4 Key Insights from TVTY's 3Q17," Jefferies, October 26, 2017 (OFP-TVTY-00005260–7)
- "EPS Beat; Increases 2017 Guidance; Maintain Overweight," Cantor Fitzgerald, October 26, 2017 (OFP-TVTY-00005284–92)
- "Everybody Take a Deep Breath - Offering a Little Perspective," SunTrust Robinson Humphrey, November 7, 2017
- "Further Acceleration in FY18 Should Drive Multiple Expansion," Piper Jaffray, October 27, 2017 (OFP-TVTY-00005309–13)
- "Sell-Off on UnitedHealth News Seems Markedly Overdone; We Are Buyers on Weakness," William Blair, November 6, 2017
- "Shares Off on UNH Announcement; Too Early to Worry About 2020; Overweight," Cantor Fitzgerald, November 6, 2017
- "Strong Third-Quarter Results Highlighted by a Dime of EPS Upside; Guidance Increased and 2018 Outlook Ahead of Street," William Blair, October 26, 2017 (OFP-TVTY-00005253–9)
- "Taking a Deeper Dive into UnitedHealth's Proprietary Fitness Program and Its Impact on Tivity Health," William Blair, November 7, 2017

- "Tivity Shares Crushed as Relationship with UnitedHealth Comes into Question," Barrington Research, November 7, 2017
- "TVTY Pullback Today Pricing in More than Worst Case Scenario with UnitedHealth," Jefferies, November 6, 2017
- "UNH Expands Senior Benefit, Less Confident in Our TVTY Estimates," Chardan Capital Markets, November 6, 2017

Books

- Bodie, Zvi, Alex Kane, and Alan J. Marcus, *Investments*, 9th ed. (New York, NY: McGraw-Hill/Irwin), 2011
- Brealey, Richard A., Stewart C. Myers, and Franklin Allen, *Principles of Corporate Finance*, 8th ed. (New York, NY: McGraw-Hill/Irwin), 2006
- Campbell, John Y., Andrew W. Lo, and A. Craig MacKinlay, *The Econometrics of Financial Markets* (Princeton, NJ: Princeton University Press), 1997
- Fama, Eugene F., Foundations of Finance: Portfolio Decisions and Securities Prices (New York, NY: Basic Books), 1976
- Greene, William H., *Econometric Analysis*, 4th ed. (Upper Saddle River, NJ: Prentice Hall), 2000
- Mishkin, Frederic S., *The Economics of Money, Banking, and Financial Markets*, 6th ed. (Boston, MA: Addison-Wesley), 2001
- Ross, Stephen A., Randolph W. Westerfield, and Jeffrey Jaffe, *Corporate Finance*, 7th ed. (Boston, MA: McGraw-Hill/Irwin), 2005

Data

- CRSP
- Factiva
- Refinitiv I/B/E/S Detailed Estimates Data
- Thomson Reuters

Depositions

- Deposition of Chad William Coffman, September 4, 2019

Expert Reports

- Expert Report and Production Materials (OFP-TVTY-0000001–7374) of Chad Coffman, CFA, July 1, 2019

Legal Documents

- *Basic v. Levinson*, 485 U.S. 224, 241 (1988)
- *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989)

- *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1431 (2013)
- First Amended Complaint, *Eric Weiner, et al. v. Tivity Health, Inc., et al.*, United States District Court for the Middle District of Tennessee, Nashville Division, Case No. 3:17-cv-01469, June 4, 2018
- Halliburton Co. v. Erica P. John Fund, Inc., 134 S. Ct. 2398, 2418 (2014)
- In re PolyMedica Corporation Securities Litigation, 453 F. Supp. 2d 260 (D. Mass. 2006)
- *Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001)
- *Unger v. Amedisys Inc.*, 401 F.3d 316 (5th Cir. 2005)

Miscellaneous

- "The Road to 5 Million Enrolled Members," Tivity Health Investor Day 2018 Presentation, June 1, 2018

