# Exhibit 2

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| ERIC WEINER, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>TIVITY HEALTH, INC., DONATO TRAMUTO, GLENN HARGREAVES and ADAM HOLLAND,<br><br>Defendants. | Case No.: 3:17-cv-01469<br><br>Chief Judge Crenshaw<br>Magistrate Judge Newbern |

# Expert Report of Paul A. Gompers, Ph.D.

August 31, 2020

CONFIDENTIAL

# Table of Contents

I. Qualifications ..... 1

II. Assignment ..... 2

III. Summary of Opinions ..... 2

IV. Background ..... 6

A. Tivity ..... 6

B. Plaintiff's Allegations ..... 7

C. Coffman Report ..... 9

V. Mr. Coffman Does Not Establish that the Alleged Misrepresentations and Omissions Were Important to Investors ..... 10

A. Mr. Coffman Does Not Demonstrate that the Alleged Misrepresentations and Omissions Were Important to Tivity's Financial Performance ..... 11

1. Mr. Coffman's Opinion Is Not Supported by Evidence ..... 11

2. Mr. Coffman Mischaracterizes Optum Fitness Advantage ..... 12

3. Mr. Coffman Ignores Tivity's Response to Optum Fitness Advantage ..... 13

4. Mr. Coffman Does Not Quantify the Expected Impact of UHC's Optum Fitness Advantage Program Offerings ..... 19

B. Mr. Coffman Fails to Support His Opinion that Analyst Commentary Shows the Alleged Misstatements and Omission Were Material ..... 22

C. A Statistically Significant Stock Price Decline On Its Own Does Not Prove the Allegedly Withheld Information Was Important to Investors ..... 28

VI. Mr. Coffman Fails to Demonstrate Loss Causation ..... 29

A. Economic Analysis Required for Establishing Loss Causation and Measuring Harm in Rule 10b-5 Securities Cases ..... 29

B. Mr. Coffman's Analysis Does Not Demonstrate a Causal Connection Between the Alleged Misrepresentations and Omissions and Plaintiff's Loss ..... 30

1. Mr. Coffman Has Not Identified Appropriate But-For Disclosures and Ignores that Information in the UHC Press Releases Was Not Known or Knowable to Tivity Earlier in the Class Period ..... 30

2. Tivity's Stock Price Decline on November 6, 2017 Could Not Have Been Caused by Information Already in the Public Domain ..... 35

3. To the Extent Mr. Coffman Contends Tivity Withheld Any Information Other Than Optum Fitness Advantage Program Offerings in 11 States, the Alleged Corrective Disclosure Did Not "Correct" Any Such Information ..... 43

4. Mr. Coffman Ignores or Does Not Consider Other Explanations for the Stock Price Decline ..... 45

C. Mr. Coffman's Analysis of "Foreseeability" Does Not Demonstrate a Casual Connection Between the Alleged Misrepresentations and Omissions and Plaintiff's Loss ..... 50

VII. Mr. Coffman's Purported Damages Methodology Is Not Reliable ..... 52

A. From an Economic Perspective, Mr. Coffman Has Not Shown That There Are Any Damages ..... 53

B. Mr. Coffman's Damages Methodology Is Severely Flawed and He Has Not Shown that the November 6, 2017 Price Decline Can Be Used to Measure Inflation and Damages ..... 53

1. Mr. Coffman Fails to Account for Varying Inflation During the Class Period ..... 54

2. Mr. Coffman's Analysis of His Purported "Inflation Creating Event" Is Unscientific and Unreliable ..... 56

3. Mr. Coffman Does Not Account for the Portion of the Stock Price Decline Attributable to the Materialization of a Disclosed Risk ..... 59

4. Mr. Coffman Fails to Remove Confounding Information from His Damages Analysis ..... 61

C. Assuming There Are Damages, Mr. Coffman Ignores More Reasonable Approaches That Imply Lower Estimates ..... 62

## I. Qualifications

1. I am the Eugene Holman Professor of Business Administration at the Harvard Business School. I teach courses and conduct research in corporate finance, the structure and governance of public and private companies, valuation of companies and the behavior of institutional investors, as well as entrepreneurial finance and management, including the venture capital and private equity industry, young start-ups, and high-growth-potential firms. I teach these courses to Ph.D., M.B.A., Executive Education, and undergraduate students. In addition to my teaching responsibilities, I am a Research Associate at the National Bureau of Economic Research. Before joining the Harvard faculty in 1995, I was a member of the faculty at the University of Chicago Graduate School of Business, where, from 1993 to 1995, I taught entrepreneurial finance. I received an A.B. in Biology from Harvard College in 1987, a M.Sc. in Economics from Oxford University in 1989, and a Ph.D. in Business Economics from Harvard University in 1993.

2. In my career as an academic, I have written numerous case studies and technical notes, and published numerous articles in peer-reviewed finance and economics journals on valuation, venture capital and private equity industries, and entrepreneurial finance. Many of these case studies, notes, and research articles have directly examined financial and valuation issues of companies. I am the coauthor of four books: The Venture Capital Cycle (editions 1 and 2), published by MIT Press, The Money of Invention, published by Harvard Business School Press, Entrepreneurial Finance: A Casebook, published by John Wiley & Sons, Inc., and Private Equity Finance, published by Anthem Press.

3. I have been an Associate Editor of the *Journal of Finance*, *Journal of Economic Literature*, *Small Business Economics*, and *Journal of Private Equity*, as well as a referee for a number of academic journals, including the *Journal of Financial Economics*, *Journal of Political Economy*, *Quarterly Journal of Economics*, and *Review of Financial Studies*. I have served on the boards of directors of several companies, including ZEFER, Mercanteo, and OnTheFrontier.com. My CV is attached as Appendix A to this report.

4. I have served as an expert in a number of legal matters. In these disputes, I have served as an expert on, among other things, whether securities markets were efficient, the valuation of public and private companies, and the factors affecting public company securities prices. These include matters in which I have been asked to analyze alleged

damages, as well as numerous matters involving class certification issues. Appendix B contains a list of my testimony over the last four years.

## II. Assignment

5. I have been retained by counsel for Tivity Health, Inc. ("Tivity" or the "Company," and, together with Donato Tramuto, Glenn Hargreaves, and Adam Holland, the "Defendants") to review and respond to the Expert Report of Chad Coffman, CFA, dated July 30, 2020 ("Coffman Report").[1]

6. I am being compensated for this matter at my regular hourly rate of $1,200. In addition, under my direction, Cornerstone Research has performed research and other support work for me on this matter. My analyses, opinions, and conclusions are based solely on the work performed by me and those under my direction. I have received compensation, and anticipate that I may receive future compensation, from Cornerstone Research that reflects, among other things, my relationship with that firm as an expert on this and other corporate and client matters. My compensation is not contingent upon the conclusions I reach or on the outcome of this matter.

7. In formulating the conclusions and opinions set forth in this report, I have relied on my knowledge, my prior experience, my academic research on relevant topics, and my formal training in economics and finance. A list of documents, data, and other information that I have considered in forming the opinions set forth in this report is attached hereto as Appendix C. I reserve the right to revise my opinions in light of my ongoing review of the materials I have considered, as well as additional materials, including data, documents, and deposition or other testimony that may subsequently come to light, or if I am asked to perform further research or analysis.

## III. Summary of Opinions

8. Mr. Coffman does not support his opinion that the alleged misrepresentations and omissions "were important to investors" and "were material and would have been viewed by

---

[1] I previously submitted an expert report in this matter addressing class certification issues (Expert Report of Paul A. Gompers, Ph.D., dated October 8, 2019, ("Gompers Class Certification Report")).

a reasonable investor as significantly altering the 'total mix' of information."[2] He does not provide a proper economic analysis and fails to review evidence in this case that contradicts his conclusions. Specifically:

i. Mr. Coffman does not analyze the economics of Tivity's business or even attempt to quantify the financial impact of the Optum Fitness Advantage program offerings on Tivity's business. Had he done so, he would have found that the Optum Fitness Advantage program offerings were expected to impact less than 1% of Tivity's forecasted 2017 revenues, and less than 4% of Tivity's forecasted 2018 revenues. Mr. Coffman has not demonstrated that the alleged misrepresentations and omissions "were important to investors" and "significantly alter[ed] the 'total mix' of information" regarding Tivity.[3]

ii. While Mr. Coffman relies on select analyst commentary to purportedly support his opinions, he ignores that the overwhelming majority of analysts did not update their forecasts of Tivity's business fundamentals, including EBITDA, EPS, long-term growth rates, and price targets, following the series of 12 press releases issued by UHC on November 6, 2017 (the "UHC Press Releases"). This indicates analysts did not view the allegedly withheld information to be of sufficient economic significance to warrant a change in their forecasts.

iii. Tivity's statistically significant stock price decline on November 6, 2017 does not by itself constitute evidence that the allegedly withheld information was important to investors. Mr. Coffman has not established that the decline (either in whole or in part) was due to the revelation of the allegedly withheld information (as explained below).

9. Mr. Coffman fails to demonstrate loss causation, *i.e.*, a causal connection between the alleged misrepresentations and omissions and Tivity's stock price decline on November 6, 2017, for the following reasons:

i. Mr. Coffman has not identified appropriate but-for disclosures (*i.e.*, the information that could and should have been disclosed to make the alleged misrepresentations and omissions not misleading)—a crucial step in

---

[2] Coffman Report, ¶¶ 43, 56.
[3] Coffman Report, ¶ 43.

demonstrating loss causation—and ignores that information in the UHC Press Releases was not known or knowable to (and/or could not be disclosed by) Tivity earlier in the Class Period. Thus, Mr. Coffman fails to establish a link between the alleged misrepresentations and omissions and the information revealed in the UHC Press Releases.

ii. Mr. Coffman ignores that the allegedly corrective information contained in the UHC Press Releases was already in the public domain. If Tivity's stock traded in an efficient market, its price would not react to information that was already public.

iii. Mr. Coffman ignores or does not consider other explanations for Tivity's November 6, 2017 stock price decline that are not due to the alleged misrepresentations and omissions. Specifically, Mr. Coffman does not consider if and to what extent the market overreacted to the UHC Press Releases, as observed by multiple analysts. Mr. Coffman also ignores the possibility that UHC's issuance of a series of 12 press releases changed investor sentiment about how aggressive UHC would be in expanding its Optum Fitness Advantage program offerings in the future, despite intraday price movements that suggest such a change in investor sentiment, consistent with an overreaction.

10. Since Mr. Coffman has not demonstrated loss causation, he has not shown that there are damages. However, even assuming, for the sake of argument, that there are damages, Mr. Coffman's damages methodology is flawed and overstates damages for the following reasons:

i. Mr. Coffman ignores that Plaintiff's allegations imply the purported inflation in Tivity's stock price changed over the course of the Class Period. He assumes inflation was constant throughout the Class Period (with one discrete change on April 28, 2017) and does not provide any economic analysis to support his assumption that inflation would not have changed on other dates during the Class Period.

ii. Mr. Coffman's assumption that there was only one day during the Class Period when the alleged inflation in Tivity's stock price increased, a so-called "Inflation Creating Event" on April 28, 2017, is unsupported and inconsistent with the facts of the case. In particular, the information released during Mr.

Coffman's "Inflation Creating Event" was not information that was "corrected" by the alleged corrective disclosure. Moreover, even if inflation increased on April 28, 2017 as Mr. Coffman assumes, his methodology to determine the extent of that increase is unreliable, because it does not consider whether any of the disclosed information had already been anticipated by market participants and does not take into account the impact of all of the pieces of positive information released on that date. Additionally, his methodology is unreliable because it would yield nonsensical results under different scenarios.

iii. Mr. Coffman does not account for the portion of Tivity's stock price decline on November 6, 2017 that is attributable to the materialization of a disclosed risk. He appears to assume that Tivity knew and could have disclosed earlier in the Class Period that "a known realized competitive threat had materialized from UHC."[4] In doing so, he ignores evidence that contradicts this assumption, *i.e.*, evidence that indicates Tivity could not have disclosed that UHC was a known competitive threat with 100% certainty earlier in the Class Period. All Tivity could have disclosed was the risk of a competitive threat from UHC. Prior to the Class Period, Tivity had disclosed that its health plan customers could pose a competitive threat. Hence, investors were aware of such a risk. As a result, even if there were any inflation in Tivity's stock price, it would be limited to the difference between the impact of the risk known by the market and the impact of the "true" risk known by Tivity. Mr. Coffman ignores this in his damages analysis.

iv. Mr. Coffman fails to parse out the impact of confounding information, *i.e.*, information unrelated to the alleged misrepresentations and omissions, on Tivity's stock price decline on November 6, 2017. Specifically, Mr. Coffman does not remove from his damages estimate the impact of a potential market overreaction in response to the UHC Press Releases, including the possibility that UHC's issuance of a series of 12 press releases changed investor sentiment about how aggressive UHC would be in expanding its Optum Fitness Advantage program offerings in the future.

---

[4] Coffman Report, ¶ 39.

v. Mr. Coffman also ignores alternative damages approaches that provide more reliable measures of the impact of the alleged misrepresentations and omissions on Tivity's stock price, including using a discounted cash flow model and an EBITDA multiples analysis. Had Mr. Coffman considered either of these approaches, his damages estimate would have been substantially lower. Examples of discounted cash flow and EBITDA multiples analyses I provide yield estimates in the $0.04 to $0.73 range for the impact of the alleged misrepresentations and omissions on Tivity's stock price, which are much lower than Mr. Coffman's inflation estimate of $16.54.

## IV. Background

### A. Tivity

11. Tivity was founded in 1981 and is a health and fitness company based in Franklin, Tennessee.[5] During the Class Period, Tivity's primary source of revenue was a program called "SilverSneakers."[6] SilverSneakers connects a network of more than 13,000 fitness centers ("participating locations") to enrollees in health insurance programs such as Medicare Advantage, Medicare Supplement, and Group Retiree programs.[7] The health insurance companies that offer these programs are Tivity's customers.[8] During the period at issue in this case, one of Tivity's largest customers was UnitedHealthcare, Inc. ("UHC"), which contributed more than 10% of Tivity's overall revenue in FY 2016.[9] In late 2017, UHC issued a series of press releases regarding its own program called Optum Fitness Advantage.[10] Optum Fitness Advantage allowed UHC to provide fitness benefits in-house instead of through Tivity or other providers for certain plan members.

---

[5] Tivity Health, Inc. Form 10-K for Fiscal Year ("FY") 2016, filed March 6, 2017 ("Tivity 2016 10-K"), p. 4.
[6] *See, e.g.*, "The Road to 5 Million Enrolled Members," Tivity Health Investor Day 2018 Presentation, June 1, 2018, pp. 76–77.
[7] Tivity 2016 10-K, pp. 4–5.
[8] Tivity 2016 10-K, pp. 4–5.
[9] UHC contributed more than 10% of Tivity's overall revenue from continuing operations in FY 2016. Tivity 2016 10-K, p. 5.
[10] *See, e.g.,* UnitedHealthcare Press Release, "UnitedHealthcare Adds New Fitness Benefit to Medicare Advantage Plans in New York," November 6, 2017.

### B. Plaintiff's Allegations

12. Plaintiff in this case alleges that Tivity made false representations to the market throughout the Class Period—from March 6, 2017 to November 6, 2017, inclusive[11]—about its contractual relationship with UHC.[12] According to Plaintiff, Tivity continued to disclose in its SEC filings that its health plan customers, such as UHC, "***might*** compete with its product offerings" even as Tivity learned by late 2016 that "UHC began to launch its Optum Fitness Advantage Program… in select states, including Washington and New Jersey."[13] Plaintiff further alleges that Tivity concealed information based on "active contract renewal negotiations with UHC" that "UHC would escalate its competition with SilverSneakers by reducing the number of markets in which UHC would offer SilverSneakers to its members."[14] Tivity allegedly formed "Project Success," which was "a strategic plan to retain customers in light of UHC's roll out of Optum Fitness Advantage in multiple states," but did not disclose this or other counter efforts to investors.[15] Plaintiff alleges that Tivity's actions "misled the investing public,"[16] particularly given that UHC was "one of Tivity's most important customers."[17] Exhibit 1 summarizes the alleged misrepresentations and omissions in the Complaint.

13. Plaintiff alleges that the "truth [was] revealed" on November 6, 2017, when UHC announced in a series of 12 press releases starting at 9:00 a.m. that it "had launched Optum Fitness Advantage to replace and compete with SilverSneakers in what would be a total of 11 states beginning in January 2018."[18] The first of the UHC Press Releases disclosed the

---

[11] The Class Period starts on March 6, 2017, the date Tivity filed its Form 10-K for 2016. First Amended Complaint, *Eric Weiner, et al. v. Tivity Health, Inc., et al.*, United States District Court for the Middle District of Tennessee, Nashville Division, Case No. 3:17-cv-01469, June 4, 2018 ("Complaint"), ¶¶ 1, 57–59. However, I understand that Tivity filed this Form 10-K after market close on March 6, 2017. ("Filing Detail," SEC, https://www.sec.gov/Archives/edgar/data/704415/000070441517000012/0000704415-17-000012-index.htm, accessed August 30, 2020.) Further, the UHC Press Release, which Plaintiff alleges was the corrective disclosure, was released before market open on November 6, 2017. Complaint, ¶¶ 80–81. As such, the alleged period of inflation in the stock price would be March 7, 2017 to November 5, 2017.

[12] Complaint, ¶ 1.

[13] Complaint, ¶¶ 2–3. (Emphasis in original.)

[14] Complaint, ¶ 50.

[15] Complaint, ¶¶ 52, 55.

[16] Complaint, ¶ 5.

[17] Complaint, ¶ 4.

[18] Complaint, ¶ 80. Plaintiff cites to a 9:00 a.m. press release issued by UHC on November 6, 2017 as the alleged corrective disclosure. This press release was addressed to individuals enrolled in Medicare Advantage plans in New York. I note that UHC issued a series of press releases that day between 9:00 a.m. and 11:45 a.m. disclosing the same information but addressed to Medicare Advantage plan participants in eight additional states, namely, Arizona, Florida, Kentucky, Ohio, Oklahoma, Oregon, Wisconsin, and Texas (specifically, San Antonio, Houston, and Austin). UnitedHealthcare Press Release, "UnitedHealthcare Adds New Fitness Benefit

following about the availability of Optum Fitness Advantage in New York State, with the eleven subsequent press releases disclosing similar information about different states:[19]

> People enrolled in UnitedHealthcare Medicare Advantage plans in New York will soon have a new fitness benefit that offers access to exercise classes, workout equipment and social activities at participating fitness locations.
>
> In January 2018, Optum Fitness Advantage will be available at no additional cost to people enrolled in eligible UnitedHealthcare Medicare Advantage plans in 11 states through a large network of participating fitness centers. Plan participants will have access to the same services, privileges, classes and programs as the fitness centers' standard members, including waiver of all enrollment fees.
>
> "Optum Fitness Advantage offers people enrolled in UnitedHealthcare Medicare Advantage plans an opportunity to stay active and engaged in their communities in a way that supports their overall health and well-being," said Phillip Franz, CEO of UnitedHealthcare Medicare & Retirement in New York.
>
> Fitness centers participating in the Optum Fitness Advantage program in New York include participating locations of 24 Hour Fitness, Anytime Fitness, LA Fitness, New York Sports Clubs and Snap Fitness. Locations also include local participating YMCAs.
>
> The Optum Fitness Advantage program, launched by UnitedHealthcare in Washington state and New Jersey in January 2017, has been well received by local Medicare Advantage plan participants…[20]

---

to Medicare Advantage Plans in Arizona," November 6, 2017; UnitedHealthcare Press Release, "UnitedHealthcare Adds New Fitness Benefit to Medicare Advantage Plans in Austin," November 6, 2017; UnitedHealthcare Press Release, "UnitedHealthcare Adds New Fitness Benefit to Medicare Advantage Plans in Florida," November 6, 2017; UnitedHealthcare Press Release, "UnitedHealthcare Adds New Fitness Benefit to Medicare Advantage Plans in Houston," November 6, 2017; UnitedHealthcare Press Release, "UnitedHealthcare Adds New Fitness Benefit to Medicare Advantage Plans in Kentucky," November 6, 2017; UnitedHealthcare Press Release, "UnitedHealthcare Adds New Fitness Benefit to Medicare Advantage Plans in New York," November 6, 2017; UnitedHealthcare Press Release, "UnitedHealthcare Adds New Fitness Benefit to Medicare Advantage Plans in Ohio," November 6, 2017; UnitedHealthcare Press Release, "UnitedHealthcare Adds New Fitness Benefit to Medicare Advantage Plans in Oklahoma," November 6, 2017; UnitedHealthcare Press Release, "UnitedHealthcare Adds New Fitness Benefit to Medicare Advantage Plans in Oregon," November 6, 2017; UnitedHealthcare Press Release, "UnitedHealthcare Adds New Fitness Benefit to Medicare Advantage Plans in San Antonio," November 6, 2017; UnitedHealthcare Press Release, "UnitedHealthcare Adds New Fitness Benefit to Medicare Advantage Plans in Wisconsin," November 6, 2017.

[19] There were two separate press releases for Florida.

[20] UnitedHealthcare Press Release, "UnitedHealthcare Adds New Fitness Benefit to Medicare Advantage Plans in New York," November 6, 2017.

14. In summary, Plaintiff claims that the alleged misrepresentations and omissions "artificially inflated and/or maintained the price of Tivity securities at an artificially high level," and when the "truth about the Company was revealed," Tivity's stock price declined—resulting in the removal of inflation from the stock price and causing "economic loss, *i.e.*, damages" to investors that purchased Tivity stock during the Class Period.[21]

### C. Coffman Report

15. In his report, Mr. Coffman states that he was asked (i) to opine on whether the alleged misstatements and omissions were important to investors and whether they caused investor losses; (ii) to quantify the losses and artificial inflation purportedly attributable to the alleged misrepresentations and omissions; and (iii) to propose a methodology to quantify damages during the Class Period.[22]

16. Mr. Coffman opines that the "alleged misstatements and omissions regarding Tivity's relationship with UHC were important to investors."[23] To reach this conclusion, Mr. Coffman purports to rely on Tivity's public statements related to the importance of Tivity's SilverSneakers program and its relationship with UHC, analyst commentary, "economic and valuation principles," and his event study analysis.[24]

17. Mr. Coffman also contends that there is a "clear economic link between the alleged misrepresentations and omissions and the foreseeable investor losses that occurred on the Corrective Disclosure Event,"[25] and that "[t]he corrective information caused the price of Tivity Common Stock to decline on the Corrective Disclosure Event."[26] To support this contention, he purports to employ a "but for" test to allegedly demonstrate that investors would not have suffered an economic loss "but for" the alleged misrepresentations and omissions, and a "foreseeability" test to allegedly demonstrate that economic loss was "a foreseeable consequence" of the alleged misrepresentations and omissions.[27]

---

[21] Complaint, ¶¶ 97–100. (Emphasis in original.)
[22] Coffman Report, ¶ 3.
[23] Coffman Report, ¶ 11.
[24] Coffman Report, ¶ 11.
[25] Coffman Report, ¶ 14.
[26] Coffman Report, ¶ 15.
[27] Coffman Report, ¶ 79.

18. Lastly, Mr. Coffman employs an event study to analyze the impact of the alleged corrective disclosure on Tivity's stock price.[28] Based on the results of this analysis, he concludes that from the beginning of the Class Period through April 27, 2017, Tivity's stock price was artificially inflated by $13.68, and from April 28, 2017 through the end of the Class Period, Tivity's stock price was artificially inflated by $16.54.[29]

## V. Mr. Coffman Does Not Establish that the Alleged Misrepresentations and Omissions Were Important to Investors

19. In his report, Mr. Coffman states that "[t]he alleged misstatements and omissions regarding Tivity's relationship with UHC were important to investors,"[30] and that "the alleged misrepresentations and omissions were material and would have been viewed by a reasonable investor as significantly altering the 'total mix' of information."[31] He states that this opinion is based on: 1) Tivity's public statements, 2) analyst commentary, 3) valuation principles, and 4) his event study.[32] He uses the term "material" purportedly based on the definition by the United States Supreme Court.[33]

20. As I discuss in detail in the following sections, from an economic perspective, Mr. Coffman's opinion is flawed and unsupported by the evidence he cites for at least three reasons. First, Mr. Coffman has not analyzed the economics of Tivity's business or quantified the expected financial impact of the Optum Fitness Advantage program offerings on Tivity's business. Had he done so, he would have found that the Optum Fitness Advantage program offerings were expected to impact less than 1% of Tivity's forecasted 2017 revenues, and less than 4% of Tivity's forecasted 2018 revenues. Second, Mr. Coffman ignores that the overwhelming majority of analysts did not update their forecasts of Tivity's fundamentals or price targets as a result of the allegedly corrective information. Finally, Mr. Coffman's event study does not prove that the alleged misrepresentations and omissions were important to investors.

---

[28] Coffman Report, ¶¶ 102, 103, Exhibit 1.
[29] Coffman Report, ¶ 129, Table B.
[30] Coffman Report, ¶ 11.
[31] Coffman Report, ¶ 43.
[32] Coffman Report, ¶ 43.
[33] Coffman Report, ¶ 41.

### A. Mr. Coffman Does Not Demonstrate that the Alleged Misrepresentations and Omissions Were Important to Tivity's Financial Performance

21. Mr. Coffman's opinion regarding the purported financial impact of the Optum Fitness Advantage program offerings on Tivity's business is flawed because (a) it is not supported by the evidence in this case; (b) he mischaracterizes Optum Fitness Advantage; (c) he ignores both Tivity's response to Optum Fitness Advantage and the possibility that Tivity's response could increase Tivity's cash flows; and (d) he fails to quantify any impact resulting from Optum Fitness Advantage.

#### 1. Mr. Coffman's Opinion Is Not Supported by Evidence

22. Mr. Coffman asserts that "Tivity's and Defendants' own public statements indicating the importance of the SilverSneakers business and Tivity's relationship with UHC to the Company's financial performance (for example, Tivity clearly stated that UHC was one of Tivity's two largest customers by revenue)"[34] are evidence that the alleged misrepresentations and omissions were material. He also asserts that because a "fundamental principle of financial economics holds that the value of a security is equal to the present value of expected future cash flows … changes to Tivity's relationship with UHC [were] important to investors."[35] However, Mr. Coffman has not analyzed the economics of Tivity's business or quantified the expected impact of the Optum Fitness Advantage program offerings on Tivity's business. Hence, his analyses cannot be used to demonstrate that the alleged misrepresentations and omissions were material.

23. Mr. Coffman also states that according to "economic and valuation principles,… a decrease in a company's future revenue or future earnings reflects a decrease in the cash flows to the common stockholders, and thus causes a decrease in the value of the security."[36] He states that this "explains why changes to Tivity's relationship with UHC was [*sic*] important to investors."[37] However, Mr. Coffman provides no evidence to support his opinion. Rather, he simply states, without any supporting analysis, that "[t]he launch of a product by UHC that would compete directly with SilverSneakers would negatively impact

---

[34] Coffman Report, ¶ 11.
[35] Coffman Report, ¶ 69.
[36] Coffman Report, Section C, ¶ 69.
[37] Coffman Report, ¶ 69.

Tivity's financial performance…by introducing competition for market share…while simultaneously reducing revenue from one of Tivity's most important customers, UHC."[38] Similarly, Mr. Coffman asserts that even though Tivity had already accounted for UHC's offering of Optum Fitness Advantage in its financial guidance for 2018, "this in no way suggests that the alleged misrepresentations and omissions were not material."[39] Again Mr. Coffman fails to provide any analysis to support this assertion, simply claiming without basis that "the expansion of OFA into additional states would impact not only cash flows in 2018 but also cash flows in 2019, 2020, and beyond as UHC's competition continued and potentially expanded."[40]

24. Understanding the impact of the alleged misrepresentations and omissions on Tivity's business from an economic perspective requires an analysis of the total impact on Tivity's cash flows of UHC's expansion of Optum Fitness Advantage to individual Medicare Advantage plans in certain markets. It is not sufficient to simply quote "economic and valuation principles" and assume that the loss of these markets would be material to Tivity's business without evaluating the evidence and conducting the actual economic and valuation analysis. Because he has not analyzed the economic impact on Tivity of UHC's Optum Fitness Advantage program offerings, Mr. Coffman's conclusion is unsupported.

### 2. Mr. Coffman Mischaracterizes Optum Fitness Advantage

25. Mr. Coffman contends that Optum Fitness Advantage "would increasingly become a direct competitor [to SilverSneakers] in the near future in additional states."[41] This is a mischaracterization. Optum Fitness Advantage was unlikely to become a direct competitor of SilverSneakers because Optum Fitness Advantage was UHC's in-house product.[42] In other words, it was offered by UHC exclusively to its own members. It was not offered to anyone who was not a UHC individual Medicare Advantage member. A different healthcare provider, such as Humana, would not have considered Optum Fitness Advantage as an alternative program that it could offer to its members instead of SilverSneakers.

---

[38] Coffman Report, ¶ 70.
[39] Coffman Report, ¶ 71.
[40] Coffman Report, ¶ 72.
[41] Coffman Report, ¶ 14.
[42] "Taking a Deeper Dive into UnitedHealth's Proprietary Fitness Program and Its Impact on Tivity Health," William Blair, November 7, 2017, OFP-TVTY-00005354–60 at OFP-TVTY-00005354–55.

26. This mischaracterization undermines Mr. Coffman's opinion that "UHC's intention [was to] directly compete with Tivity by expanding OFA"[43] and that "UHC [was] becoming a competitive threat" to Tivity.[44] If the Optum Fitness Advantage program offerings were unlikely to become a direct competitor to SilverSneakers, then Mr. Coffman cannot assert that Tivity "allegedly misrepresented and concealed information regarding UHC's intention to directly compete with Tivity."[45] Nor can he assert that this information "would have been viewed by a reasonable investor as significantly altering the 'total mix' of information."[46]

### 3. Mr. Coffman Ignores Tivity's Response to Optum Fitness Advantage

27. Mr. Coffman ignores Tivity's response to Optum Fitness Advantage, which aimed to offset lost revenues in both the near term and the long term, and the possibility that the response could increase Tivity's cash flows. He asserts without basis that Tivity would lose revenue as a result of the Optum Fitness Advantage program offerings.[47]

28. Before discussing Tivity's response, it is helpful to understand how and when members of individual Medicare plans (the type of plans UHC was moving to Optum Fitness Advantage in certain markets[48]) choose their plans. Every year, there is an open enrollment period for health plans, including Medicare plans. During this period, which typically runs from October 15 through December 7 for Medicare plans but can differ in some states and for other types of plans, individuals decide on their health plans for the following year.[49] Open enrollment applies to different types of health plans, including employer-sponsored plans and

---

[43] Coffman Report, ¶ 12.
[44] Coffman Report, ¶ 18.
[45] Coffman Report, ¶ 42.
[46] Coffman Report, ¶ 43.
[47] Coffman Report, ¶ 70.
[48] *See, e.g.,* UnitedHealthcare Press Release, "UnitedHealthcare Adds New Fitness Benefit to Medicare Advantage Plans in New York," November 6, 2017.
[49] Proctor, Clint, "Open Enrollment Runs from November 1st to December 15th, But There Are 2 Possible Ways to Get Health Insurance If You Miss It," *Business Insider*, October 20, 2019, https://www.businessinsider.com/personal-finance/when-is-open-enrollment-november-1-to-december-15, accessed August 18, 2020. The Medicare open enrollment period is from October 15 to December 7 and the Medicare Advantage open enrollment period is from January 1 to March 31. "Medicare Open Enrollment," CMS.gov, https://www.cms.gov/Outreach-and-Education/Reach-Out/Find-tools-to-help-you-help-others/Medicare-Open-Enrollment, accessed August 18, 2020; "Medicare Advantage Open Enrollment Period," Medicare.gov, https://www.medicare.gov/node/33581, accessed August 18, 2020.

individual plans.[50] In particular, open enrollment allows individual Medicare beneficiaries to review their current health plan, including benefits like Tivity's SilverSneakers, and compare to other health plans.[51] Health plans disclose the benefits that will be offered for the following year by the beginning of the open enrollment period, so that individuals have all the information necessary to make their decisions.[52] Because plan members could choose during open enrollment to switch to another plan that offered SilverSneakers, the discontinuation of SilverSneakers by a UHC individual Medicare plan in a given market would not necessarily mean that Tivity would lose all of the "eligible lives"[53] associated with that plan in that market.

29. Given plan members' ability to switch plans during open enrollment, as a response to UHC's Optum Fitness Advantage program offerings, Tivity launched Project Success to promote SilverSneakers in markets where Optum Fitness Advantage was being introduced.[54] In addition, because Tivity was told that UHC viewed the expansion of Optum Fitness Advantage in 2018 as an "experiment," Project Success was a way for Tivity to "potentially impact UHC's decisions and expand its business with UHC by demonstrating the value of the SilverSneakers brand."[55] As part of this strategy, Tivity hoped to "transition[] a meaningful number of members [of UHC plans in markets transitioning to Optum Fitness Advantage] to participating [SilverSneakers] plans during open enrollment" and build "a stronger [SilverSneakers] brand."[56] Specifically, Tivity planned to inform members that other plans offered SilverSneakers and to provide them with tools to switch to plans that provided SilverSneakers as a benefit.[57] As a result, Tivity would be able to retain its revenue from

---

[50] "Open Enrollment Period," HealthCare.gov, https://www.healthcare.gov/glossary/open-enrollment-period/, accessed August 18, 2020; Davis, Elizabeth, RN, "What Is an Open Enrollment Period?," *Verywell Health*, https://www.verywellhealth.com/what-is-open-enrollment-1738755, accessed August 18, 2020.
[51] "Medicare Open Enrollment," CMS.gov, https://www.cms.gov/Outreach-and-Education/Reach-Out/Find-tools-to-help-you-help-others/Medicare-Open-Enrollment, accessed August 18, 2020.
[52] "Medicare Marketing Guidelines," CMS.gov, https://www.cms.gov/Medicare/Health-Plans/ManagedCareMarketing/Downloads/2017MedicareMarketingGuidelines2.pdf, June 10, 2016, p. 40, accessed August 18, 2020.
[53] "Eligible lives" refers to members who are offered the SilverSneakers benefit.
[54] "Project Success," Tivity Health, TIVITY0021653–96.
[55] Defendant Donato Tramuto's Responses and Objections to Plaintiff's First Set of Interrogatories, *Eric Weiner, et al. v. Tivity Health, Inc., et al.*, United States District Court for the Middle District of Tennessee, Nashville Division, Case No. 3:17-cv-01469, April 27, 2020, pp. 4–5.
[56] "Project Success," Tivity Health, TIVITY0021653–96 at TIVITY0021656.
[57] "Project Success," Tivity Health, TIVITY0021653–96 at TIVITY0021655.

UHC members who switched to other SilverSneakers plans. In addition, Project Success would build the SilverSneakers brand, allowing Tivity to protect future revenue.[58]

30. Tivity was also working to build and protect the SilverSneakers brand as part of its broader "ABCD" strategy for all of its products, which outlined four goals that would be the focus of Tivity's strategy during 2017.[59] The first goal was to "[a]dd [n]ew [m]embers [in order to] [b]uild awareness and relevance with current and future members."[60] Second, Tivity aimed to "[b]uild… engagement in the eligible population," in line with its "fundamental growth model."[61] Third, Tivity planned to "[c]ollaborate with partners to introduce new products and services that leverage our brand trust."[62] This would "create a stickier experience that drives loyalty, and outcomes."[63] Lastly, Tivity aimed to "[d]eepen relationships with [its] partners and their instructors" to "align incentives [and] reward…increased participation."[64] Similar to the goals of Project Success, Tivity's "ABCD" strategy would build the SilverSneakers brand and allow Tivity to protect its revenue by building more member loyalty to SilverSneakers.