Press Releases

- Tivity Health Press Release, "Tivity Health Comments on UnitedHealthcare Relationship," November 6, 2017
- UnitedHealthcare Press Release, "UnitedHealthcare Adds New Fitness Benefit to Medicare Advantage Plans in Arizona," November 6, 2017
- UnitedHealthcare Press Release, "UnitedHealthcare Adds New Fitness Benefit to Medicare Advantage Plans in Austin," November 6, 2017
- UnitedHealthcare Press Release, "UnitedHealthcare Adds New Fitness Benefit to Medicare Advantage Plans in Florida," November 6, 2017 [issued at 9:15 ET]
- UnitedHealthcare Press Release, "UnitedHealthcare Adds New Fitness Benefit to Medicare Advantage Plans in Florida," November 6, 2017 [issued at 10:00 ET]
- UnitedHealthcare Press Release, "UnitedHealthcare Adds New Fitness Benefit to Medicare Advantage Plans in Houston," November 6, 2017
- UnitedHealthcare Press Release, "UnitedHealthcare Adds New Fitness Benefit to Medicare Advantage Plans in Kentucky," November 6, 2017
- UnitedHealthcare Press Release, "UnitedHealthcare Adds New Fitness Benefit to Medicare Advantage Plans in New York," November 6, 2017
- UnitedHealthcare Press Release, "UnitedHealthcare Adds New Fitness Benefit to Medicare Advantage Plans in Ohio," November 6, 2017
- UnitedHealthcare Press Release, "UnitedHealthcare Adds New Fitness Benefit to Medicare Advantage Plans in Oklahoma," November 6, 2017
- UnitedHealthcare Press Release, "UnitedHealthcare Adds New Fitness Benefit to Medicare Advantage Plans in Oregon," November 6, 2017
- UnitedHealthcare Press Release, "UnitedHealthcare Adds New Fitness Benefit to Medicare Advantage Plans in San Antonio," November 6, 2017
- UnitedHealthcare Press Release, "UnitedHealthcare Adds New Fitness Benefit to Medicare Advantage Plans in Wisconsin," November 6, 2017

Public Press

- "Aging Gracefully; Maintaining Vitality: Senior Fitness Series, Part One," Mercury Pharmacy Services, July 10, 2017
- "No Matter How Old You Are, the YMCA Has Got an Exercise Program Perfect for You," *The Bellingham Herald*, March 8, 2017
- "The Largest Managers of Hedge Funds," *Pensions & Investments*, September 18, 2017

SEC Filings

- BlackRock, Inc. Form 10-K for FY 2017, filed February 28, 2018
- Tivity Health, Inc. Form 10-K for FY 2016, filed March 6, 2017
- Tivity Health, Inc. Form 10-K for FY 2017, filed February 28, 2018
- Tivity Health, Inc. Form 10-Q for 1Q 2017, filed May 4, 2017
- Tivity Health, Inc. Form 10-Q for 2Q 2017, filed August 4, 2017
- Tivity Health, Inc. Form 10-Q for 3Q 2017, filed November 3, 2017
- UnitedHealth Group, Inc. Form 10-K for FY 2017, filed February 13, 2018

Websites

- "2017 Fall Program & Membership Guide," Randolph YMCA, https://www.randolphymca.org/sites/default/files/Fall%20Brochure%202017.pdf, accessed September 2, 2019
- "2017 Spring/Summer Program Guide May 22nd–August 27th," Meadowlands YMCA, https://www.meadowlandsymca.org/clientuploads/pdf/2017/2017MeadowlandsYMCASpringSummerProgGuide.pdf, accessed September 1, 2019
- "About," Harrison Premier Fitness, https://www.harrisonpremierfitness.com/about-us/, accessed October 7, 2019.
- "About Us," Mercury Pharmacy Services, https://www.mercuryrx.com/our-story, accessed October 5, 2019
- "About Us," *The Bellingham Herald*, https://www.bellinghamherald.com/customer-service/about-us/article22204962.html, accessed September 1, 2019
- "Become a Fitness Center or YMCA Partner," Optum Fitness Advantage, https://web.archive.org/web/20170211165532/http://fitnessadvantage.optum.com/gym-partner, accessed September 1, 2019
- "Client Cxls Med Supp for MAPD," Insurance Forums, October 4, 2017, https://insurance-forums.com/community/threads/client-cxls-med-supp-for-mapd.90436/page-2, accessed September 2, 2019
- "Coming Soon!" Optum Fitness Advantage, https://web.archive.org/web/20161007221246/http://fitnessadvantage.optum.com, accessed September 16, 2019
- "Filing Detail," SEC, https://www.sec.gov/Archives/edgar/data/704415/000070441517000012/0000704415-17-000012-index.htm, accessed October 2, 2019
- "Good News: Optum® Fitness Advantage from UnitedHealthcare Will Be Coming Soon to This Location," YMCA New Jersey, https://ymcanj.org/wp-content/uploads/2016/12/flyer.pdf, accessed September 1, 2019