31. Tivity discussed the apparent success of this strategy in its July 2017 earnings call, noting substantial increases in the number of people seeing SilverSneakers content online, unique website visitors, website visits, eligibility checks, location searches, and email opt-ins.[65] Tivity noted that these would "ignite the awareness [of] eligible members that the SilverSneakers benefit is either available and/or [that] they have an option during open enrollment to select a Medicare Advantage Plan that offers this unique program."[66] An analyst commented that such success was "particularly remarkable for an underlying fitness program that has already been in existence for over 20 years."[67]

32. In fact, as highlighted by three "case studies" discussed in a 2016 investor presentation, Tivity had already demonstrated success in retaining members when plans

---

[58] "Project Success," Tivity Health, TIVITY0021653–96 at TIVITY0021655.
[59] "William Blair 37th Annual Growth Stock Conference," Tivity Health, June 13, 2017, p. 19.
[60] "William Blair 37th Annual Growth Stock Conference," Tivity Health, June 13, 2017, p. 19.
[61] "William Blair 37th Annual Growth Stock Conference," Tivity Health, June 13, 2017, p. 19.
[62] "William Blair 37th Annual Growth Stock Conference," Tivity Health, June 13, 2017, p. 19.
[63] "William Blair 37th Annual Growth Stock Conference," Tivity Health, June 13, 2017, p. 19.
[64] "William Blair 37th Annual Growth Stock Conference," Tivity Health, June 13, 2017, p. 19.
[65] Q2 2017 Tivity Health Inc. Earnings Call, July 27, 2017, OFP-TVTY-00004953–66 at OFP-TVTY-00004958.
[66] Q2 2017 Tivity Health Inc. Earnings Call, July 27, 2017, OFP-TVTY-00004953–66 at OFP-TVTY-00004958.
[67] "Momentum Continues in Efforts to Increase SilverSneakers Awareness," Barrington Research, September 7, 2017, OFP-TVTY-00005101–04 at OFP-TVTY-00005102.

offered by its customers stopped offering SilverSneakers in certain markets.[68] In one instance, a "[l]arge [p]lan [d]iscontinued SilverSneakers in *[o]ne [r]egion*" and "24% of membership moved to an existing SilverSneakers [Medicare Advantage] plan."[69] In another, when a "[r]egional [p]lan [t]erminated SilverSneakers… 54% [of] membership moved to an existing SilverSneakers [Medicare Advantage] [p]lan."[70] Lastly, when a "[r]egional [p]lan [b]ecame [i]nsolvent…70% of membership moved to an existing [Medicare Advantage] SilverSneakers [p]lan."[71] Further, surveys conducted in 2004, 2009, and 2014 showed that 52% of SilverSneakers participants were "[l]ikely to switch plan[s] if SilverSneakers [was] not offered," and 68% of members indicated that SilverSneakers was their "[r]eason for staying with [their] health plan."[72] Tivity recognized its "advantages over [its] competitors such as [its] proprietary class programming; the brand recognition of programs such as SilverSneakers; the depth and breadth of [its] fitness center network relationships; and the trusting connections with [its] members developed over 25 years."[73] Analysts recognized this advantage as well, commenting that "SilverSneakers is a trusted brand [and] has a differentiated service offering… which should help protect the company's strong market position,"[74] and "[w]hile competition exists, we think the tailored classes, broad networks, flexible offering and credentialed fitness professionals provide differentiation and a competitive advantage."[75]

33. Mr. Coffman ignores the fact that, in light of the competitive advantages of SilverSneakers, Tivity's response to UHC's Optum Fitness Advantage program offerings could actually *increase* the Company's cash flows and therefore the value of its securities. I

---

[68] Healthways Inc. Investor Day, "Empowering Older Adults and Enabling Healthy Aging, Business and Strategy Highlights—Investor Day August 2016," August 11, 2016, p. 27.
[69] Healthways Inc. Investor Day, "Empowering Older Adults and Enabling Healthy Aging, Business and Strategy Highlights—Investor Day August 2016," August 11, 2016, p. 27. (Emphasis in original.)
[70] Healthways Inc. Investor Day, "Empowering Older Adults and Enabling Healthy Aging, Business and Strategy Highlights—Investor Day August 2016," August 11, 2016, p. 27.
[71] Healthways Inc. Investor Day, "Empowering Older Adults and Enabling Healthy Aging, Business and Strategy Highlights—Investor Day August 2016," August 11, 2016, p. 27.
[72] Healthways Inc. Investor Day, "Empowering Older Adults and Enabling Healthy Aging, Business and Strategy Highlights—Investor Day August 2016," August 11, 2016, p. 41.
[73] Tivity 2016 10-K, p. 5.
[74] "Analyst Day Highlights," William Blair, August 12, 2016, OFP-TVTY-00003540–44 at OFP-TVTY-00003541.
[75] "We Expect Investor RecepTIVITY; Initiate at Buy With a $35 Target," SunTrust Robinson Humphrey, March 15, 2017, OFP-TVTY-00004620–43 at OFP-TVTY-00004627. Other analysts had similar views. *See, e.g.,* "Upside Remains on Revenue and FCF Valuation," Piper Jaffray, August 12, 2016, OFP-TVTY-00003545–49 at OFP-TVTY-00003546; "HWAY Takes From Bus Tour," Jefferies, September 6, 2016, OFP-TVTY-00003757–61 at OFP-TVTY-00003757; "Levered to Growth of SilverSneakers; Initiating Coverage at Overweight," Cantor Fitzgerald, February 6, 2017, OFP-TVTY-00004397–424 at OFP-TVTY-00004408.

agree with Mr. Coffman that the value of a security is equal to the present value of all expected future cash flows discounted at the appropriate risk-adjusted rate.[76] However, I do not agree with Mr. Coffman that this means "a decrease in a company's future revenue…reflects a decrease in the cash flows to the common stockholders, and thus causes a decrease in the value of the security."[77] Revenues and cash flows are not the same and are not interchangeable. Cash flows are net of expenses and thus are more closely related to profits than revenues.[78] As a result, a company's cash flows can increase as its revenues decrease if its expenses decline more than revenues. Generally, stock prices move in response to information about a company's future cash flows, or the risk of these cash flows.[79]

34. The distinction between revenues and cash flows is important because Tivity utilizes two different pricing structures, which could have differing profit margins. That is, all else equal, given the same amount of revenue, one of the pricing structures could yield higher profits and higher cash flows. The contract between Tivity and UHC utilizes a flat fee structure. In other words, Tivity receives a flat fee from UHC for each eligible life.[80] In contrast, many of Tivity's contracts with other health insurers utilize a payment structure whereby Tivity receives a flat fee per member plus a fee for each member visit.[81] The "flat fee per member plus a fee per visit" payment structure could result in higher profit margins than the "flat fee per member" payment structure Tivity had with UHC. As a result, Tivity could actually earn *higher* cash flows from members who switched from a UHC plan to a different plan than it would have earned had those members stayed in a UHC plan.

35. Moreover, Tivity's contracts with participating locations specify that Tivity must pay the participating locations a fee each time a member visits a facility.[82] Thus, under a contract

---

[76] *See, e.g.*, Damodaran, Aswath, *Investment Valuation, Tools and Techniques for Determining the Value of Any Asset*, 3rd ed., (New Jersey: John Wiley & Sons), 2012, pp. 11–12.
[77] Coffman Report, ¶ 69.
[78] Cash flows are "the residual cash flows after meeting all operating expenses, reinvestment needs, and taxes, but prior to any payments to either debt or equity holders." Damodaran, Aswath, *Investment Valuation, Tools and Techniques for Determining the Value of Any Asset*, 3rd ed., (New Jersey: John Wiley & Sons), 2012, pp. 13–14.
[79] *See, e.g.*, Bodie, Zvi, Alex Kane, and Alan J. Marcus, *Investments*, 9th ed., (New York, NY: McGraw-Hill/Irwin), 2011, pp. 343–374.
[80] Fitness Service Network Access Agreement, January 1, 2012, UHC000001–59 at UHC000021; Amendment 14 to the Fitness Service Network Agreement, April 1, 2017, TIVITY0054844–71.
[81] HWAY - Healthways Inc Analyst and Investor Day, August 11, 2016, OFP-TVTY-00003488–527 at OFP-TVTY-00003513.
[82] Deposition of Caroline Khalil, June 3, 2020, 57:19–58:1. For some participating locations, Tivity's contract includes a cap on the number of visits for which it will pay for a given member. Q1 2017 Tivity Health Inc. Earnings Call, April 27, 2017, OFP-TVTY-00004663–79 at OFP-TVTY-00004665.

with a flat fee structure, Tivity could actually lose money on members who use the benefit frequently. This is not the case under the "flat fee per member plus a fee per visit" model, because Tivity receives higher compensation as the number of visits by a member increases.[83] In fact, one analyst commented that a "favorable mix occurs when visits at locations in which the company is paid by the visit are higher relative to locations that are fixed fee per member per month arrangements."[84] The majority of Tivity's SilverSneaker's business (over 60% of eligible lives in 2016, ~65% in 2017) uses this model,[85] which an analyst noted was "clearly a positive."[86]

36. Consistent with this, Tivity actively promoted a strategy to increase engagement from customers under the "paid by visit" model.[87] One analyst noted the success of this strategy, commenting that Tivity was "demonstrating its ability to drive more visits at locations in which it gets rewarded for doing so," and that "[a]t least a few of the company's initiatives are targeting this very outcome [(*i.e.*, a higher proportion of visits at locations in which the company is paid by the visit)] and we do not believe it is a coincidence that this favorable mix result has now occurred three quarters in a row."[88] Since Mr. Coffman does not analyze the economics of Tivity's contracts or consider the facts discussed above,[89] he overlooks the potential for lower profit margins under the UHC contract relative to contracts with Tivity's other customers.

37. As discussed above, from an economic perspective, understanding the impact and importance of the alleged misrepresentations and omissions requires understanding the economics of Tivity's business, as well as an analysis of the impact on Tivity's cash flows of UHC's offering of Optum Fitness Advantage to individual Medicare Advantages plans in certain markets. Mr. Coffman has not undertaken such an analysis and has, therefore, not

---

[83] HWAY - Healthways Inc Analyst and Investor Day, August 11, 2016, OFP-TVTY-00003488–527 at OFP-TVTY-00003513.

[84] "Big EPS Beat, 2017 Guidance Increased; Price Target now $46," Barrington Research, October 27, 2017, OFP-TVTY-00005321–27 at OFP-TVTY-00005321–22.

[85] In addition, over 90% of customers were using this model in 2016. Healthways Inc. Analyst and Investor Day Call, August 11, 2017, OFP-TVTY-00003488–527 at OFP-TVTY-00003513; Healthways Inc. Investor Day, "Empowering Older Adults and Enabling Healthy Aging, Business and Strategy Highlights—Investor Day August 2016," August 11, 2016, p. 62; "Big EPS Beat, 2017 Guidance Increased; Price Target now $46," Barrington Research, October 27, 2017, OFP-TVTY-00005321–27 at OFP-TVTY-00005323.

[86] "Big EPS Beat, 2017 Guidance Increased; Price Target now $46," Barrington Research, October 27, 2017, OFP-TVTY-00005321–27 at OFP-TVTY-00005323.

[87] Q2 2017 Tivity Health Inc. Earnings Call, July 27, 2017, OFP-TVTY-00004953–66 at OFP-TVTY-00004957.

[88] "Big EPS Beat, 2017 Guidance Increased; Price Target now $46," Barrington Research, October 27, 2017, OFP-TVTY-00005321–27 at OFP-TVTY-00005322–23.

[89] If Mr. Coffman performed this type of analysis, it is not mentioned in his report.

accounted for the fact that Tivity's response to the Optum Fitness Advantage program offerings would mitigate the impact of the expanded Optum Fitness Advantage program offerings on Tivity's cash flows. As a result, his assertion that the alleged misrepresentations and omissions were important to Tivity's financial performance is unreliable.

#### 4. Mr. Coffman Does Not Quantify the Expected Impact of UHC's Optum Fitness Advantage Program Offerings

38. Finally, Mr. Coffman does not attempt to quantify the expected impact of the loss of business due to UHC's Optum Fitness Advantage program offerings on Tivity's financial performance. Given the competitive advantages of SilverSneakers and Tivity's response to Optum Fitness Advantage, one cannot simply assume that Optum Fitness Advantage would have a permanent adverse impact on Tivity's financial performance. A reliable economic analysis of the impact of Optum Fitness Advantage on Tivity's financial performance would need to assess the extent, if any, to which Tivity would lose business going forward as a result of Optum Fitness Advantage and the extent, if any, to which the lost business would affect Tivity's cash flows. Without such an analysis, Mr. Coffman's opinion that the allegedly withheld information about UHC's Optum Fitness Advantage program offerings was "important to investors"[90] and "would have been viewed by a reasonable investor as significantly altering the 'total mix' of information"[91] remains mere speculation at best.

39. Mr. Coffman fails to quantify the expected impact and ignores key facts which suggest that the introduction of Optum Fitness Advantage for UHC individual Medicare Advantage plans in certain limited markets would not have a negative impact on Tivity's financial performance.

40. Mr. Coffman ignores two factors mitigating any potential financial impact. In particular, he ignores the limited nature of the Optum Fitness Advantage program offerings and that the impact of UHC's decision to offer Optum Fitness Advantage would be isolated to a portion of UHC members in select states.[92] Mr. Coffman also ignores the fact that Tivity still had a contract with UHC extending to 2020 and, as part of that contract, Tivity would

---

[90] Coffman Report, ¶ 11.
[91] Coffman Report, ¶ 43.
[92] Mr. Coffman does mention the select states, but does not mention that it was only certain UHC members in those states that were impacted. His language implies that it was all UHC members in those states.

still receive payments based on an assumed minimum level of customers.[93] Both of these factors would mitigate the financial impact on Tivity of the Optum Fitness Advantage program offerings.

41. In addition, Mr. Coffman ignores that Tivity's financial forecasts incorporated the expected impact of Optum Fitness Advantage being introduced in certain states. These forecasts showed that while Optum Fitness Advantage could lead to a small decline in Tivity's revenue and cash flows in the short run, it was not expected to have a continued negative impact on Tivity's revenue, net income, or cash flows over the long term.

42. For example, for the pilot Optum Fitness Advantage program offerings in New Jersey and Washington, Tivity projected a potential loss of approximately 130,000 eligible lives in 2017, corresponding to a "[p]revious [y]ear [r]evenue" of approximately $3.7 million.[94] As displayed in Exhibit 2, this represented 0.9% of projected eligible lives for SilverSneakers and 0.7% of Tivity's total projected 2017 revenue.[95] Similarly, for Optum Fitness Advantage program offerings in nine additional states, a May 2017 internal email exchange between Tivity executives included a preliminary estimate of $22 million in 2018 in "[p]otential loss of revenue from the [UHC] states,"[96] which represented approximately 3.5% of Tivity's total projected 2018 revenue.[97] These figures do not incorporate any offsets from Project Success or other initiatives, which would further reduce any potential impact.[98] For example, despite the rollout of Optum Fitness Advantage in 2017, Tivity actually expected to grow its business

---

[93] Amendment 14 to the Fitness Service Network Agreement, April 1, 2017, TIVITY0054844–71 at TIVITY0054845.

[94] Email from Steve Janicak to Chip Wochomurka, et al., "FW: SSF to Optum," May 1, 2017, TIVITY0067360–61 and attachment. Even though AARP is mentioned in materials discussing UHC markets switching to Optum Fitness Advantage, I understand that Tivity had a separate contract with AARP and that changes in AARP plans were not due to the Optum Fitness Advantage program offerings discussed in the UHC Press Releases. Therefore, I do not consider changes to AARP plans in my analyses in this report. *See, e.g.*, Email from Steve Janicak to Chip Wochomurka, et al., "FW: SSF to Optum," May 1, 2017, TIVITY0067360–61 and attachment; Tivity Health Board Meeting Materials, June 20, 2017, TIVITY0094900–17; UnitedHealthcare Press Release, "UnitedHealthcare Adds New Fitness Benefit to Medicare Advantage Plans in New York," November 6, 2017; Email from Stacey Eggleston to Donato Tramuto et al., "AARP Executive Summary," November 9, 2016, TIVITY0076942–49 and attachment at TIVITY0076945.

[95] Projected eligible lives for SilverSneakers and projected revenue for 2017 are based on Tivity Health Board Meeting Materials from June 20, 2017, which were prepared by J.P. Morgan and SunTrust. Email from Steve Janicak to Chip Wochomurka, et al., "FW: SSF to Optum," May 1, 2017, TIVITY0067360–61 and attachment; Tivity Health Board Meeting Materials, June 20, 2017, TIVITY0094900–17 at TIVITY0094906, TIVITY0094908.

[96] Email from Steve Janicak to Donato Tramuto, "FW: United - and AARP," May 24, 2017, TIVITY0067295–301 at TIVITY0067300.

[97] Projected revenue for 2018 is based on Tivity Health Board Meeting Materials from June 20, 2017, which were prepared by J.P. Morgan and SunTrust. Tivity Health Board Meeting Materials, June 20, 2017, TIVITY0094900–17 at TIVITY0094908.

[98] "Tivity Health Forecast Revenue through 2018," Excel Workbook, TIVITY0026130.

with UHC on a net basis, given expansion in UHC markets other than New Jersey and Washington.[99]

43. Tivity's Board of Directors reviewed and discussed the expected impact of UHC's move to Optum Fitness Advantage for select plans in 11 states on June 9, 2017, June 14, 2017, and June 20, 2017 with the assistance of J.P. Morgan and SunTrust,[100] and incorporated its findings into Tivity's October 26, 2017 financial disclosures.[101] The June 9, 2017 and June, 14, 2017 presentations included a long-term forecast for Tivity incorporating the assumptions that "United Health and AARP lives have been reduced in 2018… and [] assumed further progressive reductions in 2019/2020 to a full loss of those clients by 2021."[102] Even under those assumptions, Tivity's revenue and EBITDA were projected to increase every year from 2017 to 2022 (the ending year of the forecasts). Free cash flow and net income were projected to increase in 2017 and 2018, and then decrease in 2019 before continuing to increase.[103] The presentation on June 20, 2017 included an "[u]pdate since [the] last discussion" that "management has incorporated the implications of recent executive level dialogue with [UHC] indicating that strategies are available to mitigate post 2018 erosion of the [UHC] markets."[104] Accordingly, the long-term forecasts projected "[n]o additional loss of [UHC] lives after 2018."[105] Again, Tivity's revenue and EBITDA were projected to increase every year from 2017 to 2022 (the ending year of the forecasts), as was its net

---

[99] "[F]or United, while we have learned of some areas being reduced, we are expecting a net gain of approximately 500K new lives next year [2017] as a result of some large groups that they have added." Email from Chip Wochomurka to Donato Tramuto, et al., "Re: [External] Silver Sneakers being dropped for Kentucky and Ohio residents by United Healthcare," October 21, 2016, TIVITY0082605–09 at TIVITY0082607.
[100] Tivity Health Board Meeting Materials, June 9, 2017, TIVITY0094815–46; Tivity Health Board Meeting Materials, June 14, 2017, TIVITY0094847–99; Tivity Health Board Meeting Materials, June 20, 2017, TIVITY0094900–17.
[101] Tivity Health Press Release, "Tivity Health Comments on UnitedHealthcare Relationship," November 6, 2017.
[102] Tivity Health Board Meeting Materials, June 9, 2017, TIVITY0094815–46 at TIVITY0094820; Tivity Health Board Meeting Materials, June 14, 2017, TIVITY0094847–99 at TIVITY0094851.
[103] Tivity Health Board Meeting Materials, June 9, 2017, TIVITY0094815–46 at TIVITY0094827; Tivity Health Board Meeting Materials, June 14, 2017, TIVITY0094847–99 at TIVITY0094858.
[104] Tivity Health Board Meeting Materials, June 20, 2017, TIVITY0094900–17 at TIVITY0094903.
[105] Tivity Health Board Meeting Materials, June 20, 2017, TIVITY0094900–17 at TIVITY0094904.

income.[106] Free cash flow was projected to increase in 2017 and 2018, and then decrease in 2019 before continuing to increase.[107]

44. While Tivity expected to lose approximately 825,000 UHC members in 2018, it also expected to "recapture" approximately 25,000 UHC members.[108] The recaptured members were projected to correspond to over $9.3 million dollars in revenue in 2018.[109] Tivity also noted that the "impact on margin percentage [would be] modestly positive" because the UHC members fell under "flat fee per member" plans and were considered to be "lower margin [eligible] lives," while Tivity expected "recaptured" members to be "higher margin…customers" who would fall under "flat fee per member plus a fee per visit" plans.[110] The expected loss of approximately 825,000 UHC members corresponds to approximately 5% of projected eligible SilverSneakers lives in 2018,[111] and as discussed above, a preliminary estimate projected that the impact on Tivity's 2018 revenue would be 3.5%.[112]

45. In conclusion, Mr. Coffman's reliance on only Tivity's public statements regarding SilverSneakers and UHC generally does not provide economic evidence that the loss of UHC members in select markets for select plans was important to investors. The evidence discussed above should be considered in any economic analysis of the impact of Optum Fitness Advantage program offerings on Tivity's business. Mr. Coffman's failure to consider the evidence renders his opinion on materiality unreliable.

### B. Mr. Coffman Fails to Support His Opinion that Analyst Commentary Shows the Alleged Misstatements and Omission Were Material

46. Mr. Coffman asserts that "analysts clearly demonstrated that the market was aware that SilverSneakers was central to Tivity's financial performance and that investors were

---

[106] The revenue and EBITDA projections were higher than the projections contained in Tivity Health Board Meeting Materials from February 1, 2017 and February 2, 2017, which were based on analyst forecasts. Cash flow and net income were not included in the February projections. Tivity Health Board Meeting Materials, June 20, 2017, TIVITY0094900–17 at TIVITY0094909; Tivity Health Board Meeting Materials, February 1–2, 2017, TIVITY0094176–445 at TIVITY0094370–71.

[107] Tivity Health Board Meeting Materials, June 20, 2017, TIVITY0094900–17 at TIVITY0094909.

[108] Tivity Health Board Meeting Materials, June 20, 2017, TIVITY0094900–17 at TIVITY0094906.

[109] Tivity Health Board Meeting Materials, June 20, 2017, TIVITY0094900–17 at TIVITY0094906.

[110] Tivity Health Board Meeting Materials, June 14, 2017, TIVITY0094847–99 at TIVITY0094851.

[111] Projected eligible lives for 2018 is based on Tivity Health Board Meeting Materials from June 20, 2017, which were prepared by J.P. Morgan and SunTrust. Tivity Health Board Meeting Materials, June 20, 2017, TIVITY0094900–17 at TIVITY0094906.

[112] Email from Steve Janicak to Donato Tramuto, "FW: United - and AARP," May 24, 2017, TIVITY0067295–301; Tivity Health Board Meeting Materials, June 20, 2017, TIVITY0094900–17 at TIVITY0094908.

focused on Tivity's contract renewals, specifically the UHC contract given that UHC was one of the Company's two largest customers by revenue."[113] In addition, he asserts that "analyst commentary shows that the market was relying on Defendants' allegedly false and misleading statements and/or omissions, such as the UHC contract being renewed on 'favorable terms,' when providing investment advice."[114] These opinions are flawed because Mr. Coffman ignores that (a) the UHC contract was renewed, and on terms that appear to be favorable to Tivity;[115] (b) after the allegedly corrective information was released to the market, no analysts updated their 2018 EBITDA and EPS forecasts,[116] and only one of the seven analysts that published reports on November 6, 2017 or November 7, 2017 updated its price target for Tivity; and (c) analyst commentary demonstrates the expectation that Optum Fitness Advantage would not erode Tivity's business. Therefore, analyst commentary does not support Mr. Coffman's view that the alleged misrepresentations and omissions were important to investors.

47. First, as to the contract renewal, Mr. Coffman takes Plaintiff's allegation as given instead of considering the facts surrounding Tivity's contract renewal with UHC. In particular, when Tivity and UHC renewed their contract for 2018, it appears that the only substantial difference from the prior agreement was the pricing terms. Specifically, the per-member (per-eligible life) rate and the minimum number of assumed members both increased.[117] Tivity received from UHC a payment of the per-member fee times the number of members, where the number of members could not be less than the minimum. Neither agreement prohibited UHC from offering its own product or changing the "service areas" in which SilverSneakers was offered.[118] Both agreements required UHC to disclose the service areas for the upcoming year to Tivity by October 15 of each year.[119] Mr. Coffman does not reference the contract specifics for either the 2015 contract renewal or the 2018 contract

---

[113] Coffman Report, ¶ 56.

[114] Coffman Report, ¶ 66.

[115] I reviewed the contracts from an economic perspective, but I am not an attorney and, therefore, I do not have a legal opinion regarding the contract differences.

[116] One analyst put their estimates under review, while the rest either confirmed their estimates or did not explicitly comment on specifics.

[117] Seventh Amendment to Fitness Service Agreement, January 1, 2015, TIVITY0001112–15; Amendment 14 to the Fitness Service Network Agreement, April 1, 2017, TIVITY0054844–71.

[118] Seventh Amendment to Fitness Service Network Access Agreement, January 1, 2015, TIVITY0001112–15; Amendment 14 to the Fitness Service Network Agreement, April 1, 2017, TIVITY0054844–71.

[119] Amendment 14 to the Fitness Service Network Agreement, April 1, 2017, TIVITY0054844–71 at TIVITY0054846; Seventh Amendment to Fitness Service Network Access Agreement, January 1, 2015, TIVITY0001112–15 at TIVITY0001113; Fitness Service Network Access Agreement, January 1, 2012, UHC000001–59 at UHC000022.

renewal, and instead appears to assume, based on Plaintiff's allegations, that the contract renewal itself was not favorable. However, the contract renewal itself was favorable from an economic perspective, because the agreement signed in 2017 increased the minimum number of lives and changed the pricing terms in a way that was beneficial to Tivity, but otherwise did not differ substantially from the prior agreement. The favorable change in pricing terms, with no offsetting change in other terms, meant that even if Tivity lost some UHC members to Optum Fitness Advantage, it would earn higher revenues on the remaining UHC members than it would have under the prior contract. Thus, the 2018 contract renewal would be viewed favorably by investors irrespective of UHC's Optum Fitness Advantage program offerings. Mr. Coffman's failure to examine the terms of the 2018 contract renewal highlights the unsupported nature of his assertions.

48. Second, as to analyst commentary after the alleged corrective disclosure, while Mr. Coffman quotes several analysts that issued reports after the alleged corrective disclosure, he fails to acknowledge that analysts did not update their 2018 EBITDA and EPS forecasts, and one analyst explicitly maintained its long-term growth estimate.[120] This omission is noteworthy because in addition to offering market commentary, one of the primary roles that analysts play is to provide earnings forecasts and their forecasts tend to be reasonable. In fact, empirical research suggests that in about 50% of cases, analyst forecasts are more accurate than management forecasts.[121]

49. There were seven analysts that issued reports both before and soon after the alleged corrective disclosure.[122] As shown in Exhibits 3A–3B, of those seven analysts, three explicitly confirmed their prior estimates of EBITDA and EPS for 2018, three did not mention any changes, implicitly confirming their prior estimates, and one put its estimates under review. In addition, Cantor Fitzgerald commented both before and after the alleged

---

[120] Only one analyst, Barrington Research, lowered its 2019 EBITDA and EPS estimates following the November 6, 2017 UHC announcement. "Big EPS Beat, 2017 Guidance Increased; Price Target now $46," Barrington Research, October 27, 2017, OFP-TVTY-00005321–27; "Tivity Shares Crushed As Relationship with UnitedHealth Comes Into Question," Barrington Research, November 7, 2017, OFP-TVTY-00005366–69.

[121] Hutton, Amy P., Lian Fen Lee, and Susan Z. Shu, "Do Managers Always Know Better? The Relative Accuracy of Management and Analyst Forecasts," *Journal of Accounting Research*, Vol. 50, No. 5, 2012, pp. 1217–1244 at pp. 1219, 1230–1231. The authors note that, "analysts' information advantage stems from their ability to be objective, their industry expertise (which enables them to survey a broad set of industry statistics and data), and their access to macroeconomic expertise. Their broader perspective enables them to piece together the 'mosaic' of information needed to assess the likely impact of macroeconomic factors on a firm's competitive environment."

[122] Specifically, I consider analysts that published reports before the UHC Press Releases and on November 6, 2017 or November 7, 2017.

corrective disclosure that its DCF model assumptions included "top-line growth in the high-single-digit range" over the next few years with modestly expanding margins.[123] Cantor Fitzgerald also assumed "long-term growth of just 2% in free cash flow" both before and after the alleged corrective disclosure.[124] Thus, the overwhelming majority of analysts did not view the allegedly withheld information to be of sufficient economic significance to warrant a change in their forecasts.[125]

50. Further, only one of the seven such analysts adjusted its price target.[126] As explained by an analyst, price targets typically "represent [an] analyst's expectation of where the stock will trade in the next 12–18 months"[127] and are typically based on a combination of the company's financial metrics and an analysis of the company's future outlook. Accordingly, six of the seven analysts that issued reports both before and after the alleged corrective disclosure did not believe the information in the UHC Press Releases affected expectations about Tivity's overall financial performance and future outlook. It is unreasonable to assert that the alleged misrepresentations and omissions would be important to investors if analysts did not believe that the allegedly corrective information impacted Tivity's financial performance and future outlook.

51. Third, Mr. Coffman also argues that it did not matter that Tivity incorporated expected changes related to UHC into the 2018 guidance it provided in its October 2017 disclosures, because "investors valuing Tivity Common Stock would consider how the loss of

---

[123] "EPS Beat; Increases 2017 Guidance; Maintain Overweight," Cantor Fitzgerald, October 26, 2017, OFP-TVTY-00005284–92 at OFP-TVTY-00005285; "Shares off on UNH Announcement; Too Early to Worry about 2020; Overweight," Cantor Fitzgerald, November 6, 2017, OFP-TVTY-00005344–47 at OFP-TVTY-00005345.

[124] "EPS Beat; Increases 2017 Guidance; Maintain Overweight," Cantor Fitzgerald, October 26, 2017, OFP-TVTY-00005284–92 at OFP-TVTY-00005285; "Shares off on UNH Announcement; Too Early to Worry about 2020; Overweight," Cantor Fitzgerald, November 6, 2017, OFP-TVTY-00005344–47 at OFP-TVTY-00005345.

[125] Academic research suggests that analyst forecasts serve as a proxy for market expectations and short term forecasts are superior to other forecast models. Brown, Lawrence, et al., "An Evaluation of Alternative Proxies for the Market's Assessment of Unexpected Earnings," *Journal of Accounting and Economics*, Vol. 9, No. 2, July 1987, pp. 159–193. According to Brown, et al., "[U]nexpected earnings that are based on financial analysts' earnings forecasts, in general, explain abnormal returns better than other proxies." *See*, also, Bradshaw, et al.: "Consistent with the early research, we find that, for large, mature, and stable firms, over relatively short horizons, analysts' forecasts consistently outperform forecasts from a [random walk] model and from all of the other time series models that we evaluate." Bradshaw, Mark, et al., "A Re-Examination of Analysts' Superiority Over Time-Series Forecasts of Annual Earnings," *Review of Accounting Studies*, Vol. 17, 2012, pp. 944–968 at p. 947.

[126] See Gompers Class Certification Report, Exhibit 5. Eight reports in total were published following the UHC Press Releases, two of which were published by William Blair. In its second report, William Blair further stated that "the [UHC] announcement has no bearing on our financial forecasts." "Taking a Deeper Dive into UnitedHealth's Proprietary Fitness Program and Its Impact on Tivity Health," William Blair, November 7, 2017, OFP-TVTY-00005354–60 at OFP-TVTY-00005354.

[127] "Everybody Take A Deep Breath - Offering A Little Perspective," SunTrust Robinson Humphrey, November 7, 2017, OFP-TVTY-00005361–65 at OFP-TVTY-00005364.

UHC as a customer in certain states and the expansion of OFA into additional states would impact not only cash flows in 2018 but also cash flows in 2019, 2020, and beyond as UHC's competition continued and potentially expanded."[128] This argument is flawed because it assumes, without basis, that Optum Fitness Advantage would successfully continue to expand in later years, eroding Tivity's cash flows from UHC. As discussed above, Tivity did not expect its long-term cash flows to erode. Moreover, analysts cited by Mr. Coffman himself contradict his assumptions in their commentary, indicating that the investment community did not believe Tivity's revenue was likely to erode in the future due to Optum Fitness Advantage.

52. For example, Cantor Fitzgerald's forecasted "long-term growth" rate for Tivity was 2% before the alleged corrective disclosure, and remained at 2% after the alleged corrective disclosure.[129]

53. In addition, William Blair stated:

> [W]e believe many seniors who are accustomed to participating in specially designed group classes (with members/friends from a variety of different MA plans) may be turned off by simply having free gym access. If this is the case, and it causes member attrition in any markets, or lower utilization trends that potentially increase medical costs over time (due to less activity or social interaction), we believe United may look to use SilverSneakers more broadly again.
>
> Second, we do not believe other plans will attempt to insource the offering for several reasons. First, UnitedHealth has both scale and scope economies that make it fairly unique, in our view.
>
> We also believe the Optum subsidiary is very unique and sophisticated, and not many plans have the capabilities to run similar programs, marketing initiatives, analytics, etc.
>
> [W]e do not believe the risk/reward to insourcing is attractive for most plans (thus the company's high-90% client retention rate over decades).

---

[128] Coffman Report, ¶ 72.

[129] "EPS Beat; Increases 2017 Guidance; Maintain Overweight," Cantor Fitzgerald, October 26, 2017, OFP-TVTY-00005284–92 at OFP-TVTY-00005285; "Shares Off on UNH Announcement; Too Early to Worry about 2020; Overweight," Cantor Fitzgerald, November 6, 2017, OFP-TVTY-00005344–47 at OFP-TVTY-00005345.

[W]e believe it would be highly unlikely that smaller competitors would look to buy services from their largest competitor in most markets—thus we view this as largely a red herring.[130]

54. Similarly, Sun Trust commented:

We would highlight that the company's high net promoter scores, dominant senior fitness market share (40%+) and contracts with the vast majority of the top 10 MA plans are not by accident. In addition, we remain comfortable with the relative value of SilverSneakers and the chance that some members who are no longer offered SilverSneakers may vote with their feet, creating an opportunity with other plans.

We continue to see significant secular tailwinds which should fuel ongoing strong growth. In addition, the fitness benefit offerings of UNH and the company's other health plan customers are already reflected in 2018 preliminary guidance. We would also highlight that any impact from initiatives to drive improved engagement/participation are not included in guidance which we think could prove overly conservative.[131]

55. In addition, Piper Jaffray noted:

Per TVTY management, this represents no change to the terms of the [UHC] agreement recently negotiated, and the relationship remains excellent. In our view, this news does not impact FY18 numbers; however, it does represent an incremental risk to TVTY's pricing power in the market. Reiterate OW rating and $49 price target as we see no reason to change numbers on this announcement.[132]

56. Even though Mr. Coffman references these reports, he ignores that by and large the analysts he cites did not believe that Tivity's revenue and cash flows, including from UHC, were going to erode, and they were skeptical that Optum Fitness Advantage would expand in new markets. In addition, analysts mentioned that the allegedly corrective information was already incorporated in Tivity's financial guidance for 2018. Therefore, I find that Mr. Coffman has not demonstrated that analyst reports indicate that the alleged misrepresentations and omissions were important to investors.

---

[130] "Taking a Deeper Dive into UnitedHealth's Proprietary Fitness Program and Its Impact on Tivity Health," William Blair, November 7, 2017, OFP-TVTY-00005354–60 at OFP-TVTY-00005355.
[131] "Everybody Take A Deep Breath - Offering A Little Perspective," SunTrust Robinson Humphrey, November 7, 2017, OFP-TVTY-00005361–65 at OFP-TVTY-00005361.
[132] "Defending TVTY on Sell-Off after Optum News," Piper Jaffray, November 6, 2017, OFP-TVTY-00005341–43 at OFP-TVTY-00005341.

### C. A Statistically Significant Stock Price Decline On Its Own Does Not Prove the Allegedly Withheld Information Was Important to Investors

57. Mr. Coffman asserts that his "event study analysis, which demonstrates a statistically significant negative decline in the price of Tivity Common Stock upon correction of the alleged misstatements and/or omissions,"[133] demonstrates the importance of the allegedly withheld information to investors.

58. Mr. Coffman's use of an event study analysis to demonstrate the "importance" of the alleged misstatements and omissions does not link Tivity's stock price reaction on November 6, 2017 to the alleged corrective disclosure, but rather assumes without any other analysis that the reaction, in its entirety, was attributable to the allegedly withheld information. He *de facto* rules out that any other factors may have contributed to the stock price decline, without explaining how information about Optum Fitness Advantage program offerings in 11 states—information that was already in the public domain prior to November 6, 2017—could have caused the decline in an efficient market.

59. For example, Mr. Coffman does not consider the possibility that Tivity's stock price decline on November 6, 2017 may have been caused by UHC's issuance of a series of 12 press releases rather than the supposed revelation of the fact that UHC was offering Optum Fitness Advantage in 11 states. The rapid issuance of multiple press releases may have changed investor sentiment about how aggressive UHC would be in expanding its Optum Fitness Advantage program offerings in the future. Nor does he take into account that Tivity's stock price may have overreacted to the issuance of the UHC Press Releases.

60. Because Mr. Coffman does not analyze or account for such potential reasons for Tivity's stock price decline on November 6, 2017, his event study analysis can only be used to show that there was indeed a significant stock price decline on that day. It cannot be used to conclude either that the stock price decline was attributable to the alleged misrepresentations and omissions or that the alleged misrepresentations and omissions were important to investors.

61. I discuss Mr. Coffman's failure to properly analyze Tivity's November 6, 2017 stock price reaction in detail below.

---

[133] Coffman Report, ¶ 11.

## VI. Mr. Coffman Fails to Demonstrate Loss Causation

62. Mr. Coffman contends there is "a foreseeable causal link between Defendants' alleged misrepresentations and omissions and the Corrective Disclosure Event."[134] However, his analysis does not establish this link, and therefore, he fails to establish loss causation.

### A. Economic Analysis Required for Establishing Loss Causation and Measuring Harm in Rule 10b-5 Securities Cases

63. I understand that showing loss causation in Rule 10b-5 securities cases such as this one requires establishing a causal connection between defendants' alleged misrepresentations and plaintiffs' economic loss. A financial economist must perform the following four steps to establish loss causation and measure the losses, if any, caused by the correction of the alleged misrepresentations.

i. Identify the alleged misrepresentations and omissions made by defendants.

ii. Determine the information that could and should have been disclosed instead, as well as when that information could have been disclosed to make the alleged misrepresentations and omissions not misleading (*i.e.*, the "but-for disclosure(s)").

iii. Analyze the alleged corrective disclosure(s) and establish whether these alleged corrective disclosure(s) revealed to the public the information contained in the but-for disclosure(s) that was not already known to market participants. To establish loss causation, it is critical to demonstrate the connection between the alleged corrective disclosure(s) and the but-for disclosure(s). Absent this connection, one would fail to show that an economic loss was caused by the alleged misrepresentations and omissions.

iv. Even after establishing the connection between the alleged corrective disclosure(s) and the but-for disclosure(s), one must estimate the stock price impact, if any, from the corrective information—and only from the corrective information. If there is confounding information—that is, information that is not corrective based on the but-for disclosure that was released on the same day as the alleged corrective information—then it is necessary to parse out the

---

[134] Coffman Report, ¶ 80.

potential stock price effect of the confounding information from the potential stock price effect of the alleged corrective information.[135]

### B. Mr. Coffman's Analysis Does Not Demonstrate a Causal Connection Between the Alleged Misrepresentations and Omissions and Plaintiff's Loss

#### 1. Mr. Coffman Has Not Identified Appropriate But-For Disclosures and Ignores that Information in the UHC Press Releases Was Not Known or Knowable to Tivity Earlier in the Class Period

64. As mentioned above, the first step in establishing loss causation is to identify the alleged misrepresentations and omissions. Mr. Coffman identifies these in Appendix C of the Coffman Report.