- "Insurance-Based Memberships," Meadowlands YMCA, https://web.archive.org/web/20170430034435/https://www.meadowlandsymca.org/membership/insurance-based-memberships/, accessed September 18, 2019
- "Insurance Coverage," Randolph YMCA, https://web.archive.org/web/20170301231456/https://www.randolphymca.org/join/insurance-coverage, accessed September 18, 2019
- Meadowlands YMCA, https://www.meadowlandsymca.org, accessed October 5, 2019
- "Membership," The Gateway Family YMCA, https://web.archive.org/web/20170910064502/https://tgfymca.org/membership, accessed September 18, 2019
- "New Program Coming to HPF! – Optum Fitness Advantage," Harrison Premier Fitness, October 9, 2017, https://www.harrisonpremierfitness.com/2017/10/09/new-program-coming-to-hpf-optum-fitness-advantage/, accessed September 2, 2019
- "Record of Proceedings," Prairie Township Board of Trustees, Columbus, Ohio, April 26, 2017, https://www.prairietownship.org/AgendaCenter/ViewFile/Minutes/_04252018-494, accessed September 16, 2019
- "Strength. Stability. Hassle Free. The Advantage of UnitedHealthcare 2017 Medicare Advantage Plans," UnitedHealthcare, https://www.agentpipeline.com/wp-content/uploads/2015/07/National-Packet_0720_Low-Res.pdf, accessed September 27, 2019
- "The World's Largest Insurance Community – Insurance Forums," Insurance Forums, http://web.archive.org/web/20171101020459/https://insurance-forums.com/, accessed September 2, 2019
- Twitter – Deer Park Fitness, https://twitter.com/deerparkfitness, accessed October 5, 2019
- "UHC Bringing Back Fitness in Many States," Insurance Forums, September 15, 2017, https://insurance-forums.com/community/threads/uhc-bringing-back-fitness-in-many-states.90204/, accessed September 2, 2019
- "Welcome to Jennison Associates," Jennison Associates, https://www.jennison.com, accessed September 12, 2019
- "What Is Net Promoter?" Satmetrix Systems, https://www.netpromoter.com/know/, accessed September 2, 2019
- "Yes, We Accept Optum Fitness Advantage!!" Twitter – Deer Park Fitness, https://twitter.com/DeerParkFitness/status/798164042439426048, accessed September 1, 2019
- YMCA of Western Monmouth County, https://web.archive.org/web/20161128150417/http://ymcanj.org/, accessed October 5, 2019

# Exhibit 1A

## Tivity Health, Inc.
## Alleged Misrepresentations and Omissions in SEC Filings
Putative Class Period: 3/6/17–11/6/17

| Alleged Misrepresentation or Omission | FY 2016 Form 10-K 3/6/17 | Q1 2017 Form 10-Q 5/4/17 | Q2 2017 Form 10-Q 8/4/17 | Q3 2017 Form 10-Q 11/3/17 |
|---|---|---|---|---|
| Before and during open enrollment for 2017, which ran between October and December 2016, Tivity executives were forwarded an aggressive letter from UHC to a fitness center that stated that UHC was launching Optum Fitness Advantage and that suggested that the fitness center would lose all SilverSneakers members, not just those insured by UHC. | ✓ | ✓ | ✓ | ✓ |
| Before January 2017, UHC informed Tivity that it would not be renewing SilverSneakers in at least New Jersey and Washington state. | ✓ | ✓ | ✓ | ✓ |
| In January 2017, UHC began operating Optum Fitness Advantage in New Jersey and Washington state. | ✓ | ✓ | ✓ | ✓ |
| By early 2017, Tivity knew that UHC was sending letters about Optum Fitness Advantage to partners outside of New Jersey and Washington state. | ✓ | ✓ | ✓ | ✓ |
| Tivity launched Project Success in June 2017 to develop a strategy to combat UHC's competitive threat. | | | ✓ | ✓ |
| A communication plan was put in place by September 2017 to make direct outreach to Tivity's fitness center partners concerning UHC's competitive program. | | | | ✓ |
| Defendants would later admit that they knew of contract losses arising from UHC as early as June 2017. | | | | ✓ |
| Defendants would later admit that they took these UHC contract losses into account when formulating preliminary guidance for 2018. | | | | ✓ |