65. The second step is to identify the but-for disclosure(s). While Mr. Coffman does not explicitly articulate any but-for disclosures, he appears to assume that they would provide the information disclosed in the UHC Press Releases. For example, he states that Tivity "only warned that Tivity's own customers *could* become competitors rather than disclosing that UHC *had already* launched its own product to compete directly with Tivity's SilverSneakers in certain states."[136] He also states that he "understand[s] that Plaintiff expects to prove that Tivity was aware before the start of the Class Period that UHC was actively competing with Tivity in certain states (by dropping SilverSneakers and launching OFA) and that UHC intended on expanding its OFA offering in additional states in the near future, thus increasing its direct competition with Tivity."[137] Thus, Mr. Coffman apparently assumes a but-for disclosure at the beginning of the Class Period that would have revealed that UHC had "launched its own product to compete directly with Tivity's SilverSneakers in certain states" and intended to expand to other states. However, Tivity could not reasonably have made such a disclosure (or the alleged corrective disclosure) at the beginning of the Class Period.

---

[135] As explained in the Gompers Class Certification Report, an event study using daily stock price returns is typically used to parse the company-specific price effect from market and industry effects. Gompers Class Certification Report, ¶ 35. However, it cannot separately measure the impact of different pieces of company-specific information (*i.e.*, cannot separately measure the effects of corrective and confounding information). Therefore, if there is confounding information other than market and industry effects, the economist must rely on other valuation tools to perform the parsing, separately identifying the economic value of corrective and confounding information.

[136] Coffman Report, ¶ 28.

[137] Coffman Report, ¶ 123.

66. Documents I have reviewed are inconsistent with Mr. Coffman's assertion that Plaintiff intends to prove that Tivity knew at the beginning of the Class Period that UHC would expand its Optum Fitness Advantage program to other states in the near future.[138] In fact, given what documents suggest Tivity knew at the beginning of the Class Period and learned during the Class Period, one would need to assume a series of but-for disclosures throughout the Class Period, each adding new information that was not previously available. Based on the documents I have reviewed, below is a summary of what information about Optum Fitness Advantage program offerings was available to Tivity prior to and during the Class Period, and when that information became available:

i. Prior to the Class Period: Tivity knew that UHC would be offering Optum Fitness Advantage to UHC individual Medicare Advantage members in New Jersey and Washington in 2017.[139, 140] UHC considered this a "pilot" program and Tivity appears to have been informed that if the pilot did not go well, UHC would resume offering SilverSneakers in those two states.[141]

ii. April 4, 2017: Tivity's Chief Growth Officer indicates in an email exchange that UHC has informed Tivity that "no markets are moving for 2018," *i.e.*, "[n]o new markets added and none being subtracted."[142]

iii. April 20, 2017: Internal email communications suggest that on this date Tivity first learned of a rumor that UHC might offer Optum Fitness Advantage in Arizona and New York.[143]

---

[138] Coffman Report, ¶ 123.

[139] Tivity appears to have learned of this information in June 2016, based on an email among Tivity employees discussing "potential states moving to Optum" which stated that "last year we did not get final information until June." Email from Stacey Eggleston to Steve Janicak and Ann Kent, "Client Updates from this week," April 20, 2017, TIVITY0021959.

[140] As discussed above, as a result of the pilot offering in New Jersey and Washington, Tivity projected a loss of approximately 130,000 eligible lives in 2017, corresponding to a "[p]revious [y]ear [r]evenue" of approximately $3.7 million. This represents only 0.9% of projected eligible lives for SilverSneakers and 0.7% of Tivity's total projected 2017 revenue. Email from Steve Janicak to Chip Wochomurka, et al., "FW: SSF to Optum," May 1, 2017, TIVITY0067360–61 and attachment; Tivity Health Board Meeting Materials, June 9, 2017, TIVITY0094815–46 at TIVITY0094821, TIVITY0094823.

[141] "We didn't [] have much time to talk and I wanted to ask if they would include [SilverSneakers] in 2018 if the pilot doesn't do well and he said emphatically 'YES' that was the way it was explained to him." Email from Owen Kueser to Joy Powell, et al., "RE: UHG NJ 2017," September 19, 2016, TIVITY0005803–05.

[142] Email from Steve Janicak to Chip Wochomurka and Donato Tramuto, "RE: Tivity / United Amendment," April 4, 2017, TIVITY0067667–74 at TIVITY0067667.

[143] Email from Stacey Eggleston to Steve Janicak and Ann Kent, "Client Updates from this week," April 20, 2017, TIVITY0021959.

iv. May 1, 2017: Tivity learned of rumors that UHC might offer Optum Fitness Advantage in Arizona, Oklahoma, New York, and Wisconsin.[144]

v. May 22, 2017: UHC notified Tivity of its decision to offer Optum Fitness Advantage to UHC individual Medicare Advantage members in nine additional states for the 2018 calendar year.[145]

67. Therefore, prior to May 22, 2017, Tivity did not know that UHC would expand Optum Fitness Advantage program offerings to additional states beyond New Jersey and Washington. This timing is consistent with the testimony of Timothy Noel, Chief Executive Officer of UnitedHealthcare Medicare & Retirement, who stated that UHC "file[s] [its] benefits for the ensuing year on the first Monday of June, so everything has to be locked down at that point in time."[146] Even after May 22, 2017, Tivity had no certainty that UHC would continue to offer Optum Fitness Advantage in these same markets *after* 2018. In fact, Tivity had conversations with UHC executives that suggested the possibility that UHC would consider offering SilverSneakers to its members in the "lost markets," and the goal of Tivity's Project Success was to bring about that possibility: Tivity hoped to "impact UHC's decisions and expand its business with UHC by demonstrating the value of the SilverSneakers brand."[147]

68. Identifying what information Tivity could have or should have disclosed and when it could have disclosed it is important for the third step of a loss causation analysis—to connect the but-for disclosure(s) to the alleged corrective disclosure. If the information in the alleged corrective disclosure was not known or knowable by Tivity earlier in the Class Period, then it could not have been disclosed in any but-for disclosure(s) made at that time. In other words, any but-for disclosure made at an earlier time would not reflect the entirety of the information provided by the alleged corrective disclosure. In that case, there would be no basis to

---

[144] Email from Ann Kent to Steve Janicak, "Re: Optum Intel Follow-up," May 2, 2017, TIVITY0021934–35 at TIVITY0021934.

[145] On May 23, 2017 at 6:03 AM, Donato Tramuto, Tivity's CEO, asked Steve Janicak, Tivity's Chief Growth Officer: "Do you have any solid information that would confirm AARP is not taking the same markets from us that *United just took*[?]" (Emphasis added.) Email from Glenn Hargreaves to Donato Tramuto and Chip Wochomurka, "UHG Model 5_23," May 23, 2017, TIVITY0042661–64 at TIVITY0042663. Conan Laughlin, a member of Tivity's Board of Directors testified in his deposition that "the news that this was happening was learned by the board I believe in May." Deposition of Conan Laughlin, June 17, 2020, 181:24–182:1.

[146] Deposition of Timothy Noel as 30(b)(6), June 19, 2020 ("Noel 30(b)(6) Deposition"), 28:6–28:8.

[147] Email from Donato Tramuto to Conan Laughlin, "RE: CONFIDENTIAL – PLAN TO REPLACE RHE POTENTIAL ASARP MEDICARE SUPP LOSS," August 28, 2017, CLNT-00002162–63 at CLNT-00002162; Defendant Donato Tramuto's Responses and Objections to Plaintiff's First Set of Interrogatories, *Eric Weiner, et al. v. Tivity Health, Inc., et al.*, United States District Court for the Middle District of Tennessee, Nashville Division, Case No. 3:17-cv-01469, April 27, 2020, p. 5.

conclude that the residual stock price decline following the alleged corrective disclosure would reflect the effect of the alleged misrepresentations or omissions on the Company's stock price going back to the beginning of the Class Period. As discussed above, Tivity did not know until May 22, 2017 that UHC would be offering Optum Fitness Advantage in additional states in 2018. Therefore, even assuming Tivity could have disclosed that information as of May 22, 2017 (which I address below), it could not have made a but-for disclosure prior to that date that would have reflected the entirety of the information provided by the alleged corrective disclosure. Hence, Mr. Coffman has no basis to conclude that Tivity's residual stock price decline following the alleged corrective disclosure reflected the effect of the alleged misrepresentations or omissions on Tivity's stock price going back to the beginning of the Class Period.

69. Moreover, if Tivity knew information but could not disclose it publicly, there would similarly be no basis to conclude that the residual stock price decline following the alleged corrective disclosure reflected the effect of the alleged misrepresentations or omissions on the Company's stock price going back to the beginning of the Class Period. I understand that had Tivity made the disclosures Mr. Coffman alleges it should have, Tivity likely would have been in breach of its contract with UHC. For example, the contract stated:

> Except as may otherwise be required by applicable law or regulation or as may be mutually agreed upon, neither party will make any public announcement of this Agreement. In addition, the parties will keep the discussions between the parties regarding this Agreement confidential. Each party will maintain procedures to restrict knowledge of the terms and conditions of this Agreement to those who need to know. Healthways and United, may, on and after the Effective Date of this Agreement, communicate to Stakeholders that United and Healthways have entered into a network access relationship.[148]

70. In fact, when UHC learned that Tivity had sent emails to instructors notifying them that UHC was going to stop offering SilverSneakers in 2018 to certain UHC individual Medicare Advantage members in certain states, Steve Warner, who led the Medicare Advantage product area at UHC,[149] emailed Steve Janicak, Chief Growth Officer at Tivity, on

---

[148] Fitness Service Network Access Agreement, January 1, 2012, UHC000001–59 at UHC000012.
[149] Deposition of Timothy Noel, June 19, 2020, 109:4–8.

October 7, 2017 to express his concerns about those emails.[150] He expressed that communications like those would "not go over well" at UHC and that Tivity did not "have permission to use the UHC name (per [the parties'] contract) without [UHC's] consent, which [UHC] obviously [hadn't] given."[151] Beyond this, Mr. Warner warned that similar activity would have the potential to "destroy[] the relationship with [UHC]" and "lead to lawsuits and a very fast unwinding of our business together."[152] Ultimately, this conflict appears to have been resolved amicably, as Mr. Janicak responded to Mr. Warner's email emphasizing that Tivity "value[d its] partnership with [UHC],"[153] and Mr. Janicak and Mr. Warner then worked together to develop talking points to address members' questions about SilverSneakers eligibility under UHC's plans.[154]

71. Moreover, I understand a disclosure at the beginning of the Class Period may have violated regulations from the Centers for Medicare & Medicaid Services (CMS),[155] which place certain restrictions on marketing about health plan offerings prior to the open enrollment period.[156] Based on my understanding, and as discussed in the deposition of Timothy Noel, Chief Executive Officer of UnitedHealthcare Medicare & Retirement, disclosing information about Optum Fitness Advantage program offerings in additional states prior to the open enrollment period may have violated these regulations and could have resulted in negative consequences for Tivity.[157]

72. Mr. Coffman's failure to consider changes in Tivity's knowledge about Optum Fitness Advantage program offerings through the course of the Class Period and to account for whether and when Tivity could have disclosed what it knew indicates that he has not set forth appropriate but-for disclosures. Accordingly, he has not established what portion, if

---

[150] Email from Caroline Khalil to Mary Flipse, et al., "RE: Urgent and Important- privileged and confidential," October 7, 2017, TIVITY0055177–87 at TIVITY0055184.
[151] Email from Caroline Khalil to Mary Flipse, et al., "RE: Urgent and Important- privileged and confidential," October 7, 2017, TIVITY0055177–87 at TIVITY0055184.
[152] Email from Caroline Khalil to Mary Flipse, et al., "RE: Urgent and Important- privileged and confidential," October 7, 2017, TIVITY0055177–87 at TIVITY0055184.
[153] Email from Mary Flipse to Archelle Georgiou, et al., "FYI: Correspondence with UnitedHealth," October 16, 2017, CLNT-00002263–69 at CLNT–00002263.
[154] Email from Steve Janicak to Steve Warner and Timothy Noel, "RE: Gym communications," October 9, 2017, UHC000209–18 at UHC000209–12.
[155] CMS is the federal agency that administers the Medicare program.
[156] "Medicare Marketing Guidelines," CMS.gov, https://www.cms.gov/Medicare/Health-Plans/ManagedCareMarketing/Downloads/2017MedicareMarketingGuidelines2.pdf, accessed August 18, 2020, p. 5; Deposition of Timothy Noel, June 19, 2020, 10:4–6, 99:13–100:20.
[157] If an organization "[f]ails to comply with communication restrictions" then "CMS may impose one or more…sanctions." 42 C.F.R. § 422.752. Deposition of Timothy Noel, June 19, 2020, 99:17–100:20, 134:16–135:16.

any, of Tivity's stock price decline on November 6, 2017 would have occurred earlier in the Class Period and when it would have occurred, if Tivity had disclosed what it knew and could have disclosed it when it acquired the information. Thus, he has no basis to attribute any portion of Tivity's stock price decline on November 6, 2017, let alone all of it, to information about Optum Fitness Advantage that the Company allegedly withheld from the market during the Class Period.

### 2. Tivity's Stock Price Decline on November 6, 2017 Could Not Have Been Caused by Information Already in the Public Domain

73. For the fourth step of a loss causation analysis, it is important to understand whether the allegedly corrective information was already public, because in an efficient market, the stock price would not react to information that was already in the public domain.

74. Mr. Coffman ignores that the "corrective" information about UHC's Optum Fitness Advantage program offerings in 11 states was already in the public domain. If the stock price reaction was not caused by the allegedly corrective information since that information was already public, then it cannot be causally linked to the alleged misrepresentations and omissions. Thus, there would be no loss causation.

75. In its order certifying the class in this matter, the Court ruled that the market for Tivity stock was efficient during the Class Period.[158] As discussed in detail in the Gompers Class Certification Report,[159] an efficient market is one in which stock prices incorporate all publicly available information quickly and completely.[160] This means that the stock price at all times reflects the underlying present value of expected future cash flows, given all information that is available to investors.

76. As explained in the Gompers Class Certification Report, information need not be published in a major news outlet or widely disseminated to be considered publicly

---

[158] Memorandum Opinion, *Eric Weiner, et al. v. Tivity Health, Inc., et al.*, United States District Court for the Middle District of Tennessee, Nashville Division, Case No. 3:17-cv-01469, January 29, 2020, pp. 20–21.

[159] Gompers Class Certification Report, Section V.

[160] Ross, Stephen A., Randolph W. Westerfield, and Jeffrey Jaffe, *Corporate Finance*, 7th ed. (Boston, MA: McGraw-Hill/Irwin), 2005, pp. 355–356. Three forms of market efficiency are distinguished: the strong form, the semi-strong form, and the weak form. The strong form holds that market prices of securities reflect all available information, whether public or not. The semi-strong form holds that prices reflect all publicly available information. The weak form holds that prices reflect all information related to the trading history of securities.

available.[161] Public information includes information that is accessible to market participants or information that is in the public domain.[162] This is because, under the efficient market hypothesis, informed investors will immediately act on profitable trading opportunities, such as when they perceive that new and value-relevant information is not reflected in the current price of a stock, and will continue to trade until any perceived mispricing is eliminated.

77. Further, in an efficient market, a significant change in the stock price would not be expected in the absence of new value-relevant information. Thus, the stock price should not react to repeated disclosures of information that was already made public at an earlier date. In this case, the allegedly corrective information was indeed already in the public domain.

78. Plaintiff claims that investors suffered losses when the "truth [was] revealed" in the UHC Press Releases.[163] Specifically, Plaintiff appears to point to two statements within the UHC Press Releases as allegedly corrective of all the alleged misrepresentations and omissions:

> "In January 2018, Optum Fitness Advantage will be available at no additional cost to people enrolled in eligible UnitedHealthcare Medicare Advantage plans in 11 states through a large network of participating fitness centers. Plan participants will have access to the same services, privileges, classes and programs as the fitness centers' standard members, including waiver of all enrollment fees….
>
> [T]he Optum Fitness Advantage program, launched by UnitedHealthcare in Washington state and New Jersey in January 2017, has been well received by local Medicare Advantage plan participants."[164]

79. However, in his purported loss causation analysis, Mr. Coffman ignores evidence showing this information was publicly available weeks and even months before the UHC Press Releases. Exhibit 4 summarizes information about Optum Fitness Advantage program offerings that was publicly available throughout the Class Period. This includes information that was referenced in the Gompers Class Certification Report, as well as new information I have reviewed since I submitted that report.

---

[161] Gompers Class Certification Report, Section V.
[162] Bodie, Zvi, Alex Kane, and Alan J. Marcus, *Investments*, 9th ed. (New York, NY: McGraw-Hill/Irwin), 2011, pp. 347–48; Mishkin, Frederic S., *The Economics of Money, Banking, and Financial Markets*, 6th ed. (Boston, MA: Addison-Wesley), 2001, pp. 699–700.
[163] Complaint, ¶¶ 80–83.
[164] Complaint, ¶¶ 81–82.

### a) Information Publicly Available Before and During the Class Period Discussed in Detail in the Gompers Class Certification Report

80. In the Gompers Class Certification Report, I discussed in detail information that was publicly available before and during the Class Period.[165] Below I highlight some examples.

81. As described in Section V.A.3, there is a period of open enrollment every year during which Medicare beneficiaries can choose their health plan, and health insurers disclose their plans' benefits so that individuals have all the information necessary to make their decisions during this period. Therefore, prior to January 2017, UHC would have disclosed to Medicare recipients in New Jersey and Washington that it was changing the SilverSneakers benefit to Optum Fitness Advantage for its individual Medicare plans. It is also my understanding that in order to launch Optum Fitness Advantage in New Jersey and Washington in January 2017, UHC had to build relationships with a network of fitness centers prior to its launch. In turn, these fitness centers marketed the membership benefits of Optum Fitness Advantage to their existing and potential members. In fact, as discussed in the Gompers Class Certification Report, Plaintiff acknowledges that UHC conducted such marketing efforts before the Class Period.[166] For example, Plaintiff claims that, by December 2016, UHC sent "an aggressive letter...to a fitness center that stated that UHC was launching Optum Fitness Advantage."[167]

82. Some examples of information publicly known regarding UHC's launch of Optum Fitness Advantage in New Jersey and Washington and the additional nine states include the following:

i. UHC released a packet for insurance agents that described its plan offerings in 38 states at least as early as July 2016.[168] In this packet, SilverSneakers was mentioned as the fitness benefit for most geographic areas.[169] However, for New Jersey and Washington, instead of SilverSneakers, the packet mentioned Optum Fitness Advantage.[170] Additionally, in the detailed breakdown of the

---

[165] Gompers Class Certification Report, Section VI.B.
[166] Gompers Class Certification Report, Section VI.B.
[167] Complaint, ¶ 59.
[168] "Strength. Stability. Hassle Free. The Advantage of UnitedHealthcare 2017 Medicare Advantage Plans," UnitedHealthcare, https://www.agentpipeline.com/wp-content/uploads/2015/07/National-Packet_0720_Low-Res.pdf ("UHC Packet"), accessed August 30, 2020.
[169] See the "Market Overview" page for each geographic location. *See, e.g.*, UHC Packet, p. 7.
[170] UHC Packet, pp. 62, 65, 168.

individual plans offered in Seattle, Spokane, and New Jersey, Optum Fitness Advantage was highlighted as "Improved for 2017" in certain plans.[171]

ii. Fitness centers themselves were also marketing Optum Fitness Advantage. For example, Deer Park Fitness in Washington[172] tweeted, "Yes, we accept Optum Fitness Advantage!! #unitedhealthcare #beactive #stayhealthy" and attached a photo that showed it would be accepting Optum Fitness Advantage beginning January 1, 2017.[173] Similarly, in late 2016 the YMCA of Western Monmouth County[174] in New Jersey posted a flyer that advertised "Optum® Fitness Advantage from UnitedHealthcare will be coming soon to this location."[175]

iii. Two days after the start of the Class Period, the Bellingham Herald in Washington published an article titled "No matter how old you are, the YMCA has got an exercise program perfect for you."[176] The article noted that "[t]he SilverSneakers program is accessible through some Medicare plans. The YMCA also offers Silver & Fit, Prime, At Your Best and Optum Fitness Advantage to help with senior memberships."[177] The Bellingham Herald's website received more than 650,000 unique monthly visitors in 2017 and over 4 million page views per month.[178]

iv. On September 15, 2017, seven weeks before the alleged corrective disclosure, a user post on a site called "Insurance-Forums.com," which markets itself as

---

[171] UHC Packet, pp. 64, 66, 169.
[172] Twitter – Deer Park Fitness, https://twitter.com/deerparkfitness, accessed August 30, 2020.
[173] "Yes, We Accept Optum Fitness Advantage!!," Twitter – Deer Park Fitness, November 14, 2016, https://twitter.com/DeerParkFitness/status/798164042439426048, accessed August 30, 2020.
[174] YMCA of Western Monmouth County, https://web.archive.org/web/20161128150417/http://ymcanj.org/, accessed August 30, 2020.
[175] "Good News: Optum® Fitness Advantage from UnitedHealthcare Will Be Coming Soon to This Location," YMCA New Jersey, https://ymcanj.org/wp-content/uploads/2016/12/flyer.pdf, accessed August 30, 2020.
[176] "No Matter How Old You Are, the YMCA Has Got an Exercise Program Perfect for You," *The Bellingham Herald*, March 8, 2017, https://www.bellinghamherald.com/living/seniors-aging/article136945433.html, accessed August 25, 2020.
[177] "No Matter How Old You Are, the YMCA Has Got an Exercise Program Perfect for You," *The Bellingham Herald*, March 8, 2017, https://www.bellinghamherald.com/living/seniors-aging/article136945433.html, accessed August 25, 2020.
[178] "About Us," *The Bellingham Herald*, https://www.bellinghamherald.com/customer-service/about-us/, accessed August 30, 2020.

"the world's largest insurance community" and had over 70,000 members at that time,[179] revealed the following information:

> Just received an email from UHC that they are bringing back fitness as part of [Medicare Advantage Prescription Drug plans] in a [*sic*] 9 states (including Florida) for 2018.
>
> It won't be Silver Sneakers, it's called-
>
> *Optum Fitness Advantage… Optum Fitness Advantage will be available with many UnitedHealthcare Medicare Advantage (MA) plans in nine new states (Arizona, Florida, Kentucky, Ohio, Oklahoma, Oregon, New York, Texas (specifically Austin, Houston and San Antonio) and Wisconsin) for 2018.* Members will have access to a variety of fitness clubs at no additional cost in line with their previous fitness benefit. The good news is that we will continue to build this benefit for consumers over the next few years to provide a superior experience with UnitedHealthcare… The nine states mentioned join New Jersey and Washington, which rolled out Optum Fitness Advantage benefits in 2017. Optum Fitness Advantage contributed to higher health and wellness benefit Net Promoter Scores (NPS) this year.*[180]

v. On October 4, 2017 a user wrote, in part:

> At least in Ohio, UHC is pulling out of SilverSneakers and starting Optum Fitness Advantage. Not sure about Georgia.[181]

vi. On October 6, 2017, another user wrote on the same thread:

> In Texas as of January 2018, UHC will no longer offer [SilverSneakers] for the [Medicare Supplement]. Instead clients

---

[179] "The World's Largest Insurance Community – Insurance Forums," Insurance Forums, http://web.archive.org/web/20171101020459/https://insurance-forums.com/, accessed August 30, 2020.
[180] Gompers Class Certification Report, Exhibit 3 contains the entire forum post. "UHC Bringing Back Fitness in Many States," Insurance Forums, September 15, 2017, https://insurance-forums.com/community/threads/uhc-bringing-back-fitness-in-many-states.90204/, accessed August 30, 2020.
[181] "Client Cxls Med Supp for MAPD," Insurance Forums, October 4, 2017, https://insurance-forums.com/community/threads/client-cxls-med-supp-for-mapd.90436/page-2, accessed August 30, 2020.

will get UHC's new product through Optum that gives discounts to gyms and online health and wellness content.[182]

vii. A blog post on October 9, 2017 by Harrison Premier Fitness, a fitness center in Harrison, Ohio[183], indicated "Optum® Fitness Advantage from UnitedHealthcare will be coming soon to this location."[184]

#### b) Additional Information Publicly Available Before and During the Class Period

83. In addition to the information mentioned in the Gompers Class Certification Report, I have reviewed evidence that information about the expansion of Optum Fitness Advantage was publicly available prior to the start of the Class Period. For instance, UHC's Timothy Noel testified that he considered Optum Fitness Advantage to be "in the public domain" and "public information" prior to the alleged corrective disclosure.[185] Further, he testified that beginning in approximately April and May 2016, UHC and Optum communicated with fitness centers and gyms in New Jersey and Washington "in an effort to set up the network for the two test states."[186] The brokers that sell UHC insurance policies were also "informed about the initial rollout of Optum Fitness Advantage…somewhere in the July/August [2016] timeframe."[187] In addition, in approximately October 2016, UHC notified individual Medicare Advantage members in Washington and New Jersey that their fitness benefit was changing to Optum Fitness Advantage for the 2017 calendar year.[188] UHC sent another notification of the change in January 2017 to "33,695 new enrollees and 46,305 returning members of Medicare Advantage plans" in these markets,[189] and communicated the switch to those UHC individual Medicare Advantage members in Washington and New Jersey that had been actively using SilverSneakers during 2016—*i.e.*, the members most likely to be

---

[182] "Client Cxls Med Supp for MAPD," Insurance Forums, October 4, 2017, https://insurance-forums.com/community/threads/client-cxls-med-supp-for-mapd.90436/page-2, accessed August 30, 2020.
[183] "About," Harrison Premier Fitness, https://www.harrisonpremierfitness.com/about-us/, accessed August 30, 2020.
[184] "New Program Coming to HPF! - Optum Fitness Advantage," Harrison Premier Fitness, October 9, 2017, https://www.harrisonpremierfitness.com/2017/10/09/new-program-coming-to-hpf-optum-fitness-advantage/, accessed August 30, 2020.
[185] Noel 30(b)(6) Deposition, 57:3-17.
[186] Noel 30(b)(6) Deposition, 28:18–29:6.
[187] Noel 30(b)(6) Deposition, 65:1–11.
[188] Noel 30(b)(6) Deposition, 65:12–19.
[189] Noel 30(b)(6) Deposition, 75:22–78:2.

impacted by the change.[190] Optum Fitness Advantage also had an operational website by January 2017, which provided information on the program and the location of participating fitness centers, and UHC's customer service representatives had been trained about Optum Fitness Advantage by that time so that they could "answer questions from members about it."[191]

84. Mr. Noel testified that UHC continued to promote Optum Fitness Advantage during the Class Period. Beginning in approximately April or May 2017 and continuing during the Class Period, UHC (through Optum and a consultant, Healthy Contributions) was regularly communicating with fitness centers and gyms in the nine markets that were to be added for 2018 to promote Optum Fitness Advantage and to contract with the facilities to accept program members.[192] This included communicating via email and telephone, as well as providing marketing and background materials on the program to fitness centers and gyms.[193] Then, in July or August 2017, UHC informed the brokers that sell its insurance policies that Optum Fitness Advantage would be available in the nine additional states for the 2018 calendar year.[194] By late August 2017, Optum Fitness Advantage "promotional posters were sent to roughly 4,000 gyms… located in the nine markets where Optum Fitness Advantage was going to be expanding for 2018."[195] UHC also sent an "eCard… to roughly 16,400 agents [*i.e.*, brokers] on September 14th, 2017," and expected the brokers to "share this information with insurance members or potential insurances [*sic*] members starting October 1st of 2017."[196] In addition, in October 2017, UHC directly notified 875,000 of its individual Medicare Advantage members that their fitness offering for 2018 would change from SilverSneakers to Optum Fitness Advantage.[197]

---

[190] Noel 30(b)(6) Deposition, 58:20–59:14.
[191] Noel 30(b)(6) Deposition, 61:12–63:14.
[192] Deposition of Timothy Noel, June 19, 2020, 44:17–45:17; Email from Caroline Khalil to Jeff Pagels, "Optum Examples," August 21, 2017, TIVITY0075701–850.
[193] Email from Caroline Khalil to Jeff Pagels, "Optum Examples," August 21, 2017, TIVITY0075701–850 at TIVITY0075702–03, TIVITY0075713–15.
[194] Noel 30(b)(6) Deposition, 67:12–16.
[195] Noel 30(b)(6) Deposition, 74:20–75:6; Optum Fitness Advantage Poster, UHC000274.
[196] Noel 30(b)(6) Deposition, 72:1–73:20; Email from UnitedHealthCare Medicare Solutions to Brokers, "Optum Fitness Advantage – Coming to a Plan Near You!," December 15, 2017, UHC000272–73.
[197] Deposition of Timothy Noel, June 19, 2020, 138:7–14, quoting an email from Mr. Janicak dated October 9, 2017. Email from Steve Janicak to Steve Warner and Timothy Noel, "RE: Gym communications," October 9, 2017, UHC000209–18.

85. Members were notified in other ways as well. For example, in September 2017, the Green Bay, Wisconsin YMCA informed members that it was no longer offering SilverSneakers and was switching to Optum Fitness Advantage.[198]

86. In addition, throughout the Class Period, as part of Project Success, Tivity developed strategies to inform affected UHC members that UHC would no longer be offering SilverSneakers under their plan. Tivity communicated with instructors of SilverSneakers classes, insurance brokers, and participating locations to inform them of UHC's change from SilverSneakers to Optum Fitness Advantage and what they could do to help SilverSneakers members keep their SilverSneakers benefit.[199]

87. Tivity also planned to "inform members about their options and provid[e] them with the tools to switch to" health plans that included the SilverSneakers benefit through "call center outreach, website alerts, social media strategies and targeted paid search."[200] As a result of these efforts, during a period of less than three weeks in October 2017, Tivity's Project Success call center fielded over 1,000 calls from members, instructors, participating locations, and insurance brokers.[201]

88. Thus, prior to the UHC Press Releases, it was publicly known that Optum Fitness Advantage was replacing SilverSneakers for UHC individual Medicare Advantage plans in 11 states. Mr. Coffman ignores or fails to consider this fact. He therefore cannot establish that Tivity's stock price decline on November 6, 2017 was due to the allegedly corrective information.

---

[198] Email from Chip Wochomurka to Steve Janicak and Adam Holland, "RE: Letter about Y/UHC," September 25, 2017, TIVITY0063916–20; "Keeping You Informed: Silver Sneakers Update," Greater Green Bay YMCA, https://www.greenbayymca.org/media/310652/silversneakers-member-update-documents_96_p5.pdf, accessed August 25, 2020.

[199] Email from Caroline Khalil to Mary Flipse, et al., "RE: Urgent and Important- privileged and confidential," October 7, 2017, TIVITY0055177–87 at TIVITY0055185–87; "Project Success," Tivity Health, TIVITY0021653–96; Email from Ulya Khan to Donato Tramuto, et al., "Project Success - Call Center Update 10/17/17," October 17, 2017, TIVITY0054304.

[200] "Project Success," Tivity Health, TIVITY0021653–96 at TIVITY0021657.

[201] Email from Ulya Khan to Donato Tramuto, et al., "Project Success - Call Center Update 10/17/17," October 17, 2017, TIVITY0054304.

### 3. To the Extent Mr. Coffman Contends Tivity Withheld Any Information Other Than Optum Fitness Advantage Program Offerings in 11 States, the Alleged Corrective Disclosure Did Not "Correct" Any Such Information

89. As discussed above, information about Optum Fitness Advantage program offerings in 11 states was already in the public domain prior to November 6, 2017, and thus Mr. Coffman cannot reasonably link Tivity's stock price decline on that date to that information. To the extent Mr. Coffman contends Tivity withheld additional information from the market, such as information about Tivity's contract with UHC, he has no basis to link Tivity's November 6, 2017 stock price decline to that additional information either, because the UHC Press Releases did not "correct" any such information.

90. Specifically, Mr. Coffman asserts that "[i]nvestors who purchased Tivity Common Stock at prices that were affected by Defendants' misleading statements and/or omissions that portrayed Tivity's relationship with UHC in a positive light, including that UHC had renewed its contract with Tivity on 'favorable terms', without disclosing that Tivity knew UHC was taking market share away from SilverSneakers, suffered losses as the relevant truth was revealed."[202] In making this assertion, Mr. Coffman ignores that the alleged corrective disclosure could not have "corrected" any alleged misstatements or omissions about the contract between Tivity and UHC, because the alleged disclosure did not provide any new information about the contract, and the contract neither included any information about Optum Fitness Advantage program offerings nor changed as a result of the alleged disclosure. Thus, Mr. Coffman cannot reasonably establish a link between the contract and the alleged corrective disclosure.

91. As discussed in Section V.B, the renewed contract UHC and Tivity signed in April 2017 changed the pricing terms in a way that was economically beneficial to Tivity and otherwise did not differ substantially from the prior contract between the two parties. Donato Tramuto, Tivity's CEO, emphasized this in a press release on November 6, 2017, stating that "'[i]n April of this year, [Tivity] renewed [its] contract with UnitedHealthcare to provide the SilverSneakers Fitness Program through 2020.'"[203] He added that Tivity had "'an 18-year

---

[202] Coffman Report, ¶ 14.
[203] Tivity Health Press Release, "Tivity Health Comments on UnitedHealthcare Relationship," November 6, 2017.

relationship with UnitedHealthcare offering our SilverSneakers Fitness Program" and that "[Tivity] highly value[d] [its] relationship with UnitedHealthcare.'"[204]

92. Further, analyst commentary about the contract is inconsistent with Mr. Coffman's implied speculation that the market's view of the contract changed as a result of the alleged corrective disclosure. Specifically, analyst commentary about the contract in the days after the alleged corrective disclosure was largely similar to analyst commentary provided after the contract was signed in April 2017.[205] Similarly, of the seven analysts who published reports on Tivity on November 6, 2017 or November 7, 2017, none characterized Tivity's contract with UHC as "unfavorable."[206]

93. Thus, Mr. Coffman has no basis to conclude that investor losses were caused by alleged misrepresentations and omissions about Tivity's "favorable" contract with UHC.

94. Mr. Coffman also asserts that "UHC's offering of OFA threatened Tivity's financial performance from at least two angles" and that "[b]ecause of the economic link between revenue and the Company's anticipated future cash flows, and the link between anticipated future cash flows and the market value of Tivity Common Stock, there is a clear economic link between information regarding UHC's intention to directly compete with Tivity by

---

[204] Tivity Health Press Release, "Tivity Health Comments on UnitedHealthcare Relationship," November 6, 2017.

[205] On April 28, 2017, Barrington Research stated "Tivity disclosed that it has renewed its SilverSneakers contract with United Health for three years on 'favorable terms,'" "Strong Quarter; Increased 2017 Guidance; PT Now $35," Barrington Research, April 28, 2017, OFP-TVTY-00004703–09 at OFP-TVTY-00004705. On November 7, 2017, Barrington Research stated that the "SilverSneakers contract with UnitedHealthcare… was, in fact, renewed for three years and 'on favorable terms,' according to management's commentary," "Tivity Shares Crushed As Relationship with UnitedHealth Comes Into Question," Barrington Research, November 7, 2017, OFP-TVTY-00005366–69 at OFP-TVTY-00005366. On April 27, 2017, William Blair stated "[m]anagement also announced that the company renewed its SilverSneakers contract with UnitedHealth Group (UNH $174.63) for the next three years… management indicated that the contract was renewed on favorable terms to the organization," "Great Start to the Year as Guidance Increased, Restructuring Complete, and UnitedHealth Contract Extended," William Blair, April 27, 2017, OFP-TVTY-00004689–94 at OFP-TVTY-00004689. On November 6, 2017, William Blair stated "Tivity successfully extended its contract with UnitedHealth this year, for an incremental three years—so we believe the overall relationship between the two entities is still quite strong," "Sell-Off on UnitedHealth News Seems Markedly Overdone; We are Buyers on Weakness," William Blair, November 6, 2017, OFP-TVTY-00005338–40 at OFP-TVTY-00005338.

[206] "Shares Off on UNH Announcement; Too Early to Worry About 2020; Overweight," Cantor Fitzgerald, November 6, 2017, OFP-TVTY-00005344–47; "UNH Expands Senior Benefit, Less Confident in Our TVTY Estimates," Chardan Capital Markets, November 6, 2017, OFP-TVTY-00005348–53; "TVTY Pullback Today Pricing In More Than Worst Case Scenario With UnitedHealth" Jefferies, November 6, 2017; "Defending TVTY on Sell-Off After Optum News," Piper Jaffray, November 6, 2017, OFP-TVTY-00005341–43; "Sell-Off on UnitedHealth News Seems Markedly Overdone; We are Buyers on Weakness," William Blair, November 6, 2017, OFP-TVTY-00005338–40; "Everybody Take A Deep Breath - Offering A Little Perspective," SunTrust Robinson Humphrey, November 7, 2017, OFP-TVTY-00005361–65; "Tivity Shares Crushed As Relationship with UnitedHealth Comes Into Question," Barrington Research, November 7, 2017, OFP-TVTY-00005366–69; "Taking a Deeper Dive into UnitedHealth's Proprietary Fitness Program and Its Impact on Tivity Health," William Blair, November 7, 2017, OFP-TVTY-00005354–60.

expanding OFA rather than remain a Tivity customer in numerous states and the market value of Tivity Common Stock."[207] However, as discussed in detail in Section V.B, Mr. Coffman overlooks the fact that the alleged corrective disclosure does not appear to have altered the market's long-term financial outlook for Tivity.