Source: Complaint

# Exhibit 1B

## Tivity Health, Inc.
## Alleged Misrepresentations and Omissions Described in Complaint
Putative Class Period: 3/6/17–11/6/17

| Alleged Misrepresentation or Omission | Date First Alleged | Communication Type |
|---|---|---|
| Before and during open enrollment for 2017, which ran between October and December 2016, Tivity executives were forwarded an aggressive letter from UHC to a fitness center that stated that UHC was launching Optum Fitness Advantage and that suggested that the fitness center would lose all SilverSneakers members, not just those insured by UHC. | 3/6/17 | FY 2016 Form 10-K |
| Before January 2017, UHC informed Tivity that it would not be renewing SilverSneakers in at least New Jersey and Washington state. | 3/6/17 | FY 2016 Form 10-K |
| In January 2017, UHC began operating Optum Fitness Advantage in New Jersey and Washington state. | 3/6/17 | FY 2016 Form 10-K |
| By early 2017, Tivity knew that UHC was sending letters about Optum Fitness Advantage to partners outside of New Jersey and Washington state. | 3/6/17 | FY 2016 Form 10-K |
| Tivity's A-B-C-D strategy was failing with respect to UHC because UHC had introduced a competitive program to SilverSneakers that was necessarily causing Tivity to lose members of its SilverSneakers program in the markets that UHC was offering Optum Fitness Advantage. | 4/27/17 | Press Release |
| Tivity's A-B-C-D strategy was failing with respect to UHC because their business relationship was not "deepening" but rather eroding given UHC's rollout of a competitive program that would decrease Tivity's revenues from SilverSneakers. | 4/27/17 | Press Release |
| Tivity's market leadership position was being weakened not "strengthened" by UHC's introduction of Optum Fitness Advantage. | 4/27/17 | Press Release |
| The terms of Tivity's contract with UHC permitted UHC to offer a competitive product in certain markets. | 4/27/17 | Earnings Call |
| The actual terms of the [executed/renewed] UHC contract confirmed that the competitive threat posed by UHC was increasing, all of which represented a deterioration in Tivity's relationship with UHC which was decidedly not favorable to Tivity. | 4/27/17 | Earnings Call |
| The [new/renewed] contract altered Tivity's relationship with UHC such that UHC's increasingly competitive stance would decrease revenues derived from SilverSneakers, and increase investment risk for investors. | 4/27/17 | Earnings Call |
| Tivity launched Project Success in June 2017 to develop a strategy to combat UHC's competitive threat. | 7/27/17 | Press Release |
| UHC had introduced a competitive program to SilverSneakers that was necessarily causing Tivity to lose members of its SilverSneakers program in the markets that UHC was offering Optum Fitness Advantage. | 7/27/17 | Press Release |
| The "long-term" potential for SilverSneakers to grow was threatened given UHC's ability, under the terms of its contract with Tivity, to roll out Optum Fitness Advantage into new markets and other markets in which UHC historically offered SilverSneakers. | 7/27/17 | Press Release |
| A communication plan was put in place by September 2017 to make direct outreach to Tivity's fitness center partners concerning UHC's competitive program. | 10/26/17 | Earnings Call |
| Defendants would later admit that they knew of contract losses arising from UHC as early as June 2017. | 10/26/17 | Earnings Call |
| Defendants would later admit that they took these UHC contract losses into account when formulating preliminary guidance for 2018. | 10/26/17 | Earnings Call |