#### 4. Mr. Coffman Ignores or Does Not Consider Other Explanations for the Stock Price Decline

95. Mr. Coffman concludes that Tivity's stock price decline on November 6, 2017 was caused by information that was corrective of the alleged misrepresentations and omissions because he did not find "any other news outside of UHC's press releases that could explain the observed Tivity Common Stock price decline."[208] In doing so, he fails to consider alternative explanations for the stock price reaction that are not due to the alleged corrective information.

##### a) Investor Overreaction

96. As discussed in detail in the Gompers Class Certification Report, one potential explanation for Tivity's stock price decline on November 6, 2017 is market overreaction in response to the UHC Press Releases.[209] Consistent with an overreaction, most analysts kept their EBITDA, EPS, and long-term growth rate forecasts and their price targets for Tivity unchanged following the UHC Press Releases (see Section V.B) and commented that Tivity's stock was undervalued. Seven analysts published reports on Tivity on November 6, 2017 or November 7, 2017; five of them listed an EBITDA forecast in reports both before and after the alleged disclosure for at least one of 2018 and 2019. None of these analysts changed its 2018 EBITDA forecast from its previous report, and only two changed their 2019 EBITDA forecasts from their previous reports. Further, as summarized in Exhibit 5, five of the seven analysts suggested that the stock price reaction was overdone, leading to Tivity shares being undervalued.[210]

---

[207] Coffman Report, ¶ 82.
[208] Coffman Report, ¶ 103.
[209] Gompers Class Certification Report, Section VI.D.
[210] "Shares Off on UNH Announcement; Too Early to Worry about 2020; Overweight," Cantor Fitzgerald, November 6, 2017, OFP-TVTY-00005344–47 at OFP-TVTY-00005344; "TVTY Pullback Today Pricing In More Than Worst Case Scenario With UnitedHealth," Jefferies, November 6, 2017, p. 1; "Defending TVTY on Sell-Off after Optum News," Piper Jaffray, November 6, 2017, OFP-TVTY-00005341–43 at OFP-TVTY-

97. A price overreaction occurs when investors react to a disclosure in a manner that is not commensurate with the revealed information. Overreaction may be caused by overly optimistic or pessimistic attitudes toward a company relative to available information about the company. Such attitudes are referred to as "investor sentiment." The existence of investor sentiment has been well documented in academic literature.

98. For example, Baker and Wurgler discuss instances when a "dramatic level or change in stock prices … seems to defy explanation," and define investor sentiment as "a belief about future cash flows and investment risks that is not justified by the facts at hand."[211] They discuss conditions under which "investors are subject to sentiment" and "betting against sentimental investors is costly and risky," causing stock prices to overreact.[212]

99. To illustrate an example, Huberman and Regev discuss how ENMD, a biotech company, received favorable news related to the development of a new cancer drug.[213] The news was disclosed in *Nature* magazine and covered on an inside page of *The New York Times* ("NYT")[214] in November 1997, and led to a 28% increase in ENMD's stock price. Then, approximately five months later in May 1998, NYT published virtually the same information, but this time in an article on its front page under the heading "[a] special report." ENMD's stock price increased by over 330% following the May 1998 NYT article, despite the fact that the article did not provide any new information. Huberman and Regev comment that "[i]t seems that the market underreacted to the publication of the hard news of late November 1997 and overreacted to the great publicity of the May 3, 1998 *Times* article."[215]

100. Commentary from analysts covering Tivity suggests that Tivity investors may similarly have overreacted to the November 6, 2017 UHC Press Releases. For example, William Blair noted that the "[s]ell-[o]ff on United Health [n]ews [s]eems [m]arkedly

---

00005341; "Sell-Off on UnitedHealth News Seems Markedly Overdone; We Are Buyers on Weakness," William Blair, November 6, 2017, OFP-TVTY-00005338–40 at OFP-TVTY-00005338; "Everybody Take A Deep Breath - Offering A Little Perspective," SunTrust Robinson Humphrey, November 7, 2017, OFP-TVTY-00005361–65 at OFP-TVTY-00005361.

211 Baker, Malcom, and Jeffrey Wurgler, "Investor Sentiment in the Stock Market," *Journal of Economic Perspectives*, Vol. 21, No. 2, 2007, pp. 129–151 at p. 129.

212 Baker, Malcom, and Jeffrey Wurgler, "Investor Sentiment in the Stock Market," *Journal of Economic Perspectives*, Vol. 21, No. 2, 2007, pp. 129–151 at p. 129.

213 Huberman, Gur, and Tomer Regev, "Contagious Speculation and a Cure for Cancer: A Nonevent that Made Stock Prices Soar," *The Journal of Finance*, Vol. 56, No. 1, 2001, pp. 387–396 at p. 387.

214 The article was on page A28. Huberman, Gur, and Tomer Regev, "Contagious Speculation and a Cure for Cancer: A Nonevent that Made Stock Prices Soar," *The Journal of Finance*, Vol. 56, No. 1, 2001, pp. 387–396 at p. 390.

215 Huberman, Gur, and Tomer Regev, "Contagious Speculation and a Cure for Cancer: A Nonevent that Made Stock Prices Soar," *The Journal of Finance*, Vol. 56, No. 1, 2001, pp. 387–396 at p. 388.

[o]verdone; [w]e are [b]uyers on [w]eakness."[216] Similarly, SunTrust remarked "[w]e view the sell-off as overdone...and view the stock move as an opportunity."[217] Piper Jaffray called the sell-off a "knee-jerk reaction," and saw "no reason to change numbers on this announcement."[218] SunTrust commented "Stock action suggests the world is ending – really? We'll take our chances."[219]

101. Consistent with an overreaction, as I noted in the Gompers Class Certification Report, Tivity's stock price had increased by nearly 8% by the fifth trading day after November 6, 2017. By the tenth trading day, the price had increased by more than 10%.[220]

102. If Tivity's stock price did indeed overreact to the alleged corrective disclosure, Mr. Coffman cannot rely on the stock price decline on November 6, 2017 to conclude that the alleged misrepresentations and omissions led to an economic loss. Hence, he cannot demonstrate loss causation.

#### b) Rapid Issuance of a Series of 12 Press Releases

103. Consistent with a market overreaction, a possible explanation for Tivity's stock price reaction on November 6, 2017 is that the manner in which UHC issued a series of 12 press releases changed investor sentiment about how aggressive UHC would be in expanding its Optum Fitness Advantage program offerings in the future, leading to a stock price decline for Tivity.[221] If so, such a shift in investor sentiment about UHC's future plans for Optum Fitness

---

[216] "Sell-Off on UnitedHealth News Seems Markedly Overdone; We Are Buyers on Weakness," William Blair, November 6, 2017, OFP-TVTY-00005338–40 at OFP-TVTY-00005338.

[217] "Everybody Take A Deep Breath - Offering A Little Perspective," SunTrust Robinson Humphrey, November 7, 2017, OFP-TVTY-00005361–65 at OFP-TVTY-00005361.

[218] "Defending TVTY on Sell-Off after Optum News," Piper Jaffray, November 6, 2017, OFP-TVTY-00005341–43 at OFP-TVTY-00005341.

[219] "Everybody Take A Deep Breath - Offering A Little Perspective," SunTrust Robinson Humphrey, November 7, 2017, OFP-TVTY-00005361–65 at OFP-TVTY-00005361.

[220] Gompers Class Certification Report, ¶ 72.

[221] UnitedHealthcare Press Release, "UnitedHealthcare Adds New Fitness Benefit to Medicare Advantage Plans in Arizona," November 6, 2017; UnitedHealthcare Press Release, "UnitedHealthcare Adds New Fitness Benefit to Medicare Advantage Plans in Austin," November 6, 2017; UnitedHealthcare Press Release, "UnitedHealthcare Adds New Fitness Benefit to Medicare Advantage Plans in Florida," November 6, 2017 [issued at 9:15 ET]; UnitedHealthcare Press Release, "UnitedHealthcare Adds New Fitness Benefit to Medicare Advantage Plans in Florida," November 6, 2017 [issued at 10:00 ET]; UnitedHealthcare Press Release, "UnitedHealthcare Adds New Fitness Benefit to Medicare Advantage Plans in Houston," November 6, 2017; UnitedHealthcare Press Release, "UnitedHealthcare Adds New Fitness Benefit to Medicare Advantage Plans in Kentucky," November 6, 2017; UnitedHealthcare Press Release, "UnitedHealthcare Adds New Fitness Benefit to Medicare Advantage Plans in New York," November 6, 2017; UnitedHealthcare Press Release, "UnitedHealthcare Adds New Fitness Benefit to Medicare Advantage Plans in Ohio," November 6, 2017; UnitedHealthcare Press Release, "UnitedHealthcare Adds New Fitness Benefit to Medicare Advantage Plans in Oklahoma," November 6, 2017; UnitedHealthcare Press Release, "UnitedHealthcare Adds New Fitness Benefit

Advantage would be due to the rapid issuance of multiple press releases, not to the revelation of the fact that UHC was offering Optum Fitness Advantage in 11 states. Tivity's intraday stock price movements are consistent with this explanation.

104. As discussed in Section VI.B.2 above, there are numerous examples indicating that the information purportedly corrective of the alleged misrepresentations was already in the public domain, and, therefore, could not have caused Tivity's stock price decline in an efficient market. Academic literature measuring the speed of stock price reaction to new information indeed confirms that new information is rapidly incorporated into stock prices in efficient markets.

105. For example, Tetlock states that "[i]n an efficient market where firms' stock prices rapidly incorporate all value-relevant signals, new information becomes stale information almost instantly."[222] Also, when discussing news releases, Greene and Watts conclude that "when clock time is considered, price adjusts rapidly over the first post-announcement half hour."[223] Addressing company announcements, Patell and Wolfson state that "the price reaction to earnings and dividend announcements begins very quickly," and "by far the largest portion of the price response occurs in the first five to fifteen minutes after the disclosure."[224] More recently, Busse and Green observe that "[a]s technological advancements in financial markets have shortened our perception of 'very quickly' since Patell and Wolfson (1984), our results show that the amount of time necessary for prices to incorporate news has also decreased."[225]

106. Despite this evidence, Mr. Coffman fails to analyze the intraday movements in Tivity's stock price on November 6, 2017 to determine if and how the price reacted to the UHC Press Releases. Had he done so, he would have observed evidence inconsistent with

---

to Medicare Advantage Plans in Oregon," November 6, 2017; UnitedHealthcare Press Release, "UnitedHealthcare Adds New Fitness Benefit to Medicare Advantage Plans in San Antonio," November 6, 2017; UnitedHealthcare Press Release, "UnitedHealthcare Adds New Fitness Benefit to Medicare Advantage Plans in Wisconsin," November 6, 2017. UnitedHealthcare issued two separate press releases on November 6, 2017 that were both titled "UnitedHealthcare Adds New Fitness Benefit to Medicare Advantage Plans in Florida."

[222] Tetlock, Paul C., "All the News That's Fit to Reprint: Do Investors React to Stale Information?" *The Review of Financial Studies*, Vol. 24, No. 5, 2011, pp. 1481–1512 at p. 1481.

[223] Greene, Jason T., and Susan G. Watts, "Price Discovery on the NYSE and the NASDAQ: The Case of Overnight and Daytime New Releases," *Financial Management*, Vol. 25, No. 1, 1996, pp. 19–42 at p. 20.

[224] Patell, James M., and Mark A. Wolfson, "The Intraday Speed of Adjustment of Stock Prices to Earnings and Dividend Adjustments," *Journal of Financial Economics*, Vol. 13, 1984, pp. 223–252 at p. 249.

[225] Busse, Jeffrey A., and T. Clifton Green, "Market Efficiency in Real Time," *Journal of Financial Economics*, Vol. 65, 2002, pp. 415–437 at p. 416.

his opinion that Tivity's stock price decline on that date was caused by the disclosure of Optum Fitness Advantage program offerings in 11 states. Specifically, the initial press release was issued at 9:00 a.m. and stated that "In January 2018, Optum Fitness Advantage will be available at no additional cost to people enrolled in eligible UnitedHealthcare Medicare Advantage plans in ***11 states*** through a large network of participating fitness centers."[226] Yet, contrary to what one would expect in an efficient market if the press release contained new negative information about Tivity as Mr. Coffman claims, Tivity's stock price *increased* in the first few minutes after market open. By 10:00 a.m., *i.e.*, after thirty minutes of trading, Tivity's stock price had only decreased by less than one percent.[227]

107. Even though there were a total of 12 press releases issued throughout the morning, Mr. Coffman concedes that the only information that was not included in the 9:00 a.m. press release was the specific names of the eleven states (or markets), with the exception of New York, which was included in the first press release.[228] Exhibit 6 shows Tivity's intraday price movements on November 6, 2017, along with the timing of the 12 press releases. As Exhibit 6 shows, consistent with a reaction to the issuance of additional press releases throughout the morning, Tivity's stock price did not change substantively in the hour following the first press release and the majority of the price decline occurred between 10:00 a.m. and 12:00 p.m., as the number of releases kept increasing.

108. The rapid issuance of a series of 12 press releases could have contributed to a market overreaction and is an alternative explanation for Tivity's stock price decline on November 6, 2017 that is not due to the alleged misrepresentations and omissions. As discussed above, overly pessimistic attitudes toward a company relative to the available information about the company (*i.e.*, investor sentiment) has been documented in academic research to affect stock prices. Mr. Coffman's failure to examine this evidence and consider this alternative explanation renders his purported loss causation analysis unreliable.

---

[226] UnitedHealthcare Press Release, "UnitedHealthcare Adds New Fitness Benefit to Medicare Advantage Plans in New York," November 6, 2017. (Emphasis added.)
[227] The market closed at $48.05 on 11/3/17, opened at the same price on 11/6/17, and reached a daily high of $48.50 at 9:32 a.m., an increase of about one percent. At 10:00:03 a.m., the price was $47.60, a decrease of less than one percent.
[228] Mr. Coffman states: "Aside from naming a new location, the language contained in these press releases was the same as that of the original release at 9:00 AM." Coffman Report, ¶ 88.

### C. Mr. Coffman's Analysis of "Foreseeability" Does Not Demonstrate a Casual Connection Between the Alleged Misrepresentations and Omissions and Plaintiff's Loss

109. As part of his analysis to purportedly show loss causation, Mr. Coffman analyzes whether "the economic loss [was] a foreseeable consequence of Defendants' alleged violations."[229] Specifically, Mr. Coffman asserts that:

> UHC's offering of OFA threatened Tivity's financial performance from at least two angles: i) loss of revenues from one of Tivity's most valuable customers, UHC, no longer subscribing to SilverSneakers in certain states and ii) loss of revenues from other customers who would switch to UHC's OFA from Tivity's SilverSneakers, the Company's most important segment. Because of the economic link between revenue and the Company's anticipated future cash flows, and the link between anticipated future cash flows and the market value of Tivity Common Stock, there is a clear economic link between information regarding UHC's intention to directly compete with Tivity by expanding OFA rather than remain a Tivity customer in numerous states and the market value of Tivity Common Stock.[230]

It is not clear how this directly relates to loss causation, and Mr. Coffman's analysis is based on speculative assumptions and lacks support.

110. Mr. Coffman's assumption that the "loss of revenues from one of Tivity's most valuable customers, UHC, no longer subscribing to SilverSneakers in certain states" "threatened Tivity's financial performance" is unsupported. Mr. Coffman does not perform any analysis to quantify either the loss of revenues Tivity would experience due to Optum Fitness Advantage program offerings or the resulting impact on Tivity's cash flows. As I explained in detail in Section V.A.3 above, losing revenue from UHC did not necessarily mean that Tivity would lose revenue from current UHC members, as Mr. Coffman erroneously appears to assume.

111. As discussed in Section V.A.3 above, UHC's switch from SilverSneakers to Optum Fitness Advantage only applied to individual Medicare Advantage plans. Such plans have an open enrollment period each year during which individuals can review benefits offered under different plans and switch to a different provider. For example, a UHC member in an individual Medicare plan in New York could choose to switch to Humana for 2018 because

---

[229] Coffman Report, ¶ 79.
[230] Coffman Report, ¶ 82.

he/she wanted to continue to have access to SilverSneakers. The impact on Tivity's revenue and cash flows for this one member would equal the difference in Tivity's contract terms between UHC and Humana. However, Mr. Coffman's assessment of Tivity's expected financial performance focuses on revenue from UHC only, without considering the full impact of Optum Fitness Advantage and Tivity's response to Optum Fitness Advantage on Tivity's overall financial performance.

112. In addition, Mr. Coffman does not consider or attempt to quantify the impact of Optum Fitness Advantage on Tivity's cash flows. As discussed in Section V.A.3, Tivity's contract with UHC specified a "flat fee per member" pricing structure, which meant that UHC members enrolled in SilverSneakers were considered to be "lower margin [eligible] lives."[231] As explained above, if UHC members switched to other plans offering SilverSneakers that had "flat fee per member plus a fee per visit" pricing structures, they would be considered "higher margin…customers."[232] As a result, not only would Tivity be able to offset some amount of the potential revenue loss from Optum Fitness Advantage, but its profit margin on that revenue could actually increase.

113. Mr. Coffman's assumption that the "loss of revenues from other customers who would switch to UHC's OFA from Tivity's SilverSneakers" jeopardized Tivity's financial performance is similarly incorrect. UHC's Optum Fitness Advantage program was an in-house offering that was available only to participants enrolled in certain UHC Medicare Advantage plans. Therefore, no other insurer could have switched from offering SilverSneakers to Optum Fitness Advantage. In fact, at least one analyst commented that it was unlikely for other Tivity customers to be able to offer Optum Fitness Advantage.[233]

114. In conclusion, for all of the reasons discussed in this section, Mr. Coffman has not demonstrated that Tivity's stock price decline on November 6, 2017 is attributable to the alleged misrepresentations and omissions. Hence, Mr. Coffman has not demonstrated loss causation, *i.e.*, he has not shown that there is a "causal link" between the alleged misrepresentations and omissions and Tivity's stock price reaction on November 6, 2017.

---

[231] Tivity Health Board Meeting Materials, June 14, 2017, TIVITY0094847–99 at TIVITY0094851.
[232] Tivity Health Board Meeting Materials, June 14, 2017, TIVITY0094847–99 at TIVITY0094851.
[233] "Taking a Deeper Dive into UnitedHealth's Proprietary Fitness Program and Its Impact on Tivity Health," William Blair, November 7, 2017, OFP-TVTY-00005354–60 at OFP-TVTY-00005354.

## VII. Mr. Coffman's Purported Damages Methodology Is Not Reliable

115. In the Gompers Class Certification Report, I explained that a damages model should measure investor losses attributable solely to the alleged misrepresentations and/or omissions for which plaintiffs claim defendants are liable, and exclude any loss attributable to other causes (*i.e.*, confounding factors unrelated to the alleged misrepresentations and/or omissions).[234] To calculate damages, one first needs to measure inflation, defined as the difference between the observed market price of the stock and the stock's "true" value, *i.e.*, the price at which the stock would have traded had it reflected the allegedly concealed information—also referred to as the "but-for price." Put another way, the "but-for price" is the price at which Tivity's stock would have traded had Tivity made the appropriate "but-for" disclosure(s). Damages is the difference between the amount of inflation at the time of purchase and the amount of inflation at the time of sale.

116. Mr. Coffman's damages methodology consists of estimating per share damages using a constant dollar inflation band (with the exception of one "Inflation Creating Event" during the Class Period that increases the alleged inflation in Tivity's stock price). He bases this methodology "on the fact that the nature of the misrepresented and/or omitted information did not change during the Class Period,"[235] and finds "no economic reason to believe that the financial impact of the misstatements and/or omissions would have been any different earlier in the Class Period and thus [he] find[s] no economic reason to deviate from the standard constant dollar methodology."[236]

117. As discussed above, Mr. Coffman does not explicitly articulate any but-for disclosures, although he appears to assume that they would have provided the information conveyed in the UHC Press Releases and been issued in the same manner as the 12 UHC Press Releases, *i.e.*, in 15 minute increments over the course of 2.75 hours. However, because Mr. Coffman ignores that information in the UHC Press Releases was not known or knowable to (and/or could not be disclosed by) Tivity earlier in the Class Period, he has failed to link the alleged misrepresentations and omissions with the information revealed in the UHC Press Releases. In addition, Mr. Coffman has not demonstrated that the UHC Press Releases or information contained in the UHC Press Releases constitute an appropriate but-

---

[234] Gompers Class Certification Report, VII.A.
[235] Coffman Report, ¶ 123.
[236] Coffman Report, ¶ 127.

for disclosure. As a result, he has not demonstrated that an appropriate but-for disclosure would have caused the same decline in Tivity's stock price as was observed on November 6, 2017. Thus, his damages methodology is inconsistent with Plaintiff's theory of liability.

118. To estimate damages, Mr. Coffman uses Tivity's stock price decline on November 6, 2017, the only alleged corrective disclosure date in this case, after controlling for industry and market impacts. Additionally, he identifies one "Inflation Creating Event" on April 28, 2017, which he estimates added $2.86 of inflation per share based on a "disaggregation analysis."[237] Using these inputs, he back-casts damages throughout the Class Period. As I discuss in detail below, his methodology is flawed for several reasons.

### A. From an Economic Perspective, Mr. Coffman Has Not Shown That There Are Any Damages

119. From an economic perspective, Mr. Coffman has not demonstrated that there are any damages at all in this matter.

120. As I explained in Section VI above, Mr. Coffman has not proven that the alleged misrepresentations and omissions caused harm to investors, because he has neither demonstrated that Tivity's stock price was inflated during the Class Period nor that the alleged corrective disclosure cured the alleged inflation. Therefore, he has no basis to conclude that Tivity's stock price decline on November 6, 2017 can reasonably be used to measure damages.

### B. Mr. Coffman's Damages Methodology Is Severely Flawed and He Has Not Shown that the November 6, 2017 Price Decline Can Be Used to Measure Inflation and Damages

121. Even assuming Mr. Coffman can demonstrate loss causation, his damages methodology has several flaws that make it unreliable. First, he does not account for the changes in inflation during the Class Period that are implied by Plaintiff's allegations. Second, Mr. Coffman's analysis of his "Inflation Creating Event" is flawed and inconsistent with the evidence in this case. Third, he does not account for the portion of Tivity's stock price reaction on November 6, 2017 that is attributable to the materialization of a known risk.

---

[237] Coffman Report, ¶ 18, Exhibit 2.

Fourth, Mr. Coffman fails to remove the impact of confounding information from his calculation of inflation.

### 1. Mr. Coffman Fails to Account for Varying Inflation During the Class Period

122. Plaintiff's theory of liability as detailed in the Complaint describes the changing nature of Tivity's relationship with UHC and Tivity's knowledge of UHC's plans and actions related to Optum Fitness Advantage. As explained in the Gompers Class Certification Report,[238] discussed in Section VI.B.1 above, and shown in Exhibit 1, both the alleged misrepresentations and omissions regarding Tivity's relationship with UHC and Tivity's knowledge related to UHC's launch of Optum Fitness Advantage that Plaintiff alleges was withheld from investors were changing during the Class Period.

123. Accordingly, an appropriate damages methodology would measure, at any given point during the Class Period, the inflation in Tivity's stock price caused by the alleged misrepresentations and omissions. The measurement would need to reflect how inflation changed over the course of the Class Period as the alleged misrepresentations and omissions and Tivity's knowledge of Optum Fitness Advantage program offerings changed.

124. Mr. Coffman's methodology does not do this. Instead, Mr. Coffman asserts that he has found "no economic reason to believe that the financial impact of the misstatements and/or omissions would have been any different earlier in the Class Period."[239] However, Mr. Coffman's assumption of constant dollar inflation (or constant dollar inflation with one discrete change) is flawed. As discussed in detail in Section VI.B.1, Tivity obtained new information about UHC's potential expansion of Optum Fitness Advantage program offerings at different points throughout the Class Period. In other words, the information that Tivity allegedly had about Optum Fitness Advantage and did not disclose changed over the course of the Class Period, implying that inflation was not constant. Moreover, at the beginning of the Class Period, Tivity did not know, and therefore could not have disclosed, all of the information that was eventually revealed in the 12 UHC Press Releases.

125. As I discussed in Section VI.B.2 above, information about UHC's Optum Fitness Advantage program offerings was publicly available during the Class Period. Even if one

---

[238] Gompers Class Certification Report, Section VII.C.
[239] Coffman Report, ¶ 127.

were to assume, for the sake of argument, that such information was not publicly available but was known to Tivity, then at the beginning of the Class Period, Tivity would have only known about Optum Fitness Advantage program offerings in two states: New Jersey and Washington, where UHC had launched its trial programs in 2017.[240] If Tivity had disclosed information about Optum Fitness Advantage program offerings in these two states at the beginning of the Class Period, its stock price reaction, if any, would have been different than the stock price reaction it experienced on November 6, 2017, when the market purportedly learned about UHC's Optum Fitness Advantage program offerings in 11 states.

126. Further, as discussed in Section VI.B.1 above, documents I have reviewed suggest that Tivity learned about other markets where Optum Fitness Advantage might be offered at different points over the course of the Class Period. For example, internal email communications suggest that Tivity first learned of a rumor that UHC would offer Optum Fitness Advantage in Arizona and New York on April 20, 2017.[241] Again, if Tivity had disclosed this information at that time, its stock price reaction, if any, would have been different than the stock price reaction it experienced on November 6, 2017, when the market purportedly learned about UHC's Optum Fitness Advantage program offerings in 11 states.

127. The documents I have reviewed also suggest that Tivity learned of rumors about Optum Fitness Advantage potentially being offered in additional states in the following weeks.[242] However, UHC did not notify Tivity of its decision to offer Optum Fitness Advantage to UHC individual Medicare Advantage members in nine additional states for the 2018 calendar year until May 22, 2017.[243] Hence, assuming there was inflation in Tivity's stock price due to the alleged misrepresentations and omissions, the amount of inflation would change on at least each of the dates discussed above. Mr. Coffman's analysis does not account for this.

---

[240] Deposition of Timothy Noel, June 19, 2020, 46:4–47:6.

[241] Email from Stacey Eggleston to Steve Janicak and Ann Kent, "Client Updates from this week," April 20, 2017, TIVITY0021959.

[242] Email from Ann Kent to Steve Janicak, "Re: Optum Intel Follow-up," May 2, 2017, TIVITY0021934–35 at TIVITY0021934.

[243] On May 23, 2017 at 6:03 AM, Donato Tramuto, Tivity's CEO, asked Steve Janicak, Tivity's Chief Growth Officer: "Do you have any solid information that would confirm AARP is not taking the same markets from us that *United just took*[?]" (Emphasis added.) Email from Glenn Hargreaves to Donato Tramuto and Chip Wochomurka, "UHG Model 5_23," May 23, 2017, TIVITY0042661–64 at TIVITY0042663. Conan Laughlin, a member of Tivity's Board of Directors testified in his deposition that "the news that this was happening was learned by the board I believe in May." Deposition of Conan Laughlin, June 17, 2020, 181:24–182:1.

128. Instead, Mr. Coffman identifies a single "Inflation Creating Event" on April 28, 2017 related to how Tivity characterized its renewed contract with UHC. Mr. Coffman contends that "[t]he announcement of the UHC contract renewal on favorable terms represents new fraud-related information and increased confidence in the market's view of UHC's posture as a customer rather than a competitor."[244] However, as explained in Section V.B, Mr. Coffman ignores that the pricing terms of the renewed contract were indeed favorable and there was no other substantial difference between the existing contract and the renewed contract, facts that are inconsistent with inflation entering Tivity's stock price on the date the contract renewal was announced. Moreover, the renewed contract did not contain any information about Optum Fitness Advantage. Thus, Mr. Coffman's purported "Inflation Creating Event" is purely speculative and not related to the actual changes in Tivity's knowledge about Optum Fitness Advantage program offerings—changes that Mr. Coffman should have, but did not, take into account.

129. In short, even assuming, for the sake of argument, that Tivity's stock price was inflated during the Class Period, Mr. Coffman has provided no economic analysis to support his use of constant inflation throughout the Class Period with the exception of one discrete change in inflation on April 28, 2017, a date on which he in fact has no basis to assert additional inflation was created. As a result, he has not demonstrated that Tivity's November 6, 2017 price decline (adjusted for his "Inflation Creating Event") can be used to measure inflation throughout the Class Period. His damages calculation is thus unreliable.

### 2. Mr. Coffman's Analysis of His Purported "Inflation Creating Event" Is Unscientific and Unreliable

130. To quantify the inflation that was purportedly created by his "Inflation Creating Event" on April 28, 2017, Mr. Coffman performs what he calls a "disaggregation analysis." This analysis appears to be arbitrary and neither scientific nor supported by academic literature or methods.

131. Mr. Coffman claims that April 28, 2017 was an "Inflation Creating Event" because after market hours on April 27, 2017, Tivity allegedly made false statements regarding its newly signed contract with UHC.[245] After market hours on April 27, 2017, Tivity released its

---

[244] Coffman Report, ¶ 111.
[245] Coffman Report, ¶ 104, note 146.

quarterly financial results.[246] Mr. Coffman identifies two pieces of positive information in those results: 1) "positive earnings information;" and 2) the "official announcement of the UHC contract renewal."[247] Based on his event study, he estimates Tivity's residual stock price movement on April 28, 2017, after controlling for market and industry effects, was $4.06.[248]

132. To isolate the portion of this movement that is attributable to the purported inflation created by the alleged misstatements related to the UHC contract, Mr. Coffman first calculates Tivity's implied forward price to earnings ratio ("P/E ratio") by dividing the Company's closing price on April 27, 2017 by its adjusted EPS guidance for fiscal year 2017.[249] He then measures the difference between the Company's updated 2017 EPS guidance and its prior 2017 EPS guidance (a difference of $0.06) and multiplies this difference by his calculated P/E ratio, resulting in a stock price impact of $1.20 purportedly attributable to the "positive earnings information."[250] He then subtracts this amount from Tivity's residual stock movement on April 28, 2017 and asserts that the resulting difference of $2.86 represents the inflation in Tivity's stock price attributable to the official announcement of the UHC contract renewal.[251]

133. Mr. Coffman's methodology is unscientific and unreliable. As an initial matter, he fails to provide any support or basis that his approach is an appropriate methodology to disaggregate stock price movements. Nor am I aware of any support for his methodology in the academic literature. This is not surprising because his methodology is flawed for many reasons.

134. First, Mr. Coffman makes no attempt to determine if any of the information Tivity disclosed on April 27, 2017 had already been anticipated by market participants. In an efficient market, stock prices consistently reflect current expectations about future cash flows.[252] Thus, only previously unanticipated information leads to a stock price reaction. In other words, to the extent that market participants already anticipated, even to some degree, Tivity's disclosures regarding its earnings guidance, then stock price changes could be

---

[246] Coffman Report, ¶ 105.
[247] Coffman Report, ¶ 112.
[248] Coffman Report, ¶ 115.
[249] Coffman Report, ¶ 113, Exhibit 2.
[250] Coffman Report, ¶¶ 114, 115.
[251] Coffman Report, ¶ 115.
[252] Damodaran, Aswath, *Investment Valuation, Tools and Techniques for Determining the Value of Any Asset*, 3rd ed. (New Jersey: John Wiley & Sons), 2012, pp. 11–12.

attributed only to the unanticipated portion of those disclosures. Market participants update their expectations about future cash flows based on multiple sources of information. Company disclosures are just one of the sources upon which they rely. Thus, Mr. Coffman has no basis to assume that the unanticipated portion of Tivity's earning guidance equaled the difference between what it announced on April 27, 2017 and the guidance it previously provided.

135. Next, Mr. Coffman's methodology fails to account for the impact of additional pieces of positive information, such as cost saving measures and renewal of credit facilities, that Tivity disclosed on April 27, 2017.[253]

136. Finally, his methodology is unreliable because it would yield nonsensical results under different scenarios. For example, his methodology would fail to produce meaningful results if earnings surpassed expectations, but near-term EPS guidance did not change and the stock price increased.[254] In addition, Mr. Coffman's purported estimate of the stock price movement attributable to positive earnings results may exceed the actual price movement in many instances because his methodology solely depends on the change in near-term EPS guidance and the P/E ratio, and does not take into account the actual change in the stock price.

137. To purportedly validate his approach, Mr. Coffman uses the Gordon Growth Model formula to measure implied discount rates before and after the stock price change he attributes to the UHC contract renewal.[255] He finds that the implied "after" discount rate is lower than the implied "before" discount rate, and that therefore his price allocation estimate is reasonable and consistent with analyst commentary referring to a decrease in risk after the announcement of Tivity's contract renewal with UHC.[256]

---

[253] Tivity also announced it had "realized cost savings that annualize to approximately $15 million" as a result of its restructuring and had "completed the refinancing of its senior credit facilities." Tivity Health Press Release, "Tivity Health Reports First-Quarter 2017 Financial Results and Increases Revenue and Earnings Guidance," April 27, 2017.

[254] For example, consider the scenario when earnings surpassed expectations and the residual stock price increased, but near-term EPS guidance did not change. In this case, the change in near-term guidance would be $0.00. Mr. Coffman would then multiply this by the P/E ratio leading to a result of zero. This would be interpreted to mean that no part of the residual stock price movement was associated with a change in earnings expectations, but rather the entirety of the residual stock price movement was due to the fraud-related information.

[255] Coffman Report, ¶ 116.

[256] Coffman Report, ¶ 119.

138. Mr. Coffman's purported validation approach is also severely flawed. The Gordon Growth Model formula is commonly used to estimate the value of a security.[257] By using it to estimate a discount rate, Mr. Coffman appears to conflate idiosyncratic and systematic risk. The status of the UHC contract represents idiosyncratic risk, that is, risk that is company-specific and can be eliminated by investors through diversification.[258] The cost of capital, *i.e.* the discount rate, depends on *systematic* risk, not *idiosyncratic* risk.[259] Therefore, there is no reason to believe there would be a change in Tivity's cost of capital in response to the news about the UHC contract. To measure systematic risk, Mr. Coffman would need to estimate Tivity's beta, meaning the relationship between the Company's stock returns and market returns,[260] which he does not do.

### 3. Mr. Coffman Does Not Account for the Portion of the Stock Price Decline Attributable to the Materialization of a Disclosed Risk

139. Even assuming that some portion of Tivity's stock price decline on November 6, 2017 is attributable to the alleged misrepresentations and omissions, Mr. Coffman would still need to parse out the portion of the stock price decline caused by factors not corrective of the alleged misrepresentations and omissions, including the materialization of a previously disclosed and therefore publicly known risk. Public companies are required to disclose risk factors in their financial disclosures. These risks can eventually materialize. The materialization of a disclosed risk does not lead to damages by itself. Even if Plaintiff were able to show that a particular risk known to Tivity had a higher probability of occurring than the probability that the market assessed that the risk would materialize, damages could only be attributed to the difference between the probability of the risk known by the market and the "true" probability of the risk known by Tivity.

140. This concept is best illustrated with an example. Suppose an online retailer sells a pair of pants for $20. On the retailer's website, the pants are advertised as normal quality, and the website states that with normal wear and tear, there is a 50% chance that the pants

---

[257] Mishkin, Frederick S., and Stanley G. Eakins, *Financial Markets and Institutions*, 8th ed. (Boston, MA: Pearson), 2015, pp. 304–305.
[258] Brealey, Richard A., Myers, Stewart C., and Allen, Franklin, *Principles of Corporate Finance*, 10th ed. (New York, NY: McGraw-Hill Irwin), 2011, pp. 168–170.
[259] Brealey, Richard A., Myers, Stewart C., and Allen, Franklin, *Principles of Corporate Finance*, 10th ed. (New York, NY: McGraw-Hill Irwin), 2011, p. 213.
[260] Brealey, Richard A., Myers, Stewart C., and Allen, Franklin, *Principles of Corporate Finance*, 10th ed. (New York, NY: McGraw-Hill Irwin), 2011, pp. 174–175.

will rip within a year. However, these particular pants are not well made and are certain to rip within a year of use—*i.e.*, there is a 100% chance that the pants will rip within a year. Within a year of purchase, the pants do rip and the customer that purchased a pair of these pants is left with a worthless product (price of $0) that she paid $20 for. From an economic perspective, inflation in the customer's purchase price is not $20 (the decline in value of the pants), but $10 since it was known that there was a 50% chance that the pants would rip within a year. This example illustrates that inflation can only be attributed to the concealed risk and not to the entire decline in value resulting from the pants actually ripping (the materialization of the disclosed risk). In other words, the observed $20 decline in value of the pants overstates inflation.

141. In this matter, Plaintiff alleges that "a known realized competitive threat had materialized from UHC and Tivity failed to disclose this to investors."[261] This particular allegation is closely related to a risk previously disclosed in Tivity's financial disclosures. Specifically, on March 6, 2017, Tivity disclosed that, "health plan customers could attempt to offer services themselves that compete directly with our offerings or stop providing our offerings to their members,"[262] and that "[o]ther entities, whose financial and marketing resources may exceed our resources, may choose to initiate or expand programs in competition with our offerings."[263] The alleged corrective disclosure represents the materialization of this disclosed risk. Plaintiff and Mr. Coffman appear to assert, albeit without support, that while the risk itself was known, the true magnitude of its potential probability was not known by market participants and Tivity failed to disclose the true magnitude of that probability.