Source: Complaint

# Exhibit 2

# Tivity Health, Inc.

## Selected Publicly Available Information About Optum Fitness Advantage

*(boldface added throughout)*

| Date | Document Type | Quote | Source |
|---|---|---|---|
| July 2016 [1] | Marketing Packet | **Optum Fitness Advantage membership** — Stay active with a gym membership for no additional cost on plans H3805-014 and H3805-015 | UnitedHealthcare |
| Late 2016 [2] | Website | With **Optum® Fitness Advantage** you can visit any participating fitness center or YMCA at no additional cost to you as part of your UnitedHealthcare Medicare Advantage plan. | UnitedHealthcare |
| Late 2016 [3] | Flyer | **Optum® Fitness Advantage from UnitedHealthcare** will be coming soon to this location | YMCA of Western Monmouth County New Jersey |
| 11/14/16 | Tweet | Yes, we accept **Optum Fitness Advantage**!!<br><br>**OPTUM FITNESS ADVANTAGE FROM UNITED HEALTH CARE** ACCEPTED HERE!!!<br>Starting January 1st | Deer Park Fitness Washington |
| 3/8/17 | News Article | The SilverSneakers program is accessible through some Medicare plans. The YMCA also offers Silver & Fit, Prime, At Your Best and **Optum Fitness Advantage** to help with senior memberships. | The Bellingham Herald Washington |
| Spring 2017 [4] | Brochure | **Optum® Fitness**<br>Enjoy a free Facility Membership with no joiner Fee!<br>If you know you are eligible for **Optum Fitness**, Please bring in your unique program Id and register at the Welcome Desk Today! | YMCA Meadowlands New Jersey |
| 4/26/17 | Meeting Minutes | Mr. Gant asked the Board to enter into an agreement with **Optum Fitness Advantage Program**. This program is almost identical to Silver Sneakers and Silver N Fit programs that we currently offer. The major difference is that Optum will pay more per person per visit and the two programs work with different insurance carriers.<br><br>The program will go into effect in January 2018. | Prairie Township Board Of Trustees Ohio |

# Exhibit 2

# Tivity Health, Inc.

## Selected Publicly Available Information About Optum Fitness Advantage

*(boldface added throughout)*

| Date | Document Type | Quote | Source |
|---|---|---|---|
| 7/10/17 | Blog Post | Popular Health Plans and coverage:<br>Aetna- Silver & Fit<br>Humana- Silver Sneaker<br>Kaiser Permanente- Silver & Fit<br>**Optum Fitness Advantage (United Healthcare)- Optum**<br>Premera Blue Cross- Silver & Fit<br>Regence Blue Cross & Blue Shield- Silver & Fit<br>United Healthcare- Silver Sneakers | Mercury Pharmacy Services |
| 9/15/17 | Forum Post | Just receivled an email from UHC that they are bringing back fitness as part of MAPD in a [sic] 9 states (including Florida) for 2018.<br>It won't be Silver Sneakers, it's called-<br>**Optum Fitness Advantage** - Coming to a Plan Near You!<br>It's competitive; it's tested; it's ready for prime time! **Optum Fitness Advantage** will be available with many UnitedHealthcare Medicare Advantage (MA) plans **in nine new states (Arizona, Florida, Kentucky, Ohio, Oklahoma, Oregon, New York, Texas (specifically Austin, Houston and San Antonio) and Wisconsin) for 2018**.* Members will have access to a variety of fitness clubs at no additional cost in line with their previous fitness benefit. The good news is that we will continue to build this benefit for consumers over the next few years to provide a superior experience with UnitedHealthcare.<br><br>**The nine states mentioned join New Jersey and Washington, which rolled out Optum Fitness Advantage benefits in 2017**. Optum Fitness Advantage contributed to higher health and wellness benefit Net Promoter Scores (NPS) this year. | Insurance-Forums.com |
| Fall 2017 [5] | Brochure | **Optum Fitness Advantage** through United Health Care<br>The Randolph YMCA is participating in this program that is available to NJ residents who are insured members covered under AARP Medicare Supplement Insurance Plan insured by United Health Care. | Randolph YMCA New Jersey |
| 10/4/17 | Forum Post | At least in Ohio, **UHC is** pulling out of SilverSneakers and **starting Optum Fitness Advantage**. Not sure about Georgia. | Insurance-Forums.com |