142. Yet, Mr. Coffman does not attempt to quantify either the probability of the risk known by the market or the "true" probability of the risk known by Tivity. He simply assumes that Tivity's stock price decline on November 6, 2017 reflected the impact of the previously undisclosed portion of the probability of the risk, *i.e.*, the difference between the "true" probability of the risk known by Tivity and the probability of the risk previously known by the market. This cannot be true. Even if the market has full information about the "true" probability of the risk of a given event, the materialization of the risk will cause a stock price reaction because the event is no longer just probable, it has actually occurred, *i.e.*, the

---

[261] Coffman Report, ¶ 39.
[262] Tivity 2016 10-K, p. 8.
[263] Tivity 2016 10-K, p. 5.

probability is 100%. Thus, the stock price reaction on its own cannot constitute evidence that the true magnitude of the probability of the risk was not previously known. In order to measure the impact of the previously unknown portion of the probability of the risk, Mr. Coffman's damages analysis has to disaggregate (a) the portion of the stock price decline that is attributable to the difference between the probability of the risk known by the market and the "true" probability of the risk from (b) the portion of the stock price decline that is attributable to the materialization of the "true" risk.

143. To illustrate, suppose that Tivity's investors understood that the probability that Tivity's customers would offer competing programs was 50%—*i.e.*, Tivity's stock price incorporated a 50% probability—while the "true" probability (assumed for the sake of argument) was 60% given what Tivity knew and could have disclosed.[264] Inflation in this case would only be attributable to the concealed probability of the risk (difference between the "true" probability of the risk and the known probability of the risk, or 60% probability minus 50% probability). Mr. Coffman has not provided any economic analysis that attempts to quantify the probability of the risk known by the market or the "true" probability of the risk that Tivity purportedly should have disclosed. On the other hand, the price decline on November 6, 2017 reflects the actual materialization of the risk, *i.e.*, a 100% probability. Hence, using the entire decline as a measure of inflation ignores that a portion of the decline is not due to the allegedly concealed risk.

144. Since Mr. Coffman's damages analysis does not parse out the portion of the price decline on November 6, 2017 due to the materialization of a known risk, his damages estimates are overstated and unreliable.[265]

### 4. Mr. Coffman Fails to Remove Confounding Information from His Damages Analysis

145. An appropriate damages methodology would measure only the market reaction associated with the alleged corrective information. In other words, if there were confounding

---

[264] As noted above, I understand that Tivity likely could not have disclosed information it knew about the Optum Fitness Advantage program offerings due to the terms of its contract with UHC and CMS regulations. Fitness Service Network Access Agreement, January 1, 2012, UHC000001–59 at UHC000012; Deposition of Timothy Noel, June 19, 2020, 99:15–100:20, 134:16–135:16.

[265] As also explained in the Gompers Class Certification Report, the materialization of a known risk is a confounding factor unrelated to the alleged misrepresentations or omissions. Gompers Class Certification Report, Section VII.B. As discussed in the following section, any portion of the November 6, 2017 price decline due to confounding factors does not represent inflation.

information that contributed to the stock price decline, the effects of this information would need to be removed from the estimated price impact. Failing to do so overstates inflation.

146. As I explained in Section VI.B.4, Mr. Coffman fails to consider the possibility that the market overreacted to the UHC Press Releases on November 6, 2017, a possibility that is consistent with analyst commentary about Tivity's stock price reaction. If the market indeed overreacted to the UHC Press Releases on November 6, 2017 as analysts indicated it did, then Tivity's stock price reaction on that day cannot constitute a reasonable measure of inflation in the price, if any, prior to the UHC Press Releases. Because the stock price overreaction cannot reasonably be attributed to the alleged misrepresentations and omissions, it would need to be quantified and removed from the measurement of alleged inflation. Mr. Coffman does not do this, and instead uses Tivity's full stock price decline on November 6, 2017 (after controlling for market and industry effects) to measure inflation. His damages estimates are therefore overstated and unreliable.

147. Mr. Coffman also ignores the possibility that UHC's issuance of a series of 12 press releases changed investor sentiment about how aggressive UHC would be in expanding its Optum Fitness Advantage program offerings in the future, contributing to a market overreaction. His failure to remove this impact from his inflation and damages estimates similarly renders his damages estimate overstated and unreliable.

### C. Assuming There Are Damages, Mr. Coffman Ignores More Reasonable Approaches That Imply Lower Estimates

148. As discussed above, there are alternative explanations for Tivity's stock price reaction on November 6, 2017 that are not related to the alleged misrepresentations and omissions. Mr. Coffman does not appear to consider these alternative explanations in his damages methodology. Thus, even assuming for the sake of argument that there are damages in this case, Mr. Coffman's methodology overstates damages. There are alternative damages approaches that Mr. Coffman could have considered that would yield more reliable measures of the impact of the alleged misrepresentations and omissions on Tivity's stock price.

149. For example, one approach that Mr. Coffman could have considered is to use a discounted cash flow ("DCF") model to measure the present value of the cash flows associated with the alleged misrepresentations and omissions. In essence, a DCF model estimates a firm's future cash flows and long term growth rate, then applies an appropriate

rate to discount those future cash flows based on the riskiness of those cash flows.[266] Mr. Coffman describes the "fundamental principle" that underlies the DCF model, saying, "a security's value is the sum of the estimated future cash flows discounted at a rate that reflects their riskiness."[267]

150. Mr. Coffman could have used the DCF model to measure the change in Tivity's value based on the change in its expected future cash flows as a result of UHC's expansion of Optum Fitness Advantage to 11 states. Such an approach would capture the impact of the specific allegations more closely than Mr. Coffman's methodology and, as illustrated below, yields a lower stock price impact than what he calculates.

151. For example, I show the magnitude of damages that would result from using a DCF model included in an analyst report dated October 26, 2017, less than two weeks prior to the alleged corrective disclosure.[268] Using this DCF model as a framework, I estimate the change in Tivity's stock value that would correspond to the change in mean and median EBITDA estimated by analysts before and after the alleged corrective disclosure.[269] Prior to November 6, 2017, the mean expected 2018 EBITDA for Tivity was $139.42 million and the median was $139.15 million. Those figures did not change after the alleged corrective disclosure.[270] For 2019, analysts' mean expected EBITDA changed from $157.72 million before the alleged corrective disclosure to $155.39 million after. The median expected 2019 EBITDA changed from $155.60 million to $155.39 million. To be conservative, I assume the 2019 changes in EBITDA, in dollar terms, would continue in perpetuity. As displayed in Exhibit

---

[266] Brealey, Richard A., Myers, Stewart C., and Allen, Franklin, *Principles of Corporate Finance*, 10th ed. (New York, NY: McGraw-Hill Irwin), 2011, p. 80. Based on my experience, many courts have accepted the DCF model as a reliable valuation technique.

[267] Coffman Report, ¶ 69.

[268] Cantor Fitzgerald includes a DCF valuation in many of its analyst reports, including its October 26, 2017 report. "EPS Beat; Increases 2017 Guidance; Maintain Overweight," Cantor Fitzgerald, October 26, 2017, OFP-TVTY-00005284–92 at OFP-TVTY-00005290. I have replicated Cantor Fitzgerald's DCF analysis within $0.06 of per share value and attribute this difference mainly to rounding. I have not been asked to develop my own DCF model in this case. Had I been asked to do so, I may have used assumptions that differ from those used in the Cantor Fitzgerald model. Nonetheless, the Cantor Fitzgerald model allows me to show the magnitude of damages associated with a DCF analysis and yields results that are much more reasonable than Mr. Coffman's damage estimate.

[269] To determine these figures, I use I/B/E/S detailed data. I/B/E/S consensus data is updated only periodically and thus may not provide a precise comparison of analyst estimates across a short period that does not include an I/B/E/S update date, such as the period starting immediately before and ending immediately after the alleged corrective disclosure. I/B/E/S detailed data reports analysts' financial forecasts along with publication dates as well as dates when a given forecast is no longer considered active ("excluded" or "stopped"). I use this data to find the set of "active" analyst EBITDA forecasts as of November 5, 2017 and as of November 20, 2017. I then calculate the median and mean of these forecast sets to use in my analysis.

[270] The change in forecasts was measured between November 5, 2017 and November 20, 2017.

7, based on these changes in EBITDA, I find the impact of the information about Optum Fitness Advantage program offerings in 11 states on Tivity's stock price, if any, was $0.04 to $0.42 per share, much lower than Mr. Coffman's inflation estimate of $16.54.

152. Another approach Mr. Coffman could have considered is an EBITDA multiples analysis. An EBITDA multiples analysis approximates value based on the ratio of a company's enterprise value to forward-looking measures of a company's EBITDA. This technique can be used to validate the results from a DCF analysis, which, by its nature, is more complex and includes more assumptions.[271] An EBITDA multiples model can be used to measure the change in Tivity's value attributable to the impact of the specific allegations. As illustrated below, this method similarly results in a lower stock price impact than what Mr. Coffman calculates.

153. To show the magnitude of damages that would result from using an EBITDA multiples analysis, I estimate Tivity's enterprise value after the October 26, 2017 post-market earnings release, but prior to the alleged corrective disclosure. Enterprise value is the sum of market capitalization (fully diluted total shares outstanding multiplied by Tivity's closing stock price on October 27, 2017) and net debt.[272] I then calculate the ratio of enterprise value to the median analyst EBITDA forecast for both 2018 and 2019[273] and obtain multiples of 15.4x and 13.8x, respectively.[274] The next step is to apply these multiples to the change in median analyst EBITDA forecasts before and after the alleged corrective disclosure.[275] As displayed in Exhibit 7, using this approach, I find the impact of the information about Optum Fitness Advantage program offerings in 11 states on Tivity's stock price, if any, to be $0.07 to $0.73. Notably, these estimates are much lower than Mr. Coffman's inflation estimate of $16.54 and similar to the estimates I obtained using a DCF model.

154. In summary, even assuming there are damages in this case, Mr. Coffman's failure to consider more reasonable and reliable approaches to measure damages, such as the examples I provided above, underscores the speculative and unreliable nature of his damages estimates.

---

[271] A multiples analysis is fundamentally a DCF analysis with highly simplified assumptions. For example, an EBITDA multiples analysis essentially assumes that enterprise value is the present value of EBITDA in perpetuity.

[272] Total shares outstanding and net debt are estimated as of October 27, 2017 using Tivity's 3Q 2017 earnings press release. The closing stock price as of October 27, 2017 is used. CRSP; Tivity Health Press Release, "Tivity Health Reports Third-Quarter 2017 Results," October 26, 2017.

[273] Analyst forecasts from I/B/E/S data are as of November 5, 2017. Refinitiv I/B/E/S Detailed Estimates Data.

[274] I have also calculated mean estimates, which yield similar results of 15.4x and 13.6x.

[275] The change in analysts' estimated EBITDA is calculated between November 5, 2017 and November 20, 2017.

Had he done so, the examples above demonstrate that he would have obtained much lower damages estimates.

Executed this 31st of August, 2020

______________________________________

Paul A. Gompers

# Paul A. Gompers CV

Baker Library 263
Graduate School of Business Administration
Harvard University
Boston, MA 02163

(617) 495-6297 (ph)
(617) 496-8443 (fax)
pgompers@hbs.edu
http://www.people.hbs.edu/pgompers

## ACADEMIC POSITIONS

2000–present HARVARD BUSINESS SCHOOL — BOSTON, MA
Eugene Holman Professor of Business Administration. Research interests include venture capital, private equity, entrepreneurial finance, institutional investors, corporate governance, optimal security design, dynamic capital structure, long-run performance of firms, and sources of financing for start-up businesses.

1998–2000 HARVARD BUSINESS SCHOOL — BOSTON, MA
Associate Professor of Business Administration.

1995–1998 HARVARD BUSINESS SCHOOL — BOSTON, MA
Assistant Professor of Business Administration.

1993–1995 UNIVERSITY OF CHICAGO — CHICAGO, IL
Assistant Professor of Finance and Policy at the Graduate School of Business. Created new course on the financing of start-up companies.

1995–present NATIONAL BUREAU OF ECONOMIC RESEARCH — CAMBRIDGE, MA
Research Associate. Appointed as an NBER affiliate in corporate finance.

## EDUCATION

1989–1993 HARVARD UNIVERSITY — CAMBRIDGE, MA
Received Ph.D. in Business Economics, June 1993.

1987–1989 OXFORD UNIVERSITY — OXFORD, UK
Graduated *summa cum laude* with a M.Sc. in economics, July 1989.

1982–1987 HARVARD COLLEGE — CAMBRIDGE, MA
Graduated *summa cum laude* with an A.B. in biology.

## PUBLICATIONS

### Books

The Venture Capital Cycle, (MIT Press, Cambridge) October 1999. (Joint with Josh Lerner.) First Edition.

The Money of Invention, (Harvard Business School Press, Boston) November 2001. (Joint with Josh Lerner.)

Entrepreneurial Finance: A Casebook, (John Wiley, New York) December 2001. (Joint with William Sahlman.)

The Venture Capital Cycle, (MIT Press, Cambridge) October 1999. (Joint with Josh Lerner.) Second Edition. 2004.

Private Equity Finance, (Anthem Press, London). March 2019. (Joint with Victoria Ivashina and Richard Ruback.)

### Articles in Refereed Journals

"Optimal Investment, Monitoring, and the Staging of Venture Capital," *Journal of Finance* 50, 1461-1489. December 1995. Reprinted in Michael Wright and Ken Robbie, editors, Venture Capital (International Library of Management) (Aldershot: Dartmouth Publishing, 1997.)

"Grandstanding in the Venture Capital Industry," *Journal of Financial Economics* 42, 133–156. July 1996.

"The Rise and Fall of Venture Capital," Business and Economic History 23, 1–24. Winter 1994. Awarded Newcomen Prize essay for best paper in business history.

"The Use of Covenants: An Empirical Analysis of Venture Partnership Agreements," *Journal of Law and Economics* 39, 463–498. October 1996. (with Josh Lerner.)

"Myth or Reality? The Long-Run Underperformance of Initial Public Offerings: Evidence from Venture and Nonventure Capital-backed Companies." *Journal of Finance* 52, 1791–1821. December 1997. (with Alon Brav.) Awarded the Smith-Breeden Distinguished Paper Award.

"Venture Capital Growing Pains: Should the Market Diet?" *Journal of Banking and Finance* 22, 1089–1104. August 1998.

"An Analysis of Compensation in the US Venture Capital Partnership," *Journal of Financial Economics* 51, 3–44. January 1999. (with Josh Lerner.)

"Venture Capital Distributions: Short-Run and Long-Run Reactions," *Journal of Finance* 53, 2161–2184. December 1998. (with Josh Lerner.)

"Conflict of Interest in the Issuance of Public Securities: Evidence from Venture Capital," *Journal of Law and Economics* 42, 1-28. April 1999. (with Josh Lerner.)

"What Drives Venture Capital Fundraising?" *Brookings Proceedings on Microeconomic Activity*, 149-192. August 1998. (with Josh Lerner.)

"Money Chasing Deals? The Impact of Fund Inflows on Private Equity Valuations," *Journal of Financial Economics* 55, 281-325. February 2000. (with Josh Lerner.)

"Is the Abnormal Return Following Equity Issuances Anomalous?" *Journal of Financial Economics* 56, 209–250. May 2000. (with Alon Brav and Chris Geczy.)

"Institutional Investors and Equity Prices," *Quarterly Journal of Economics* 114, 229–260. 2001. (with Andrew Metrick.)

"The Venture Capital Revolution," *Journal of Economic Perspectives* 15, 145–168. Spring 2001. (with Josh Lerner.)

"Who Underreacts to Cash Flow News?" *Journal of Financial Economics* 66, 409–462. 2002. (with Randy Cohen and Tuomo Vuolteenaho.)

"The Role of Lock-ups in Initial Public Offerings Provisions," *Review of Financial Studies* 16, 1–29. Spring 2003. (with Alon Brav.)

"Corporate Governance and Equity Prices," *Quarterly Journal of Economics* 118, 107-156. February 2003. (with Joy Ishii and Andrew Metrick.)

"The Really Long-Run Performance of Initial Public Offerings: Evidence from the Pre-Nasdaq Period, 1933–1972," *Journal of Finance* 56, 1355–1392. August 2003. (with Josh Lerner.)

"The Determinants of Board Structure and Function in Entrepreneurial Firms," *Journal of Law and Economics* 46, 569–598. October 2003. (with Malcolm Baker.)
"Entrepreneurial Spawning: Corporations and the Genesis of New Ventures, 1986–1999," *Journal of Finance* 60, 577-614. April 2005. (with Josh Lerner and David Scharfstein.)
"Large Blocks of Stock: Prevalence, Size, and Measurement," *Journal of Corporate Finance* 12, 594-618. June 2006. (with Rudiger Fahlenbrach, Jennifer Dlugosz, and Andrew Metrick.)
"Venture Capital Investment Cycles: The Impact of Public Markets," *Journal of Financial Economics*, 1–23. 2008. (with Anna Kovner, Josh Lerner, and David Scharfstein.)
"Specialization and Success: Evidence from Venture Capital," *Journal of Economic and Management Strategy* 18, 817–845. 2009. (with Anna Kovner, Josh Lerner, and David Scharfstein.)
"Extreme Governance: An Analysis of Dual-Class Firms in the United States," *Review of Financial Studies* 23, 1051–1088. 2010. (with Joy Ishii and Andrew Metrick.)
"Performance Persistence in Entrepreneurship and Venture Capital," *Journal of Financial Economics* 96, 18–32. 2010. (with Anna Kovner, Josh Lerner, and David Scharfstein.)
"Buy Local? The Geography of Successful Venture Capital Expansion," *Journal of Urban Economics* 67, 90–102. 2010. (with Henry Chen, Anna Kovner, and Josh Lerner.)
"The Cost of Friendship," *Journal of Financial Economics* 119, 626–644. March 2016. (with Vladimir Mukharlyamov and Yuhai Xuan.)
"What Do Private Equity Firms Say They Do?" *Journal of Financial Economics* 121, 449–476. September 2016. (with Steven N. Kaplan and Vladimir Mukharlyamov.)
"The Other Diversity Dividend," *Harvard Business Review.* July 2018. (with Silpa Kovvali.)
"More than Money: Venture Capitalists on Boards." *Journal of Law, Economics, and Organizations.* 2019, 35, 513-543. (with Natee Amornsiripanitch and Yuhai Xuan.)
"How Do Venture Capitalists Make Decisions," January 2020. /*Journal of Financial Economics* 135, 169-190. (joint with Will Gornall, Steve Kaplan, and Ilya Strebulaev.)
"Gender Effects in Venture Capital," March 2020. Forthcoming in the *Journal of Financial and Quantitative Analysis.* Joint with Vladimir Muhkarlyamov, Emily Weisburst, and Yuhai Xuan.)
"And the Children Shall Lead: Gender Diversity and Performance in Venture Capital," June 2020. Forthcoming in the *Journal of Financial Economics.* (with Sophie Calder-Wang.)

**<u>Other Articles</u>**

"Venture Capital and the Creation of Public Companies: Do Venture Capitalists Really Bring More than Money?" *Journal of Private Equity* 1, 15-32. Fall 1997. (with Josh Lerner.)
"Risk and Reward in Private Equity Investments: The Challenge of Performance Assessment," *Journal of Private Equity* 1, 5-12. Winter 1997. (with Josh Lerner.)
"Resource Allocation, Incentives, and Control: The Importance of Venture Capital in Financing Entrepreneurial Firms," *Entrepreneurship, SMEs, and the Macroeconomy* (Cambridge University Press, Cambridge), 206-238. February 1997.
"Venture Capital," *The Handbook of Technology Management* (Richard Dorf, Editor-in-Chief). January 1997. (with Josh Lerner.)
"The Determinants of Corporate Venture Capital Success: Organizational Structure, Incentives, and Complementarities," NBER Conference Volume on Concentrated Corporate Ownership, 17-54. September 1998.
"Capital Formation and Investment in Venture Markets: An Assessment of Market Imperfections," *The Economic Evaluation of Technological Change* (Richard Spivack, Editor). June 1998.
"Corporations and the Financing of Innovation: The Corporate Venturing Experience," *The Atlanta Federal Reserve Bank Conference Volume*, 1-17. 2002.
"Venture Capital and Private Equity," *The Handbook of Corporate Finance* (Espen Eckbo, Editor) (North-Holland Press, New York). 2002.
"Short-Term America Revisited? Boom and Bust in the Venture Capital Industry and the Impact on Innovation," *Innovation Policy and the Economy* 3, 1-28. March 2002. (with Josh Lerner.)
"Venture Capital," Chap. D5 of *The Handbook of Modern Finance* (Dennis Lougue, Editor). 2007. (with

Josh Lerner.)

"Equity Financing," *Handbook of Entrepreneurship Research: An Interdisciplinary Survey and introduction* (Zoltan Acs and David B. Audretsch, Editor). 2010. (with Josh Lerner.)

"The Role of Venture Capitalists in the Acquisition of Private Companies." In *Research Handbook on International Banking and Governance*, edited by James Barth, Chen Lin, and Clas Wihlborg. Cheltenham, UK: Edward Elgar Publishing, 2012. (with Yuhai Xuan).

**Working Papers**

"Diversity in Innovation," January 2019. (with Sophie Calder-Wang.)

"Homophily in Entrepreneurial Team Formation," January 2019. (with Sophie Calder-Wang and Kevin Huang.)

"To Err is Human, To Forgive is a Mistake: Evidence from Venture Capital Hiring," December 2013. (with Vladimir Mukharlyamov and Yuhai Xuan.)

"Bridge Building in Venture Capital: Evidence from Acquisitions of Venture Capital-backed Companies," December 2011.

"Reputation and Contractual Flexibility: Evidence from Venture Capital Distribution Pricing Policies," August 2011. (with Timothy Dore and Andrew Metrick.)

"Why Experienced Venture Capitalists Leave Money on the Table: Evidence from Initial Public Offerings," July 2009. (with Alon Brav and Tim Dore.)

"Institutions, Capital Constraints and Entrepreneurial Firm Dynamics: Evidence from Europe," November 2006. (with Mihir Desai and Josh Lerner.)

"Skill vs. Luck in Entrepreneurship and Venture Capital: Evidence from Serial Entrepreneurs," December 2006. (with Anna Kovner, Josh Lerner, and David Scharfstein.)

"The Role of Venture Capitalists in the Acquisition of Private Companies," October 2005. (with Yuhai Xian.)

"Incentives vs. Control: An Analysis of U.S. Dual-class Companies," April 2004. (with Andrew Metrick and Joy Ishii.)

"Ownership and Control in Entrepreneurial Firms: An Examination of Convertible Securities in Venture Capital Investment," January 2000.

"An Analysis of Executive Compensation, Ownership, and Control in Entrepreneurial Firms," May 2000. (with Malcolm Baker.)

**Opinion — Editorials**

"This Tax Cut Will Pay Dividends," *Wall Street Journal,* August 13, 2002. (with Andrew Metrick and Jeremy Siegel.)

**Projects in Process**

- "Migration and Entrepreneurship." (with Natee Amornsiripanitch and Kaushik Vasudevan.)
- "The Role of Immigrants in the Innovation Ecosystem." (with Natee Amornsiripanitch and Kaushik Vasudevan.)
- "Dual Class IPOs." (with Malcolm Baker.)
- "Shark Tank." (with Sophie Calder-Wang.)
- "Pre-public Financing in Entrepreneurial Ventures."
- "Institutional Ownership and Corporate Governance." (with Andrew Metrick and Joy Ishii.)
- "The Dynamics of Global Entrepreneurship." (with Mihir Desai and Josh Lerner.)
- "The Determinants of Entrepreneurial Success." (with Anna Kovner, Josh Lerner, and David Scharfstein.)
- "Risk and Return in Private Equity." (with Leslie Jeng, Josh Lerner, and Andrew Metrick.)
- "Corporate Governance through Time." (with Martijn Cremers, Allen Ferrell, and Andrew Metrick.)

**COURSE MATERIALS**

**Cases**

- "Abraaj Capital and Acibadem Healthcare Invesetment (A)." Harvard Business School Case 214-021.
- "Abraaj Capital and Acibadem Healthcare Invesetment (B)." Harvard Business School Case 214-022.
- "Advantage Partners: Dia Kanri (A)." Harvard Business School Case 214-016.
- "Advantage Partners: Dia Kanri (B)." Harvard Business School Case 214-017.
- "The Advent Israel Venture Capital Program." Harvard Business School Case 298–072.
- "ALWAYSi." Harvard Business School Case 201–075.
- "APV Technology Partners II, L.P." Harvard Business School Case 298–048.
- "Ardian: The Sale of Diana." Harvard Business School Case 215-033.
- "Aspect Ventures." Harvard Business School Case 217-046.
- "Bain Capital: Outback Steakhouse." Harvard Business School Case 212-087.
- "Bang Networks, Inc." Harvard Business School Case 201–074.
- "Beyond Meat." Harvard Business School Case 220-053.
- "BioTransplant, Inc.: Initial Public Offering, January 1996." Harvard Business School Case 297–095.
- "Blackstone's Julia Kahr at the Summit." Harvard Business School Case 218-002.
- "Cachet Technologies." Harvard Business School Case 200–031.
- "Cambridge Technology Partners: 1991 Start Up." Harvard Business School Case 298–044.
- "Cambridge Technology Partners: Corporate Venturing (August 1996)." Harvard Business School Case 297–033.
- "Car Wash Partners, Inc." Harvard Business School Case 299–034.
- "Charles River Velocity." Harvard Business School Case 201–092.
- "Charter Communication Bankruptcy." Harvard Business School Case 211-035.
- "Clover Food Lab." Harvard Business School Case Study 818-073.
- "Dell Ventures." Harvard Business School Case 200–062.
- "Digital Everywhere, Inc." Harvard Business School Case 298–099.
- "edocs, Inc. (A)." Harvard Business School Case 200–015.
- "edocs, Inc. (B-1): Kevin Laracey." Harvard Business School Case 200–020.
- "edocs, Inc. (B-2): Jonathon Guerster." Harvard Business School Case 200–021.
- "Efficient Market Services: August 1993 (A)." Harvard Business School Case 298–009.
- "Efficient Market Services: August 1993 (B1), EMS Management." Harvard Business School Case 298–010.
- "Efficient Market Services: August 1993 (B2), Comdisco Ventures." Harvard Business School Case 298–011.
- "Elliot Lebowitz." Harvard Business School Case 297–094.
- "Endeca: New Growth Opportunities." Harvard Business School Case 206–041.
- "Entrepreneurial Finance Vignettes – 2020." Harvard Business School Case 220-049.
- "EyeControl: Inspiring Communication." Harvard Business School Case 820-078.
- "First Mark Capital." Harvard Business School Case 212-041.
- "Fitzpatrick Hotel Group (A)." Harvard Business School Case 298–002.
- "Fitzpatrick Hotel Group (B1): Niall Carroll." Harvard Business School Case 298–003.
- "Fitzpatrick Hotel Group (B2): Paddy Fitzpatrick." Harvard Business School Case 298–004.
- "Founders Fund." Harvard Business School Case 211-040.
- "Genset Initial Public Offering (A)." Harvard Business School Case 297–096.
- "Genset Initial Public Offering (B)." Harvard Business School Case 297–097.
- "Genset: 1989." Harvard Business School Case 298–070.
- "Ginkgo Bioworks: The Cell as a Factory." Harvard Business School Case 220-069.
- "Global Digital Utilities Corp." Harvard Business School Case 297–065.
- "Globant: Going Public." Harvard Business School Case 215-021.
- "Harrah's Entertainment LBO." Harvard Business School Case13-054.
- "HgCapital and the Visma Transaction: (A)." Harvard Business School Case 214-018.
- "HgCapital and the Visma Transaction: (B)." Harvard Business School Case 214-019.

- "HgCapital and the Visma Transaction: (C)." Harvard Business School Case 214-020.
- "Honest Tea." Harvard Business School Case 201–076.
- "Hudson Manufacturing." Harvard Business School Case 203–064.
- "ICSGroup." Harvard Business School Case 819-097.
- "Knightsbridge Advisers, Inc." Harvard Business School Case 296–054.
- "Knoll Furniture: Going Public." Harvard Business School Case 202–114.
- "Loma Vista Medical." Harvard Business School Case 819-050.
- "MSE, Inc. Privatization: August 1997." Harvard Business School Case 298–135.
- "MSE, Inc. Privatization: August 1997 (Abridged)." Harvard Business School Case 298–136.
- "New Oriental." Harvard Business School Case.
- "New York Bagel: Hungary, April 1994." Harvard Business School Case 297–078.
- "NSK Software Technologies Ltd." Harvard Business School Case 298–071.
- "Nykaa.com: A Passion for Beauty." Harvard Business School Case 218-049.
- "Ocular." Harvard Business School Case 202–118.
- "Panoramic Power." Harvard Business School Case 818-072.
- "Pet Doctors: 1999." Harvard Business School Case 200–016 "The Prague Post." Harvard Business School Case 299–033.
- "Private Equity Finance Vignettes: 2016." Harvard Business School Case 216-005.
- "Private Equity Vignettes: 2014." Harvard Business School Case 213-026.
- "Rapid7." Harvard Business School Case 817-077.
- "Sales Razor Technologies." Harvard Business School Case 217-040.
- "Sarvega." Harvard Business School Case 204–137.
- "Shenzhen Capital Group: A Pioneer in China's VC Industry" Harvard Business School Case 211-029.
- "Sky Air, Inc." Harvard Business School Case 297–110.
- "SRS and the Defense Innovation Unit: Rethinking Procurement." Harvard Business School Case 220-047."
- "TA Associates and SpeedCast." Harvard Business School Case 217-051.
- "TaskRabbit." Harvard Business School Case 217-047.
- "Torrent Systems." Harvard Business School Case 298–084.
- "Tutor Time (A)." Harvard Business School Case 297–064.
- "Tutor Time (B)." Harvard Business School Case 297–074.
- "United Capital Partners (A)." Harvard Business School Case 213-044.
- "United Capital Partners (B)." Harvard Business School Case 213-045.
- "Venture Capital in Ireland: Getting Their ACT Together." Harvard Business School Case 298–001.
- "Vueling Airlines." Havard Business School Case.
- "WeWork – November 2018." Harvard Business Schoo Case 220-075.
- "Xedia and Silicon Valley Bank (A)." Harvard Business School Case 298–119.
- "Xedia and Silicon Valley Bank (B1): The Bank's Perspective." Harvard Business School Case 298–120.
- "Xedia and Silicon Valley Bank (B2): The Company's Perspective." Harvard Business School Case 298–121.
- "Xedia and Silicon Valley Bank (C): The Final Agreement." Harvard Business School Case 298–122.
- "Yo-Yo Ma and Silkroad." Harvard Business School Case 818-110.
- "ZEFER: November 1998." Harvard Business School Case 299–032.

**Course Notes and Teaching Notes**

- "Advent Israel Venture Capital Program TN." Harvard Business School Teaching Note 299–054.
- "APV Technology Partners II, L.P. TN." Harvard Business School Teaching Note 299–053.
- "Beta Golf." Harvard Business School Teaching Note 202–062.
- "BioTransplant Inc.: Initial Public Offering, January 1996 TN." Harvard Business School Teaching Note 299–055.

- “Cachet Technologies.” Harvard Business School Teaching Note 202–068.
- “Cambridge Technology Partners —1991 Start Up TN.” Harvard Business School Teaching Note 299–057.
- “Cambridge Technology Partners: Corporate Venturing (August 1996) TN.” Harvard Business School Teaching Note 299–056.
- “Carlton Polish Co.” Harvard Business School Teaching Note 202–076.
- “Car Wash Partners, Inc. TN.” Harvard Business School Teaching Note 299–058.
- “Contracting and Control in Venture Capital.” Harvard Business School Note 298–067.
- “Dell Ventures.” Harvard Business School Teaching Note 202–072.
- “Digital Everywhere, Inc. TN.” Harvard Business School Teaching Note 299–059.
- “edocs, Inc. Series.” Harvard Business School Teaching Note 202–064.
- “Efficient Market Services: August 1993 Series TN.” Harvard Business School Teaching Note 299–061.
- “Elliot Lebowitz TN.” Harvard Business School Teaching Note 299–060.
- “Emergence of Silicon Wadi.” Harvard Business School Note 204–156.
- “Entrepreneurial Exits.” Harvard Business School Note 220-077.
- “The Entrepreneurial Manager: Course Overview, Harvard Business School Case.” 818-080
- “The Entrepreneurial Manager, Module I: Defining and Developing the Business Model.” Harvard Business School Case 817-108.
- “The Entrepreneurial Manager, Module 2 Part 1: Resourcing the Business Model.” Harvard Business School Case 817-109.
- “The Entrepreneurial Manager, Module 2 Part 2: Resourcing the Business Model.” Harvard Business School Case 817-110.
- “Fenchel Lampshade Company.” Harvard Business School Teaching Note 202–063.
- “Fitzpatrick Hotel Group Series TN.” Harvard Business School Teaching Note 299–062.
- “Genset: 1989 TN.” Harvard Business School Teaching Note 299–063.
- “Genset Initial Public Offering (A) & (B) TN.” Harvard Business School Teaching Note 299–064.
- “Global Digital Utilities Corporation TN.” Harvard Business School Teaching Note 299–065.
- “HIMSCORP, Inc.” Harvard Business School Teaching Note 202–073.
- “Honest Tea.” Harvard Business School Teaching Note 202–069.
- “Introduction to Entrepreneurial Finance.” Harvard Business School Note 298–061.
- “Introduction to Entrepreneurial Finance – 2020.” Harvard Business School Note 220-050.
- “Introduction to Private Equity Finance.” Harvard Business School Note 213-026.
- “Knightsbridge Advisers, Inc. TN.” Harvard Business School Teaching Note 299–066.
- “Knot, The.” Harvard Business School Teaching Note 202–070.
- “MSE, Inc. Privatization: August 1997 & MSE, Inc. Privatization: August 1997 (Abridged) TN.” Harvard Business School Teaching Note 299–067.
- “Nantucket Nectars.” Harvard Business School Teaching Note 202–074.
- “New York Bagel: Hungary, April 1994 TN.” Harvard Business School Teaching Note 299–068.
- “A Note on Angel Financing.” Harvard Business School Note 298–083.
- “A Note on LBO Capital Structure.” Harvard Business School Note 213-091.
- “A Note on Franchising.” Harvard Business School Note 297–108.
- “A Note on Franchising.” Harvard Business School Note 217-059.
- “A Note on Government Sources of Financing for Small Businesses.” Harvard Business School Note 298–015.
- “Note on Strategic Alliances, A.” Harvard Business School Note 298–047.
- “A Note on the Internet.” Harvard Business School Note 297–109.
- “A Note on Private Equity Exits.” Harvard Business School Note 213-112.
- “A Note on the Venture Capital Industry.” Harvard Business School Note 295–065.
- “A Note on Valuation in Entrepreneurial Ventures.” Harvard Business School Note 298–082.
- “A Note on Valuation in Private Equity.” Harvard Business School Note 213-034.

- "NSK Software Technologies Ltd. TN." Harvard Business School Teaching Note 299–069.
- "Parenting Magazine TN." Harvard Business School Teaching Note 202–065.
- "Penelope's Personal Pocket Phones TN." Harvard Business School Teaching Note 299–070.
- "Prague Post, The TN." Harvard Business School Teaching Note 299–071.
- "Private Equity Valuation in Emerging Markets." Harvard Business School Note 213-043.
- "Record Masters." Harvard Business School Teaching Note 202–075.
- "Penelope's Personal Pocket Phones." Harvard Business School Case 299–004.
- "Sky Air, Inc. TN." Harvard Business School Teaching Note 299–072.
- "Torrent Systems TN." Harvard Business School Teaching Note 299–073.
- "Tutor Time (A) TN." Harvard Business School Teaching Note 299–074.
- "Tutor Time (B) TN." Harvard Business School Teaching Note 299–078.
- "Valuation in Entrepreneurial Settings." Harvard Business School Note 220-057.
- "Venture Capital in Ireland: Getting Their ACT Together TN." Harvard Business School Teaching Note 299–075.
- "Xedia and Silicon Valley Bank Series TN." Harvard Business School Teaching Note 299–076.
- "ZEFER: November 1998 TN." Harvard Business School Teaching Note 299–077.

**<u>SEMINARS AND CONFERENCE PRESENTATIONS — Academic</u>**

American Economic Association: Annual Meeting, January 1995, "Optimal Investment, Monitoring, and the Staging of Venture Capital."

American Finance Association: Annual Meeting, January 1995, "An Analysis of Compensation in the U.S. Venture Capital Partnership."

American Finance Association: Annual Meeting, January 1996, "Myth or Reality? The Long-Run Underperformance of Initial Public Offerings: Evidence from Venture and Nonventure-backed Companies."

American Finance Association: Annual Meeting, January 1999, "What Drives Venture Capital Fundraising."

American Finance Association: Annual Meeting, January 2000, "An Analysis of Executive Compensation, Ownership, and Control in Entrepreneurial Firms."

American Finance Association: Annual Meeting, January 2004, "Incentives vs. Control: An Analysis of U.S. Dual-class companies."

American Finance Association: Annual Meeting, January 2015, "Cost of Friendship."

American Finance Association: Annual Meeting, January 2015, "What Do Private Equity Firms (Say) They Do?"

American Law and Economics Association: Annual Meeting, May 1996, "The Use of Covenants: An Empirical Analysis of Venture Partnership Agreements."

Association of Financial Economists: Annual Meeting, January 2001, "The Determinants of Board Structure and Function in Entrepreneurial Firms."

Association of Financial Economists: Annual Meeting, January 2006, "Skill vs. Luck: An Analysis of Serial Entrepreneurs."

Arizona State University School of Business: Finance Seminar, December 1995, "Venture Capital Distributions: Short-Run and Long-Run Reactions."

Boston University: Finance Seminar, December 1996, "Myth or Reality? The Long-Run Underperformance of Initial Public Offerings: Evidence from Venture and Nonventure-backed Companies."