**Exhibit 2**

# Tivity Health, Inc.

## Selected Publicly Available Information About Optum Fitness Advantage

*(boldface added throughout)*

| Date | Document Type | Quote | Source |
|---|---|---|---|
| 10/6/17 | Forum Post | UHC has announced some changes as to Silversneakers. **In Texas as of January 2018, UHC will no longer offer Silversneakers for the Med Supp. Instead clients will get UHC's new product through Optum** that gives discounts to gyms and online health and wellness content. Also in Texas the Advantage product has also dropped Silversneakers for the new program in most areas for 2018. Dallas-Fort Worth will continue with Silversneakers for 2018 but is scheduled to drop Silversneakers there in 2019. | Insurance-Forums.com |
| 10/9/17 | Flyer | **Optum Fitness Advantage** from UnitedHealthcare will be coming soon to this location. | Harrison Premier Fitness Ohio |

Source: "Strength. Stability. Hassle Free. The Advantage of UnitedHealthcare 2017 Medicare Advantage Plans," UnitedHealthcare, https://www.agentpipeline.com/wp-content/uploads/2015/07/National-Packet_0720_Low-Res.pdf, accessed September 27, 2019; "Coming Soon!," https://web.archive.org/web/20161007221246/http://fitnessadvantage.optum.com/, accessed September 16, 2019; "Yes, we accept Optum Fitness Advantage," Twitter – Deer Park Fitness Twitter, https://twitter.com/DeerParkFitness/status/798164042439426048, accessed September 1, 2019; "Good News: Optum® Fitness Advantage from UnitedHealthcare will be coming soon to this location," https://ymcanj.org/wp-content/uploads/2016/12/flyer.pdf, accessed September 1, 2019; "No matter how old you are, the YMCA has got an exercise program perfect for you," *The Bellingham Herald*, March 8, 2017; "Aging Gracefully, Maintaining Vitality: Senior Fitness Series, Part One," Mecrcury Pharmacy Services, July 10, 2017, https://www.mercuryrx.com/single-post/2017/06/27/Aging-Gracefully-Maintaining-Vitality-Senior-Fitness-Series-Part-One, accessed September 1, 2019; "2017 Spring / Summer Program Guide May 22nd–August 27th," Meadowlands Area YMCA, https://www.meadowlandsymca.org/clientuploads/pdf/2017/2017MeadowlandsYMCASpringSummerProgGuide.pdf, accessed September 1, 2019; "2017 Fall Program & Membership Guide," Randolph YMCA, https://www.randolphymca.org/sites/default/files/Fall%20Brochure%202017.pdf, accessed September 2, 2019; "Record of Proceedings," Prairie Township Board of Trustees, Columbus, Ohio, April 26, 2017, https://www.prairietownship.org/AgendaCenter/ViewFile/Minutes/_04252018-494, accessed September 16, 2019; "New Program Coming to HPF! – Optum Fitness Advantage," Harrison Premier Fitness, October 9, 2017, https://www.harrisonpremierfitness.com/2017/10/09/new-program-coming-to-hpf-optum-fitness-advantage/, accessed September 2, 2019; "UHC Bringing Back Fitness in Many States," Insurance-Forums, September 15, 2017, https://insurance-forums.com/community/threads/uhc-bringing-back-fitness-in-many-states.90204/, accessed September 2, 2019; "Client Cxls Med Supp for MAPD," Insurance-Forums, October 4, 2017, https://insurance-forums.com/community/threads/client-cxls-med-supp-for-mapd.90436/page-2, accessed September 2, 2019; Twitter – Deer Park Fitness, https://twitter.com/deerparkfitness, accessed October 5, 2019; YMCA of Western Monmouth County, https://web.archive.org/web/20161128150417/http://ymcanj.org/, accessed on October 5, 2019; "About Us," The Bellingham Herald, https://www.bellinghamherald.com/customer-service/about-us/article22204962.html, accessed September 1, 2019; "About," Harrison Premier Fitness, https://www.harrisonpremierfitness.com/about-us/, accessed October 7, 2019.

Note:

[1] The web address of this document (https://www.agentpipeline.com/wp-content/uploads/2015/07/National-Packet_0720_Low-Res.pdf) suggests it was made available in July 2016 to insurance agents. The content of the packet notes that "star ratings are current as of July 2016 and are subject to change in October," suggesting that the document was created between July and October 2016.