Brandeis University: Entrepreneurship Conference, April 2014, "The Next Big Question in Entrepreneurship Research."

Brookings Institute: Microeconomic Conference, June 1998, "What Drives Venture Fundraising?"

Business and Economic History: Annual Meeting, March 1994, "The Rise and Fall of Venture Capital."

Cambridge University, Finance Seminar, May 2019, "And the Children Shall Lead: Gender Diversity and Performance in Venture Capital."

Center for Research on Security Prices: Biannual Meeting, March 1995, "Myth or Reality? The Long-Run Underperformance of Initial Public Offerings: Evidence from Venture and Nonventure-backed Companies."

Center for Research on Security Prices: Biannual Meeting, November 1994, "Venture Capital Distributions: Short-Run and Long-Run Reactions."

Center for Economic and Policy Research: European Finance Conference on Financing Innovation, November 1998, "What Drives Venture Capital Fundraising?"

Columbia Law School: Law and Economics Seminar, November 1995, "An Analysis of Compensation in the U.S. Venture Capital Partnership."

Columbia Law School: Law and Economics Seminar, November 1995, "The Use of Covenants: An Empirical Analysis of Venture Partnership Agreements."

Columbia Law School: Financing Innovation Conference, December 1997, "An Analysis of Covenants in Venture Capital Investments."

Columbia University School of Business: Finance Seminar, January 1993, "Grandstanding in the Venture Capital Industry."

Copenhagen Business School: Finance Seminar, May 1999, "An Analysis of Executive Compensation, Ownership, and Control in Closely Held Firms."

Cornell Business School: Finance Seminar, October 2001, "Corporate Governance and Equity Prices."

Federal Reserve Bank of Chicago: January 1994, "Optimal Investment, Monitoring, and the Staging of Venture Capital."

Duke University Fuqua Business School: Finance Seminar, January 1993, "Grandstanding in the Venture Capital Industry."

Georgetown Law School: April 2003, "Corporate Governance and Equity Prices."

Harvard Business School: Business History Seminar, December 2000, "The History of Silicon Valley."

Harvard Business School: Entrepreneurship Conference, December 2000, "The Really Long-run Performance of Initial Public Offerings."

Harvard Business School: Financial Decision and Control Workshop, July 1994, "Optimal Investment, Monitoring, and the Staging of Venture Capital."

Harvard Business School: Financial Decision and Control Workshop, July 1996, "Myth or Reality? The Long-Run Underperformance of Initial Public Offerings: Evidence from Venture and Nonventure- backed Companies."

Harvard Business School: Financial Decision and Control Workshop, July 1997, "Reputation and Conflict of Interest in the Issuance of Public Securities: Evidence from Venture Capital."

Harvard Business School: Financial Decision and Control Workshop, July 1998, "How are Large Institutions Different From Other Investors? Why Do These Differences Matter for Equity Prices and Returns?"

Harvard Business School: Finance Seminar, February 1994, "An Analysis of Compensation in the U.S. Venture Capital Partnership."

Harvard Business School: Finance Seminar, January 1993, "Grandstanding in the Venture Capital Industry."

Harvard Business School: Finance Seminar, October 1996, "Venture Capital Distributions: Short-Run and Long-Run Reactions."

Harvard Business School: Finance Seminar, May 1999, "An Analysis of CEO Compensation, Ownership, and Control in Closely Held Firms."

Harvard Business School: Finance Seminar, October 2011, "The Cost of Friendship."

Harvard Business School: Research Symposium, May 2018, "Diversity in the Innovation Sector."

Harvard Business School: Organizations and Markets Seminar, May 1999, "An Analysis of CEO Compensation, Ownership, and Control in Closely Held Firms."

Harvard Business School: Finance Seminar, November 2000, "The Venture Capital Revolution."

Harvard Business School: Finance Seminar, March 2006, "Skill vs. Luck: An Analysis of Serial Entrepreneurs."

Harvard Business School: Finance Seminar, December 2008, "Bridge Building in Venture Capital: Evidence from Acquisitions."
Harvard Business School: Finance Seminar, December 2014, "More than Money: Venture Capitalists on Boards."
Harvard Business School: Finance Seminar, February 2015, "What do Private Equity Firms (Say) They Do?"
Harvard Business School: Organizational Behavior Seminar, February 2012, "The Role of Social Ties in Venture Capital."
Harvard Kennedy School: Gender Diversity Conference, June 2018, "And the Children Shall Lead: Gender Diversity and Performance in Venture Capital."
Harvard University Department of Economics: Workshop, December 1992, "Optimal Investment, Monitoring, and the Staging of Venture Capital."
Harvard University Department of Economics: Organizations Workshop, December 1996, "Reputation and Conflict of Interest in the Issuance of Public Securities: Evidence from Venture Capital."
Harvard University Department of Economics: Organizations Workshop, December 2002, "Entrepreneurial Spawning."
Harvard University Department of Economics: Organizations Workshop, December 1998, "Are the Hundred-Million-Dollar Managers Just Like Everyone Else? An Analysis of the Stock Ownership of Large Institutions."
Harvard University Department of Economics: Organizations Workshop, September 2003, "Entrepreneurial Spawning: Corporations and the Genesis of New Ventures, 1986–1999."
Hebrew University School of Business: Finance Seminar, March 1994, "An Analysis of Compensation in the U.S. Venture Capital Partnership."
Hebrew University School of Business: Finance Seminar, March 1995, "Venture Capital Distributions: Short-Run and Long-Run Reactions."
Hebrew University School of Business: Distinguished Lecture: December 2014, "What Do Private Equity Firms (Say) They Do?"
IESE Business School, October 2019, "And the Children Shall Lead: Gender Diversity and Performance in Venture Capital."
London School of Economics: Venture Capital Conference, October 1998, "How You Get There Matters: The Path Dependency of Executive Compensation in Closely Held Firms."
Massachusetts Institute of Technology: Organizations Workshop, March 1996, "The Use of Covenants: An Empirical Analysis of Venture Partnership Agreements."
Massachusetts Institute of Technology and Harvard University: Public Finance Workshop, March 1998, "What Drives Venture Fundraising?"
National Bureau of Economic Research: Corporate Finance Group, April 1994, "Optimal Investment, Monitoring, and the Staging of Venture Capital
National Bureau of Economic Research: Entrepreneurship Group, July 2017, "How do Venture Capitalists Make Decisions."
National Bureau of Economic Research: Summer Institute, July 1994, "An Analysis of Compensation in the U.S. Venture Partnership Agreement."
National Bureau of Economic Research: Summer Institute, July 1995, "Myth or Reality? The Long-Run Underperformance of Initial Public Offerings: Evidence from Venture and Nonventure-backed Companies."
National Bureau of Economic Research: Summer Institute, July 1996, "Venture Capital Distributions: Short-Run and Long-Run Reactions."
National Bureau of Economic Research: Finance Series, December 1997, "Are the Hundred-Million-Dollar Managers Just Like Everyone Else? An Analysis of the Stock Ownership of Large Institutions."
National Bureau of Economic Research: Finance Series, November 1998, "How You Get There Matters: The Path Dependency of Executive Compensation in Closely-Held Firms."
National Bureau of Economic Research: Summer Institute, July 2001, "Corporate Governance and Equity Prices."

New York Federal Reserve Bank: May 2000, "The Determinants of Board Structure and Function in Entrepreneurial Firms."
New York University, Stern School of Business: Finance Seminar, January 1993, "Grandstanding in the Venture Capital Industry."
New York University, Stern School of Business: Finance Seminar, February 1999, "How You Get There Matters: The Path Dependency of Executive Compensation in Closely-Held Firms."
New York University, Stern School of Business: Finance Seminar, October 2006, "Skill vs. Luck: An Analysis of Serial Entrepreneurs."
Northwestern University, Kellogg Business School: Finance Seminar, January 1993, "Grandstanding in the Venture Capital Industry."
Northwestern University, Kellogg Business School: Finance Seminar, October 1997, "Money Chasing Deals? The Impact of Fund Inflows on Private Equity Valuations."
Norwegian School of Management: Finance Seminar, May 1999, "An Analysis of Executive Compensation, Ownership, and Control in Closely Held Firms."
Ohio State University: Finance Seminar, October 1998, "How You Get There Matters: The Path Dependency of Corporate Governance in Closely Held Firms."
Oxford University: Graduate Student Seminar, May 1989.
Oxford University: Finance Seminar, May 1999, "An Analysis of Executive Compensation, Ownership, and Control in Closely Held Firms."
Oxford University, Finance Seminar, May 2019, "And the Children Shall Lead: Gender Diversity and Performance in Venture Capital."
Queens University (Kingston, Ontario) School of Business: Finance Seminar, November 1996, "Myth or Reality? The Long-Run Underperformance of Initial Public Offerings: Evidence from Venture and Nonventure-backed Companies."
Rutgers University: Finance Seminar, October 1997, "Money Chasing Deals? The Impact of Fund Inflows on Private Equity Valuations."
Stanford University Graduate School of Business: Strategy Workshop, January 1993, "Grandstanding in the Venture Capital Industry."
Stanford University Graduate School of Business: Center for Economic and Political Research, March 1997, "The Valuation of Private Equity Investments."
Stanford University: Finance Seminar, October 2012, "The Cost of Friendship."
Stanford University: Financing Innovation Conference, November 2018, "And the Children Shall Lead: Gender Diversity and Performance in Venture Capital."
Stockholm Business School: September 2003, "Entrepreneurial Spawning: Corporations and the Genesis of New Ventures, 1986–1999."
Tel Aviv University School of Business: Finance Seminar, March 1994, "An Analysis of Compensation in the U.S. Venture Capital Partnership."
Tel Aviv University School of Business: Finance Seminar, March 1995, "Venture Capital Distributions: Short-Run and Long-Run Reactions."
Tel Aviv University School of Business: Finance Seminar, December 2014, "What Do Private Equity Firms (Say) They Do?"
University of Arizona School of Business: Finance Seminar, December 1995, "Venture Capital Distributions: Short-Run and Long-Run Reactions."
University of California, Davis: Diversity Conference, December 2017, "And the Children Shall Lead: Gender Diversity and Performance in Venture Capital."
University of California at Berkeley, Haas School of Business: Finance Seminar, April 1993, "Grandstanding in the Venture Capital Industry."
University of California at Los Angeles: Finance Seminar, May 1997, "The Valuation of Private Equity Investments."
University of California at Los Angeles: Behavioral Finance Conference, April 1998, "Are the Hundred-Million-Dollar Managers Just Like Everyone Else? An Analysis of the Stock Ownership of Large Institutions."
University of Chicago Graduate School of Business: Finance Seminar, January 1993, "Grandstanding in

the Venture Capital Industry."
University of Chicago Graduate School of Business: Information and Uncertainty Seminar, April 1995, "Venture Capital Distributions: Short-Run and Long-Run Reactions."
University of Chicago Graduate School of Business: Finance Seminar, May 2006, "Skill vs. Luck: An Analysis of Serial Entrepreneurs."
University of Chicago Economics Department: Economic and Legal Organization Workshop, February 1994, "The Use of Covenants: An Empirical Analysis of Venture Partnership Agreements."
University of Chicago Economics Department: Economic and Legal Organization Workshop, October 1997, "Reputation and Conflict of Interest in the Issuance of Public Securities: Evidence from Venture Capital."
University of Georgia School of Business: Finance Seminar, "Myth or Reality? The Long-Run Underperformance of Initial Public Offerings: Evidence from Venture and Nonventure-backed Companies."
University of Illinois School of Business: Finance Seminar, October 1994, "Optimal Investment, Monitoring, and the Staging of Venture Capital."
University of Michigan School of Business: Finance Seminar, November 1995, "Venture Capital Distributions: Short-Run and Long-Run Reactions."
University of North Carolina School of Business: Finance Seminar, November 1995, "Venture Capital Distributions: Short-Run and Long-Run Reactions."
University of Pennsylvania Wharton School: Finance Workshop, March 1998, "Money Chasing Deals? The Impact of Venture Inflows of Private Equity Prices."
University of Rochester Simon School of Business: Finance Seminar, December 1996, "Myth or Reality? The Long-Run Underperformance of Initial Public Offerings: Evidence from Venture and Nonventure-backed Companies."
University of Rochester Simon School of Business: Organizations Seminar, February 1993, "Grandstanding in the Venture Capital Industry."
University of Washington: Finance Seminar, November 2018, "And the Children Shall Lead: Gender Diversity and Performance in Venture Capital."
Virginia Tech University School of Business: Finance Seminar, October 1995, "Myth or Reality? The Long-Run Underperformance of Initial Public Offerings: Evidence from Venture and Nonventure-backed Companies."
Warwick University, Finance Seminar, May 2019, "And the Children Shall Lead: Gender Diversity and Performance in Venture Capital."
Western Finance Association: Annual Meeting, June 1994, "Optimal Investment, Monitoring, and the Staging of Venture Capital."
Western Finance Association: Annual Meeting, June 1995, "The Long-run Underperformance of Seasoned Equity Offerings Revisited."
Western Finance Association: Annual Meeting, June 1996, "The Use of Covenants: An Empirical Analysis of Venture Partnership Agreements."
Western Finance Association: Annual Meeting, June 1997, "Reputation and Conflict of Interest in the Issuance of Public Securities: Evidence from Venture Capital."
Western Finance Association: Annual Meeting, June 1998, "How are Large Institutions Different from Other Investors? Why These Differences Matter for Equity Prices and Returns?"
World Bank: Finance Seminar, May 1999, "An Analysis of CEO Compensation, Ownership, and Control in Closely Held Firms."
Yale University, School of Management: Finance Seminar, January 1993, "Grandstanding in the Venture Capital Industry."

**SPEECHES AND CONFERENCE PRESENTATIONS — Practitioner**

Advanced Technology Program, National Institute for Standards and Technology and NBER Conference on Financing Innovation, June 1998.
Amsterdam Institute of Finance, October 1994, "Venture Capital and the Finance of Emerging

Companies."

American Friends of the Technion, October 1998, "The Development of High Technology and Venture Capital in Israel."

AT&T Small Business Conference, April 1994, "Venture Capital: The Road Ahead."

Center for Economic Policy Research, Venture Capital Conference, March 1997, "The Pricing of Private Equity Investments: A Window on the Returns of Tomorrow."

Deloitte and Touche, May 2003, "Entrepreneurial Leadership."

Ernst and Young Silicon Valley Venture Capital Conference, 2002, "The Future of Venture Capital."

Ernst and Young Buyout Roundtable, 2002, "Corporate Governance and Private Equity."

Greenwich Roundtable, 2015, "Skill in Private Equity."

Harvard Business School Venture Capital Conference, December 1995, "Myth or Reality? The Long-Run Underperformance of Initial Public Offerings: Evidence from Venture and Nonventure-backed Companies" and "Venture Capital Distributions: Short-run and Long-run Reactions."

Harvard Business School Alumni Series, May 2000 and May 2003, "The Future of Private Equity."

Harvard Business School European Conference, June 2003, "European Private Equity."

Harvard Business School Global Alumni Conference, June 1998, "Consolidation Buy-outs."

Harvard Business School Global Alumni Conference, May 2001, "Venture Capital 2001: Boom or Bust?"

Harvard Business School Centennial Celebration, February 2010, "Private Equity at the Crossroads."

Harvard Business School Global Alumni Venture Capital Conference, May 2012, "New Venture Capital Models"

Harvard Business School Global Alumni Venture Capital Conference, October 2014, "Lessons from the Trenches."

Hambrecht and Quist, Post-Venture Forum, March 1999, "Venture and Post-Venture Opportunities: Insightsfrom Research."

Iceland Pension Conference, May 2018, "The Opportunity in Venture Capital."

Institutional Limited Partner's Association, September 1997, "Risk and Return in Private Equity."

Institutional Limited Partner's Association, April 2002, "New Tools for Assessing Private Equity Valuation and Asset Allocation."

International Business Forum, June 1999, "Venture Capitalists and the Public Markets." Investors' Press Alpha Roundtable, October 1996, "The Future of Private Equity." Israel Business Forum, March 1994.

Israeli Venture Capital and High Technology Conference, 2002, "The Future of Venture Capital and Its Implication for Israel."

Japanese Private Equity Forum, July 1997, "Corporations and Venture Capital: Old and New Challenges."

Latin American Chamber of Commerce, February 1995, "Capital for Entrepreneurial Companies: A Look Ahead."

Massachusetts Public Pension Fund Investment Forum, October 1998, "Venture Capital: Investing in Start-up and Newly Public Firms."

National Venture Capital Association, March 2003, "The Future of Venture Capital." Nova Pharmaceuticals, September 2009, "Venture Capital after the Downturn."

OPAL Institutional Investors Conference, December 2000, "The Future of Private Equity." Rocky Mountain Venture Capital Association, March 2003, "Venture Capital: Challenges and Opportunities."

Russell Capital Private Equity Conference, March 1997, "The Pricing of Private Equity Investments: A Window on the Returns of Tomorrow."

Russell Capital Private Equity Conference, November 1998, "Advent Israel Venture Capital Program."

Salomon Smith Barney Private Equity Conference, March 2000, "The Future of Private Equity."

Salomon Smith Barney Consulting Group, March 2001, "Risk and Return in Private Equity."

Samsung Venture Capital Group, October 1997, "Corporations and Venture Capital: Old and New Challenges."

Seeking Alpha, March 2015, "What's Hot in Venture Capital Fundraising?"
Silicon Valley Bank, May 2003, "Venture Capital: Challenges and Opportunity."
SuperReturn Conference US, May 2009, "Insights from Private Equity Academic Research at the Harvard Business School."
SuperReturn Conference Europe, February 20011, "Insights from Private Equity Academic Research at the Harvard Business School."
SuperReturn Conference US, May 2013, "The Future of Private Equity."
University of Chicago Business Forum, May 1995, "The Next Ten Years in Venture Capital." (Organized and moderated panel.)
Venture Economics Venture Forum, November 1994, "The Venture Cycle." (Keynote Address.)
Venture Economics Venture Forum, November 1994, Panelist for IPO performance issues.
Venture Economics Venture Forum, November 1996, Plenary session speaker on venture capital returns.
VentureOne / Ernst and Young Venture Capital Conference, July 2002, "The Future of Venture Capital."
VentureOne / Ernst and Young Venture Capital Conference, July 2003, "The Future of European Venture Capital."
Young Presidents' Organization Conference, November 1998, "Entrepreneurial Opportunities in Crisis Situations."
Young Presidents' Organization Conference, January 2003, "The Future of Venture Capital."
Young Presidents' Organization Conference, January 2010, "New Models in Venture Capital."
Young Presidents' Organization Conference, January 2013, "Private Equity Trends."
In addition, made presentations of research findings for several institutional investors and investment managers who contributed data for the project on interactions between venture organizations and institutional investors.

## TEACHING

### University of Chicago

Developed and taught course "Entrepreneurial Finance and Management," a second-year MBA elective, 1993–1995.

### Harvard Business School

Taught "First-Year Finance," in Required Curriculum, 1995–1997.

Taught "Entrepreneurial Finance," in Elective Curriculum, 1997–2003. 2019-2020.

Taught "The Entrepreneurial Manager," in Required Curriculum, 2003–2008.

Taught "Venture Capital and Private Equity," in Elective Curriculum, 2009–2012.

Co-developed and taught, "Private Equity Finance," in Elective Curriculum, 2012-2017. Developed and taught, "Private Equity Field," in Elective Curriculum, 2013.

Developed and taught, "Immersive Field Couse: Israel. Startup Nation." 2017-2018.

Course Head for "The Entrepreneurial Manager" in Required Curriculum 2005–2008.

Course Head for "The Entrepreneurial Manager" in Required Curriculum 2016–2019.

Co-developed and co-taught Ph.D. course "Empirical Topics in Corporate Finance," 1999–2015. (with Josh Lerner.)

Co-developed and partially taught three-day executive courses on venture capital and private equity: "Conflict and Evolution in Private Equity" (1996), "Corporate Venture Capital: The Third Wave" (1997), "The Internationalization of Private Equity" (1998), "Structuring Effective Private Equity Organizations" (1999, 2000), "Optimizing Corporate Investments" (2000), "Doing Private Equity Deals" (2001, 2003), "Private Equity in a Downturn" (2002), "Private Equity Deals" (2004), "Private Equity and Corporate Governance" (2005), "Venture Capital and Private Equity"

(2006), "Internationalization of Private Equity" (2007), "Private Equity and Venture Capital" (2008), and "Private Equity after the Downturn" (2009), "Venture Capital and Private Equity" (2010-2011). "Private Equity and Venture Capital: After the Financial Crisis" (2012), Private Equity and Venture Capital: The Future" (2013). "Private Equity and Venture Capital: At the Crossroads" (2014). "Private Equity and Venture Capital: Changing Market Power." (2015), Private Equity and Venture Capital (2016-2020.) (all with Josh Lerner.)

Co-developed and taught "Economics of Markets," in Elective Curriculum, 1997.

Partially taught in a variety of programs including:

General Management Program / START, August 1996.
HBS / CIEBA Pension Workshop, April 1996.
YPO Conference, February 1997, February 2003, February 2006, February 2008.
Strategic Finance for Small Business, February 1998, March 1999, March 2000.
Entrepreneur's Toolkit, June 1997, June 1998, June 1999.

## PROFESSIONAL SERVICE AND EXPERIENCE

1985–1986 BAYER CHEMICAL CO. LEVERKUSEN, GERMANY
Researcher. Performed biochemical analysis on locust flight muscle metabolism.

1997–present Associate Editor for *Small Business Economics*.

1997–present Associate Editor for *Journal of Private Equity*.

1997–2016 Associate Editor for *Journal of Finance*.

1997–2018 Western Finance Association Meetings Program Committee.

1998 Program Committee, *Journal of Financial Economics* conference on research methodologies in finance.

2006–2014 Associate Editor for Journal of Economic Literature.

2010–present Associate Editor for Journal of Economics and Management Strategy.

Referee for the Journal of Financial Economics, Journal of Finance, Journal of Political Economy, Quarterly Journal of Economics, Journal of Economic Theory, Rand Journal of Economics, Review of Financial Studies, American Economic Review, Journal of Public Economics, Journal of Corporate Finance, Journal of Small Business Management, Economic Letter, Small Business Economics, Journal of Business Venturing, Journal of Small Business Finance, Journal of Business, Journal of Law, Economics, and Organizations, and Journal of Law and Economics, Review of Economic and Statistics.

Reviewer for reports and proposals for the National Science Foundation. Reviewer for reports and proposals for the Securities and Exchange Commission.

## COMMUNTY SERVICE

Board Member, Beth Israel Deaconess Hospital, (2014-present).

Board member, Friends of Harvard Track, (2014-2018).

Board Member, USA Triathlon Foundation, (2015-present)
Beth Israel Deaconess Wellness Center Advisory Board (2013-present)
Vice President, Treasurer, and Executive Board Member, Harvard Hillel (1995–2010).
Board Member, Camp Yavneh (2007–2010).
Ivy League Eikeden Committee (1997–2010)
Young Israel of Brookline, Internet Advisory Board (2000–2001).
Technion Institute of Management: Boston Advisory Board (2000).
Board Member, Anshe Shalom B'nei Israel Congregation (1993–1995).

**CONSULTING PROJECTS**

Apax Venture Partners, 2003.
Bain Capital, 2008-2010.
Battery Venture Partners, 2001.
Bessemer Venture Partners, 1998.
Deloitte and Touche, 2003.
Department of Energy, Idaho Falls National Laboratory, 1994–1995.
Department of Energy, Savannah River National Laboratory, 1995–1997.
Department of Energy, Butte, Montana National Laboratory, 1997–1998.
E.M. Warburg, Pincus, 1997.
Ernst and Young, 2002.
GTCR Golder Rauner, 1999.
Jerusalem Venture Partners, 2001.
Kleiner Perkins, 2014.
Montana Science and Engineering, Inc., 1997.
Patricoff & Co., 1995.
Phillip's Petroleum, 1998, 2000, 2001, 2002.
PriceWaterhouse Coopers, 2001.
RogersCasey Investment Advisors, 1994.
Salomon Smith Barney, 1999–2003.
TA Associates, 2015.
Thermo Electron Corporation, 1994–1997.
VentureOne, 1995.

**BOARDS OF DIRECTORS AND ADVISORY BOARDS**

Beth Israel Deaconess Hospital, 2016-Present.
Evergreen Partners, 2005–2015.
Gemini Venture Capital, 2003–2015.
Highland Capital Consumer Fund, 2007–Present.
Khosla Ventures, 2009-Present.
Knightsbridge Investment Advisers, 1995–2012.
Mercanteo, 1999.
New Capital Partners, 2000–2001.
Onpoint Technology Ventures, 2003–2017.
OnTheFrontier.com, 2000–2001.
Spur Capital Partners, 2002–Present.
Triple Point Capital, 2003.
USA Triathlon Foundation, 2016-Present.
Xfund, 2019-present.
ZEFER, 1998.

## GRANTS AND AWARDS

National Science Foundation Grant, 1994–1997, “Financing New Business Formation.”
National Science Foundation Grant, 2002–2005, “Corporate Governance and Firm Performance.”
National Institute of Standards and Technology, Advanced Technology Program, 1996–1997, “Venture Capital and the Financing of Emerging Technologies.”
Newcomen Business History Paper Prize, 1994.
American Association of Individual Investors Award for Best Paper on Investments, at the Western Finance Association Meeting, 1998.
Journal of Financial Economics, Fama-DFA Price, Second Prize, 2008.
Journal of Finance, Smith Breeden Distinguished Paper Prize, 1998.
Rodney White Center for Financial Research, Best Paper Prize, 2002.
MBA Class of 1961 Fellow, 1997–1998.

## ATHLETICS

Alternate on the 1988 Olympic team in the marathon. Finished fourth in the Olympic trials. Qualified for 1984, 1988, 1992 Olympic marathon trials. Cross-Country All-American. Academic All-American. Set World Junior Record in the marathon (1983). Bronze medalist in 1985 World University Games in Japan (marathon). Qualified for two US cross-country teams and competed in the World Championships. Set Harvard Records in the 5,000 and 10,000 meters. Triathlon Age Group All-American 2007, 2009, 2010, 2013, 2014, 2015, 2016, 2017, 2018. Ranked second in the world by World Triathlon Corporation in Age Group at the Ironman 70.3 distance in 2014. Competed in ITU Age Group World Championships (2007, 2015). Competed in Ironman 70.3 World Championship (2007, 2016, 2017, 2019). Competed in Ironman World Championships in Kailua Kona (2009, 2010, 2018).

# Paul A. Gompers
# Expert Depositions and Testimony for Prior Four Years

Arbitration Testimony of Paul A. Gompers in Todd M. Rainville v. Symmetric Capital, LLC, et al., on behalf of Symmetric Capital, LLC, et al., American Arbitration Association, Arbitration No. 01-15-003-8498 (August 2016).

Arbitration Testimony of Paul A. Gompers in Michael Christopher v. ArcLight Capital Holdings, LLC, et al., on behalf of Michael Christopher, Judicial Arbitration and Mediation Services, Arbitration No. 1400015869 (October 6, 2016).

Deposition of Paul A. Gompers in ITW Global Investments Inc. v. American Industrial Partners Capital Fund IV, L.P., et al., on behalf of ITW Global Investments Inc., Superior Court of the State of Delaware in and for New Castle County, C.A. No. N14C-10-236 (JRJ) (November 3, 2016).

Deposition of Paul A. Gompers in Keith Thomas, Richard Hayes, Herb Smith, and Oklahoma Police Pension & Retirement System v. Magnachip Semiconductor Corp., Sang Park, Tae Young Hwang, Margaret Sakai, R. Douglas Norby, Ilbok Lee, Nader Tavakoli, Randal Klein, Michel Elkins, Avenue Capital Management II, L.P., Barclays Capital Inc., Deutsche Bank Securities Inc., Citigroup Global Markets Inc., UBS Securities LLC, and Needham and Company, LLC, on behalf of Avenue Capital Management II, L.P., United States District Court for the Northern District of California, Case No. 3:14-cv-01160-JST (November 16, 2016).

Deposition of Paul A. Gompers in Dr. Joseph F. Kasper v. AAC Holdings, Inc. et al., on behalf of AAC Holdings, Inc. and the individual defendants, United States District Court for the Middle District of Tennessee, Case No. 3:15-cv-00923 (January 23, 2017).

Deposition of Paul A. Gompers in In Re Facebook, Inc. IPO Securities and Derivative Litigation, on behalf of Facebook, Inc. and its officers and directors named in the suit, United States District Court for the Southern District of New York, MDL No. 12-2389 (March 28, 2017).

Deposition of Paul A. Gompers in Louisiana Municipal Police Employees' Retirement System, et al. v. Green Mountain Coffee Roasters, Inc. et al., on behalf of Green Mountain Coffee Roasters, Inc., United States District Court for the District of Vermont, Civil Action No. 2011-CV-00289 (August 3, 2017).

Deposition of Paul A. Gompers in Ohio Public Employees Retirement System, On Behalf of Itself and All Others Similarly Situated v. Federal Home Loan Mortgage Corporation a/k/a Freddie Mac, et al., on behalf of Federal Home Loan Mortgage Corporation, United States District Court for the Northern District of Ohio, Eastern Division, Civil Action No. 4:08-CV-00160 (September 15, 2017).

Deposition of Paul A. Gompers in Hudson Bay Master Fund Ltd. v. Patriot National, Inc. and Steven M. Mariano and CVI Investments, Inc. v. Patriot National, Inc., on behalf of Patriot National, Inc. and Steven M. Mariano, United States District Court for the Southern District of New York, Case Nos. 16-cv-2767 (GBD) (RLE) and 16-cv-2787 (GBD) (RLE) (October 4, 2017).

# Paul A. Gompers
# Expert Depositions and Testimony for Prior Four Years

Testimony of Paul A. Gompers in Musashi, L.L.C. and W.R. Huff Asset Management Co., L.L.C. v. Virgin Media Inc., on behalf of Musashi, L.L.C. and W.R. Huff Asset Management Co., L.L.C., Superior Court of New Jersey, Law Division: Morris County, Civil Action No. MRS-L-734-13 (October 18, 2017).

Deposition of Paul A. Gompers in Winson Tang v. Lindsay Rosenwald, Michael Weiss, Opus Point Partners, LLC, Mustang Bio, Inc. (aka Mustang Therapeutics, Inc.), City of Hope, and Fortress Biotech, Inc. (f/k/a Coronado Biosciences, Inc.), on behalf of Opus Point Partners, LLC, Mustang Therapeutics, Inc., Fortress Biotech, Inc., Lindsay Rosenwald, and Michael Weiss, Superior Court of the State of California, County of Los Angeles, Case No. BC 607346 (October 23, 2017).

Deposition of Paul A. Gompers in EWC Holdings, Inc. v. Princeton Ventures II, LLC and Brazos/EWC, LLC, on behalf of EWC Holdings, Inc., Court of Chancery of the State of Delaware, C.A. No. 12519-VCL (November 7, 2017).

Deposition of Paul A. Gompers in Securities and Exchange Commission v. AVEO Pharmaceuticals, Inc., Tuan Ha-Ngoc, David Johnston, and William Slichenmeyer, on behalf of the individual defendants, United States District Court for the District of Massachusetts, Case No. 1:16-cv-10607-NMG (December 13, 2017).

Deposition of Paul A. Gompers in Ralph S. Janvey, In His Capacity as Court-Appointed Receiver for the Stanford Receivership Estate, and the Official Stanford Investors Committee v. Proskauer Rose, LLP, Chadbourne & Parke, LLP, and Thomas V. Sjoblom, on behalf of Proskauer Rose, LLP and Thomas V. Sjoblom, United States District Court for the Northern District of Texas, Dallas Division, Civil Action No. 3:13-cv-00477-N (January 22, 2018).

Arbitration Testimony of Paul A. Gompers in Credit Agricole Corporate and Investment Bank (f/k/a Calyon Bank New York Branch), et al. v. Black Diamond Capital Management LLC, et al., on behalf of Black Diamond Capital Management LLC, BDC Finance LLC, and Black Diamond CLO 2006-1, American Arbitration Association, Arbitration No. 01-17-0007-1196 (February 6, 2018).

Deposition of Paul A. Gompers in Michael J. Angley, Individually and on Behalf of All Others Similarly Situated v. UTi Worldwide Inc., et al., on behalf of UTi Worldwide Inc. and the individual defendants, United States District Court for the Central District of California, Western Division, Case No. 2:14-cv-02066-CBM-E (February 27, 2018).

Deposition of Paul A. Gompers in Gary Koopmann, Timothy Kidd, and Victor Pirnik, Individually and on Behalf of All Others Similarly Situated v. Fiat Chrysler Automobiles N.V., et al., on behalf of Fiat Chrysler Automobiles N.V., United States District Court for the Southern District of New York, Case No. 1:15-cv-07199-JMF (March 5, 2018).

Deposition of Paul A. Gompers in Kortright Capital Partners LP, et al. v. Investcorp Investment Advisers Limited, on behalf of Kortright Capital Partners LP, Matthew Taylor, and Ty Popplewell, United States District Court for the Southern District of New York, Case No. 16-cv-7619 (March 27, 2018).

# Paul A. Gompers
# Expert Depositions and Testimony for Prior Four Years

Deposition of Paul A. Gompers in In Re Medtronic, Inc. Securities Litigation, on behalf of Medtronic, Inc. and the individual defendants, United States District Court for the District of Minnesota, Master File No. 0:13-cv-01686-JRT-FLN (May 10, 2018).

Deposition of Paul A. Gompers in Hsingching Hsu, Individually and on Behalf of All Others Similarly Situated v. Puma Biotechnology, Inc., et al., on behalf of Puma Biotechnology, Inc., United States District Court for the Central District of California, Southern Division, Case No. 8:15-cv-00865-AG-JCG (June 5, 2018).

Deposition of Paul A. Gompers in Akorn, Inc. v. Fresenius Kabi AG, Quercus Acquisition, Inc., and Fresenius SE & Co. KGaA, on behalf of Akorn, Inc., Court of Chancery of the State of Delaware, C.A. No. 2018-0300-JTL (June 28, 2018).

Evidentiary Hearing Testimony of Paul A. Gompers in In Re Goldman Sachs Group, Inc. Securities Litigation, on behalf of The Goldman Sachs Group, Inc., United States District Court for the Southern District of New York, Case No. 1:10-cv-03461-PAC (July 25, 2018).

Deposition of Paul A. Gompers in Gary Koopmann, Timothy Kidd, and Victor Pirnik, Individually and on Behalf of All Others Similarly Situated v. Fiat Chrysler Automobiles N.V., et al., on behalf of Fiat Chrysler Automobiles N.V., United States District Court for the Southern District of New York, Case No. 1:15-cv-07199-JMF (October 19, 2018).

Testimony of Paul A. Gompers in Securities and Exchange Commission v. AVEO Pharmaceuticals, Inc., Tuan Ha-Ngoc, David Johnston, and William Slichenmeyer, on behalf of the individual defendants, United States District Court for the District of Massachusetts, Case No. 1:16-cv-10607-NMG (November 16, 2018).

Testimony of Paul A. Gompers in Kortright Capital Partners LP, et al. v. Investcorp Investment Advisers Limited, on behalf of Kortright Capital Partners LP, Matthew Taylor, and Ty Popplewell, United States District Court for the Southern District of New York, Case No. 16-cv-7619 (December 17, 2018).

Testimony of Paul A. Gompers in Hsingching Hsu, Individually and on Behalf of All Others Similarly Situated v. Puma Biotechnology, Inc., et al., on behalf of Puma Biotechnology, Inc., United States District Court for the Central District of California, Southern Division, Case No. 8:15-cv-00865-AG-JCG (January 24, 2019).

Deposition of Paul A. Gompers in Oaktree Principal Fund V, LP, et al. v. Warburg Pincus LLC, et al., on behalf of Warburg Pincus LLC, Warburg Pincus Private Equity X, L.P., and Sean Carney, United States District Court for the Central District of California, Western Division, Case No. 2:15-CV-08574-PSG-MRWx (February 1, 2019).

Deposition of Paul A. Gompers in Monroe County Employees' Retirement System and Roofers Local No. 149 Pension Fund, Individually and on Behalf of All Others Similarly Situated v. The Southern Company, et al., on behalf of The Southern Company, United States District Court for the Northern District of Georgia, Atlanta Division, Civil Action No. 1:17-cv-00241-MHC (March 15, 2019).

# Paul A. Gompers
# Expert Depositions and Testimony for Prior Four Years

Deposition of Paul A. Gompers in Reynolds American, Inc. v. Third Motion Equities Master Fund Ltd, et al., on behalf of Reynolds American, Inc., State of North Carolina, Forsyth County, In the General Court of Justice, Superior Court Division, Case No. 17-CVS-7086 (April 24, 2019).

Deposition of Paul A. Gompers in Roofers' Pension Fund, Individually and on Behalf of All Others Similarly Situated v. Perrigo Co., PLC, et al., on behalf of Perrigo Co., PLC, United States District Court for the District of New Jersey, Case No. 2:16-cv-02805-MCA-LDW (May 16, 2019).

Hearing Testimony of Paul A. Gompers in Monroe County Employees' Retirement System and Roofers Local No. 149 Pension Fund, Individually and on Behalf of All Others Similarly Situated v. The Southern Company, et al., on behalf of The Southern Company, United States District Court for the Northern District of Georgia, Atlanta Division, Civil Action No. 1:17-cv-00241-MHC (May 21, 2019).

Testimony of Paul A. Gompers in Reynolds American, Inc. v. Third Motion Equities Master Fund Ltd, et al., on behalf of Reynolds American, Inc., State of North Carolina, Forsyth County, In the General Court of Justice, Superior Court Division, Case No. 17-CVS-7086 (June 13, 2019).