[2] The first capture of this website by the Internet Archive was on October 7, 2016.

[3] The web address of this document (https://ymcanj.org/wp-content/uploads/2016/12/flyer.pdf) suggests it was made available in December 2016.

[4] This program guide advertised their "Grand Opening" which began on May 8, 2016 which suggests that the flyer was made available before then.

[5] This program guide advertised swim lessons where you could register as an "Early Bird" at a reduced rate. The deadline for early bird registration was August 28, 2017, suggesting that this flyer was made available before then.

# Tivity Health, Inc.
# Insurance-Forums.com Post
9/15/17

**UHC Bringing Back Fitness in Many States**

Just received an email from UHC that they are bringing back fitness as part of MAPD in a [sic] 9 states (including Florida) for 2018.

It won't be Silver Sneakers, it's called-

*Optum Fitness Advantage - Coming to a Plan Near You!*

*It's competitive; it's tested; it's ready for prime time! Optum Fitness Advantage will be available with many UnitedHealthcare Medicare Advantage (MA) plans in nine new states (Arizona, Florida, Kentucky, Ohio, Oklahoma, Oregon, New York, Texas (specifically Austin, Houston and San Antonio) and Wisconsin) for 2018.* Members will have access to a variety of fitness clubs at no additional cost in line with their previous fitness benefit. The good news is that we will continue to build this benefit for consumers over the next few years to provide a superior experience with UnitedHealthcare.*

*Highlights for members*

*Continue to have flexibility to exercise and participate in group classes at multiple fitness centers in their areas, rather than being restricted to membership at just one fitness center*

*New upscale fitness centers that have historically not been part of these types of programs (i.e. Lifetime Fitness); continuing to build the network*
*Connection between Optum and UnitedHealthcare ensuring data for a holistic member experience and streamlined communications*

*Streamlined UnitedHealthcare call center member experience – members simply call the number on the back of their UnitedHealthcare membership cards with questions*

*The nine states mentioned join New Jersey and Washington, which rolled out Optum Fitness Advantage benefits in 2017. Optum Fitness Advantage contributed to higher health and wellness benefit Net Promoter Scores (NPS) this year.*

I checked my local network and it's pretty good although it doesn't have the local Y (but does have LA Fitness)

**Exhibit 4**

# Tivity Health, Inc.
# Test for Autocorrelation Using Different Estimation Periods [1]

| Estimation Period [2] | Percentage of Days in Putative Class Period | Coefficient on Previous Day's Abnormal Return | T-Statistic | Significance Level [4] |
|---|---|---|---|---|
| Putative Class Period [3] | 100% | -0.32 | -2.61 | ** |
| Putative Class Period +/- 1 Month | 81% | -0.15 | -2.23 | * |
| Putative Class Period +/- 2 Month | 68% | -0.14 | -2.31 | * |
| Putative Class Period +/- 3 Month | 59% | -0.16 | -2.79 | ** |
| Putative Class Period +/- 4 Month | 52% | -0.17 | -3.12 | ** |
| Putative Class Period +/- 5 Month | 46% | -0.14 | -2.68 | ** |
| Putative Class Period +/- 6 Month | 41% | -0.13 | -2.77 | ** |
| Putative Class Period +/- 7 Month | 37% | -0.09 | -1.90 | |
| Putative Class Period +/- 8 Month | 34% | -0.02 | -0.37 | |
| Putative Class Period +/- 9 Month | 31% | -0.02 | -0.41 | |
| Putative Class Period +/- 10 Month | 29% | -0.02 | -0.43 | |
| Putative Class Period +/- 11 Month | 27% | -0.02 | -0.50 | |
| Putative Class Period +/- 12 Months (Mr. Coffman's Analysis Period) [5] | 25% | -0.02 | -0.42 | |

Source: Coffman Report; OFP-TVTY-00000182_Confidential.xlsx
Note:

[1] The test for autocorrelation follows Mr. Coffman's methodology of performing a regression using Tivity's abnormal return estimated from his event study as the dependent variable and Tivity's abnormal return from the previous trading day as the independent variable.