Deposition of Paul A. Gompers in United States Securities and Exchange Commission v. Daniel C. Ustian, on behalf of Daniel C. Ustian, United States District Court for the Northern District of Illinois, Eastern Division, Case No. 16-cv-03885 (July 10, 2019).

Deposition of Paul A. Gompers in In Re Twitter, Inc. Securities Litigation, on behalf of Twitter, Inc., Richard Costolo, and Anthony Noto, United States District Court for the Northern District of California, Case No. 3:16-cv-05314-JST (September 10, 2019).

Deposition of Paul A. Gompers in Kevin L. Dougherty, Individually and on Behalf of All Others Similarly Situated v. Esperion Therapeutics, Inc., et al., on behalf of Esperion Therapeutics, Inc. and Tim Mayleben, United States District Court for the Eastern District of Michigan, Civil Action No. 2:16-cv-10089-AJT-RSW (September 16, 2019).

Deposition of Paul A. Gompers in Eric Weiner, Individually and on Behalf of All Others Similarly Situated v. Tivity Health, Inc., et al., on behalf of Tivity Health, Inc., United States District Court for the Middle District of Tennessee, Nashville Division, Case No. 3:17-cv-01469 (November 21, 2019).

Testimony of Paul A. Gompers in In the Matter of the Companies Law (2016 Revision) and In the Matter of Nord Anglia Education, Inc., on behalf of the respondents, In the Grand Court of the Cayman Islands, Financial Services Division, Cause No. FSD 235 of 2017 (IKJ) (December 12, 13, 16, and 17, 2019).

Deposition of Paul A. Gompers in Brigade Leveraged Capital Structures Fund Ltd., Brigade Cavalry Fund Ltd., and Brigade Distressed Value Master Fund Ltd. v. Kindred Healthcare, Inc., on behalf of Brigade Leveraged Capital Structures Fund Ltd., Brigade Cavalry Fund Ltd., and Brigade Distressed Value Master Fund Ltd., Court of Chancery of the State of Delaware, C.A. No. 2018-0566-KJSM (January 23, 2020).

# Paul A. Gompers
# Expert Depositions and Testimony for Prior Four Years

Deposition of Paul A. Gompers in Plymouth County Retirement System v. Patterson Companies, Inc., Scott P. Anderson, Ann B. Gugino, R. Stephen Armstrong, and James W. Wiltz, on behalf of Patterson Companies, Inc. and Scott P. Anderson, United States District Court for the District of Minnesota, Case No. 0:18-cv-00871-MJD-SER (July 6, 2020).

Deposition of Paul A. Gompers in Michael Karsch v. Blink Health Ltd. (f/k/a/ Chaiken Holdings LLC and Vital Matters LLC), Geoffrey Chaiken and Matthew Chaiken, on behalf of Blink Health Ltd., United States District Court for the Southern District of New York, Case No. 17-cv-03880 (July 15, 2020).

Deposition of Paul A. Gompers in In Re Celgene Corporation Securities Litigation, on behalf of Celgene Corporation, Bristol-Myers Squibb, Scott A. Smith, Terrie Curran, and Phillippe Martin, United States District Court for the District of New Jersey, Civil Action No. 18-4772 (July 17, 2020).

Deposition of Paul A. Gompers in Kevin L. Dougherty, Individually and on Behalf of All Others Similarly Situated v. Esperion Therapeutics, Inc., et al., on behalf of Esperion Therapeutics, Inc. and Tim Mayleben, United States District Court for the Eastern District of Michigan, Civil Action No. 2:16-cv-10089-AJT-RSW (August 11, 2020).

# List of Documents Considered

Academic Articles


- Baker, Malcom, and Jeffrey Wurgler, "Investor Sentiment in the Stock Market," *Journal of Economic Perspectives*, Vol. 21, No. 2, 2007, pp. 129–151
- Bradshaw, Mark, et al., "A Re-Examination of Analysts' Superiority Over Time-Series Forecasts of Annual Earnings," *Review of Accounting Studies*, Vol. 17, 2012, pp. 944–968
- Brown, Lawrence, et al. "An Evaluation of Alternative Proxies for the Market's Assessment of Unexpected Earnings," *Journal of Accounting and Economics*, Vol. 9, No. 2, 1987, pp. 159–193
- Busse, Jeffrey A., and T. Clifton Green, "Market Efficiency in Real Time," *Journal of Financial Economics,* Vol. 65, 2002, pp. 415–437
- Cornell, Bradford, and R. Gregory Morgan, "Using Finance Theory to Measure Damages in Fraud on the Market Cases," *UCLA Law Review*, Vol. 37, No. 5, 1990, pp. 883–924
- Fama, Eugene F., "Efficient Capital Markets: A Review of Theory and Empirical Work," *The Journal of Finance*, Vol. 25, No. 2, 1970, pp. 383–417
- Greene, Jason T., and Susan G. Watts, "Price Discovery on the NYSE and the NASDAQ: The Case of Overnight and Daytime New Releases," *Financial Management,* Vol. 25, No. 1, 1996
- Huberman, Gur, and Tomer Regev, "Contagious Speculation and a Cure for Cancer: A Nonevent That Made Stock Prices Soar," *The Journal of Finance*, Vol. 56, No. 1, 2001, pp. 387–396
- Hutton, Amy P., Lian Fen Lee, and Susan Z. Shu, "Do Managers Always Know Better? The Relative Accuracy of Management and Analyst Forecasts," *Journal of Accounting Research*, Vol. 50, No. 5, 2012, pp. 1217–1244
- Lamont, Owen A., and Richard H. Thaler, "Anomalies: The Law of One Price in Financial Markets," *Journal of Economic Perspectives*, Vol. 17, No. 4, 2003, pp. 191–202
- Patell, James M., and Mark A. Wolfson, "The Intraday Speed of Adjustment of Stock Prices to Earnings and Dividend Announcements," Journal of Financial Economics, Vol. 13, 1984, pp. 223–252
- Tetlock, Paul C., "All the News That's Fit to Reprint: Do Investors React to Stale Information?" *The Review of Financial Studies*, Vol. 24, No. 5, 2011, pp. 1481–1512


Analyst Reports


- "1Q Beat, Guidance Raised and UNH Renewed - Raising Target, Buy the Stock," SunTrust Robinson Humphrey, April 28, 2017 (OFP-TVTY-00004739–45)
- "1Q17 Performance is Impressive; TVTY Benefited from Growth in All Three Platforms," Cantor Fitzgerald, April 27, 2017 (OFP-TVTY-00004680–88)
- "2016 Form 10-K Review," Barclays, March 8, 2017 (OFP-TVTY-00004566–80)
- "2Q First Look–Solid Results, Awareness Pilots and Renewals Encouraging, Guidance Reaffirmed," Oppenheimer, July 28, 2017 (OFP-TVTY-00005009–15)

- "3Q Beat & Raise, Mgmt Confident for '18, Reit. Neutral, PT to $44," Chardan Capital Markets, October 27, 2017 (OFP-TVTY-00005293–301)
- "3Q Well Ahead, 2018 Shaping up to Be a Big Year. Reiterate Buy, Raising Target," SunTrust Robinson Humphrey, October 27, 2017 (OFP-TVTY-00005314–20)
- "4 Key Insights from HWAY's 2Q," Jefferies, August 9, 2016 (OFP-TVTY00003442–46)
- "4 Key Insights from TVTY's 1Q17," Jefferies, April 27, 2017 (OFP-TVTY-00004695–702)
- "4 Key Insights from TVTY's 2Q17," Jefferies, July 27, 2017 (OFP-TVTY-00004982–89)
- "4Q Beat & Strong '18 Guide; Reit. Neutral, PT to $41," Chardan Capital Markets, February 23, 2018 (OFP-TVTY-00005826–31)
- "A 'Beat and Raise' Quarter to Kick-Off 2017; UNH Contract Renewal is Icing on the Cake," UBS Global Research, April 28, 2017 (OFP-TVTY-00004710–16)
- "A Leveraged Buyout Analysis of TVTY Model Shows Potential Upside to Current Price," Oppenheimer, June 13, 2017 (OFP-TVTY-00004903–11)
- "A Predictable Rev Model with Upside; Mgmt Meeting Takeaways; Price Target Raised," UBS Global Research, June 23, 2017 (OFP-TVTY-00004921–31)
- "Analyst Day Highlights," William Blair, August 12, 2016 (OFP-TVTY-00003540–44)
- "Beat & Raise, UNH Renewed, Pilots Encouraging," Piper Jaffray, April 28, 2017 (OFP-TVTY-00004734–38)
- "Big EPS Beat, 2017 Guidance Increased; Price Target Now $46," Barrington Research, October 27, 2017 (OFP-TVTY-00005321–27)
- "Defending TVTY on Sell-Off after Optum News," Piper Jaffray, November 6, 2017 (OFP-TVTY-00005341–43)
- "Digital Marketing Pilots Hold Promise to Accelerate Growth," Piper Jaffray, February 24, 2017 (OFP-TVTY-00004498–502)
- "Do 2Q16 Results Illustrate 'a Powerful Financial Engine Inside the Network Solutions business'?," UBS Global Research, August 9, 2016 (OFP-TVTY-00003436–41)
- "Early Halloween Candy: 4 Key Insights from TVTY's 3Q17," Jefferies, October 26, 2017 (OFP-TVTY-00005260–67)
- "EPS Beat; Increases 2017 Guidance; Maintain Overweight," Cantor Fitzgerald, October 26, 2017 (OFP-TVTY-00005284–92)
- "Everybody Take A Deep Breath - Offering a Little Perspective," SunTrust Robinson Humphrey, November 7, 2017 (OFP-TVTY-00005361–69)
- "Further Acceleration in FY18 Should Drive Multiple Expansion," Piper Jaffray, October 27, 2017 (OFP-TVTY-00005309–13)
- "Great Start to the Year as Guidance Increased, Restructuring Complete, and UnitedHealth Contract Extended," William Blair, April 27, 2017 (OFP-TVTY-00004689–94)
- "Highlights From Recent Travels With Management; Detailed Analysis of Medicare Advantage Enrollment Data," William Blair, January 24, 2017 (OFP-TVTY-00004371–77)
- "Highlights from the 29th Annual Piper Jaffray Healthcare Conference," November 29, 2017 (OFP-TVTY-00005489–91)

- "HWAY Takes From Bus Tour," Jefferies, September 6, 2016 (OFP-TVTY-00003757–61)
- "Investor Day Emphasizes a Leaner HWAY with Stronger Growth Prospects," UBS Global Research, August 12, 2016 (OFP-TVTY-00003528–39)
- "Levered to Growth of SilverSneakers; Initiating Coverage at Overweight," Cantor Fitzgerald, February 6, 2017 (OFP-TVTY-00004397–424)
- "Management Feeling Positive Ahead of 2018 MA Bid Submissions," UBS Global Research, May 31, 2017 (OFP-TVTY-00004829–35)
- "Margin Makeover Warrants Higher Multiple," Piper Jaffray, August 10, 2016 (OFP-TVTY-00003458–62)
- "Momentum Continues in Efforts to Increase SilverSneakers Awareness," Barrington Research, September 7, 2017 (OFP-TVTY-00005101–04)
- "Outlook Bullish Despite Complicated Results, CFO Departure," Barrington Research, November 2, 2016 (OFP-TVTY-00004075–82)
- "Post-Divestiture Results Muddy; More Details Expected in NY Thursday," Oppenheimer, August 10, 2016 (OFP-TVTY-00003463–68)
- "Proprietary Analysis of Medicare Advantage Enrollment Data Points to Share Gains for Tivity Health's Partners," January 22, 2018, OFP-TVTY00005658–64)
- "Q2 Beat; 2H Outlook Conservative; Biz Wins/High Contract Renewals Setting Up for a Strong 2018," UBS Global Research, July 27, 2017 (OFP-TVTY-00004990–96)
- "Reuters Reports Takeover Interest; Reiterate Overweight; Price Target Raised," Cantor Fitzgerald, June 8, 2017 (OFP-TVTY-00004889–96)
- "Second-Quarter Results, 8-K Filing Provide Incremental Details on Network Solutions Business," William Blair, August 9, 2016 (OFP-TVTY-00003431–35)
- "Seeing a Way for Superior Returns, Upgrade to Buy," UBS Global Research, November 8, 2016 (OFP-TVTY-00004118–31)
- "Sell-Off on UnitedHealth News Seems Markedly Overdone; We Are Buyers on Weakness," William Blair, November 6, 2017 (OFP-TVTY-00005338–40)
- "Shares Off on UNH Announcement; Too Early to Worry About 2020; Overweight," Cantor Fitzgerald, November 6, 2017 (OFP-TVTY-00005344–47)
- "Solid 2Q17 Results Point to More Consistent Performance; Maintain Overweight," Cantor Fitzgerald, July 27, 2017 (OFP-TVTY-00004973–81)
- "Solid 4Q and 2017 Guidance Implies 20%+ Pretax Growth," Barclays, February 24, 2017 (OFP-TVTY-00004481–97)
- "Solid 4Q16 Results and Strong 2017 Guidance; Raising Target Price; Overweight," Cantor Fitzgerald, February 23, 2017 (OFP-TVTY-00004450–58)
- "Solid Quarter as Engagement Initiatives Continue to Drive Growth; Guidance Maintained and Very Strong Renewals," William Blair, July 27, 2017 (OFP-TVTY-00004967–72)
- "Solid Quarter, Strong 2017 Guidance Supports Bullish Stance," Barrington Research, February 24, 2017 (OFP-TVTY-00004474–80)
- "Strong 1Q17 and Guidance Boost with Additional Signs of Conservatism," Barclays, April 28, 2017 (OFP-TVTY-00004717–33)
- "Strong Medicare Advantage Enrollment Sets the Stage for a Solid 2017; Guidance Above Expectations," William Blair, February 23, 2017 (OFP-TVTY-00004444–49)

- "Strong Quarter; Increased 2017 Guidance; PT Now $35," Barrington Research, April 28, 2017 (OFP-TVTY-00004703–09)
- "Strong Third-Quarter Results Highlighted by a Dime of EPS Upside; Guidance Increased and 2018 Outlook Ahead of Street," William Blair, October 26, 2017 (OFP-TVTY-00005253–59)
- "Taking a Deeper Dive into UnitedHealth's Proprietary Fitness Program and Its Impact on Tivity Health," William Blair, November 7, 2017 (OFP-TVTY-00005354–60)
- "Tivity Shares Crushed as Relationship with UnitedHealth Comes into Question," Barrington Research, November 7, 2017 (OFP-TVTY-00005366–69)
- "Transformed Healthways Deserves Fresh Look; Price Target is $29," Barrington Research, August 10, 2016 (OFP-TVTY-00003480–87)
- "Transitioning Quarter; Making Headway to a Clear 2017," Oppenheimer, November 2, 2016 (OFP-TVTY-00004088–95)
- "TVTY Pullback Today Pricing in More than Worst Case Scenario with UnitedHealth," Jefferies, November 6, 2017
- "UNH Expands Senior Benefit, Less Confident in Our TVTY Estimates," Chardan Capital Markets, November 6, 2017 (OFP-TVTY-00005348–53)
- "Update From The Road - Still Plenty To Be Excited About," SunTrust Robinson Humphrey, November 20, 2017 (OFP-TVTY-00005370–76)
- "Upgrading to Buy: Upside to 2017-18 Expectations," Jefferies, January 6, 2017 (OFP-TVTY-00004330–48)
- "Upside Remains on Revenue and FCF Valuation," Piper Jaffray, August 12, 2016 (OFP-TVTY-00003545–09)
- "We Expect Investor RecepTIVITY; Initiate at Buy With a $35 Target," SunTrust Robinson Humphrey, March 15, 2017 (OFP-TVTY-00004620–43)

Bates Stamped Documents

- "2018 Growth Update," Tivity Health, February 2018 (TIVITY0054525–31)
- "Life Time Available with Optum Fitness Advantage!" United Healthcare Medicare Solutions (UHC000270–71)
- "Optum Fitness Advantage – Coming to a Plan Near You!" United Healthcare Medicare Solutions (UHC000250–51)
- "Optum Medicare Advantage Fitness Program," Optum (TIVITY0075656)
- "Project Success," Tivity Health (TIVITY0021653–96)
- "Tivity Health Forecast Revenue through 2018," Excel Workbook (TIVITY0026130)
- "Welcome to Optum® Fitness Advantage," United Healthcare Medicare Solutions (UHC000288–89)
- "YMCA of Greater Syracuse Available with Optum Fitness Advantage in New York!" United Healthcare Medicare Solutions (UHC000242–43)
- 4Q 2016 Tivity Health, Inc. Earnings Call, February 23, 2017 (OFP-TVTY-00004425-43)
- Amendment 14 to the Fitness Service Network Agreement between UnitedHealthcare Insurance Company and American Healthways Services, LLC, April 1, 2017 (TIVITY0054844–71)

- Email from Ann Kent to Steve Janicak, “Re: Optum Intel Follow-up,” May 2, 2017 (TIVITY0021934–35)
- Email from Caroline Khalil to Devin Paulin, “RE: AARP Member comments on Optum/SSFP switch,” January 2, 2017 (TIVITY0075322–23)
- Email from Caroline Khalil to Jeff Pagels, “Optum Examples,” August 21, 2017, (TIVITY0075701–850)
- Email from Caroline Khalil to Jeff Pagels, “RE: $5 $40,” August 21, 2017 (TIVITY0011938–39)
- Email from Caroline Khalil to Kate Hampton, “FW: Optum Fitness Advantage Website,” September 25, 2017 (TIVITY0075653–55)
- Email from Caroline Khalil to Mary Flipse, et al., “RE: Urgent and Important- privileged and confidential,” October 7, 2017 (TIVITY0055177–87)
- Email from Chip Wochomurka to Donato Tramuto, et al., “Re: [External] Silver Sneakers being dropped for Kentucky and Ohio residents by United Healthcare,” October 21, 2016 (TIVITY0082605–09)
- Email from Chip Wochomurka to Steve Janicak and Adam Holland, “RE: Letter about Y/UHC,” September 25, 2017 (TIVITY0063916–20)
- Email from Donato Tramuto to Conan Laughlin, “RE: CONFIDENTIAL – PLAN TO REPLACE RHE POTENTIAL ASARP MEDICARE SUPP LOSS,” August 28, 2017 (CLNT-00002162–63)
- Email from Donato Tramuto to Steve Janicak, “Re: United Videos Update,” May 5, 2017 (TIVITY0065264–67)
- Email from Glenn Hargreaves to Donato Tramuto and Chip Wochomurka, “UHG Model 5_23,” May 23, 2017 (TIVITY0042661–64)
- Email from Jeff Pagels to Chip Wochomurka and Glenn Hargreaves, “RE: [External] UBS: Managed Care ‘Uneventful for Some, Full of Action for Others; 4Q16 Earnings…,’” January 15, 2017 (TIVITY0015015–18)
- Email from Mary Flipse to Archelle Georgiou, et al., “FYI: Correspondence with UnitedHealth,” October 16, 2017 and attachment (CLNT-00002263–69)
- Email from Mary Flipse to Steve Janicak and Adam Holland, “Fwd: United/Tivity C&D's,” September 29, 2017 and attachment (TIVITY0063913–15)
- Email from Mary Flipse to Steve Janicak, “Fwd: UnitedHealth False Statement Cease & Desist Notice,” September 11, 2017 and attachment (TIVITY0043631–33)
- Email from Owen Kueser to Joy Powell, et al., “RE: UHG NJ 2017,” September 19, 2016 (TIVITY0005803–05)
- Email from Owen Kueser to Steve Janicak, “UHC Info,” January 31, 2017 and attachment (TIVITYO0005693–94)
- Email from Stacey Eggleston to Donato Tramuto et al., “AARP Executive Summary,” November 9, 2016 and attachment (TIVITY0076942–49)
- Email from Stacey Eggleston to Steve Janicak and Ann Kent, “Client Updates from this week,” April 20, 2017 (TIVITY0021959)
- Email from Steve Janicak to Chip Wochomurka and Donato Tramuto, “RE: Tivity / United Amendment,” April 4, 2017 (TIVITY0067667–74)
- Email from Steve Janicak to Chip Wochomurka, “Re: SSF to Optum,” May 5, 2017 (TIVITY0067268–77)

- Email from Steve Janicak to Chip Wochomurka, et al., "FW: SSF to Optum," May 1, 2017 and attachment (TIVITY0067360–61)
- Email from Steve Janicak to Donato Tramuto, "FW: United - and AARP," May 24, 2017 (TIVITY0067295–301)
- Email from Steve Janicak to Donato Tramuto, et al., "RE: [Extrenal] Fwd: New Program! Optum® Fitness Advantage," May 2, 2017 (TIVITY0067379–82)
- Email from Steve Janicak to Liz Janicak, "FW: Renewal Briefing Document-updated as of 1/27," January 30, 2017 and attachment (TIVITY0006294–308)
- Email from Steve Janicak to Steve Warner and Timothy Noel, "RE: Gym communications," October 9, 2017 (UHC000209–18)
- Email from Steve Janicak to Timothy Noel, "RE: Issue," September 5, 2017 (TIVITY0070590–92)
- Email from Ulya Khan to Donato Tramuto, et al., "Project Success - Call Center Update 10/17/17," October 17, 2017 (TIVITY0054304)
- Email from Ulya Khan to Donato Tramuto, et al., "Project Success - Call Center Update 10/20/17," October 20, 2017 (TIVITY0052614)
- Email from UnitedHealthCare Medicare Solutions to Brokers, "Optum Fitness Advantage - Coming to a Plan Near You!" December 15, 2017 (UHC000272–73)
- Fitness Service Network Access Agreement entered into by and between UnitedHealthcare Insurance Company and American Healthways Services, LLC, January 1, 2012 (UHC000001–59)
- Fitness Service Network Access Agreement into by and between UnitedHealthcare Insurance Company and American Healthways Services, LLC, January 1, 2012 (TIVITY0001075–104)
- HWAY - Healthways Inc Analyst and Investor Day, August 11, 2016 (OFP-TVTY-00003488–527)
- HWAY - Q2 2017 Tivity Health Inc Earnings Call, Thomson Reuters, July 27, 2017 (OFP-TVTY-00004953–66)
- Letter from Mary Flipse to Richard Mattera, September 14, 2017 (TIVITY0074567–69)
- Optum Fitness Advantage Poster (UHC000274)
- Q1 2017 Tivity Health Inc. Earnings Call, April 27, 2017 (OFP-TVTY-00004663-79)
- Seventh Amendment to Fitness Service Network Access Agreement entered into by and between American Healthways Services, LLC and United Healthcare Insurance Company, January 1, 2015 (TIVITY0001112–15)
- Tivity Health Board Meeting Materials, June 14, 2017 (TIVITY0094847–99)
- Tivity Health Board Meeting Materials, June 20, 2017 (TIVITY0094900–17)
- Tivity Health Board Meeting Materials, June 9, 2017 (TIVITY0094815–46)
- Tivity Health Board of Directors Meeting Materials, February 1–2, 2017 (TIVITY0094176–445)
- UnitedHealthcare Letter Template (UHC000280–81)

Books

- Bodie, Zvi, Alex Kane, and Alan J. Marcus, *Investments*, 9th ed. (New York, NY: McGraw-Hill/Irwin), 2011
- Brealey, Richard A., Stewart C. Myers, and Franklin Allen, *Principles of Corporate Finance*, 8th ed. (New York, NY: McGraw-Hill/Irwin), 2006
- Brealey, Richard A., Stewart C. Myers, and Franklin Allen, *Principles of Corporate Finance*, 10th ed. (New York, NY: McGraw-Hill/Irwin), 2011
- Campbell, John Y., Andrew W. Lo, and A. Craig MacKinlay, *The Econometrics of Financial Markets* (Princeton, NJ: Princeton University Press), 1997
- Damodaran, Aswath, *Investment Valuation, Tools and Techniques for Determining the Value of Any Asset*, 3rd ed. (New Jersey: John Wiley & Sons), 2012
- Fama, Eugene F., *Foundations of Finance: Portfolio Decisions and Securities Prices* (New York, NY: Basic Books), 1976
- Greene, William H., *Econometric Analysis*, 4th ed. (Upper Saddle River, NJ: Prentice Hall), 2000
- Mishkin, Frederic S., *The Economics of Money, Banking, and Financial Markets*, 6th ed. (Boston, MA: Addison-Wesley), 2001
- Mishkin, Frederick S., and Stanley G. Eakins, *Financial Markets and Institutions*, 8th ed. (Boston, MA: Pearson), 2015
- Ross, Stephen A., Randolph W. Westerfield, and Jeffrey Jaffe, *Corporate Finance*, 7th ed. (Boston, MA: McGraw-Hill/Irwin), 2005

Data

- CRSP
- Factiva
- Refinitiv I/B/E/S Detailed Estimates Data
- Thomson Reuters
- TICK data

Depositions

- Deposition of Caroline Khalil, June 3, 2020
- Deposition of Chad William Coffman, September 4, 2019
- Deposition of Conan Laughlin, June 17, 2020
- Deposition of Timothy Noel as 30(b)(6), June 19, 2020
- Deposition of Timothy Noel, June 19, 2020

Expert Reports

- Expert Rebuttal Report of Chad Coffman, CFA, December 20, 2019
- Expert Report and Production Materials (OFP-TVTY-0000001–7374) of Chad Coffman, CFA, July 1, 2019
- Expert Report of Amanda Rose, July 30, 2020
- Expert Report of Chad Coffman, CFA, July 30, 2020

- Expert Report of Paul A. Gompers, Ph.D., October 8, 2019

Legal Documents

- *Basic v. Levinson*, 485 U.S. 224, 241 (1988)
- *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989)
- *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1431 (2013)
- Defendant Donato Tramuto's Responses and Objections to Plaintiff's First Set of Interrogatories, *Eric Weiner, et al. v. Tivity Health, Inc., et al.,* United States District Court for the Middle District of Tennessee, Nashville Division, Case No. 3:17-cv-01469, April 27, 2020
- First Amended Complaint, *Eric Weiner, et al. v. Tivity Health, Inc., et al.*, United States District Court for the Middle District of Tennessee, Nashville Division, Case No. 3:17-cv-01469, June 4, 2018
- *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2418 (2014)
- In re PolyMedica Corporation Securities Litigation, 453 F. Supp. 2d 260 (D. Mass. 2006)
- *Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001)
- Memorandum Opinion, *Eric Weiner, et al. v. Tivity Health, Inc., et al.*, United States District Court for the Middle District of Tennessee, Nashville Division, Case No. 3:17-cv-01469, January 29, 2020
- *Unger v. Amedisys Inc.*, 401 F.3d 316 (5th Cir. 2005)

Miscellaneous

- "Empowering Older Adults and Enabling Healthy Aging, Business and Strategy Highlights—Investor Day August 2016," Healthways Inc., August 11, 2016
- "Keeping You Informed: Silver Sneakers Update," Greater Green Bay YMCA https://www.greenbayymca.org/media/310652/silversneakers-member-update-documents_96_p5.pdf, accessed August 25, 2020
- "The Road to 5 Million Enrolled Members," Tivity Health Investor Day 2018 Presentation, June 1, 2018
  "William Blair 37th Annual Growth Stock Conference," Tivity Health, June 13, 2017
- 42 C.F.R. § 422.752 – Basis for imposing intermediate sanctions and civil money penalties
- SilverSneakers Eligible's 2017 Budget

Press Releases

- Tivity Health Press Release, "Tivity Health Comments on UnitedHealthcare Relationship," November 6, 2017
- Tivity Health Press Release, "Tivity Health Reports First-Quarter 2017 Financial Results and Increases Revenue and Earnings Guidance," April 27, 2017
- Tivity Health Press Release, "Tivity Health Reports Third-Quarter 2017 Results," October 26, 2017
- UnitedHealthcare Press Release, "UnitedHealthcare Adds New Fitness Benefit to Medicare Advantage Plans in Arizona," November 6, 2017

- UnitedHealthcare Press Release, "UnitedHealthcare Adds New Fitness Benefit to Medicare Advantage Plans in Austin," November 6, 2017
- UnitedHealthcare Press Release, "UnitedHealthcare Adds New Fitness Benefit to Medicare Advantage Plans in Florida," November 6, 2017 [issued at 9:15 ET]
- UnitedHealthcare Press Release, "UnitedHealthcare Adds New Fitness Benefit to Medicare Advantage Plans in Florida," November 6, 2017 [issued at 10:00 ET]
- UnitedHealthcare Press Release, "UnitedHealthcare Adds New Fitness Benefit to Medicare Advantage Plans in Houston," November 6, 2017
- UnitedHealthcare Press Release, "UnitedHealthcare Adds New Fitness Benefit to Medicare Advantage Plans in Kentucky," November 6, 2017
- UnitedHealthcare Press Release, "UnitedHealthcare Adds New Fitness Benefit to Medicare Advantage Plans in New York," November 6, 2017
- UnitedHealthcare Press Release, "UnitedHealthcare Adds New Fitness Benefit to Medicare Advantage Plans in Ohio," November 6, 2017
- UnitedHealthcare Press Release, "UnitedHealthcare Adds New Fitness Benefit to Medicare Advantage Plans in Oklahoma," November 6, 2017
- UnitedHealthcare Press Release, "UnitedHealthcare Adds New Fitness Benefit to Medicare Advantage Plans in Oregon," November 6, 2017
- UnitedHealthcare Press Release, "UnitedHealthcare Adds New Fitness Benefit to Medicare Advantage Plans in San Antonio," November 6, 2017
- UnitedHealthcare Press Release, "UnitedHealthcare Adds New Fitness Benefit to Medicare Advantage Plans in Wisconsin," November 6, 2017

Public Press

- "Aging Gracefully; Maintaining Vitality: Senior Fitness Series, Part One," Mercury Pharmacy Services, July 10, 2017
- "No Matter How Old You Are, the YMCA Has Got an Exercise Program Perfect for You," *The Bellingham Herald*, March 8, 2017, https://www.bellinghamherald.com/living/seniors-aging/article136945433.html, accessed August 25, 2020
- "The Largest Managers of Hedge Funds," *Pensions & Investments*, September 18, 2017

SEC Filings

- BlackRock, Inc. Form 10-K for FY 2017, filed February 28, 2018
- Tivity Health, Inc. Form 10-K for FY 2016, filed March 6, 2017
- Tivity Health, Inc. Form 10-K for FY 2017, filed February 28, 2018
- Tivity Health, Inc. Form 10-Q for 1Q 2017, filed May 4, 2017
- Tivity Health, Inc. Form 10-Q for 2Q 2017, filed August 4, 2017
- Tivity Health, Inc. Form 10-Q for 3Q 2017, filed November 3, 2017
- UnitedHealth Group, Inc. Form 10-K for FY 2017, filed February 13, 2018

Websites


- "2017 Fall Program & Membership Guide," Randolph YMCA, https://www.randolphymca.org/sites/default/files/Fall%20Brochure%202017.pdf, accessed August 30, 2020
- "2017 Spring/Summer Program Guide May 22nd–August 27th," Meadowlands YMCA, https://www.meadowlandsymca.org/clientuploads/pdf/2017/2017MeadowlandsYMCASpringSummerProgGuide.pdf, accessed August 30, 2020
- "About Us," Mercury Pharmacy Services, https://www.mercuryrx.com/our-story, accessed October 5, 2019
- "About Us," *The Bellingham Herald*, https://www.bellinghamherald.com/customer-service/about-us/article22204962.html, accessed August 30, 2020
- "About," Harrison Premier Fitness, https://www.harrisonpremierfitness.com/about-us/, accessed August 30, 2020
- "Become a Fitness Center or YMCA Partner," Optum Fitness Advantage, https://web.archive.org/web/20170211165532/http://fitnessadvantage.optum.com/gym-partner, accessed September 1, 2019
- "Client Cxls Med Supp for MAPD," Insurance Forums, October 4, 2017, https://insurance-forums.com/community/threads/client-cxls-med-supp-for-mapd.90436/page-2, accessed August 30, 2020
- "Coming Soon!" Optum Fitness Advantage, https://web.archive.org/web/20161007221246/http://fitnessadvantage.optum.com, accessed August 30, 2020
- "Filing Detail," SEC, https://www.sec.gov/Archives/edgar/data/704415/000070441517000012/0000704415-17-000012-index.htm, accessed August 30, 2020
- "Good News:  Optum® Fitness Advantage from UnitedHealthcare Will Be Coming Soon to This Location," YMCA New Jersey, https://ymcanj.org/wp-content/uploads/2016/12/flyer.pdf, accessed August 30, 2020
- "Insurance Coverage," Randolph YMCA, https://web.archive.org/web/20170301231456/https://www.randolphymca.org/join/insurance-coverage, accessed September 18, 2019
- "Insurance-Based Memberships," Meadowlands YMCA, https://web.archive.org/web/20170430034435/https://www.meadowlandsymca.org/membership/insurance-based-memberships/, accessed September 18, 2019
- "Medicare Advantage Open Enrollment Period," Medicare.gov, https://www.medicare.gov/node/33581, accessed August 18, 2020
- "Medicare Marketing Guidelines," CMS.gov, June 10, 2016, https://www.cms.gov/Medicare/Health-Plans/ManagedCareMarketing/Downloads/2017MedicareMarketingGuidelines2.pdf, accessed August 18, 2020
- "Medicare Open Enrollment," CMS.gov, https://www.cms.gov/Outreach-and-Education/Reach-Out/Find-tools-to-help-you-help-others/Medicare-Open-Enrollment, accessed August 18, 2020

- "Membership," The Gateway Family YMCA, https://web.archive.org/web/20170910064502/https://tgfymca.org/membership, accessed September 18, 2019
- "New Program Coming to HPF! – Optum Fitness Advantage," Harrison Premier Fitness, October 9, 2017, https://www.harrisonpremierfitness.com/2017/10/09/new-program-coming-to-hpf-optum-fitness-advantage/, accessed August 30, 2020
- "Open Enrollment Period," HealthCare.gov, https://www.healthcare.gov/glossary/open-enrollment-period/, accessed August 18, 2020
- "Record of Proceedings," Prairie Township Board of Trustees, Columbus, Ohio, April 26, 2017, https://www.prairietownship.org/AgendaCenter/ViewFile/Minutes/_04262017-428, accessed August 30, 2020
- "Strength. Stability. Hassle Free. The Advantage of UnitedHealthcare 2017 Medicare Advantage Plans," UnitedHealthcare, https://www.agentpipeline.com/wp-content/uploads/2015/07/National-Packet_0720_Low-Res.pdf, accessed August 30, 2020
- "The World's Largest Insurance Community – Insurance Forums," Insurance Forums, http://web.archive.org/web/20171101020459/https://insurance-forums.com/, accessed August 30, 2020
- "UHC Bringing Back Fitness in Many States," Insurance Forums, September 15, 2017, https://insurance-forums.com/community/threads/uhc-bringing-back-fitness-in-many-states.90204/, accessed August 30, 2020
- "Welcome to Jennison Associates," Jennison Associates, https://www.jennison.com, accessed September 12, 2019
- "What Is Net Promoter?" Satmetrix Systems, https://www.netpromoter.com/know/, accessed September 2, 2019
- "Yes, We Accept Optum Fitness Advantage!!," Twitter – Deer Park Fitness, November 14, 2016, https://twitter.com/DeerParkFitness/status/798164042439426048, accessed August 30, 2020
- Davis, Elizabeth, RN, "What Is an Open Enrollment Period?" *Verywell Health*, https://www.verywellhealth.com/what-is-open-enrollment-1738755, accessed August 18, 2020
- Meadowlands YMCA, https://www.meadowlandsymca.org, accessed October 5, 2019
- Proctor, Clint, "Open Enrollment Runs from November 1st to December 15th, But There are 2 Possible Ways to Get Health Insurance if You Miss It," Business Insider, October 20, 2019, https://www.businessinsider.com/personal-finance/when-is-open-enrollment-november-1-to-december-15, accessed August 18, 2020
- Twitter – Deer Park Fitness, https://twitter.com/deerparkfitness, accessed August 30, 2020
- YMCA of Western Monmouth County, https://web.archive.org/web/20161128150417/http://ymcanj.org/, accessed August 30, 2020

**Exhibit 1**

# Tivity Health, Inc.
## Allegedly Misrepresented and/or Withheld Information
Class Period: 3/6/17–11/6/17

| Alleged Misrepresentation or Omission | Date First Alleged | Communication Type |
|---|---|---|
| Before and during open enrollment for 2017, which ran between October and December 2016, Tivity executives were forwarded an aggressive letter from UHC to a fitness center that stated that UHC was launching Optum Fitness Advantage and that suggested that the fitness center would lose all SilverSneakers members, not just those insured by UHC. | 3/6/17 | FY 2016 Form 10-K |
| Before January 2017, UHC informed Tivity that it would not be renewing SilverSneakers in at least New Jersey and Washington state. | 3/6/17 | FY 2016 Form 10-K |
| In January 2017, UHC began operating Optum Fitness Advantage in New Jersey and Washington state. | 3/6/17 | FY 2016 Form 10-K |
| By early 2017, Tivity knew that UHC was sending letters about Optum Fitness Advantage to partners outside of New Jersey and Washington state. | 3/6/17 | FY 2016 Form 10-K |
| Tivity's A-B-C-D strategy was failing with respect to UHC because UHC had introduced a competitive program to SilverSneakers that was necessarily causing Tivity to lose members of its SilverSneakers program in the markets that UHC was offering Optum Fitness Advantage. | 4/27/17 | Press Release |
| Tivity's A-B-C-D strategy was failing with respect to UHC because their business relationship was not "deepening" but rather eroding given UHC's rollout of a competitive program that would decrease Tivity's revenues from SilverSneakers. | 4/27/17 | Press Release |
| Tivity's market leadership position was being weakened not "strengthened" by UHC's introduction of Optum Fitness Advantage. | 4/27/17 | Press Release |
| The terms of Tivity's contract with UHC permitted UHC to offer a competitive product in certain markets. | 4/27/17 | Earnings Call |
| The actual terms of the [executed/renewed] UHC contract confirmed that the competitive threat posed by UHC was increasing, all of which represented a deterioration in Tivity's relationship with UHC which was decidedly not favorable to Tivity. | 4/27/17 | Earnings Call |
| The [new/renewed] contract altered Tivity's relationship with UHC such that UHC's increasingly competitive stance would decrease revenues derived from SilverSneakers, and increase investment risk for investors. | 4/27/17 | Earnings Call |
| Tivity launched Project Success in June 2017 to develop a strategy to combat UHC's competitive threat. | 7/27/17 | Press Release |
| UHC had introduced a competitive program to SilverSneakers that was necessarily causing Tivity to lose members of its SilverSneakers program in the markets that UHC was offering Optum Fitness Advantage. | 7/27/17 | Press Release |
| The "long-term" potential for SilverSneakers to grow was threatened given UHC's ability, under the terms of its contract with Tivity, to roll out Optum Fitness Advantage into new markets and other markets in which UHC historically offered SilverSneakers. | 7/27/17 | Press Release |
| A communication plan was put in place by September 2017 to make direct outreach to Tivity's fitness center partners concerning UHC's competitive program. | 10/26/17 | Earnings Call |
| Defendants would later admit that they knew of contract losses arising from UHC as early as June 2017. | 10/26/17 | Earnings Call |
| Defendants would later admit that they took these UHC contract losses into account when formulating preliminary guidance for 2018. | 10/26/17 | Earnings Call |

Source: Complaint

# Tivity Health, Inc.
# Estimated Impact of UHC's Offering of Optum Fitness Advantage in Certain Markets
## According to May 2017 Emails

**Offering of Optum Fitness Advantage in New Jersey and Washington in 2017**

| | **Estimated 2017 Impact** [1] | **Percent Impact on 2017 Total** [2] |
|---|---|---|
| Eligible Lives | 132,696 | 0.9% |
| Revenue | $3,726,103 | 0.7% |

**Offering of Optum Fitness Advantage in Nine States in 2018**

| | **Estimated 2018 Impact** [3] | **Percent Impact on 2018 Total** [4] |
|---|---|---|
| Eligible Lives | 783,462 | 4.8% |
| Revenue | $22,187,644 | 3.5% |

Source: Email from Steve Janicak to Chip Wochomurka, et al., "FW: SSF to Optum," May 1, 2017, TIVITY0067360–61 and attachment; Email from Steve Janicak to Donato Tramuto, "FW: United - and AARP," May 24, 2017, TIVITY0067295–301; "Tivity Health Forecast Revenue through 2018" Excel Workbook, TIVITY0026130; Tivity Health Board Meeting Materials, June 20, 2017, TIVITY0094900–17

Note:

[1] Figures are based on an email chain between Tivity employees in May 2017 and the attached table, which is titled "AARP/UHG SilverSneakers Markets Move to Optum." The estimated impact to eligible lives is based on the column "Eligibles" and the estimated impact to revenue is based on the column "Previous Year Revenue." The email and attachment only included the impact for 2017.