[2] Using an estimation period of March 7, 2017 to November 5, 2017, the coefficient on the previous day's abnormal return is -0.20 and statistically significant at the 99% confidence level. This estimation period corresponds to the trading days on which alleged inflation would have been incorporated in the stock price because, as noted in this report, Tivity filed its March 6, 2017 Form 10-K after market close, and the UHC Press Release was issued before market open on November 6, 2017.

[3] The Putative Class Period runs from March 6, 2017 to November 6, 2017.

[4] One asterisk denotes statistical significance at the 95% confidence level. Two asterisks denote statistical significance at the 99% confidence level.

[5] There are 675 trading days in Mr. Coffman's Analysis Period, but his autocorrelation test for his Analysis Period uses a sample of returns over 674 trading days. Specifically, Mr. Coffman omits from his estimation sample Tivity's abnormal return on March 7, 2016, the first day of his Analysis Period.

**Exhibit 5**

# Tivity Health, Inc.
# Analyst Price Targets Before and After the 11/6/17 UHC Press Release [1]

| | Last Report Before UHC Press Release | | First Report After UHC Press Release | |
|---|---|---|---|---|
| **Contributor** | **Report Date** | **Price Target** | **Report Date** | **Price Target** |
| Cantor Fitzgerald | 10/26/17 | $45.00 | 11/6/17 | $45.00 |
| Chardan Capital | 10/27/17 | $44.00 | 11/6/17 | $44.00 [2] |
| Jefferies | 10/26/17 | $51.00 | 11/6/17 | $51.00 |
| Piper Jaffray | 10/27/17 | $49.00 | 11/6/17 | $49.00 |
| William Blair [3] | 10/26/17 | - | 11/6/17 | - |
| Barrington Research | 10/27/17 | $46.00 | 11/7/17 | $40.00 |
| SunTrust Robinson Humphrey | 10/27/17 | $50.00 | 11/7/17 | $50.00 |

Source: "EPS Beat; Increases 2017 Guidance; Maintain Overweight," Cantor Fitzgerald, October 26, 2017; "3Q Beat & Raise, Mgmt Confident for '18, Reit. Neutral, PT to $44," Chardan Capital Markets, October 27, 2017; "Early Halloween Candy: 4 Key Insights from TVTY's 3Q17," Jefferies, October 26, 2017; "Further Acceleration in FY18 Should Drive Multiple Expansion," Piper Jaffray, October 27, 2017; "Strong Third-Quarter Results Highlighted by a Dime of EPS Upside; Guidance Increased and 2018 Outlook Ahead of Street," William Blair, October 26, 2017; "Big EPS Beat, 2017 Guidance Increased; Price Target Now $46," Barrington Research, October 27, 2017; "3Q Well Ahead, 2018 Shaping up to Be a Big Year. Reiterate Buy, Raising Target," SunTrust Robinson Humphrey, October 27, 2017; "Shares Off on UNH Announcement; Too Early to Worry about 2020; Overweight," Cantor Fitzgerald, November 6, 2017; "UNH Expands Senior Benefit, Less Confident in Our TVTY Estimates," Chardan Capital Markets, November 6, 2017; "TVTY Pullback Today Pricing in More than Worst Case Scenario with UnitedHealth," Jefferies, November 6, 2017; "Defending TVTY on Sell-Off after Optum News," Piper Jaffray, November 6, 2017; "Sell-Off on UnitedHealth News Seems Markedly Overdone; We Are Buyers on Weakness," William Blair, November 6, 2017; "Tivity Shares Crushed as Relationship with UnitedHealth Comes into Question," Barrington Research, November 7, 2017; "Everybody Take a Deep Breath - Offering a Little Perspective," SunTrust Robinson Humphrey, November 7, 2017; "4Q Beat & Strong '18 Guide; Reit. Neutral, PT to $41," Chardan Capital Markets, February 23, 2018

Note:

[1] Displayed contributors published analyst reports on November 6, 2017 or November 7, 2017.

[2] In its November 6, 2017 report, Chardan noted that they were "less confident in [their] estimates for the company and [they were] putting [their] estimates under review." In its subsequent report on February 23, 2018, Chardan lowered its price target to $41.

[3] William Blair did not provide price targets but rated the stock "Outperform" on October 26, 2017 and November 6, 2017.