[2] The impact on eligible lives is calculated by dividing the Estimated 2017 Impact by 14,920,950, which is calculated by adding the Estimated 2017 Impact (132,696) to the projected "Ending Lives" for 2017 (14,788,254) in the Tivity Health Board Meeting Materials from June 20, 2017. The impact on revenue is calculated by dividing the Estimated 2017 Impact by $563,977,103, which is calculated by adding the Estimated 2017 Impact ($3,726,103) to the projected total revenue for 2017 ($560,251,000) in the Tivity Health Board Meeting Materials from June 20, 2017.

[3] Figures are based on an email chain between Tivity employees in May 2017 and the "Tivity Health Forecast Revenue through 2018" Excel Workbook, which appears to be an attachment to the email chain. The email and attachment only included the impact for 2018. The impact to revenue is calculated in the Excel Workbook as the number of "Individual Lives" multiplied by 12 multiplied by the "2018 Rate (PMPM [Per Member Per Month])" of $2.36.

[4] The impact on eligible lives is calculated by dividing the Estimated 2018 Impact by 16,366,675, which is calculated by adding the Estimated 2018 Impact (783,462) to the projected "Ending Lives" for 2018 (15,583,213) in the Tivity Health Board Meeting Materials from June 20, 2017. The impact on revenue is calculated by dividing the Estimated 2018 Impact by $635,333,269, which is calculated by adding the Estimated 2018 Impact ($22,187,644) to the "2018 Updated Forecast" revenue ($613,145,625) in the "Tivity Health Forecast Revenue through 2018" Excel Workbook.


CONFIDENTIAL

# Tivity Health, Inc.
# Analyst EBITDA Forecasts Before and After the 11/6/17 UHC Press Releases [1]

| Contributor | Forecast Year | Last Report Before UHC Press Release | | First Report After UHC Press Release | | Next Report After UHC Press Release | |
|---|---|---|---|---|---|---|---|
| | | Report Date | EBITDA | Report Date | EBITDA | Report Date | EBITDA |
| Cantor Fitzgerald [2] | 2018 | 10/26/17 | $142.3 | 11/6/17 | – | – | – |
| | 2019 | 10/26/17 | – | 11/6/17 | – | – | – |
| Chardan Capital [3] | 2018 | 10/27/17 | $138.9 | 11/6/17 | – | – | – |
| | 2019 | 10/27/17 | $155.4 | 11/6/17 | – | – | – |
| Jefferies | 2018 | 10/26/17 | $142.4 | 11/6/17 | – | 1/25/18 | $142.4 |
| | 2019 | 10/26/17 | $160.6 | 11/6/17 | – | 1/25/18 | $152.2 |
| Piper Jaffray [4] | 2018 | 10/27/17 | $138.7 | 11/6/17 | $138.7 | 11/29/17 | – |
| | 2019 | 10/27/17 | – | 11/6/17 | – | 11/29/17 | – |
| William Blair [5] | 2018 | 10/26/17 | $134.7 | 11/6/17 | $134.7 | 1/22/18 | $134.7 |
| | 2019 | 10/26/17 | – | 11/6/17 | – | 1/22/18 | – |
| Barrington Research | 2018 | 10/27/17 | $140.0 | 11/7/17 | $140.0 | – | – |
| | 2019 | 10/27/17 | $155.6 | 11/7/17 | $144.0 | – | – |
| SunTrust Robinson Humphrey | 2018 | 10/27/17 | $139.0 | 11/7/17 | – | 11/20/17 | $139.0 |
| | 2019 | 10/27/17 | $154.0 | 11/7/17 | – | 11/20/17 | $154.0 |

Source: "EPS Beat; Increases 2017 Guidance; Maintain Overweight," Cantor Fitzgerald, October 26, 2017; "3Q Beat & Raise, Mgmt Confident for '18, Reit. Neutral, PT to $44," Chardan Capital Markets, October 27, 2017; "Early Halloween Candy: 4 Key Insights from TVTY's 3Q17," Jefferies, October 26, 2017; "Further Acceleration in FY18 Should Drive Multiple Expansion," Piper Jaffray, October 27, 2017; "Strong Third-Quarter Results Highlighted by a Dime of EPS Upside; Guidance Increased and 2018 Outlook Ahead of Street," William Blair, October 26, 2017; "Big EPS Beat, 2017 Guidance Increased; Price Target now $46," Barrington Research, October 27, 2017; "3Q Well Ahead, 2018 Shaping Up To Be A Big Year. Reiterate Buy, Raising Target," SunTrust Robinson Humphrey, October 27, 2017; "Shares off on UNH Announcement; Too Early to Worry about 2020; Overweight," Cantor Fitzgerald, November 6, 2017; "UNH expands senior benefit, less confident in our TVTY estimates," Chardan Capital Markets, November 6, 2017; "TVTY Pullback Today Pricing In More Than Worst Case Scenario With UnitedHealth," Jefferies, November 6, 2017; "Defending TVTY on Sell-Off after Optum News," Piper Jaffray, November 6, 2017; "Sell-Off on UnitedHealth News Seems Markedly Overdone; We are Buyers on Weakness," William Blair, November 6, 2017; "Tivity Shares Crushed As Relationship with UnitedHealth Comes Into Question," Barrington Research, November 7, 2017; "Everybody Take A Deep Breath - Offering A Little Perspective," SunTrust Robinson Humphrey, November 7, 2017; "Update From The Road - Still Plenty To Be Excited About," SunTrust Robinson Humphrey, November 20, 2017; "Highlights from the 29th Annual Piper Jaffray Healthcare Conference," Piper Jaffray, November 29, 2017; "Proprietary Analysis of Medicare Advantage Enrollment Data Points to Share Gains for Tivity Health's Partners," William Blair, January 22, 2018; "Attractive 2018 Set-Up With Catalysts And Improving Risk Profile," Jefferies, January 25, 2018.

Note.

[1] Forecasts are expressed in millions. Displayed contributors published analyst reports on November 6, 2017 or November 7, 2017.
[2] Cantor Fitzgerald did not publish numerical estimates on November 6, 2017 and did not change its price target stating "we reiterate our Overweight rating on the shares." It also did not mention any changes to its valuation model. Therefore, it appears that this analyst did not change its prior forecasts.
[3] Chardan Capital stated in its November 6, 2017 report that it was "less confident in [its] estimates [for Tivity] and [it was] putting [its] estimates under review."
[4] Piper Jaffray did not publish numerical estimates on November 6, 2017, but noted that "we see no reason to change numbers on this announcement." Thus, forecasts from its previous report are listed.
[5] William Blair also published a report on November 7, 2017, which contained the same EBITDA forecasts as its November 6, 2017 report.

# Tivity Health, Inc.
## Analyst EPS Forecasts Before and After the 11/6/17 UHC Press Releases [1]

| | | Last Report Before UHC Press Release | | First Report After UHC Press Release | | Next Report After UHC Press Release | |
|---|---|---|---|---|---|---|---|
| Contributor | Forecast Year | Report Date | EPS | Report Date | EPS | Report Date | EPS |
| Cantor Fitzgerald [2] | 2018 | 10/26/17 | $1.75 | 11/6/17 | – | – | – |
| | 2019 | 10/26/17 | – | 11/6/17 | – | – | – |
| Chardan Capital [3] | 2018 | 10/27/17 | $1.70 | 11/6/17 | – | – | – |
| | 2019 | 10/27/17 | $2.00 | 11/6/17 | – | – | – |
| Jefferies | 2018 | 10/26/17 | $1.77 | 11/6/17 | – | 1/25/18 | $2.14 |
| | 2019 | 10/26/17 | $2.06 | 11/6/17 | – | 1/25/18 | $2.35 |
| Piper Jaffray [4] | 2018 | 10/27/17 | $1.67 | 11/6/17 | $1.67 | 11/29/17 | – |
| | 2019 | 10/27/17 | – | 11/6/17 | – | 11/29/17 | – |
| William Blair [5] | 2018 | 10/26/17 | $1.68 | 11/6/17 | $1.68 | 1/22/18 | $1.68 |
| | 2019 | 10/26/17 | – | 11/6/17 | – | 1/22/18 | – |
| Barrington Research | 2018 | 10/27/17 | $1.70 | 11/7/17 | $1.70 | – | – |
| | 2019 | 10/27/17 | $1.92 | 11/7/17 | $1.78 | – | – |
| SunTrust Robinson Humphrey | 2018 | 10/27/17 | $1.74 | 11/7/17 | – | 11/20/17 | $1.74 |
| | 2019 | 10/27/17 | $1.96 | 11/7/17 | – | 11/20/17 | $1.96 |

Source: "EPS Beat; Increases 2017 Guidance; Maintain Overweight," Cantor Fitzgerald, October 26, 2017; "3Q Beat & Raise, Mgmt Confident for '18, Reit. Neutral, PT to $44," Chardan Capital Markets, October 27, 2017; "Early Halloween Candy: 4 Key Insights from TVTY's 3Q17," Jefferies, October 26, 2017; "Further Acceleration in FY18 Should Drive Multiple Expansion," Piper Jaffray, October 27, 2017; "Strong Third-Quarter Results Highlighted by a Dime of EPS Upside; Guidance Increased and 2018 Outlook Ahead of Street," William Blair, October 26, 2017; "Big EPS Beat, 2017 Guidance Increased; Price Target now $46," Barrington Research, October 27, 2017; "3Q Well Ahead, 2018 Shaping Up To Be A Big Year. Reiterate Buy, Raising Target," SunTrust Robinson Humphrey, October 27, 2017; "Shares off on UNH Announcement; Too Early to Worry about 2020; Overweight," Cantor Fitzgerald, November 6, 2017; "UNH expands senior benefit, less confident in our TVTY estimates," Chardan Capital Markets, November 6, 2017; "TVTY Pullback Today Pricing In More Than Worst Case Scenario With UnitedHealth," Jefferies, November 6, 2017; "Defending TVTY on Sell-Off after Optum News," Piper Jaffray, November 6, 2017; "Sell-Off on UnitedHealth News Seems Markedly Overdone; We are Buyers on Weakness," William Blair, November 6, 2017; "Tivity Shares Crushed As Relationship with UnitedHealth Comes Into Question," Barrington Research, November 7, 2017; "Everybody Take A Deep Breath - Offering A Little Perspective," SunTrust Robinson Humphrey, November 7, 2017; "Update From The Road - Still Plenty To Be Excited About," SunTrust Robinson Humphrey, November 20, 2017; "Highlights from the 29th Annual Piper Jaffray Healthcare Conference," Piper Jaffray, November 29, 2017; “Proprietary Analysis of Medicare Advantage Enrollment Data Points to Share Gains for Tivity Health’s Partners,” William Blair, January 22, 2018; “Attractive 2018 Set-Up With Catalysts And Improving Risk Profile,” Jefferies, January 25, 2018.

Note.
- [1] Displayed contributors published analyst reports on November 6, 2017 or November 7, 2017.
- [2] Cantor Fitzgerald did not publish numerical estimates on November 6, 2017 and did not change its price target stating "we reiterate our Overweight rating on the shares." It also did not mention any changes to its valuation model. Therefore, it appears that this analyst did not change its prior forecasts.
- [3] Chardan Capital stated in its November 6, 2017 report that it was "less confident in [its] estimates [for Tivity] and [it was] putting [its] estimates under review."
- [4] Piper Jaffray did not publish numerical estimates on November 6, 2017, but noted that "we see no reason to change numbers on this announcement." Thus, forecasts from its previous report are listed.
- [5] William Blair also published a report on November 7, 2017, which contained the same EPS forecasts as its November 6, 2017 report.


CONFIDENTIAL

Exhibit 4

# Tivity Health, Inc.
## Selected Publicly Available Information About Optum Fitness Advantage

*(boldface added throughout)*

| Date | Included In Gompers Class Certification | Document Type | Quote | Source |
|---|---|---|---|---|
| April and May 2016 | | Unspecified Communication | Q: And so is it fair to say that United was already -- prior to April or May of 2016, United was already communicating to fitness centers or gyms in an effort to set up the network for the two test states, New Jersey and Washington?<br>A: Yeah... | Noel 30(b)(6) Deposition, 28:18–29:6 |
| July 2016 [1] | ✓ | Marketing Packet | **Optum Fitness Advantage membership** — Stay active with a gym membership for no additional cost on plans H3805-014 and H3805-015 | UnitedHealthcare |
| July and August 2016 | | Unspecified Communication | Q: And when would the brokers have been informed about the initial rollout of Optum Fitness Advantage?<br>A: I don't know specifically in 2016, but somewhere in the July/August time frame. | Noel 30(b)(6) Deposition, 65:1–5 |
| October 2016 | | Change of Plan Notification | Q: And when would the official change of plan notification go out to individual Medicare Advantage members in New Jersey and Washington about the Optum Fitness Advantage rollout?<br>A: It's somewhere in the first week of October. | Noel 30(b)(6) Deposition, 65:12–17 |
| Late 2016 [2] | ✓ | Website | With **Optum® Fitness Advantage** you can visit any participating fitness center or YMCA at no additional cost to you as part of your UnitedHealthcare Medicare Advantage plan. | UnitedHealthcare |
| Late 2016 [3] | ✓ | Flyer | **Optum® Fitness Advantage from UnitedHealthcare** will be coming soon to this location | YMCA of Western Monmouth County New Jersey |
| Fourth Quarter of 2016 | | Unspecified Communication | Q: And who did United send this letter to?<br>A: I believe it sent it to the members that were currently utilizing the SilverSneakers fitness program. So not all of our members used their fitness benefit, and this was sent to the subset of people that would be most interested in this change.<br><br>Q: Okay. So you expect that this communication would have been sent in the fourth quarter of 2016?<br>A: Yes. | Noel 30(b)(6) Deposition, 59:20–60:14 |
| 11/14/16 | ✓ | Tweet | Yes, we accept **Optum Fitness Advantage**!!<br><br>**OPTUM FITNESS ADVANTAGE FROM UNITED HEALTH CARE** ACCEPTED HERE!!! Starting January 1st | Deer Park Fitness Washington |
| January 2017 | | Customer Service Representative Training | Q: Is it correct to say, then, that prior to the time that this letter went out in the fourth quarter of 2016, United would have trained its customer service representatives about the Optum Fitness Advantage program and how to answer questions from members about it?<br>A: Yes. | Noel 30(b)(6) Deposition, 63:8–14 |

# Tivity Health, Inc.
## Selected Publicly Available Information About Optum Fitness Advantage

*(boldface added throughout)*

| Date | Included In Gompers Class Certification | Document Type | Quote | Source |
|---|---|---|---|---|
| January 2017 | | Optum Fitness Advantage Website | Q: Is it correct to say that the fitnessadvantage.optum.com website would have been operational as of the time that this letter went out in the fourth quarter of 2016?<br>A: I hope so.<br>Q: Do you know when the Optum Fitness Advantage website was first operational?<br>A: I don't, but it would have been, of course, before the plan year... | Noel 30(b)(6) Deposition, 61:6–62:1 |
| 1/17/17 | | Letters | Q: So is it correct that these -- at least one of these [letter] templates would have been mailed on January 17th, 2017 to 33,695 new enrollees and 46,305 returning members of Medicare Advantage plans?<br>A: Yeah. | Noel 30(b)(6) Deposition, 77:15–20; UHC000280–81 |
| 3/8/17 | ✓ | News Article | The SilverSneakers program is accessible through some Medicare plans. The YMCA also offers Silver & Fit, Prime, At Your Best and **Optum Fitness Advantage** to help with senior memberships. | The Bellingham Herald Washington |
| Spring 2017 [4] | ✓ | Brochure | **Optum® Fitness**<br>Enjoy a free Facility Membership with no joiner Fee!<br>If you know you are eligible for **Optum Fitness**, Please bring in your unique program Id and register at the Welcome Desk Today! | YMCA Meadowlands New Jersey |
| 4/26/17 | ✓ | Meeting Minutes | Mr. Gant asked the Board to enter into an agreement with **Optum Fitness Advantage Program**. This program is almost identical to Silver Sneakers and Silver N Fit programs that we currently offer. The major difference is that Optum will pay more per person per visit and the two programs work with different insurance carriers.<br><br>The program will go into effect in January 2018. | Prairie Township Board Of Trustees Ohio |
| April or May 2017 | | Healthy Contributions Marketing Materials | Optum® Fitness Advantage: At a Glance<br>**Program Summary: Fitness Center:** Will provide general access to fitness center at no cost and waive any enrollment/joiners fee. **Optum® Fitness Advantage members:** Will receive access to fitness center at no cost. This includes programs, services, classes that would normally be included in a member's fitness center membership. **Optum®:** Pays fitness center based on member's usage per month. For pricing, please connect with your Healthy Contributions contact.<br><br>**Who is eligible?:** This program will be offered to certain individual policy plan holders of a UnitedHealthcare Medicare Advantage Plan in your state. Each UnitedHealthcare Medicare Advantage Program member will need to have their own agreement at your fitness facility and will have their own Confirmation ID letter. | Noel Deposition, 44:17-45:17; TIVITY0075701–850 |

# Tivity Health, Inc.

## Selected Publicly Available Information About Optum Fitness Advantage

*(boldface added throughout)*

| Date | Included In Gompers Class Certification | Document Type | Quote | Source |
|---|---|---|---|---|
| 7/10/17 | ✓ | Blog Post | Popular Health Plans and coverage:<br>Aetna- Silver & Fit<br>Humana- Silver Sneaker<br>Kaiser Permanente- Silver & Fit<br>**Optum Fitness Advantage (United Healthcare)- Optum**<br>Premera Blue Cross- Silver & Fit<br>Regence Blue Cross & Blue Shield- Silver & Fit<br>United Healthcare- Silver Sneakers | Mercury Pharmacy Services |
| July or August 2017 | | Unspecified Communication | Q: And similarly, for -- in July or August 19 of 2017, United gave a presentation to brokers outside of United concerning the expansion of Optum Fitness Advantage into nine additional markets; is that right?<br>A: Yep. | Noel 30(b)(6) Deposition, 91:18–92:1 |
| Late August 2017 | | Promotional Posters | Q: Is it correct that these promotional posters were sent to roughly 4,000 gyms in late August 2017?<br>A: That's correct. | Noel 30(b)(6) Deposition,74:20–75:6; UHC000274 |
| 9/14/17 | | eCard | Q: Is it correct that this eCard was sent to roughly 16,400 agents on September 14th, 2017?<br>A: That is correct.<br><br>Q: Was it United's expectation that those 16,400 brokers would share this information with insurance members or potential insurances members starting October 1st of 2017?<br>A: Yes. | Noel 30(b)(6) Deposition, 72:1–73:20; UHC000272–73 |

# Tivity Health, Inc.
## Selected Publicly Available Information About Optum Fitness Advantage
*(boldface added throughout)*

| Date | Included In Gompers Class Certification | Document Type | Quote | Source |
|---|---|---|---|---|
| 9/15/17 | ✓ | Forum Post | Just received an email from UHC that they are bringing back fitness as part of MAPD in a 9 states (including Florida) for 2018.<br>It won't be Silver Sneakers, it's called-<br>**Optum Fitness Advantage** - Coming to a Plan Near You!<br>It's competitive; it's tested; it's ready for prime time! **Optum Fitness Advantage** will be available with many UnitedHealthcare Medicare Advantage (MA) plans **in nine new states (Arizona, Florida, Kentucky, Ohio, Oklahoma, Oregon, New York, Texas (specifically Austin, Houston and San Antonio) and Wisconsin) for 2018**.* Members will have access to a variety of fitness clubs at no additional cost in line with their previous fitness benefit. The good news is that we will continue to build this benefit for consumers over the next few years to provide a superior experience with UnitedHealthcare.<br><br>**The nine states mentioned join New Jersey and Washington, which rolled out Optum Fitness Advantage benefits in 2017**. Optum Fitness Advantage contributed to higher health and wellness benefit Net Promoter Scores (NPS) this year. | Insurance-Forums.com |
| 9/22/17 [5] | | Flyer | **The Greater Green Bay YMCA will no longer offer SilverSneakers® program effective January 1, 2018.**<br><br>Frequently Asked Questions<br><br>I received a letter from United Health Care stating they will no longer be offering SilverSneakers in 2018 but offering membership through Optum Health Advantage?<br>**The Y will be offering membership through Optum Health Advantage beginning January 1, 2018.** | Greater Green Bay YMCA; TIVITY0063916–20 |
| Fall 2017 [6] | ✓ | Brochure | **Optum Fitness Advantage** through United Health Care<br>The Randolph YMCA is participating in this program that is available to NJ residents who are insured members covered under AARP Medicare Supplement Insurance Plan insured by United Health Care. | Randolph YMCA<br>New Jersey |
| 10/4/17 | ✓ | Forum Post | At least in Ohio, **UHC is** pulling out of SilverSneakers and **starting Optum Fitness Advantage**. Not sure about Georgia. | Insurance-Forums.com |
| 10/6/17 | ✓ | Forum Post | UHC has announced some changes as to Silversneakers. **In Texas as of January 2018, UHC will no longer offer Silversneakers for the Med Supp. Instead clients will get UHC's new product through Optum** that gives discounts to gyms and online health and wellness content. Also in Texas the Advantage product has also dropped Silversneakers for the new program in most areas for 2018. Dallas-Fort Worth will continue with Silversneakers for 2018 but is scheduled to drop Silversneakers there in 2019. | Insurance-Forums.com |

**Exhibit 4**

# Tivity Health, Inc.
## Selected Publicly Available Information About Optum Fitness Advantage

*(boldface added throughout)*

| Date | Included In Gompers Class Certification | Document Type | Quote | Source |
|---|---|---|---|---|
| 10/9/17 | ✓ | Flyer | **Optum Fitness Advantage** from UnitedHealthcare will be coming soon to this location. | Harrison Premier Fitness Ohio |
| 10/9/17 [7] | | Letters | So, by noon tomorrow, given the success of our SilverSneakers awareness campaign, we can assure you will get even more calls from the **875,000 United members who have received letters from United notifying them that United won't offer SilverSneakers in 2018.** | UHC000209–18 |
| 10/17/17 [8] | | Email | **Open Enrollment email launched to 200,000 website visitors** who failed eligibility check during 2017.<br>The email directs individuals to 3rd party website and phone number so there will be no impact to call volume; however we have seen 32 email responses. The responses vary from "thank you for the communication" to "I do not plan to switch" | TIVITY0054304 |

Source: "Strength. Stability. Hassle Free. The Advantage of UnitedHealthcare 2017 Medicare Advantage Plans," UnitedHealthcare, https://www.agentpipeline.com/wp-content/uploads/2015/07/National-Packet_0720_Low-Res.pdf, accessed August 30, 2020; "Coming Soon!," https://web.archive.org/web/20161007221246/http://fitnessadvantage.optum.com/, accessed August 30, 2020; "Yes, we accept Optum Fitness Advantage," Twitter – Deer Park Fitness Twitter, https://twitter.com/DeerParkFitness/status/798164042439426048, accessed August 30, 2020; "Good News: Optum® Fitness Advantage from UnitedHealthcare will be coming soon to this location," https://ymcanj.org/wp-content/uploads/2016/12/flyer.pdf, accessed August 30, 2020; "No matter how old you are, the YMCA has got an exercise program perfect for you," *The Bellingham Herald*, March 8, 2017, https://www.bellinghamherald.com/living/seniors-aging/article136945433.html, accessed August 30, 2020; "Aging Gracefully; Maintaining Vitality: Senior Fitness Series, Part One," Mecrcury Pharmacy Services, July 10, 2017, https://www.mercuryrx.com/single-post/2017/06/27/Aging-Gracefully-Maintaining-Vitality-Senior-Fitness-Series-Part-One, accessed August 30, 2020; "2017 Spring / Summer Program Guide May 22nd–August 27th," Meadowlands Area YMCA, https://www.meadowlandsymca.org/clientuploads/pdf/2017/2017MeadowlandsYMCASpringSummerProgGuide.pdf, accessed August 30, 2020; "2017 Fall Program & Membership Guide," Randolph YMCA, https://www.randolphymca.org/sites/default/files/Fall%20Brochure%202017.pdf, accessed August 30, 2020; "Record of Proceedings," Prairie Township Board of Trustees, April 25, 2018, https://www.prairietownship.org/AgendaCenter/ViewFile/Minutes/_04262017-428, accessed August 30, 2020; "New Program Coming to HPF! – Optum Fitness Advantage," Harrison Premier Fitness, October 9, 2017, https://www.harrisonpremierfitness.com/2017/10/09/new-program-coming-to-hpf-optum-fitness-advantage/, accessed August 30, 2020; "UHC Bringing Back Fitness in Many States," Insurance-Forums, September 15, 2017, https://insurance-forums.com/community/threads/uhc-bringing-back-fitness-in-many-states.90204/, accessed August 30, 2020; "Client Cxls Med Supp for MAPD," Insurance-Forums, October 6, 2017, https://insurance-forums.com/community/threads/client-cxls-med-supp-for-mapd.90436/page-2, accessed August 30, 2020; "Keeping you informed: Silver Sneakers Update," Greater Green Bay YMCA, https://www.greenbayymca.org/media/310652/silversneakers-member-update-documents_96_p5.pdf, accessed August 30, 2020; Email from Chip Wochomurka to Steve Janicak and Adam Holland, "RE: Letter about Y/UHC," September 25, 2017, TIVITY0063916–20; Email from Caroline Khalil to Kate Hampton, "FW: Optum Fitness Advantage Website," September 25, 2017, TIVITY007653–55; Email from Steve Janicak to Steve Warner and Timothy Noel, "RE: Gym communications," October 9, 2017, UHC000209–18; Email from Ulya Khan to Donato Tramuto, et al., "Project Success - Call Center Update 10/17/17," October 17, 2017, TIVITY0054304; Email from UnitedHealthcare Medicare Solutions, "Optum Fitness Advantage - Coming to a Plan Near You!," December 15, 2017, UHC000272–73; Optum Fitness Advantage Poster, UHC000274; UnitedHealthcare Letter Template, UHC000280–81; Deposition of Timothy Noel, June 19, 2020; Deposition of Timothy Noel as 30(b)(6), June 19, 2020; Email from Caroline Khalil to Jeff Pagels, "Optum Examples," August 21, 2017, TIVITY0075701–850

Note:

[1] The web address of this document (https://www.agentpipeline.com/wp-content/uploads/2015/07/National-Packet_0720_Low-Res.pdf) suggests it was made available in July 2016 to insurance agents. The content of the packet notes that "star ratings are current as of July 2016 and are subject to change in October," suggesting that the document was created between July and October 2016.

[2] The first capture of this website by the Internet Archive was on October 7, 2016.

[3] The web address of this document (https://ymcanj.org/wp-content/uploads/2016/12/flyer.pdf) suggests it was made available in December 2016.

[4] This program guide advertised their "Grand Opening" which began on May 8, 2016 which suggests that the flyer was made available before then.

[5] An email chain among Tivity employees on September 22, 2017 appears to have referred to this flyer, which suggests that it was made available before then.

[6] This program guide advertised swim lessons where you could register as an "Early Bird" at a reduced rate. The deadline for early bird registration was August 28, suggesting that this flyer was made available before then.

[7] On October 9, 2017, Mr. Janicak (Tivity) referenced the "875,000 United members who have received letters from United notifying them that United won't offer SilverSneakers in 2018" in an email to Mr. Warner (UHC), which suggests that UHC had notified its members before then.

[8] An email chain among Tivity employees on October 17, 2017 stated "Open Enrollment email launched to 200,000 website visitors who failed eligibility check during 2017," which suggests that such emails were sent out before then.

**Exhibit 5**

# Tivity Health, Inc.

## Analyst Reaction to the Stock Price Movement After the 11/6/17 UHC Press Release

*(boldface added throughout)*

| Date | Title | Quote | Source |
|---|---|---|---|
| 11/6/17 | Shares off on UNH Announcement; Too Early to Worry about 2020; Overweight | Tivity shares are trading lower by more than 30% today, presumably in response to UNH's announcement this morning that it will offer the Optum Fitness Advantage to Medicare Advantage members in 11 states.<br><br>Based on our estimates (assuming that UNH does not renew in 2020), **the shares now trade below our worst case scenario and are undervalued at current levels.** It is far from certain that UNH will not renew in 2020. Accordingly, we reiterate our Overweight rating on the shares. | Cantor Fitzgerald |
| 11/6/17 | TVTY Pullback Today Pricing In More Than Worst Case Scenario With UnitedHealth | TVTY shares are down ~30% on news that UnitedHealth Group (TVTY's #2 customer) has launched a competitive offering to TVTY's SilverSneakers. We estimate the UnitedHealth contract is worth 15% of TVTY's revenue. **Thus, the pullback seems to be pricing in more than a worst case scenario for 2021** as TVTY just renewed its UnitedHealth Group through 2020. We would be buyers on the sell-off. | Jefferies |
| 11/6/17 | Defending TVTY on Sell-Off after Optum News | Shares of TVTY are down >30% on today's news that Optum has launched Optum Fitness Advantage in 11 Markets. Per TVTY management, this represents no change to the terms of the UNH agreement recently negotiated, and the relationship remains excellent. In our view, this news does not impact FY18 numbers; however, it does represent an incremental risk to TVTY's pricing power in the market. Reiterate OW rating and $49 price target as we see no reason to change numbers on this announcement.<br><br>**UNH is TVTY's largest customer, so the knee-jerk reaction in the marketplace has been swift.** | Piper Jaffray |
| 11/6/17 | Sell-Off on UnitedHealth News Seems Markedly Overdone; We are Buyers on Weakness | Moreover, if UnitedHealth is 15% of sales, this is only in 11 states, and only for individual lives (roughly 80% of the book of business), we believe the ultimate revenue headwind for Tivity is likely only in the low- to midsingle-digit level. We also believe that UnitedHealth is likely a smaller percentage of EBITDA than this given its pricing power in the market. **As such, we view the stock reaction as overdone**, but we acknowledge that this will remain an overhang on the stock, and investors will look to see what Tivity can do to prove their value in these markets (e.g., can they move share, show higher returns or engagement versus the insourced offering, etc.).<br><br>**On the stock, we view the current sell-off as overdone, given that management remains confident in their ability to drive double-digit growth next year**. While this clearly establishes a risk surrounding renewal of the remaining UnitedHealth business in 2020, **we remain believers in Tivity's value proposition to payers.** | William Blair |
| 11/7/17 | Everybody Take A Deep Breath - Offering A Little Perspective | Shares Get Hammered, We See An Opportunity. Shares of TVTY sold off sharply following UnitedHealthcare's (UNH, $212.12, NR) announcement that beginning January 2018, Optum Fitness Advantage will be available at no additional cost in 11 states (9 incremental, had been rolled out in WA and NJ) to people enrolled in eligible UNH's Medicare Advantage plans. **We view the sell-off as overdone**, remain bullish on the business model/underlying trends and view the stock move as an opportunity. We reiterate our Buy rating. | SunTrust Robinson Humphrey |

Source: "Shares Off on UNH Announcement; Too Early to Worry about 2020; Overweight," Cantor Fitzgerald, November 6, 2017; "TVTY Pullback Today Pricing In More Than Worst Case Scenario with UnitedHealth," Jefferies Group LLC, November 6, 2017; "Defending TVTY on Sell-Off after Optum News," Piper Jaffray, November 6, 2017; "Sell-Off on UnitedHealth News Seems Markedly Overdone; We Are Buyers on Weakness," William Blair, November 6, 2017; "Everybody Take a Deep Breath - Offering a Little Perspective," SunTrust Robinson Humphrey, November 7, 2017; "Taking a Deeper Dive into UnitedHealth's Proprietary Fitness Program and Its Impact on Tivity Health," William Blair, November 7, 2017.

**Exhibit 6**

# Tivity Health, Inc.
# Intraday Stock Price [1][2]
## 11/6/17




Source: TICK Data; CRSP; Factiva

Note:

[1] The last trade of each minute with trading activity is shown.

[2] From 9:00 AM to 11:45 AM, UHC issued a series of 12 press releases announcing that it was launching Optum Fitness Advantage in 9 additional states.



CONFIDENTIAL

# Tivity Health, Inc.
# Changes in Value Per Share
# Using a DCF Model and EV/EBITDA Multiples [1]

| DCF Model: Implied Change in Value per Share [2] | Year End 2017 Valuation |
|---|---|
| Using Median EBITDA: | -$0.04 |
| Using Mean EBITDA: | -$0.42 |

| EV/EBITDA Multiple: Implied Change in Value per Share [3] | FY 2018 | FY 2019 |
|---|---|---|
| Using Median EBITDA: | $0.00 | -$0.07 |
| Using Mean EBITDA: | $0.00 | -$0.73 |

Source: "EPS Beat; Increases 2017 Guidance; Maintain Overweight," Cantor Fitzgerald, October 26, 2017; CRSP; Refinitiv I/B/E/S Detailed Estimates Data; Tivity Health Press Release, "Tivity Health Reports Third-Quarter 2017 Results," October 26, 2017.

Note:

[1] These models show the magnitude of damages from alternative approaches that estimate the change in Tivity's stock price associated with the change in analyst expectations following the UHC Press Releases, *i.e.*, the alleged corrective disclosure. The models calculate the change in value per share using active median and mean I/B/E/S detailed EBITDA forecasts for FY 2018 and/or FY 2019 as of November 5, 2017 and November 20, 2017. The change in the median and mean analyst EBITDA forecasts for FY 2018 are both $0.00M. The change in the median analyst EBITDA forecasts for FY 2019 is -$0.22M; the change in the mean analyst EBITDA forecasts for FY 2019 is -$2.32M.

[2] This analysis is based on the Cantor Fitzgerald discounted cash flow ("DCF") model for Tivity included in its October 26, 2017 report using the "YE 2017 valuation." This approach estimates the implied change in per share value based on the changes in median and mean analyst EBITDA forecasts for FY 2019, applied to the EBIT line of the model and carried through to future years and in perpetuity.

[3] This analysis calculates enterprise value ("EV") to EBITDA multiples using FY 2018 and FY 2019 EBITDA forecasts. For each EBITDA forecast, the implied change in value per share is calculated as the EV/EBITDA multiple multiplied by the change in median/mean EBITDA forecast following the UHC Press Releases divided by fully diluted shares outstanding. The FY 2018 multiple based on both median and mean EBITDA is 15.4, the FY 2019 multiple based on median EBITDA is 13.8, and the FY 2019 multiple based on mean EBITDA is 13.6. EV is calculated as market capitalization minus cash ($4.9M) plus debt ($149.0M). Market capitalization is calculated as the closing share price on October 27, 2017 ($46.05) multiplied by fully diluted shares outstanding (43.5M). Cash, debt, and diluted shares outstanding are obtained from Tivity's 3Q 2017 financial results press release.